**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Nephron Pharmaceuticals Corporation, Nephron S.C., Inc., and Nephron Sterile Compounding Center LLC,<br><br>    Plaintiffs,<br><br>  vs.<br><br>Jennifer Shelly Hulsey, U.S. Compounding Inc. d/b/a U.S. Compounding Pharmacy, and Adamis Pharmaceuticals Corporation<br><br>    Defendants. | Civil Action No. 6:18-cv-1573-Orl-31KRS |

**THIRD AMENDED VERIFIED COMPLAINT**
(PRELIMINARY INJUNCTION REQUESTED)
(JURY TRIAL REQUESTED)

Plaintiffs Nephron Pharmaceuticals Corporation ("Nephron FL"), Nephron S.C. Inc. ("Nephron SC"), and Nephron Sterile Compounding Center LLC ("Nephron Compounding") (collectively, "Nephron"), by and through their undersigned counsel, hereby bring the following Third Amended Verified Complaint for injunctive and other relief against Defendants Jennifer Shelly Hulsey ("Hulsey"), U.S. Compounding, Inc. d/b/a U.S. Compounding Pharmacy ("U.S. Compounding"), and Adamis Pharmaceuticals Corporation ("Adamis") (collectively, "Defendants"), alleging as follows:

**PARTIES AND JURISDICTION**

1.     Nephron FL is a corporation organized and existing under and by virtue of the laws of the State of Florida, with a principal place of business at 4121 SW 34th Street, Orlando, Florida 32811.

2.      Nephron SC is a corporation organized and existing under and by virtue of the laws of the State of South Carolina, with a principal place of business at 4500 12th Street Extension, West Columbia, South Carolina 29172.

3.      Nephron Compounding is a corporation organized and existing under and by virtue of the laws of the State of South Carolina, with a principal place of business at 4500 12th Street Extension, West Columbia, South Carolina 29172.  Nephron SC is the sole member of Nephron Compounding.

4.      Upon information and belief, Hulsey is a natural person and is a citizen of and domiciled in the State of Kansas, Johnson County.

5.      U.S. Compounding is a corporation organized and existing under and by virtue of the laws of the State of Arkansas with its principal place of business at 1270 Don's Lane, Conway, Arkansas 72032.

6.      Adamis is a corporation organized and existing under and by virtue of the laws of the State of California with its principal place of business at 11682 El Camino Real, Suite 300, San Diego, California 92130.

7.      This Court has personal jurisdiction over Hulsey pursuant to, without limitation, Fla. Stat. § 48.193(1)(a)(1), (2), (6), and (7) because:

(a)      upon information and belief, Hulsey operates, conducts, engages in, or carries on business in the State of Florida and is specifically competing with Nephron in the State of Florida;

(b)      Hulsey has committed tortious acts against Nephron in the State of Florida;

(c)   by both her acts and omissions, Hulsey has caused and continues to cause injury to persons in the State of Florida and, more specifically, to Nephron.  Moreover, at the time of her acts and omissions, Hulsey was engaged in the solicitation and service of activities for U.S. Compounding and Adamis within the State of Florida and U.S. Compounding's and Adamis's products, materials, or things were consumed in the State of Florida, within the ordinary course of commerce, trade, or use; and

(d)   Hulsey breached a contract entered into in the State of Florida.

8.   More specifically, this Court has personal jurisdiction over Hulsey because this action arises, in whole or in part, from Hulsey's knowing and intentional breach of certain statutory and common law obligations owed to Nephron arising under Florida law, as well as contractual obligations arising under and pursuant to a June 17, 2015 Employee Confidentiality and Non-Disclosure Agreement between Hulsey and Nephron ("NDA") that (i) is controlled by Florida law, (ii) contains a forum selection clause mandating that any action brought under or pursuant to the NDA be brought and maintained exclusively in federal or state court in Orange County, Florida, and  (iii) expressly waives, on Hulsey's behalf, any defense to jurisdiction in this location, to which she expressly consents.  Hulsey's unlawful actions occurred in and have caused injury to Nephron within the State of Florida.

9.   This Court has personal jurisdiction over U.S. Compounding at least pursuant to Fla. Stat. § 48.193(1)(a)(1), (2), (6), and (7) because:

(a)   U.S. Compounding operates, conducts, engages in, or carries on business in the State of Florida and specifically operates its business in direct competition with Nephron in the State of Florida;

(b)      U.S. Compounding has committed tortious acts against Nephron in the State of Florida;

(c)      by both its acts and omissions, U.S. Compounding has caused and continues to cause injury to persons in the State of Florida and, more specifically, to Nephron.   Moreover, at the time of its acts and omissions, U.S. Compounding was engaged in the solicitation and service of activities within the State of Florida and it products, materials, or things were consumed in the State of Florida, within the ordinary course of commerce, trade, or use; and

(d)      U.S. Compounding aided and abetted the breach of a contract entered into in the State of Florida.

10.      More specifically, this Court has personal jurisdiction over U.S. Compounding because Hulsey is currently an employee and agent of U.S. Compounding who is expressly authorized to act on U.S. Compounding's behalf, and Nephron's claims against U.S. Compounding arise, in whole or in part, as a direct result of U.S. Compounding's knowingly, intentionally, and tortiously: (i) aiding and abetting Hulsey's breach of the duty of loyalty, and other common law and statutory obligations that she either owed or currently owes to Nephron pursuant to Florida law; (ii) conspiring with Hulsey for the purpose of converting, misappropriating, and using Nephron's confidential and proprietary information including, without limitation, its trade secrets, to unlawfully compete against Nephron; and (iii) upon information and belief, contacting and soliciting Nephron's customers and potential customers by improper and unlawful means including, without limitation, in Florida.  U.S. Compounding's unlawful actions occurred in and have caused injury to Nephron within the State of Florida.

11.     This Court has personal jurisdiction over Adamis at least pursuant to Fla. Stat. § 48.193(1)(a)(1), (2), (6), and (7) because:

(a)     Adamis is a foreign for profit corporation registered with the Florida Secretary of State since May 18, 2015, with FEI/EIN Number 82-0429727;

(b)     Adamis operates, conducts, engages in, or carries on business in the State of Florida and specifically operates its business in direct competition with Nephron in the State of Florida;

(c)     Adamis has committed tortious acts against Nephron in the State of Florida;

(d)     by both its acts and omissions, Adamis has caused and continues to cause injury to persons in the State of Florida and, more specifically, to Nephron.  Moreover, at the time of its acts and omissions, Adamis was engaged in the solicitation and service of activities within the State of Florida and it products, materials, or things were consumed in the State of Florida, within the ordinary course of commerce, trade, or use; and

(e)     Adamis aided and abetted the breach of a contract entered into in the State of Florida

12.     Pursuant to 28 U.S.C. §§ 1331 and 1367, this Court has federal question jurisdiction over this action because it arises in part under the federal Defend Trade Secrets Act, 28 U.S.C. § 1836 *et seq.*, and because all supplemental state law claims arise out of the same case or controversy as the federal claim over which this Court has original jurisdiction.

13.     Pursuant to 28 U.S.C. § 1332, the Court also has original subject matter jurisdiction over this action based on the complete diversity of citizenship among the parties to

this action and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District because Hulsey executed the NDA containing a mandatory forum selection clause requiring that any action brought under or pursuant to the NDA be brought and maintained exclusively in federal or state court in Orange County, Florida, and because a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**A.**     **Nephron's Business, Confidential Information, and Trade Secrets.**

15.     Nephron is a leading manufacturer of generic respiratory products and sterile 503B medications.

16.     Nephron has, over the course of its more than 20 years of existence, developed and maintained longstanding relationships with major drug wholesalers who distribute Nephron's respiratory products to, without limitation, hospitals, retail pharmacies, mail order pharmacies, home care companies, and long-term care facilities.  In an effort to alleviate the ongoing drug shortages in the U.S. drug supply chain, Nephron also has developed a sterile 503B outsourcing facility equipped to manufacture products that are in short supply under Current Good Manufacturing Practice (cGMP) conditions.  Nephron's 503B customers include, without limitation, individual patients, hospitals, retail pharmacies, mail order pharmacies, home care companies, and long-term care facilities.  Both Nephron's respiratory and compounding products are distributed across all fifty states, Puerto Rico, South America, the Middle East, and Europe.

17.     Nephron annually does tens of millions of dollars in business in Florida with its Florida-based customers.  Nephron is licensed by the Florida Board of Pharmacy to import certain pharmaceuticals in the State of Florida, and regularly does so.  All of Nephron's sales

6

employees are employees of and were paid by Nephron FL, as was Ms. Hulsey during the course of her employment.

18.     The pharmaceutical industry is extremely competitive, and Nephron has, over the course of its more than 20 years of existence, expended substantial time, money, and effort developing its respiratory and 503B medications, services, professional reputation, goodwill, and sales networks throughout the United States and other parts of the world.  In doing so, Nephron has developed highly valuable confidential and proprietary business information, as well as trade secrets including, without limitation, current and prospective customer lists and related databases, pricing data, purchasing histories, consumer data, market intelligence and strategies, product formulations and development information, proprietary manufacturing processes, and overall industry and product expertise.

19.     Neither Nephron's confidential and proprietary information nor its trade secrets are publicly known or reasonably ascertainable by competitors or other third parties, and Nephron has taken reasonable measures to maintain the confidentiality and secrecy of all such information.  More specifically, among other measures, Nephron requires that all employees with access to confidential and proprietary information including, without limitation, trade secrets, sign contractual agreements defining their obligations to maintain the confidentiality and secrecy of its business information and related competitive interests.

20.     Nephron's Customer Resource Management software ("CRM"), which is hosted by Nephron, contains highly confidential and proprietary current and historic details regarding all of Nephron's customers, as well as prospective Nephron customers including, without limitation, their identity; their location; contact information for the customer or prospective customer's purchasing decision-makers; extensive order history, including specifics of products

purchased; customer-specific pricing details; customer and prospective customer purchasing habit details, preferences, quantities, and content; latitude and longitude of customer locations in order to electronically generate a mapping of the most efficient sales routes; and extensive customer and prospective customer notes input by sales representatives related to specific customer and prospective customer concerns, issues, and preferences.

21.     Another key piece of software used by Nephron is a web-based program called Power BI, which is an interface that serves as a data warehouse.  Power BI is populated by pulling the data, described above, from the CRM.  However, Power BI has the capacity to organize the data in numerous ways designed to aid Nephron's sales employees in making sales, servicing current customers, and identifying and marketing to potential new customers including, without limitation, those customers of other sales representatives who are located across Nephron-assigned sales territories.

22.     Both the CRM and Power BI contain extensive confidential and proprietary data, discussed above, related to Nephron's current customers, as well as to its prospective customers. The CRM was designed, developed, built, and populated by Nephron over a period of ten-plus years.  Nephron has spent millions of dollars on both the CRM and Power BI, which is hosted by Microsoft including, without limitation, on their development, refinement and annual maintenance, as well as on obtaining the customer data, marketing data, and sales leads reflected in the CRM and Power BI, in the form of thousands of hours of employee and management time and other hard costs, travel, and other expensive and critically important customer investment activities over the course of their existence.

23.     The data contained in the CRM and Power BI is extremely valuable to Nephron, not only because these systems serve as a comprehensive repository for information regarding

Nephron's competitive and confidential data regarding its products, pricing and all of Nephron's current and prospective customers, but also because U.S. Compounding and others competing against Nephron for the same customers and sales do not have the benefit of access to Nephron's exhaustively maintained databases and the confidential and proprietary customer information and sales leads contained therein.

24.     Nephron also engages in continual training of its sales representatives, including by conducting group sales calls during which there were discussions of specific customers.  Such calls frequently involved discussions of Nephron's confidential, proprietary, and trade secret information, including without limitation strategies and methods to respond to customer inquiries and concerns, selling methods and distribution plans, and product pipeline strategy.  Hulsey recorded more than 30 of these group sales calls.

**B.     Hulsey's Employment and Her Promise to Preserve Nephron's Confidential and Proprietary Business Information Including, Without Limitation, Its Trade Secrets.**

25.     In January of 2002, Nephron hired Hulsey as a marketing representative.  Over the course of her sixteen years of employment with Nephron, Hulsey was promoted within Nephron and ultimately rose to the position of Territory Manager for Missouri, Kansas, Nebraska, Colorado, North Dakota, South Dakota, Montana, Idaho, and Iowa.

26.     As Nephron's Midwestern Territory Manager, Hulsey was generally responsible for promoting, developing, and making sales of Nephron's respiratory and 503B medications, and managing and developing current and prospective customer relationships within her nine-state sales territory.  Hulsey traveled frequently throughout that territory and otherwise worked from her home with a Nephron-issued laptop.  Hulsey also frequently traveled to Florida for meetings and training at Nephron FL's headquarters, which she did on at least an annual basis during the course of her employment.

27.     During the course of her employment with Nephron and in order to assist Hulsey in performing her job duties, Nephron provided Hulsey with access to key pieces of software—including, without limitation, the CRM and Power BI—that contained Nephron's highly confidential and proprietary information including, without limitation, its trade secrets. Importantly, in Power BI Hulsey could access the customer and prospective customer data, not only for her own sales territory, but also for the territories of other Nephron sales representatives.

C.     **The Confidentiality and Non-Disclosure Agreement ("NDA").**

28.     As a result of her sales role and related access to Nephron's customers, prospective customers, and confidential and proprietary information including, without limitation, its trade secrets, Nephron required Hulsey to execute various agreements throughout her employment, including the NDA.

29.     On June 17, 2015, Hulsey executed the NDA as a condition of her continued employment at Nephron, and as a condition of her continued access to Nephron's customers and its confidential and proprietary information including, without limitation, its trade secrets.  A true and accurate copy of Hulsey's executed NDA is attached hereto as **Exhibit A**.

30.     By signing the NDA, Hulsey agreed, among other things, that, during her employment or at any time thereafter, she would hold Nephron's "Confidential Information" in strict confidence, not disclose Nephron's Confidential Information to anyone other than Nephron employees with a business-related need to know the information, and that she would not use the Confidential Information for any purpose other than in connection with her employment and for the benefit of Nephron.  Specifically, Hulsey agreed:

> . . .  during the term of his/her employment with Nephron and any time thereafter, (a) to hold the Confidential Information in strict confidence, (b) not to disclose the Confidential Information to anyone other than Nephron employees who have a need to know as part of their job duties, (c) not to use Confidential Information

for any purpose other than in connection with his/her employment
and for the benefit of Nephron only . . . .

*See* Exhibit A, ¶ 2.

31.     Hulsey further agreed that "Confidential Information" for purposes of the NDA

was comprised of Nephron's confidential, proprietary, and trade secret information including,

without limitation, its customer data, customer names or information, financial records and

analysis, market information, marketing strategies, and other information constituting Nephron's

"trade secrets."  Specifically, Hulsey agreed:

> "Confidential Information" means . . . Nephron's business
> plans, methods of operation, ingredients, formulae, compositions,
> sample products, customer data, customer names or information,
> vendor names or information, distributor names or information,
> designs, documents, drawings, accounting and financial records,
> financial analysis, hardware, inventions, market information,
> marketing plans, marketing strategies, new materials research,
> technological data, technological services, specifications, recipes,
> methods, [and] trade secrets . . . .

*See* Exhibit A, ¶ 1.

32.     By signing the NDA, Hulsey also acknowledged that Nephron retained ownership

of the Confidential Information, that she would not copy or remove any Confidential Information

from Nephron including, without limitation, from its computer systems except as expressly

authorized by Nephron's Chief Executive Officer, Lou Kennedy, and that she would take

precautions to protect the confidentiality, and the unauthorized use and disclosure of, Nephron's

Confidential Information.  Specifically, Hulsey acknowledged and agreed as follows:

> Employee acknowledges that at all times Nephron retains
> all right, title and/or interest in the Confidential Information,
> including derivatives thereof, under patent, copyright, trade secret,
> and other applicable laws.  Employee agrees not to copy any
> Confidential Information or remove any Confidential Information
> from Nephron's office locations, manufacturing facilities and/or
> computer systems, except as expressly authorized in writing by

> Nephron's President and Chief Executive Officer, Lou Kennedy.
> Employee shall use all reasonable precautions to protect the
> confidentiality, and to prevent the unauthorized use or disclosure,
> of the Confidential Information.  Without limiting the foregoing,
> Employee shall take at least those precautions that he/she takes to
> protect his/her own most highly confidential information.

*See* Exhibit A, ¶ 2.

33.     By signing the NDA, Hulsey also agreed to promptly return to Nephron any and

all originals and copies of Confidential Information in her possession or control, without

retaining copies in any form, upon the termination of her employment and at any other time upon

Nephron's request.  *See* Exhibit A, ¶ 2.

34.     Hulsey further agreed that her breach or threatened breach of the terms of the

NDA would cause Nephron irreparable harm and that Nephron would be entitled to obtain

temporary and permanent injunctive relief against any breach or threatened breach of the NDA,

in addition to all other rights and remedies available to Nephron under applicable law.

Specifically, Hulsey agreed, in pertinent part:

> The parties each acknowledge that any breach or threatened
> breach of this Agreement would cause irreparable harm to
> Nephron and that monetary damages alone would be inadequate
> compensation.  Accordingly, the parties agree that Nephron will
> have the right to obtain temporary and/or permanent injunctive
> relief against any breach or threatened breach of this Agreement,
> without the necessity of proving actual damages, as well as the
> right to pursue any and all other rights and remedies available at
> law, in equity or otherwise for such a breach or threatened breach.

*See* Exhibit A, ¶ 4.

35.     Hulsey also agreed that Florida law governed the NDA and any dispute arising

thereunder, that any action brought to enforce the NDA must be brought and maintained

exclusively in federal or state court in Orange County, Florida, and that she consented to

jurisdiction and venue in federal or state court in Orange County, Florida, waiving all defenses thereto.  Specifically, Hulsey agreed:

> The parties agree that Florida law shall govern this Agreement and any dispute arising hereunder.  Any action brought under or pursuant to this Agreement must be brought and maintained exclusively in federal or state court in Orange County, Florida, and Employee agrees and consents to jurisdiction and venue in federal or state court, as applicable, in Orange County, Florida, and waives any defenses thereto.

*See* Exhibit A, ¶ 11.

36.     Hulsey agreed that, in the event either she or Nephron was required to institute litigation related to the Agreement, the prevailing party was entitled to recover from the other party reasonable attorneys' fees and court costs incurred in such action.  Specifically, Hulsey agreed:

> In the event either party is required to commence a judicial action regarding a dispute between the parties concerning this Agreement, the prevailing party shall be entitled to recover from the other . . . reasonable attorneys' fees and court costs incurred in such action.

*See* Exhibit A, ¶ 13.

**D.    Hulsey's Misappropriation and Improper Use of Nephron's Confidential and Proprietary Information Including, Without Limitation, Its Trade Secrets, at the Direction of U.S. Compounding and Adamis.**

37.     On August 10, 2018, Hulsey unexpectedly provided Nephron with notice that she was resigning from her employment effective August 24, 2018.  Hulsey did not communicate to Nephron that she was resigning to accept a position with a competitor company, U.S. Compounding and Adamis, but instead claimed that her resignation was due to health and family reasons.  Despite Nephron's attempts to meet with Hulsey to discuss her resignation and to transition her job duties, Hulsey did not do so and, instead, took vacation for much of the notice period.

38.     On Monday, August 20, 2018, Stephanie Simmonds, Nephron's Chief of Marketing Operations, directed Hulsey to review and provide, by the morning of August 21, 2018, notes on each of her customer accounts in the CRM to help facilitate a smooth transition. Hulsey did not do so.

39.     On the afternoon of August 24, 2018, Hulsey's final day of employment, Nephron terminated Hulsey's electronic access to Nephron's electronic communications and data systems, including, without limitation, Nephron's email system, the CRM, Power BI, and other document and data management systems.  In addition, because Hulsey was many customers' primary point of contact with Nephron, Nephron redirected any emails sent to Hulsey's Nephron account to Simmonds' Nephron account until a long-term transition plan or a replacement could be put in place.

40.     Nephron requested that Hulsey return her Nephron-owned and issued laptop, which Nephron received on August 28, 2018.

41.     On or about August 30, 2018, Nephron's Illinois Territory Manager, Kyle Phillips, became aware that Hulsey had, following her separation from Nephron, emailed one of Nephron's current hospital customers.  In the email, a screenshot of which was forwarded to Phillips via text message, Hulsey conveyed that she was now employed by U.S. Compounding, a direct Nephron competitor.  According to its website, U.S. Compounding provides drug compounding services to physician clinics, hospitals, and surgery centers throughout the United States, as does Nephron.

42.     Hulsey conveyed in the email to one of Nephron's current customers that U.S. Compounding could provide the customer with the same sterile 503B medications, which she identified by name, that the customer had previously obtained from Nephron.  The email was

clearly crafted using Nephron's confidential, proprietary, and trade secret information related to product positioning in the marketplace and sales strategies.

43.     Upon his receipt of the email screenshot, Phillips notified Nephron's Vice President of National Accounts, Hunter Gordy, of the email.  Gordy, in turn, notified Kennedy and Hank Jibaja, Nephron's Chief Information Officer, of same.

44.     Given the concerning nature of the email, discussed above, which evidenced that Hulsey was not complying with her obligations set forth in the NDA in connection with her new employment with U.S. Compounding and Adamis, Nephron, through counsel, sent correspondence to Hulsey, individually, and to U.S. Compounding, by way of its registered agent for service of process, on September 5, 2018.  In these letters, Nephron demanded, *inter alia*, that Hulsey and U.S. Compounding immediately cease and desist all misappropriation, use, and disclosure of Nephron's confidential and proprietary information including, without limitation, its trade secrets, and that Hulsey and U.S. Compounding return to Nephron any devices containing such information.  Nephron demanded a response to these letters by no later than Friday, September 14, 2018, including the return of any referenced devices as well as other Nephron property in Hulsey's possession.

45.     Following her receipt of the September 5, 2018 correspondence, Hulsey contacted Nephron's counsel claiming that she had not used, retained, or divulged any of Nephron's confidential and proprietary information, or its trade secrets.

**E.     Nephron's Investigation into Hulsey's Pre-Separation Misconduct.**

46.     After becoming aware of Hulsey's use of Nephron's confidential and proprietary information including, without limitation, its trade secrets, in an attempt to lure an existing Nephron customer over to U.S. Compounding, Nephron sent Hulsey's Nephron-owned laptop,

which Hulsey had returned to Nephron on or about August 28, 2018, for digital forensic assessment at the direction and under the direct supervision of Nephron's legal counsel.

47.     On September 7, 2018, Nephron learned from the forensic assessment that contrary to her representations, on Hulsey's last day of employment with Nephron, August 24, 2018, and on at least one other occasion shortly before that time, Hulsey connected a Seagate external hard drive ("Hard Drive") to her Nephron-issued laptop.  The forensic assessment further showed that shortly after connecting the Hard Drive, Hulsey accessed Nephron's highly confidential and proprietary information stored in both the CRM and Power BI.

48.     Nephron further learned from the forensic assessment that, on her final day of employment with Nephron and on at least one prior occasion, Hulsey used the CRM and Power BI to, without limitation, generate numerous reports containing information and data that constitutes Nephron's confidential and proprietary information including, without limitation, "trade secrets" within the meaning of the federal Defend Trade Secrets Act and the Florida Uniform Trade Secret Act, Fla. Stat. Ann. § 688.001, *et seq*.

49.     Upon information and belief, Hulsey transferred the numerous reports that she generated from the CRM and Power BI, first onto the desktop of her Nephron laptop, and subsequently onto the Hard Drive.  Hulsey also created and, upon information and belief, transferred, numerous other files from her Nephron-owned laptop and Nephron's various systems onto the Hard Drive, which files contained confidential and proprietary information, including without limitation trade secrets, and were Nephron property.  Hulsey then proceeded to delete the reports and files that she created from her desktop in an effort to conceal her wrongdoing before returning the laptop to Nephron.

50.     Despite Hulsey's attempts to delete all record of her misconduct, through its ongoing forensic assessment, Nephron determined that, in the time period immediately preceding her departure, Hulsey created and/or accessed, and, upon information and belief, transferred onto the Hard Drive, reports detailing confidential and proprietary information including, without limitation, trade secrets, related to Nephron's customers and sales leads including, without limitation, Nephron's Florida customers and sales leads.  Notably, Florida was not part of Ms. Hulsey's sales territory.   Consequently, she had no reason to access this information in connection with her employment with Nephron.  The file names created by Ms. Hulsey indicate that she took confidential and proprietary information pertaining to, without limitation, Nephron's "Top 50" customers, "Major Cancer Centers," "Top Hospitals," "VA Sales," and that she transferred numerous screenshots, customer contacts, and Nephron emails from the Nephron laptop onto the Hard Drive before deleting the files from her desktop, all of which were Nephron's property and contained Nephron's confidential and proprietary information including, without limitation, its trade secrets.

**F.     Defendants' Collective Refusal to Return Nephron's Confidential Information and Preserve Evidence of their Wrongdoing.**

51.     Notwithstanding the above, on September 10, 2018 Ms. Hulsey emailed Nephron, by way of counsel, maintaining that she "no longer retain[ed] any . . . Nephron information/secrets . . . that would infringe on [her NDA]," and that the only Nephron property still in her possession consisted of pens, pads, hand sanitizer, and business cards.

52.     Nephron, by way of counsel, sent follow-up correspondence to Hulsey, with a copy to U.S. Compounding, on September 10, 2018, demanding that Hulsey return the Hard Drive, unaltered, to Nephron for forensic analysis and that she identify any devices used in conjunction with the Hard Drive.  Ms. Hulsey did not do so.

53.     On September 12, 2018, U.S. Compounding's Senior HR Director, Susan Duell, emailed counsel for Nephron stating that U.S. Compounding had not received Nephron's September 5, 2018, cease and desist correspondence until that day.  Although Duell claimed that Nephron had sent the letter to an incorrect address, Nephron had mailed the letter to U.S. Compounding's registered agent for service of process at the address set forth on the Arkansas Secretary of State's website.   In her email, Duell conveyed U.S. Compounding's intent to respond, not by September 14, 2018 as demanded, but, rather, by September 21, 2018.  Duell did not agree to return the Hard Drive, nor had Hulsey done so or indicated any intention of doing so as Nephron had again demanded on September 10, 2018.

54.     Counsel for Nephron responded via email to Duell the same day, forwarding courtesy copies of all correspondence to date either addressed to U.S. Compounding, or on which U.S. Compounding was copied.  Nephron, again, demanded return of the Hard Drive in an unaltered state.

55.     Upon receiving no response from U.S. Compounding to that email, Nephron, through counsel, sent another letter to U.S. Compounding, with a copy to Hulsey, on September 14, 2018, demanding that U.S. Compounding and Hulsey provide an adequate response to Nephron's cease and desist letters of September 5 and 10, 2018, and to its September 12, 2018 email by no later than September 17, 2018, and that the Hard Drive be returned.

56.     On September 17, 2018 counsel for U.S. Compounding and Hulsey contacted counsel for Nephron and indicated that, despite Nephron's demands that she return the Hard Drive to Nephron, Hulsey still had the Hard Drive in her possession.  Instead of returning the Hard Drive as demanded by Nephron, Defendants instead proposed that they send the Hard Drive containing Nephron's confidential and proprietary information including, without

18

limitation, its trade secrets, to a third party located in Oklahoma for forensic review and assessment. Defendants also indicated their unwillingness to preserve or provide Nephron with forensic images of any other devices to which Hulsey may have connected the Hard Drive including, without limitation, her U.S. Compounding-issued computer.

57. Following this communication, Nephron, by way of counsel, sent email correspondence to Defendants by way of their counsel demanding, among other things, that the Hard Drive be returned to Nephron's forensic analyst that day, September 17, 2018, via FedEx insured delivery. Nephron also demanded that U.S. Compounding send to its own selected forensic analyst any other electronic devices that Hulsey had connected to the Hard Drive for preservation and imaging, as well as any data that was transferred from the Hard Drive to the Cloud or some other storage location. Nephron demanded a response by September 18 at 5:00 p.m.

**G.    Nephron's Continuing Investigation, and Discovery in This Action, Reveals Additional Information Regarding Hulsey's Pre-Separation Misconduct.**

58. Nephron's ongoing analysis of, and investigation into, Hulsey's pre-separation misconduct, as well as documents produced by Defendants in this action, reveals numerous ways in which Hulsey—encouraged, aided, and assisted by U.S. Compounding and Adamis—acted to harm Nephron *during her employment with Nephron* and continuing thereafter.

59. Nephron learned on September 18 and 19, 2018 that Hulsey had used her Nephron-owned and issued email account (the "Nephron Email") to begin misappropriating Nephron's confidential and proprietary information including, without limitation, its trade secrets, at least as early as May 2018, three months prior to her resignation, in clear violation of the NDA and her common law and statutory obligations to Nephron, and in anticipation of her future employment with U.S. Compounding.

19

60.     Specifically, as early as May 3, 2018, Hulsey had emailed Nephron's confidential and proprietary information including, without limitation, its trade secrets, from her Nephron Email to two of her personal email accounts, a Hotmail account and a Gmail account (the "Personal Emails") one of which it appears she created during her employment with Nephron for the specific purpose of doing so.  The information that Hulsey sent to her Personal Emails, in direct violation of the NDA, included, but was not limited to, Nephron's confidential and proprietary pricing sheets, customer order information, customer contracts, and customer lists. On June 28, 2018, Hulsey noted in a spreadsheet of Nephron customers, which she emailed to her Personal Emails, that the customer "Uses Nephron and U.S. Compounding," in clear contemplation of her imminent employment with U.S. Compounding.

61.     Nephron's review and assessment of the Nephron Email revealed that Hulsey also sent inquiries from current or prospective Nephron customers to her Personal Emails, including a request for pricing information and an inquiry regarding an outstanding order.

62.     On or about May 18, 2018, Hulsey divulged confidential, trade secret, and proprietary information regarding Nephron's business practices and strategy to U.S. Compounding, which then relayed this information to Adamis. In relaying this information to Adamis, U.S. Compounding took particular care to note that Nephron employees were not required to sign non-compete agreements.

63.     On information and belief, in or around July 2018, some of the information provided by Hulsey regarding Nephron's market strategy was incorporated into a PowerPoint presentation intended to solicit investors for Adamis.  Later that same month, personnel at U.S. Compounding and Adamis had a discussion about U.S. Compounding's sales force.  Although

Hulsey did not work for U.S. Compounding at that time, she was listed in notes from the meeting as one of several "Key Revenue Generators."

64.     Also in mid-May 2018, Hulsey made efforts to recruit two Nephron employees to leave Nephron and work for U.S. Compounding.  U.S. Compounding and Adamis were fully aware of, and supported, Hulsey's recruitment efforts.  Hulsey, U.S. Compounding, and Adamis communicated with each other during at least May and June 2018 regarding the status of negotiations with the two Nephron employees.

65.     Moreover, and upon information and belief, after Hulsey left her employment with Nephron, U.S. Compounding sought her assistance in recruiting three other Nephron employees to work for U.S. Compounding.

66.     In addition to recruiting other Nephron employees, and also while still employed by Nephron, Hulsey sought to divert sales from Nephron to U.S. Compounding.  On or about July 12, 2018, Hulsey asked U.S. Compounding whether a specific hospital system located in North and South Dakota was already assigned to a U.S. Compounding sales representative.  She explained that she had been "pursuing" the hospital system for Nephron and it had contacted her about purchasing 503b medications.  Hulsey promised U.S. Compounding she would "try to hold them off for now."  Upon information and belief, Hulsey's statement that she would "try to hold them off" meant that she intended, if possible, to persuade the hospital system to defer ordering until she was employed by U.S. Compounding so that U.S. Compounding would be benefitted by the sale, rather than Nephron.

67.     While Hulsey was employed with Nephron but was attempting to secure employment with U.S. Compounding and Adamis, Hulsey used her position of trust with

Nephron to access Nephron's confidential and proprietary information including, without limitation, its trade secrets, and provided that information to U.S. Compounding and Adamis.

68.     For example, Hulsey took screenshots of Nephron's confidential and proprietary information and sent those screenshots to U.S. Compounding and Adamis.  Nephron is informed and believes that Hulsey's actions were taken at the direction of U.S. Compounding and Adamis, and that U.S. Compounding and Adamis wanted this information so they could assess whether Hulsey would bring new customers from Nephron to U.S. Compounding and Adamis in the event U.S. Compounding hired Hulsey as a sales representative.

69.     Additionally, Hulsey—again, while still employed by Nephron—provided U.S. Compounding and Adamis with Nephron's proprietary and trade secret information regarding specific, "high volume" products in Nephron's product line, as well as specific pricing information regarding certain products.  Upon information and belief, Defendants agreed that Hulsey would provide U.S. Compounding and Adamis with Nephron's confidential, proprietary, and trade secret information concerning pricing of products.  Specifically, on or about August 17, 2018, U.S. Compounding responded to an email containing a competitor's pricing information by noting that U.S. Compounding would "very soon" have access to Nephron's pricing, which would enable U.S. Compounding to adjust is pricing strategy.

70.     After starting her job with U.S. Compounding, Hulsey used Nephron's confidential, proprietary, and trade secret information to persuade Nephron customers to purchase products from U.S. Compounding.  For example, on at least one occasion Hulsey specifically compared prices a Nephron customer was currently paying for certain products to prices offered by U.S. Compounding, while in other instances she contacted existing Nephron customers with promises of "lower" pricing through U.S. Compounding.  On other occasions,

Hulsey used Nephron's confidential, proprietary, and trade secret information regarding negotiations with specific customers or prospective customers to convince them to give their business to U.S. Compounding.

71.     On information and belief, Defendants have succeeded in their efforts to interfere with Nephron's existing and prospective customer relationships.  As a result of Defendants' interference, Nephron has lost hundreds of thousands of dollars in lost sales.

72.     Defendants have failed and refused to adequately respond to Nephron's demands, and, in the face of conclusive evidence to the contrary, have outright denied Hulsey's theft of Nephron's confidential and proprietary business information including, without limitation, its trade secrets.  Defendants have also failed to produce the Hard Drive to Nephron, despite Nephron demanding on at least five separate occasions that they do so.  Prior to Plaintiffs filing this lawsuit, Defendants also refused to obtain forensic images of, or otherwise investigate, preserve, or control, other devices to which Ms. Hulsey connected the Hard Drive and other relevant evidence pertaining to her misconduct such as, without limitation, her U.S. Compounding and Personal Emails.  Upon information and belief, U.S. Compounding and Adamis have ratified and sanctioned Ms. Hulsey's wrongful and unlawful acts by continuing to employ her after learning of same and taking no steps whatsoever to investigate and/or stop the further unlawful disclosure, dissemination, retention, and use of Nephron's confidential and proprietary information including, without limitation, its trade secrets.

**H.     Adamis—U.S. Compounding's Parent Company—Actively Recruited Ms. Hulsey to Join U.S. Compounding and Misappropriate Nephron's Confidential and Proprietary Information.**

73.     Adamis trades publicly on the NASDAQ Stock Market as ADMP.  Both Adamis's website and its SEC filings identify "U.S. Compounding, Inc." as its subsidiary

corporation.   Moreover, Adamis's press releases are replete with references to "its subsidiary U.S. Compounding."

74.     Nephron filed its Complaint on September 21, 2018, the District Court entered a Case Management and Scheduling Order on November 14, 2018, and Nephron filed its First Amended Complaint on December 14, 2018.  Both Complaints identified only Ms. Hulsey and U.S. Compounding as Defendants.

75.     On February 3, 2019, in response to Nephron's First Set of Production Requests to U.S. Compounding, Nephron received 85 pages of Bates Numbered Documents from Defendants.

76.     Included within these Bates Numbered Documents were more than a dozen e-mails between Ms. Hulsey and Gus Fernandez (the "Fernandez E-mails").  Mr. Fernandez's e-mail address is gfernandez@adamispharma.com and his signature block identifies him as the "Vice President, Commercial Operations" for "Adamis Pharmaceuticals Corporation."

77.     The Fernandez E-mails demonstrate that:

    a.   Adamis, by and through Fernandez, communicated with and actively recruited Ms. Hulsey to take employment with U.S. Compounding in the months leading up to her August 2018 resignation from Nephron.

    b.   While still employed with Nephron, Ms. Hulsey sent Fernandez Nephron's confidential, proprietary, and trade secret information (including, without limitation, pricing information, customer information, and historical purchase information for products sold by both Nephron and U.S. Compounding) in an attempt to gain employment with U.S. Compounding, promising Fernandez that she could pull at least $2.5 million in business from existing Nephron

customers to U.S. Compounding during her first twelve months of employment with U.S. Compounding, if hired; and

c.   Fernandez negotiated directly with Ms. Hulsey regarding the terms and conditions of her forthcoming employment with U.S. Compounding, including directly negotiating her salary, benefits, and commission package after receiving, reviewing, and considering Nephron's confidential, proprietary, and trade secret information emailed to him by Ms. Hulsey (including, without limitation, after considering and comparing Nephron's customer and sales information to U.S. Compounding's and creating a pro forma for Ms. Hulsey based off of that information), and Ms. Hulsey's promises to bring current Nephron customers with her to U.S. Compounding if employed.

78.    Adamis and U.S. Compounding jointly employ Ms. Hulsey and are jointly liable for her efforts to misappropriate Nephron's confidential, proprietary, and trade secret information, as well as any and all damage resulting therefrom.

**FOR A FIRST CAUSE OF ACTION**
**(Violation of the Federal Defend Trade Secrets Act)**
**(By All Plaintiffs Against All Defendants)**

79.    The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

80.    The following constitutes Nephron's confidential, proprietary, and trade secret information collectively and individually, within the meaning of the federal Defend Trade Secrets Act, 28 U.S.C. § 1836 *et seq.*:

(a)     Nephron's contracts with its various customers which include, without limitation, confidential and proprietary pricing information;

(b)     Numerous compilations and reports generated from the CRM and Power BI which contain, without limitation, customer and prospective customers' identities; locations; contact information for the customer and prospective customer's purchasing decision-makers; extensive order history, including specifics of products purchased; customer-specific pricing details; customer and prospective customer purchasing habit details, preferences, quantities, and content; latitude and longitude of customer locations in order to electronically generate a mapping of effective and efficient sales routes; and extensive customer and prospective customer notes input by sales representatives related to specific customer and prospective customer concerns, issues, and preferences;

(c)     Numerous pricing sheets containing compilations of Nephron's individually negotiated pricing with customers;

(d)     Customer and prospective customer pricing proposals;

(e)     Customer lists and prospective customer lists, as well as new customer set up forms;

(f)     Sales summaries; and

(g)     Compilations of extensive data pertaining to Nephron's sales leads developed by Nephron over the course of many years.

81.     Each of Nephron's trade secrets identified above is confidential, proprietary, and trade secret information that derives independent economic value by not being generally known, or reasonably ascertainable through proper means, by competitors or others who can value from its disclosure or use, including, without limitation, Defendants.

82.     Nephron took reasonable measures under the circumstances to maintain the secrecy of all trade secrets identified above.

83.     As a worldwide leader in the manufacturing of generic respiratory and compounding medications, Nephron's business generally, and the products it manufactures by use of its trade secrets specifically, move in and through interstate commerce.

84.     Hulsey misappropriated Nephron's trade secrets by acquiring and/or retaining those trade secrets through improper means outside the time and scope of her former employment with Nephron, by disclosing those trade secrets to U.S. Compounding and Adamis and/or agents and representatives of the same, and by using those trade secrets with knowledge that she had acquired the same under circumstances giving rise to a duty to maintain their secrecy and limit their use.

85.     Upon information and belief, U.S. Compounding and Adamis misappropriated Nephron's trade secrets by acquiring the above-referenced trade secrets from Hulsey and by using and/or disclosing and/or retaining the same in an effort to unfairly compete against Nephron, with knowledge or reason to know that Hulsey acquired those trade secrets by improper means and/or with knowledge that Hulsey had acquired the same under circumstances giving rise to a duty to maintain their secrecy and limit their use.

86.     As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron has suffered and will continue to suffer actual damages, and Defendants have been unjustly enriched.

87.     As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron is entitled to an award of actual damages, including but not limited to the value of the unjust enrichment caused by Defendants' misappropriation and benefit therefrom, in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.  Alternatively, Nephron is entitled to payment by Defendants of a reasonable royalty for their wrongful retention, disclosure, and use of Nephron's trade secrets.

88.     As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron also seeks an award of exemplary damages, attorney's fees, and costs.

89.     Nephron is entitled to injunctive relief to prevent Defendants' further actual or threatened misappropriation of Nephron's trade secrets.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)
### (By Nephron FL Against Hulsey)

90.     The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

91.     The NDA constitutes a valid and binding contract between Nephron FL and Hulsey.

92.     Upon information and belief, Hulsey intentionally, willfully, and materially breached the NDA in at least the following particulars:

(a)     Hulsey breached Paragraphs 1 and 2 of the NDA by not holding Nephron FL's confidential and proprietary information including, without limitation, its trade secrets, in the strictest confidence;

(b)     Hulsey breached Paragraph 2 the NDA by retaining and failing to immediately return all of Nephron FL's property within her possession at the time of her resignation or upon Nephron's request;

(c)     Hulsey breached Paragraph 2 of the NDA by retaining and failing to return all Nephron FL's customer records within her possession at the time of her resignation or upon Nephron's request;

(d)     Hulsey breached Paragraph 2 of the NDA by disclosing Nephron FL's confidential and proprietary information including, without limitation, its trade secrets, to U.S. Compounding and Adamis and other third parties; and

(e)     Hulsey breached Paragraph 2 of the NDA disclosing Nephron FL's confidential and proprietary information including, without limitation, its trade secrets, to U.S. Compounding and Adamis and/or on U.S. Compounding's and Adamis's behalf.

93.     As a direct and proximate result of Hulsey's material breaches of the NDA, Nephron FL has suffered and will continue to suffer actual damages.

94.     As a direct and proximate result of Hulsey's material breaches of the NDA, Nephron FL is entitled to recover its actual damages from Hulsey in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

95.     As a direct and proximate result of Hulsey's material breaches of the NDA, Nephron FL is entitled to immediate injunctive relief to prevent Hulsey's further breach or threatened breach of the same.

96.     As a direct and proximate result of Hulsey's material breaches of the NDA, and as is expressly provided for in Paragraph 13 of the NDA, Nephron FL is entitled to recover its attorneys' fees and costs incurred in bringing this Action.

<u>FOR A THIRD CAUSE OF ACTION</u>
**(Violation of the Florida Uniform Trade Secrets Act)**
**(By All Plaintiffs Against All Defendants)**

97.     The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

98.     The following compilations of Nephron's confidential, proprietary, and trade secret information collectively and individually constitute "trade secrets" within the meaning of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.*:

(a)     Nephron's contracts with its various customers which includes, without limitation, confidential and proprietary pricing information;

(b)     Numerous compilations and reports generated from the CRM and Power BI which contain, without limitation, customer and prospective customers' identities; locations; contact information for the customer and prospective customer's purchasing decision-makers; extensive order history, including specifics of products purchased; customer-specific pricing details; customer and prospective customer purchasing habit details, preferences, quantities, and content; latitude and longitude of customer locations in order to electronically generate a mapping of

30

effective and efficient sales routes; and extensive customer and prospective customer notes input by sales representatives related to specific customer and prospective customer concerns, issues, and preferences;

(c)  Numerous pricing sheets containing compilations of Nephron's individually negotiated pricing with customers;

(d)  Customer and prospective customer pricing proposals;

(e)  Customer lists and prospective customer lists, as well as new customer set up forms;

(f)  Sales summaries; and

(g)  Compilations of extensive data pertaining to Nephron's sales leads developed by Nephron over the course of many years.

99.  Each of Nephron's trade secrets identified above is a compilation of Nephron's confidential, proprietary, and trade secret information that derives independent economic value by not being generally known, or reasonably ascertainable through proper means, by competitors or others who can value from its disclosure or use, including, without limitation, Defendants.

100.  Nephron has taken reasonable measures under the circumstances to maintain the secrecy of all trade secrets identified above.

101.  Hulsey misappropriated Nephron's trade secrets by acquiring and/or retaining those trade secrets through improper means outside the time and scope of her former employment with Nephron, by disclosing those trade secrets to U.S. Compounding and Adamis and/or agents and representatives of the same, and by using those trade secrets with knowledge

that she had acquired the same under circumstances giving rise to a duty to maintain their secrecy and limit their use.

102.    U.S. Compounding and Adamis misappropriated Nephron's trade secrets by acquiring those trade secrets from Hulsey and by using and/or disclosing the same in an effort to unfairly compete against Nephron, with knowledge or reason to know that Hulsey acquired those trade secrets by improper means and/or with knowledge that Hulsey had acquired the same under circumstances giving rise to a duty to maintain their secrecy and limit their use.

103.    As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron has suffered and will continue to suffer actual damages, and Defendants have been unjustly enriched.

104.    As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron is entitled to an award of actual damages, including but not limited to the value of the unjust enrichment caused by Defendants' misappropriation and benefit therefrom, in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.  Alternatively, Nephron is entitled to payment by Defendants of a reasonable royalty for their wrongful retention, disclosure, and use of Nephron's trade secrets.

105.    As a direct and proximate result of Defendants' willful and malicious misappropriation of Nephron's trade secrets, Nephron also seeks an award of exemplary damages, attorneys' fees, and costs.

106.    Nephron is entitled to injunctive relief to prevent Defendants' further actual or threatened misappropriation of Nephron's trade secrets.

**FOR A FOURTH CAUSE OF ACTION**
**(Breach of the Duty of Loyalty)**
**(By Nephron FL Against Hulsey)**

107.   The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

108.   While employed by Nephron FL, Hulsey owed Nephron FL a common law duty of loyalty to act at all times in Nephron FL's best interests with diligence and in good faith, and to refrain from acting in any manner inconsistent with its legitimate business interests.  Among other things, Hulsey's common law duty of loyalty prohibited her from engaging in disloyal acts in anticipation of future competition, such as soliciting customers and other employees prior to the end of employment. Further, Hulsey's duty of loyalty prohibited her from using Nephron's confidential information to compete with Nephron, both during and after her employment. Hulsey breached her common law duty of loyalty arising from her employment relationship with Nephron FL in, at least, the following ways:

    a.   By falsely telling Nephron FL that she was resigning for family and health reasons, when she was actually resigning to take a job with U.S. Compounding and Adamis.  Hulsey's dishonesty deprived Nephron FL of the ability to terminate Hulsey's access to its systems, including without limitation the CRM and Power BI, as soon as she gave her notice on August 10, 2018.  During the period between her notice and the last day of her employment with Nephron on August 24, 2018, Hulsey downloaded troves of Nephron's confidential, proprietary, and trade secret information.

    b.   By intentionally accessing, downloading, storing, and retaining vast quantities of Nephron's confidential and proprietary information, including without

limitation its trade secrets, for the express and wrongful purpose of preserving all such information and using it to compete against Nephron FL on behalf of U.S. Compounding and Adamis following the termination of her employment.

c.  By taking Nephron's confidential and proprietary information, including without limitation its trade secrets, relating not just to customers within Hulsey's sales territory, but also to other Nephron customers that would be useful to U.S. Compounding and Adamis because they do business throughout the United States.

d.  By taking screenshots of Nephron's confidential and proprietary customer information and sending the screenshots to U.S. Compounding and Adamis so they could assess whether Hulsey, if hired as a sales representative, could bring new customers to U.S. Compounding and Adamis from Nephron. Hulsey did so while still employed with Nephron and, upon information and belief, at the direction of U.S. Compounding and Adamis.

e.  By disclosing Nephron's confidential, proprietary, and trade secret information to U.S. Compounding and Adamis, which they used not only to gauge the value of the business Hulsey would potentially take from Nephron, but also to inform decisions regarding business strategy and pricing.  Among other things, Hulsey disclosed to U.S. Compounding and Adamis a specific business strategy of Nephron's.  Subsequently, this information was included in a presentation for investors, in which Adamis touted its knowledge of, and intent to coopt, the strategy wrongly disclosed by Hulsey.

f.  By recruiting other Nephron employees to seek jobs with U.S. Compounding and Adamis, while she was still employed by Nephron.

g.  By seeking to "hold off," until Hulsey had begun employment with U.S. Compounding and Adamis, a customer she had been pursuing on behalf of Nephron, so that the customer's business would be diverted from Nephron to U.S. Compounding and Adamis.

h.  By telling certain Nephron customers, while Hulsey was still employed by Nephron, that she would be going to work for U.S. Compounding and Adamis.  Upon information and belief, Hulsey advised Nephron customers of her move to U.S. Compounding and Adamis to make it more likely that they would stop ordering from Nephron and would instead order from U.S. Compounding and Adamis.

i.  By using her knowledge of the prices actually paid by specific Nephron customers to offer substantially lower prices for U.S. Compounding and Adamis's products, in order to induce Nephron customers to transfer their business to U.S. Compounding and Adamis.

109.   Upon information and belief, Hulsey took the foregoing actions on behalf of and to benefit U.S. Compounding and Adamis, beginning while she was employed by Nephron FL, and continuing thereafter.

110.   Hulsey's breaches of her duty of duty of loyalty began at least as early as May 2018, and continued throughout the remainder of her employment with Nephron, during which time Nephron continued to pay Hulsey substantial remuneration, including without limitation her salary and benefits.

35

111.    Nephron FL has been harmed as a direct and proximate result of Hulsey's multiple breaches of her common law duty of loyalty, including without limitation by the loss of control over its confidential, proprietary, and trade secret information; the destabilizing effect of Hulsey's attempts to recruit other Nephron employees; and the loss of business due to Hulsey's use of her knowledge of Nephron's pricing to offer substantially lower prices to Nephron customers, thereby inducing them to transfer their business to U.S. Compounding and Adamis. Nephron FL is entitled to recover such damages from Hulsey, including without limitation all amounts paid to Hulsey during the entire period of her disloyalty.

112.    Nephron FL is also entitled to recover punitive damages from Hulsey as a result of her knowing, willful, and intentional misconduct.

**FOR A FIFTH CAUSE OF ACTION**
**(Aiding and Abetting a Breach of the Duty of Loyalty)**
**(By Nephron FL Against U.S. Compounding and Adamis)**

113.    The allegations contained in paragraphs 1-78 and 107-112 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

114.    While employed by Nephron FL, Hulsey owed Nephron FL a common law duty of loyalty to act at all times in Nephron FL's best interests with diligence and in good faith, and to refrain from acting in any manner inconsistent with its legitimate business interests.  Among other things, Hulsey's common law duty of loyalty prohibited her from engaging in disloyal acts in anticipation of future competition, such as soliciting customers and other employees prior to the end of employment. Further, Hulsey's duty of loyalty prohibited her from using Nephron's confidential information to compete with Nephron, both during and after her employment.

115.    Hulsey breached her common law duty of loyalty arising from her employment relationship with Nephron FL in, at least, the following ways:

a.  By falsely telling Nephron FL that she was resigning for family and health reasons, when she was actually resigning to take a job with U.S. Compounding and Adamis.  Hulsey's dishonesty deprived Nephron FL of the ability to terminate Hulsey's access to its systems, including without limitation the CRM and Power BI, as soon as she gave her notice on August 10, 2018.  During the period between her notice and the last day of her employment with Nephron on August 24, 2018, Hulsey downloaded troves of Nephron's confidential, proprietary, and trade secret information.

b.  By intentionally accessing, downloading, storing, and retaining vast quantities of Nephron's confidential and proprietary information, including without limitation its trade secrets, for the express and wrongful purpose of preserving all such information and using it to compete against Nephron FL on behalf of U.S. Compounding and Adamis following the termination of her employment.

c.  By taking Nephron's confidential and proprietary information, including without limitation its trade secrets, relating not just to customers within Hulsey's sales territory, but also to other Nephron customers that would be useful to U.S. Compounding and Adamis because they do business throughout the United States.

d.  By taking screenshots of Nephron's confidential and proprietary customer information and sending the screenshots to U.S. Compounding and Adamis so they could assess whether Hulsey, if hired as a sales representative, could bring new customers to U.S. Compounding and Adamis from Nephron.

Hulsey did so while still employed with Nephron and, upon information and belief, at the direction of U.S. Compounding and Adamis.

e. By disclosing Nephron's confidential, proprietary, and trade secret information to U.S. Compounding and Adamis, which they used not only to gauge the value of the business Hulsey would potentially take from Nephron, but also to inform decisions regarding business strategy and pricing. Among other things, Hulsey disclosed to U.S. Compounding and Adamis a specific business strategy of Nephron's. Subsequently, this information was included in a presentation for investors, in which Adamis touted its knowledge of, and intent to coopt, the strategy wrongly disclosed by Hulsey.

f. By recruiting other Nephron employees to seek jobs with U.S. Compounding and Adamis, while she was still employed by Nephron.

g. By seeking to "hold off," until Hulsey had begun employment with U.S. Compounding and Adamis, a customer she had been pursuing on behalf of Nephron, so that the customer's business would be diverted from Nephron to U.S. Compounding and Adamis.

h. By telling certain Nephron customers, while Hulsey was still employed by Nephron, that she would be going to work for U.S. Compounding and Adamis. Upon information and belief, Hulsey advised Nephron customers of her move to U.S. Compounding to make it more likely that they would stop ordering from Nephron and would instead order from U.S. Compounding and Adamis.

      i.   By using her knowledge of the prices actually paid by specific Nephron customers to offer substantially lower prices for U.S. Compounding and Adamis's products, in order to induce Nephron customers to transfer their business to U.S. Compounding and Adamis.

116.    Upon information and belief, Hulsey took the foregoing actions on behalf of and to benefit U.S. Compounding and Adamis, beginning while she was employed by Nephron FL.

117.    Upon information and belief, after Hulsey sent this information to U.S. Compounding and Adamis and they determined that Nephron had customers and prospective customers who were not already a part of U.S. Compounding's and Adamis's customer or prospective customer base, and while Hulsey was still employed with Nephron, Hulsey, U.S. Compounding, and Adamis together conspired to solicit Nephron's employees, customers, and prospective customers away from Nephron.

118.    Upon information and belief, U.S. Compounding and Adamis had knowledge of Hulsey's breach of her common law duty of loyalty prior to and contemporaneous with that breach.  Among other things, U.S. Compounding and Adamis (1) specifically asked and/or directed Hulsey to provide them with Nephron's confidential, proprietary, and trade secret information; and (2) knew of, and encouraged, Hulsey's efforts to recruit other Nephron employees, and involved her directly in those recruitment efforts.

119.    Upon information and belief, U.S. Compounding and Adamis substantially aided, abetted, and encouraged Hulsey in breach of her duty of loyalty to Nephron in, at least, the following ways:

a.  By deliberately eliciting Nephron's confidential, proprietary, and trade secret information from Hulsey on the premise that such information was needed to assess her candidacy for a job.

b.  By encouraging Hulsey to disclose Nephron's confidential, proprietary, and trade secret information regarding its business strategies for the purpose of adopting the same strategies, even touting to investors its plan to coopt Nephron's strategies.

c.  By specifically requesting that Hulsey provide U.S. Compounding and Adamis with Nephron's confidential, proprietary, and trade secret information regarding prices paid by specific customers and for specific products, even asking Hulsey to "dollarize" information regarding number of units sold, making it easy to determine the per-unit price charged by Nephron.

d.  Upon information and belief, by instructing Hulsey to take screenshots of Nephron's confidential and proprietary customer information and send them to U.S. Compounding and Adamis so they could assess whether Hulsey would be able to bring new customers to U.S. Compounding and Adamis from Nephron.

e.  By deliberately failing to respond to Nephron's cease-and-desist letters of September 5 and 10, 2018, and Nephron's September 12, 2018 letter demanding that the Hard Drive be returned to Nephron, unaltered, no later than September 17, 2018.

f.  By sheltering Hulsey from Nephron's demands that she return the Hard Drive and the confidential, proprietary, and trade secret information therein.

40

Although Nephron demanded return of the Hard Drive from Hulsey, U.S. Compounding and Adamis intervened on Hulsey's behalf and proposed that the Hard Drive be sent to a third party in Oklahoma for forensic review and assessment.  Further aiding Hulsey's disloyalty and refusal to cooperate, U.S. Compounding and Adamis were unwilling to preserve or provide Nephron with forensic images of any other device to which Hulsey might have connected the Hard Drive, including without limitation any PC, laptop, or other device that may have been connected to Hulsey's Nephron-issued laptop or the Hard Drive, including without limitation her U.S. Compounding-issued computer.

120.    More specifically, and upon information and belief, U.S. Compounding and Adamis had knowledge of, encouraged, acquiesced in, and helped conceal Hulsey's disloyal conduct, beginning at least as early as May 3, 2018, when Hulsey began emailing Nephron's confidential, proprietary, and trade secret information from her Nephron FL Email to her Personal Emails while still employed by Nephron FL, with the intent to wrongfully use this information while unfairly competing against Nephron FL during her subsequent employment with U.S. Compounding and Adamis.

121.    Nephron FL has been harmed as a direct and proximate result of U.S. Compounding and Adamis's knowing and deliberate aiding and abetting of Hulsey's multiple breaches of her common law duty of loyalty, including without limitation by the loss of control over its confidential, proprietary, and trade secret information; the destabilizing effect of Hulsey's attempts to recruit other Nephron employees; and the loss of business due to Hulsey's use of her knowledge of Nephron's pricing to offer substantially lower prices to Nephron

customers, thereby inducing them to transfer their business to U.S. Compounding and Adamis. Nephron FL is entitled to recover such damages from U.S. Compounding and Adamis, including without limitation the value of any and all profits obtained through their misconduct.

122.    Nephron FL is also entitled to recover punitive damages from U.S. Compounding and Adamis as a result of their knowing, willful, and intentional misconduct.

**FOR A SIXTH CAUSE OF ACTION**
**(Tortious Interference with Business Relationships)**
**(By All Plaintiffs Against All Defendants)**

123.    The allegations contained in Paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

124.    During the period when Hulsey was employed by Nephron but seeking a position with U.S. Compounding, Nephron had existing and/or prospective business relationships with identifiable customers and identifiable prospective customers.   Such business relationships included, without limitation, the following:

a.   A hospital in Nebraska that was an existing customer of Nephron;

b.   A hospital pharmacy in Kansas that Hulsey had been marketing to, and which indicated, in July 2018, that it intended to purchase Nephron products;

c.   At least the following existing Nephron customers, all located within Hulsey's territory (identified by initials only): CH, SJMC, NRMC, MH, SLDPH, PMC, SSH, VAMCSC, DH.   Nephron had ongoing sales relationships with these customers, many of which had been purchasing the same products from Nephron, on a routine basis, for months and even years.   Based on the duration of these relationships and the consistency of the customers'

42

purchasing patterns, Nephron and reasonably expected these customers to continue ordering products from Nephron.

d.  One or more of Nephron's existing customers had an agreement with Nephron for recurring purchases.

125.   Hulsey was intimately familiar with these relationships given her sales role while employed with Nephron, in that some or all of the relationships were with customers within Hulsey's sales territory for Nephron, and Hulsey was responsible for establishing, cultivating, and maintaining such relationships.  Additionally, Hulsey obtained knowledge of existing and prospective Nephron customers assigned to other sales representatives through a variety of means, including without limitation meetings, sales reports, email communications or group chats, sales calls, and conversations with other Nephron employees.

126.   Hulsey's knowledge of Nephron's existing and/or prospective business relationships with existing and prospective customers included confidential, proprietary, and trade secret information specific to each such relationship, including without limitation the pricing offered and/or agreed upon, existing clients' ordering history, and prior marketing contacts with existing and prospective customers.   Hulsey also had other information, knowledge, and experience relating to Nephron's business that she garnered while working as a sales representative with Nephron, and which she misappropriated and retained on behalf of herself, U.S. Compounding, and Adamis.

127.   U.S. Compounding and Adamis had knowledge of Nephron's existing and prospective business relationships because Hulsey provided this information to them, sometimes in response to specific demands from U.S. Compounding and Adamis.  Specifically, beginning at least in May 2018 and continuing through Hulsey's acceptance of U.S. Compounding's offer of

employment in late July 2018—*i.e.*, during her employment with Nephron—Hulsey repeatedly sent U.S. Compounding and Adamis information, including without limitation confidential, proprietary, and trade secret information, regarding Nephron's existing and prospective customer relationships.

128.    For example, in late June 2018, Hulsey sent U.S. Compounding and Adamis screenshots of showing a list of some of her accounts.  Upon information and belief, Hulsey did so at the direction of U.S. Compounding and Adamis, so they could assess whether Hulsey, if hired as a sales representative, could bring new customers to U.S. Compounding and Adamis.

129.    In July 2018, shortly before U.S. Compounding and Adamis extended an offer of employment to Hulsey, she informed them that a potential customer she had been pursuing on behalf of Nephron had contacted her regarding a purchase of Nephron's 503b products.  Hulsey promised U.S. Compounding and Adamis that she would "try to hold them off for now," to which U.S. Compounding and Adamis responded with enthusiasm.

130.    Hulsey intentionally, wrongfully, maliciously, and without justification interfered with Nephron's existing or prospective business relationships with these identifiable customers and prospective customers.  Specifically, upon information and belief, Hulsey has used and continues to use Nephron's confidential, proprietary, and trade secret information, as well as other information, knowledge, and experience specifically relating to Nephron's business Hulsey garnered during her employment with Nephron, in order to interfere with Nephron's existing business relationships by inducing Nephron customers to order from U.S. Compounding and Adamis, and in order to interfere with Nephron's prospective business relationships by postponing orders by new customers that Hulsey had pursued on behalf of Nephron during her employment and diverting those customers to U.S. Compounding and Adamis.

131.    By way of example, after starting employment with U.S. Compounding and Adamis, Hulsey interfered with Nephron's existing and prospective customer relationships in at least the following ways:

    a.  On one or more occasions, Hulsey contacted Nephron customers, reminding them that they had met when she was with Nephron, and telling the customers that U.S. Compounding offered "significantly lower pricing" than Nephron on several specific products.  Hulsey's interference has caused specific Nephron customers, who otherwise would have continued to order those products from Nephron, to order those products from U.S. Compounding and Adamis.  In particular, Hulsey's interference and improper undercutting of Nephron's prices induced Nephron customer MH to purchase certain products from U.S. Compounding and Adamis that it otherwise would have purchased from Nephron, causing Nephron to lose tens of thousands of dollars in sales.

    b.  On one or more occasions, Hulsey requested authority from U.S. Compounding and Adamis to offer existing Nephron customers lower prices than what she knew (because of her theft of Nephron's confidential, proprietary, and trade secret information) Nephron was charging.  Upon information and belief, Hulsey needed to seek such authority because she wanted to offer prices lower than what U.S. Compounding normally charged for certain products in order to undercut Nephron's pricing.  By doing so, Hulsey induced longstanding, loyal Nephron customers to stop purchasing products from Nephron and instead purchase such products from U.S. Compounding and Adamis.

c.  At least one longstanding Nephron customer opened an account with U.S. Compounding after meeting with Hulsey, despite having previously expressed satisfaction with Nephron's products and a reluctance to abandon the Nephron relationship.

132.    Nephron had legal rights in its business relationships with existing customers, based upon longstanding business relationships, customer satisfaction, and recurring orders over the course of months or years.  Consequently, there was a reasonable probability that these customers would continue to purchase from Nephron.

133.    Nephron had legal rights in its relationships with prospective Nephron customers, including without limitation its relationship with the prospective customer identified by Hulsey in her July email to U.S. Compounding and Adamis, in that the prospective customer had contacted Hulsey regarding an actual, contemplated purchase of Nephron products.

134.    As a result of Hulsey's knowing, deliberate, and unlawful interference, including by deliberately undercutting Nephron's pricing, Nephron lost sales because customers who otherwise would have purchased from Nephron were wrongly induced to give their business to U.S. Compounding and Adamis. .

135.    Hulsey's interference with Nephron's existing and prospective business relationships has proximately caused Nephron to suffer damages, including without limitation hundreds of thousands of dollars in lost sales.

136.    U.S. Compounding and Adamis are vicariously liable for Hulsey's interference with Nephron's existing and prospective business relationships under the doctrine of *respondeat superior* because, upon information and belief, Hulsey's intentional and unjustified interference with such relationships was undertaken with express or apparent authority as an employee and

46

agent of U.S. Compounding and Adamis, and was within the scope of her employment with U.S. Compounding and Adamis.  In fact, and upon information and belief, U.S. Compounding and Adamis tracked the number of accounts Hulsey "flipped" from Nephron to U.S. Compounding and Adamis.

137.    Upon information and belief, U.S. Compounding and Adamis had knowledge of, and expressly encouraged and continues to encourage, Hulsey's intentional, wrongful, malicious, and unjustified interference with Nephron's existing or prospective contractual relationships with Nephron's identifiable customers and prospective customers including, without limitation, one of Nephron's current hospital customers in Nebraska.  More specifically, upon information and belief, U.S. Compounding and Adamis have sanctioned and encouraged Hulsey's use of not only Nephron's confidential, proprietary, and trade secret information, but also other information, knowledge, and experience relating to Nephron's business that she garnered while working as a sales representative with Nephron, for the specific purpose of interfering with these numerous identifiable business relationships in order to solicit those customers via phone, email, and other communication methods to do business with U.S. Compounding and Adamis and not Nephron.

138.    As a direct and proximate result of Defendants' tortious interference with Nephron's existing and prospective contractual relationships, Nephron is entitled to recover its damages from Defendants in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

139.    Nephron is also entitled to an award of punitive damages due to the willful and intentional actions of Hulsey, U.S. Compounding, and Adamis.

**FOR A SEVENTH CAUSE OF ACTION**
**(Intentional Interference with Advantageous Relationships)**
**(Nephron FL Against U.S. Compounding and Adamis)**

140.    The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

141.    Nephron FL's NDA with Hulsey is a valid and binding contract and advantageous business relationship under which Nephron FL had and has legal rights.

142.    In addition, Nephron FL and Hulsey's at-will employment relationship was an advantageous business relationship under which Nephron FL had and has legal rights.

143.    Upon information and belief, U.S. Compounding and Adamis had actual and/or constructive knowledge of the existence and terms of the NDA with Hulsey, including, without limitation, Hulsey's contractual obligation prohibiting the disclosure or use of Nephron's confidential and proprietary information including, without limitation, its trade secrets, to any third party unrelated to her job duties at Nephron FL.

144.    Upon information and belief, U.S. Compounding and Adamis had actual and/or constructive knowledge of the existence of Hulsey's at-will employment relationship with Nephron FL.

145.    More specifically, and upon information and belief, U.S. Compounding and Adamis encouraged and/or aided and/or interfered with, and/or were willfully blind to, Hulsey's misappropriation of Nephron's confidential and proprietary information including, without limitation, its trade secrets, in violation of her obligations under the NDA.

146.    Furthermore, and upon information and belief, U.S. Compounding and Adamis encouraged and/or aided and/or was willfully blind to, Hulsey's wrongful use of Nephron's confidential and proprietary information including, without limitation, its trade secrets, on behalf

48

of both herself as well as U.S. Compounding and Adamis, in violation of Hulsey's obligations under the NDA and in violation of statutory and common law.

147.    U.S. Compounding's and Adamis's interference with Nephron FL's and Hulsey's business relationship described above was intentional and unjustified.

148.    U.S. Compounding's and Adamis's interference with Nephron and Hulsey's business relationship was without justification or excuse, but was instead committed in an effort to unfairly compete against Nephron in its business

149.    As a direct and proximate result of U.S. Compounding's and Adamis's tortious interference with Nephron FL's advantageous business relationships, Nephron FL has suffered and will continue to suffer actual damages.

150.    As a direct and proximate result of U.S. Compounding's and Adamis's tortious interference with Nephron FL's advantageous business relationships, Nephron FL is entitled to recover its damages from U.S. Compounding and Adamis in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

151.    Nephron FL is also entitled to an award of punitive damages due to the willful and intentional actions of U.S. Compounding and Adamis.

**FOR AN EIGHTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(By All Plaintiffs Against Defendants)**

152.    The allegations contained in paragraphs 1-78 are repeated, realleged, and reasserted as if fully set forth verbatim herein.

153.    Hulsey, U.S. Compounding, and Adamis entered into a civil conspiracy, the illegal goals of which were to (1) misappropriate Nephron's confidential, proprietary, and trade secret information; (2) interfere with Nephron's existing and prospective business relationships;

49

(3) breach the NDA by disclosing Nephron's confidential information, contrary to Hulsey's contractual obligations; and (4) breach the common law duty of loyalty Hulsey owed to Nephron as her employee.

154.    Defendants initiated this conspiracy while Hulsey was still employed by Nephron and subject to legal and contractual obligations to Nephron, including without limitation the NDA and the common law duty of loyalty.

155.    In the course of this civil conspiracy, Defendants committed several unlawful and overt acts as detailed above, including, upon information and belief and without limitation, U.S. Compounding and Adamis directing Hulsey to download and misappropriate Nephron's confidential, proprietary, and trade secret information prior to and contemporaneous with her beginning employment with U.S. Compounding and Adamis; Hulsey's wrongful retention and use of this information for her own personal gain and for the benefit of U.S. Compounding and Adamis; Defendants' efforts to recruit other Nephron employees to work for U.S. Compounding; and Hulsey's attempt to "hold off" a prospective Nephron customer so that U.S. Compounding and Adamis would receive the order.  .

156.    As a direct and proximate result of Defendants civil conspiracy, Nephron has suffered and will continue to suffer actual damages.

157.    As a direct and proximate result of Defendants' conspiracy against Nephron, Nephron has suffered and will continue to suffer special damages specific to the civil conspiracy including, but not limited to, reputational damage, loss of goodwill, expenses to protect its interests, and emotional and mental distress to Nephron's employees due to Hulsey's betrayal and the conspiracy itself.

50

158.    As a direct and proximate result of Defendants' civil conspiracy, Nephron is entitled to recover its damages from Defendants in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

159.    Nephron is also entitled to an award of punitive damages due to the willful and intentional actions of Defendants.

**WHEREFORE**, Plaintiffs Nephron Pharmaceuticals Corporation, Nephron S.C., Inc., and Nephron Sterile Compounding Center LLC, having fully complained, pray for judgment against Defendants Jennifer Shelly Hulsey, U.S. Compounding Inc. d/b/a U.S. Compounding Pharmacy, and Adamis Pharmaceuticals Corporation with the following particular relief:

(1)    That the Court issue an Order granting Nephron's Motion for a Preliminary and Permanent Injunction;

(2)    That Nephron be provided a jury trial on all claims asserted herein;

(3)    That Nephron be awarded actual, compensatory, consequential, and special damages in an amount to be determined at trial;

(4)    That Nephron be awarded punitive damages;

(5)    That Nephron be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(6)    That Nephron be awarded prejudgment interest; and

(7)    That Nephron be awarded such other and further relief as this Court deems just and proper.

**[SIGNATURE BLOCK FOLLOWS]**

Respectfully submitted,

NEPHRON PHARMACEUTICALS
CORPORATION, NEPHRON S.C.,
INC., AND NEPHRON STERILE
COMPOUNDING CENTER LLC

By their attorneys,

Date:  July 1, 2019                     *s/ Mary Ruth Houston*
                                        Mary Ruth Houston, Esq. (Fl. Bar No. 0834440)
                                        Jaclyn S. Clark, Esq. (Fl. Bar No. 117652)
                                        SHUTTS & BOWEN LLP
                                        300 South Orange Avenue, Suite 1600
                                        Orlando, FL 32801
                                        Telephone: (407) 835-6939
                                        Facsimile: (407) 425-8316
                                        E-mail: mhouston@shutts.com
                                        E-mail:  sferguson@shutts.com

                                        *Admitted pro hac vice*
                                        Nikole S. Mergo
                                        NEXSEN PRUET, LLC
                                        1230 Main Street, Suite 700 (29201)
                                        Post Office Drawer 2426
                                        Columbia, SC  29202
                                        Phone:  803.771.8900
                                        Facsimile:  803.727.1429
                                        nmergo@nexsenpruet.com

                                        Jennifer S. Cluverius
                                        NEXSEN PRUET, LLC
                                        55. E. Camperdown Way, Suite 400
                                        Phone:  (864) 370-2211
                                        Facsimile (864) 282-1177
                                        Greenville, SC 29601
                                        jcluverius@nexsenpruet.com

## <u>CERTIFICATE OF SERVICE</u>

On this 1st day of July, 2019, the undersigned counsel hereby certifies that a copy of the foregoing documents has been electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all counsel of record.

/s/  Mary Ruth Houston

Mary Ruth Houston

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Nephron Pharmaceuticals Corporation, Nephron S.C., Inc., and Nephron Sterile Compounding Center LLC, | Civil Action No. 6:18-cv-1574-Orl-31KRS |
| Plaintiffs, | |
| vs. | |
| Jennifer Shelly Hulsey and U.S. Compounding Inc. d/b/a U.S. Compounding Pharmacy, | |
| Defendants. | |

## <u>VERIFICATION</u>

The undersigned, Henry J. Jibaja, Jr., being duly sworn, deposes and says that he is the Chief Information Officer for Nephron Pharmaceuticals Corporation, Nephron S.C., Inc., and Nephron Sterile Compounding Center LLC. The undersigned states that he has read the foregoing Verified Complaint, has personal knowledge of the contents thereof, and that said Verified Complaint is true to the best of his knowledge, except as matters stated therein to be alleged on information and belief, and as to those matters, he is informed and believes that they are true.

I, **Henry J. Jibaja**, hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this _1st__ day of July, 2019.

Signature: _____

Print Name: HENRY J. Jibaja