**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

NEPHRON PHARMACEUTICALS
CORPORATION, NEPHRON S.C., INC. and
NEPHRON STERILE COMPOUNDING
CENTER LLC,

            *Plaintiffs,*

    vs.

JENNIFER SHELLY HULSEY and U.S.
COMPOUNDING, INC., d/b/a US
COMPOUNDING PHARMACY and
ADAMIS PHARMACEUTICALS
CORPORATION,

            *Defendants.*

Case No. 6:18-cv-1573-Orl-31LRH

**DEFENDANTS U.S. COMPOUNDING, INC. AND ADAMIS PHARMACEUTICALS**
**CORPORATION'S MOTION TO EXCLUDE THE**
**OPINIONS OF CARRIE L. DISTLER**

Pursuant to Federal Rules of Civil Procedure 403 and 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[1] Defendants U.S. Compounding, Inc. ("USC") and Adamis Pharmaceuticals Corporation ("Adamis," and collectively, "Defendants") move to exclude the opinions of Plaintiffs' designated expert Carrie L. Distler.

## BACKGROUND

The background of this case is laid out in detail in Defendants' Motion for Summary Judgment and Statement of Undisputed Material Facts.[2] Stated succinctly, this case is premised on Plaintiffs' allegations of misappropriation of trade secrets by Shelly Hulsey (Plaintiffs' former employee) and Defendants' alleged use of alleged trade secrets in connection with Hulsey's employment at USC.[3] Three claims remain: (1) violation of the Federal Defend Trade Secrets Act (Count I), (2) violation of the Florida Uniform Trade Secrets Act (Count III), and (3) tortious interference (Count VII).[4]

On May 8, 2020, Plaintiffs designated Carrie L. Distler as their damages expert.[5] Ms. Distler issued two reports: (1) the May 8, 2020 Report (the "May Report");[6] and (2) the July

---

[1] 509 U.S. 579 (1993).

[2] *See* Docs. 107 & 108 (refiled in unredacted form at Docs. 118-1 and 118-2).

[3] *See generally* Doc. 74. However, for the reasons set forth in Defendants' Motion for Summary Judgment, Plaintiffs are unable to create any issues of material fact with respect to the claims remaining against Defendants. *See* Doc. 107 (refiled in unredacted form at Doc. 118-1).

[4] *See* Docs. 74 & 82. Plaintiffs' alleged breach of nondisclosure agreement (Count II) also remains pending, but it is not currently at issue because the claims against Hulsey have been stayed. *See* Doc. 90.

[5] *See* **Exhibit 1**, May 8, 2020 Report of Carrie L. Distler.

[6] *See generally* **id.** The May Report contained an appendix identifying documents Ms. Distler purportedly relied upon in connection with her report. *See id.* at App'x B. Some of these documents had not been previously produced in discovery. Ms. Distler then updated her May Report on May 13, 2020, to remove the documents that had not been produced in discovery. **Exhibit 2**, Supplemental Appendix B to May Report. Plaintiffs claimed the removed documents were not relied upon by Ms. Distler in the May Report because they were "irrelevant." Yet, these documents—which Plaintiffs eventually produced to Defendants on May 15, 2020—are items Hulsey forwarded from her Nephron email account to her personal email accounts supporting Hulsey's contention that she transferred a number of personal items from her Nephron laptop shortly prior to her departure from Nephron.

8, 2020 Rebuttal Report (the "July Report").[7] Ms. Distler offers two theories of Plaintiffs' alleged damages: (1) disgorgement, and (2) a royalty.[8]

### 1.   Ms. Distler's Disgorgement Opinion[9]

First, Ms. Distler limits her disgorgement opinion by collectively valuing only *four* of the twenty-six alleged misappropriated trade secrets.[10] Ms. Distler then analyzes the revenues for five pharmaceutical 503(b) compounding drugs sold by both Plaintiffs and USC ("Five Primary Drugs") and identifies the revenues she claims are subject to disgorgement by applying three additional criteria:[11] (1) USC sales made to customers where Hulsey had stored customer information (which Plaintiffs refer to as "Customary Summary Compilations") on an external hard drive; (2) USC's sales from a list Hulsey provided to Gus Fernandez (a USC employee) that identified Hulsey's "pretty good accounts"; and (3) USC sales to customers where USC had not made a sale of the Five Primary Drugs in the twelve months preceding Hulsey's USC employment.[12] Ms. Distler identifies revenues from nineteen USC customers subject to disgorgement despite the undisputed fact that Hulsey only sold to *six* of those nineteen customers at USC.[13] After factoring in costs, Ms. Distler opines Plaintiffs are entitled to $351,527 in disgorgement damages.[14]

---

[7] *See generally* **Exhibit 3**, July 8, 2020 Rebuttal Report of Carrie L. Distler.

[8] **Exhibit 1** at ¶ 11.

[9] *Id.* at § VII.

[10] *Id.* at ¶ 31, App'x C; **Exhibit 4**, Deposition Transcript of Deposition of Carrie L. Distler ("Distler Depo.") at 120:13–23.

[11] **Exhibit 1** at ¶¶ 12, 36, 43–47.

[12] *Id.* at ¶¶ 12, 44–47. As referenced below, despite explaining that such criteria were applied in a sequential fashion in the May Report, Ms. Distler did not in fact apply her criteria in the way she explained in the May Report. *Id.* at ¶¶ 44–48; **Exhibit 4**, Distler Depo. at 132:4–142:22.

[13] **Exhibit 1** at ¶ 48, Table 6, Schedule 3.0; **Exhibit 4**, Distler Depo. at 200:4–9. The sales to the thirteen remaining customers were made by Prodigy, who is not a party to this litigation. **Exhibit 1** at Table 6, n.114.

[14] **Exhibit 3** at ¶ 51, Schedule 12.0. Alternatively, Ms. Distler opines that if revenues from six customers are subject to disgorgement instead of nineteen customers, Plaintiffs are entitled to $44,177 to $80,135 in

Ms. Distler also opines to additional disgorgement "specifically related to Ms. Hulsey's alleged wrongdoing" in the amount of $77,184, which accounts for wages earned by Hulsey from Plaintiffs after the alleged misappropriation occurred and commissions earned by Hulsey from the sale of the Five Primary Drugs at USC.[15]

### 2. Ms. Distler's Royalty Opinion[16]

Relying on *University Computing Co. v. Lykes-Youngstown Corp.*,[17] Ms. Distler also opines as to royalty damages by applying a hypothetical negotiation construct for a perpetual license for the purported trade secrets. Ms. Distler utilizes two approaches to calculate a royalty: (1) the Market Approach,[18] and (2) the Income Approach.[19]

In applying the Market Approach, Ms. Distler considers three royalty bases: (1) the 2018 annualized net revenue from forty-nine of Plaintiffs' customers using factors from her disgorgement analysis, yielding approximately $2.75 million;[20] (2) Hulsey's projection that she could make $2.5 million in sales during her first year at USC;[21] and (3) Hulsey's alternative projection that she could make $1.712 million in sales during her first year at USC.[22] Ms. Distler then examines what she deemed to be comparable transactions in the marketplace and

---

disgorgement damages, depending on the costs taken into consideration by the factfinder. *Id.* at ¶ 51, Schedules 11.0–11.1.

[15] **Exhibit 1** at ¶ 13.

[16] *Id.* at § VIII.

[17] 504 F.2d 518 (5th Cir. 1974).

[18] **Exhibit 1** at ¶¶ 85–92, 97–98.

[19] *Id.* at ¶¶ 93–96. Ms. Distler refers to this method as the "Discounted Future Profits Method." *Id.* at p. 43.

[20] *Id.* at ¶¶ 86–87 (explaining that she identified the forty-nine customers by comparing the customers in the "Customer Summary Compilations" and the "List of Pretty Good Accounts"). Again, Ms. Distler utilizes forty-nine customers despite the undisputed fact Hulsey only made sales to *six* customers at USC. *See supra* at n.13.

[21] **Exhibit 1** at ¶¶ 97–98, Table 13.

[22] *Id.*

identified implied revenue and EBITDA multiples to use as the royalty rate.[23] Thus, Ms. Distler opines as to a royalty damages in the range summarized as follows:

| Distler's Royalty Analysis Using Market Approach | | |
|---|---|---|
| **2018 Annualized Revenue from 49 Customers ($2.75M)** | | |
| Revenue Multiple | 1.8x to 1.9x | $4,876,916–$5,188,208[24] |
| EBITDA Multiple | 4.8x to 4.9x | $4,846,533–$4,884,397[25] |
| **Hulsey $2.5M Projection** | | |
| Revenue Multiple | 1.8x to 1.9x | $3,033,493–$3,227,120[26] |
| **Hulsey $1.712M Projection** | | |
| Revenue Multiple | 1.8x to 1.9x | $4,429,750–$4,712,500[27] |

With respect to the Income Approach, Ms. Distler discounts the "estimated future stream of profits from [the forty-nine customers identified in the Market Approach] to their present value as of a June 2018 hypothetical negotiation date."[28] Ms. Distler started with the revenues from the forty-nine customers as identified in her Market Approach—$2.75 million.[29] She then uses a customer attrition rate of 9.5% per year,[30] and, based solely on the suggestion of Plaintiffs' Chief Executive Officer Lou Kennedy and Chief Technology Officer Hank Jibaja, extrapolates that each customer relationship would last ten years.[31] Once she calculated the future revenues from the forty-nine customers over a ten-year period, she deducts certain costs

---

[23] *Id.* at ¶¶ 65–76, 90–91.
[24] *Id.* at ¶ 90, Table 10.
[25] *Id.* at ¶ 91, Table 11.
[26] *Id.* at ¶¶ 97–98, Table 13.
[27] *Id.*
[28] *Id.* at ¶ 93.
[29] *Id.* at ¶ 94.
[30] *Id.*
[31] *Id.*

and discounts the future revenues to present value using a weighted average cost of capital, resulting in a purported royalty value of $5.1 million.[32]

Ultimately, Ms. Distler opines that a royalty in this case should be "no less than $4.5 million and likely closer to $5.0 million."[33]

## LEGAL STANDARD

Federal Rule of Evidence 702 provides: "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" four conditions are met:

    (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)  the testimony is based on sufficient facts or data;

    (c)  the testimony is the product of reliable principles and methods; and

    (d)  the expert has reliably applied the principles and methods to the facts of the case.[34]

Under Rule 702, a court must act as a "gatekeeper," admitting expert testimony only if it is both reliable and relevant,[35] to ensure that "speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation expert testimony."[36] The proponent of the expert testimony bears the burden of satisfying these *Daubert* and Rule 702 requirements.[37] "Finally, even expert testimony that passes muster under Rule 702 may be excluded if irrelevant or if 'its probative value is substantially

---

[32] *Id.* at ¶¶ 95–96.
[33] *Id.* at ¶¶ 14, 109.
[34] Fed. R. Evid. 702; *see also Daubert*, 509 U. S. 579.
[35] *McDowell v. Brown*, 392 F.3d 1283, 129 (11th Cir. 2004).
[36] *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation marks omitted).
[37] *Id.* at 1292.

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"[38]

## ARGUMENT

### 1.  Ms. Distler's opinion as to disgorgement damages related solely to Hulsey is not relevant and should be excluded.

Ms. Distler offers an opinion regarding disgorgement damages "specifically related to Ms. Hulsey's alleged wrongdoing"[39] in the form of the commissions Hulsey earned at USC and Hulsey's earnings from her employment at Nephron in the total amount of $77,184.[40] Ms. Distler, however, testified this component of her opinion does not apply to damages attributable to Defendants' alleged wrongful conduct:

> Q: [A]re you going to tell the jury and is it your opinion that that $77,184 should be attributable to USC and Adamis?
>
> A: As I sit here, I am — I do not believe so, you know, based on the footnote in my report around that dollar amount being inclusive within the disgorgement calculation that I provided for USC and Adamis and Miss Hulsey together.
> . . . .
>
> Q: So in other words, you do not plan on — you're not going to issue an opinion to the jury that USC and Adamis are liable for $77,184 due to the unjust enrichment as referenced in paragraph 12 of your report?
>
> A: As I sit here today, to the extent that Dr. Wiggins and I would differ on what revenues would be subject to disgorgement, potentially. But to the extent that the jury were to award unjust enrichment on all of the defendants based on my analysis in 7B, then no, I would not.[41]

---

[38] *Mamani v. Sanchez Berzain*, No. 07-22459-CIV, 2018 WL 1090546, at *2 (S.D. Fla. Feb. 28, 2018) (quoting Fed. R. Evid. 403).
[39] **Exhibit 1** at ¶ 13.
[40] *See* **Exhibit 1** at ¶¶ 13, 50–52; **Exhibit 3** at ¶¶ 10, 52.
[41] **Exhibit 4**, Distler Depo. at 108:22–109:6; 109:23–110:9.

Ms. Distler's opinion as to disgorgement damages that, according to her, solely flow from Hulsey is neither relevant to the claims made against Defendants nor collectible from Defendants given the undisputed fact that no amount of money could possibly be "disgorged" by Defendants. Accordingly, it is irrelevant, confusing to the factfinder, and prejudicial to allow Ms. Distler to testify as to disgorgement damages that are not attributable to USC or Adamis during a trial in which the claims against Hulsey are stayed and therefore not at issue. This portion of her opinion should therefore be excluded.[42]

### 2. Ms. Distler's opinion as to damages related to Plaintiffs' claim for tortious interference (Count VII) should be excluded.

Neither of Ms. Distler's two theories of damages (disgorgement or royalty) are applicable to a claim for tortious interference.[43] "An integral element of a claim of tortious interference with a business relationship requires *proof of damage to the plaintiff* as a result of the breach of the relationship."[44] Thus, compensatory damages for a claim of tortious interference are limited to lost profits which reflect damages actually incurred by the plaintiff.[45] Because Ms. Distler has not identified any legally recoverable damages for Plaintiffs' tortious

---

[42] *See* Fed. R. Civ. P. 403 & 702; *Giraldo v. City of Hollywood Fla.,* 142 F. Supp. 3d 1292, 1303 (S.D. Fla. 2015).

[43] *Intelsat Corp. v. Multivision TV LLC*, No. 10-21982-CIV, 2010 WL 5437261, at *6 (S.D. Fla. Dec. 27, 2010) (denying unjust enrichment damages for tortious interference claim and holding the proper measure of damages is lost profits); *see also KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 F. App'x 591, 601–02 (11th Cir. 2006) (stating that lost profits was the appropriate measure of damages on a claim of tortious interference); *Eclipse Med.*, *Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1355–56 (S.D. Fla. 1999) (noting the requirement of "proof of damage *to the plaintiff*") (emphasis added); *accord Acuity Brands, Inc. v. Bickley*, No. CV 13-366-DLB-REW, 2017 WL 1426800, at *32 (E.D. Ky. Mar. 31, 2017) (recognizing that a claim for tortious interference is limited to standard tort damages); *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 232 (5th Cir. 1986).

[44] *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1091 (11th Cir. 1994) (emphasis added).

[45] *See Intelsat Corp.*, 2010 WL 5437261, at *6. Moreover, unlike Plaintiffs' claims for misappropriation, Plaintiffs did not plead entitlement to disgorgement or royalty damages for their tortious interference claim. *Compare* Doc. 74 at ¶¶ 87, 104; *with* Doc. 74 at ¶ 150.

interference claim, her opinion as to any tortious interference damages is irrelevant and should be excluded.

Ms. Distler should also be precluded from offering an opinion as to damages flowing from Plaintiffs' claim for tortious interference for the additional reason that her damages opinions are not tethered to any actionable interference and are therefore speculative and unreliable. As laid out in Defendants' Motion for Summary Judgment, Plaintiffs' claim for tortious interference is entirely premised on the alleged misappropriation of Plaintiffs' alleged trade secrets, which is preempted by Plaintiffs' claim under the Florida Uniform Trade Secrets Act.[46] Thus, to the extent Plaintiffs attempt to base their claim for tortious interference on some other unpled set of allegations, Ms. Distler's damages analysis makes no mention of any such allegations or the potential economic damages flowing therefrom.[47] Instead, both of Ms. Distler's damages theories are linked to the alleged misappropriation, which is the only conduct forming the basis of Plaintiffs' claim for tortious interference.[48] As such, Ms. Distler's opinion will not assist the factfinder in determining Plaintiffs' damages on a claim for tortious interference, and her opinions should be excluded.

### 3.  Ms. Distler should be precluded from offering an opinion on royalty damages.

Royalty damages are available only in the alternative to and instead of actual damages or damages for disgorgement. Under both the Federal Defend Trade Secrets Act and the Florida

---

[46] *See* Doc. 107 at 1–3 (refiled in unredacted form at Doc. 118-1).
[47] *See generally* **Exhibit 1** & **Exhibit 3**.
[48] *See* **Exhibit 1** at ¶ 11 ("I have calculated damages resulting from *the alleged misappropriation* in two ways: the Defendants' unjust enrichment and the Plaintiffs' actual losses in the form of a reasonable royalty.") (emphasis added); *see also id.* at ¶ 27 ("The details regarding the above claims contained in the Third Amended Complaint *all relate to Defendants' alleged misappropriation* of Nephron's trade secrets and/or confidential information.") (emphasis added); **Exhibit 4**, Distler Depo. at 116:15–17 ("I'm assuming misappropriation in the use of the trade secrets, and I'm assuming that they are trade secrets.").

Uniform Trade Secrets Act, a royalty is available "[i]n *lieu of* damages measured by any other methods."[49] Stated differently, a royalty is available only "in the absence of actual loss or unjust enrichment"[50] and not where, as in this case, Plaintiffs have calculated and sought disgorgement as damages.[51]

Because royalty damages are *only* available in the absence of lost profits or disgorgement damages, and Plaintiffs have alleged and Ms. Distler has opined to disgorgement damages, the Court should preclude Ms. Distler from offering an opinion as to royalty damages because it will be misleading and confusing to the factfinder.

## 4. Both Ms. Distler's disgorgement and royalty opinions should be excluded because she failed to apportion damages among the trade secrets Plaintiffs allege were misappropriated.

A fatal flaw to Ms. Distler's opinions is that she failed to assign economic value on a trade-secret-by-trade-secret basis, either in calculating damages for disgorgement or a royalty.[52] Ms. Distler testified as follows:

> Q: So you didn't provide a specific value on an individual basis for any of the alleged trade secrets, did you, either in your unjust enrichment analysis or in your reasonable royalty analysis, is that correct?
>
> A: My analysis did not provide a separate calculation for the Nephron confidential information items that I highlight in this section of my report.[53]

As such, her opinion is insufficient to assist the factfinder in its task of determining damages and should be excluded. In addition to the fact that she did not apportion her damages

---

[49] Fla. Stat. § 688.004; 18 U.S.C. § 1836(b)(3)(B)(ii) (emphasis added).
[50] *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1336–37 (S.D. Fla. 2006); *Selectica, Inc. v. Novatus, Inc.*, No. 6:13-cv-1708-Orl-40TBS, 2015 WL 12843840, at *3 (M.D. Fla. Sept. 30, 2015).
[51] *Indyne, Inc. v. Abacus Tech.*, No. 2011-CA-013914-O, 2014 WL 12591994, at *1 (Fla. Cir. Ct. Oct. 20, 2014).
[52] *See generally* **Exhibit 1**; **Exhibit 4**, Distler Depo. at 126:17–127:23.
[53] **Exhibit 4**, Distler Depo. at 127:15–23.

calculations among the relevant trade secrets for which she offered a damages opinion, significantly, Ms. Distler failed to offer any reasonable basis for lumping the valuation of the trade secrets together. Nor did Ms. Distler offer any methodology by which the factfinder could calculate damages if fewer than all of the twenty-six trade secrets are found to be misappropriated, an issue which is indeed present in this case and relied upon by Ms. Distler throughout her report.[54]

Notwithstanding Ms. Distler admittedly did not apportion the purported damages among the twenty-six alleged trade secrets, Ms. Distler in fact placed a collective, economic value on only four of the twenty-six alleged trade secrets. Given Ms. Distler's admitted lack of apportionment, Ms. Distler's damages opinions are inherently flawed. One of the four alleged trade secrets Ms. Distler collectively values as part of both her disgorgement and royalty analyses are what Plaintiffs refer to as "Customary Summary Compilations," which Ms. Distler recognized USC and Adamis never received.[55] In analyzing the evidence regarding the "Customer Summary Compilations," Ms. Distler solely relied on the expert report of Clark C. Walton, Plaintiffs' computer forensics expert and Rule 30(b)(6) designee, who affirmatively stated he could not conclude that the "Customer Summary Compilations" were ever transferred to USC or Adamis.[56] No other evidence exists that these "Customer Summary Compilations" were ever provided to anyone at USC or Adamis.[57] Because Ms. Distler did not rely on any

---

[54] *See* Doc. 127 at 14 n.84.
[55] **Exhibit 1** at ¶ 31, App'x C.
[56] *Id.* at ¶¶ 8, 31(4), 45 n.107; **Exhibit 4**, Distler Depo. at 123:15–125:7; **Exhibit 6**, Walton Report at p. 3, ¶ C. (opining that forensic records are insufficient to conclusively determine whether and to what extent Hulsey transferred Nephron information derived from those platforms to any USC/Adamis device or network sharing service); **Exhibit 5**, Nephron 30(b)(6) Deposition ("Nephron Depo.") at 209:12–210:11.
[57] *See* Doc. 127 at 14–15 (discussing Plaintiffs' misappropriation claims as they relate to the customer summary compilations and explaining that it is undisputed that this information was not provided to Defendants).

evidence, even disputed evidence, that would even tend indicate that this particular alleged trade secret (of twenty-six alleged misappropriated trade secrets) was ever provided to USC or Adamis, the lumping of four out of twenty-six trade secrets together for the purpose of valuing them either under a theory of disgorgement or royalty is inherently speculative and unreliable.

*LivePerson, Inc. v. [24]7.AI, Inc.*[58] is instructive. There, the court excluded the opinion of the plaintiff's damages expert in a trade secret misappropriation case because "he [did] not apportion trade secret misappropriation damages among particular alleged trade secrets, and offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case."[59] Likewise, in *Ford Motor Co. v. Versata Software, Inc.*,[60] the court rejected an expert's opinion where he failed to apportion damages among several trade secrets alleged to have been misappropriated by the defendant:

> [The expert] failed to apportion [the plaintiff's] alleged damages on a trade-secret-by-trade-secret basis. More specifically, instead of calculating how much [the defendant's] use of each specific trade secret damaged [the plaintiff] on an individual basis, [the expert] calculated a *single* amount of damages that [the plaintiff] allegedly suffered from [the defendant's] misappropriation of *all* of the trade secrets at issue. But the jury will have to make an independent determination—on a trade-secret-by-trade-secret basis—as to whether [the defendant] misappropriated each of the relevant trade secrets. [The expert's] all-or-nothing approach thus does not fit well with the jury's task and poses a substantial risk of confusing and/or misleading the jury. Indeed, if the jury were to conclude that [the defendant] misappropriated less than all of [the plaintiff's] trade secrets (a distinct possibility, if not a likelihood in a hotly-

---

[58] No. 17-CV-01268-JST, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018).

[59] *See also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005); *Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of Cal., Inc.*, No. 2:08-CV-02947-CAS, 2015 WL 3825318, at *12 (C.D. Cal. June 18, 2015) (concluding that an expert's opinion was "fundamentally flawed" because he did not apportion the royalty between multiple trade secrets that were alleged to have been misappropriated).

[60] No. 15-11624, 2018 WL 10733561, at *11 (E.D. Mich. July 9, 2018).

disputed action like this), then [the expert's] damages calculation would not assist the jury in calculating damages and could only serve to confuse them.[61]

Like the experts in *LivePerson* and *Ford*, Ms. Distler offers damages opinions that encompass more than one alleged trade secret and provides no methodology to apportion damages when less than all of the trade secrets have been misappropriated. And, as discussed above, Ms. Distler's opinions are premised upon four trade secrets out of the twenty-six total Plaintiffs allege were misappropriated, one of which Plaintiffs concede was never provided to USC or Adamis. Ms. Distler does not even attempt to tie her damages theories and methodologies to the remaining twenty-two alleged trade secrets. She simply asks the factfinder to bootstrap the remaining twenty-two alleged trade secrets to her calculations specifically related to only four of the trade secrets. This logic is fundamentally flawed and legally unsupported, rendering Ms. Distler's opinions speculative and unreliable.

Ms. Distler's all-or-nothing damages calculations, which provide no methodology for apportionment, should be excluded to avoid misleading and confusing the factfinder.[62] By excluding Ms. Distler's all-or-nothing damages calculations the Court avoids the appreciable risk of an award of damages based on speculation and guesswork. Consequently, because Ms. Distler failed to apportion her damages opinions on a trade-secret-by-trade secret basis or to provide a methodology for the factfinder to apportion the damages, Ms. Distler's opinion as to both disgorgement and royalty damages should be excluded.

---

[61] *Id.*; *see also O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1076–77 (holding that an expert's failure to provide a reasonable basis to determine damages on a trade-secret-by-trade secret basis rendered the expert's opinion useless to the jury and the jury's verdict was based on speculation and guesswork, not evidence).
[62] *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1317 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 2741 (2019).

To the extent the Court permits Ms. Distler to testify despite her lack of apportionment, Ms. Distler's disgorgement and royalty opinions should be limited to the four trade secrets she collectively valued in her May Report, and Ms. Distler should be precluded from opining as to damages flowing from misappropriation of the remaining twenty-two trade secrets identified in Appendix C[63] of her May Report.[64] As stated above, Ms. Distler considered only four of the alleged twenty-six trade secrets in offering her opinion on disgorgement damages.[65] Thus, her disgorgement opinion is only relevant and helpful, if at all, as to those four alleged trade secrets.

Likewise, with respect to Ms. Distler's royalty opinion, and despite the fact that she states that her opinion encompasses all of the trade secrets identified in Appendix C,[66] the only trade secrets she identifies, considers, assigns economic value to, and incorporates into her royalty analysis were the four alleged trade secrets relied upon in connection with her disgorgement analysis:

> Q: All right. So it's your understanding that exhibit—this Appendix C which references the alleged trade secrets, it's your understanding that there are trade secrets and you've been asked to assume that. And then you've also been asked to assume that all of these trade secrets have been misappropriated, is that correct?

---

[63] Notably, Appendix C was created by Plaintiffs for purposes of this litigation. *See* **Exhibit 4**, Distler Depo. at 118:13–119 ("Q: Let's look at Exhibit—I'm sorry, let's look at Exhibit 2, Appendix C. That's your report from May 8th. Who created this list of alleged trade secrets, to your knowledge? A: Well, I'm relying on Exhibit 10 from Miss Kennedy's deposition, so I would defer to her. And then I had it created, like, into a general summary of various aspects. Q: Okay. Now, you're aware that Exhibit 10 to Miss Kennedy's deposition is in fact this document, Appendix C, right, it's the same document? A: Yes. I just don't know if I rearranged any of the bullet points or not."); *see also* **Exhibit 5**, Nephron Depo. at 93:17–23; Doc. 121-6 (Exhibit 10 to Nephron Depo.).
[64] *Id.* at App'x C.
[65] **Exhibit 1** at ¶ 31; **Exhibit 4**, Distler Depo. at 120:13–23 ("Q: Okay. Let's look at your unjust enrichment analysis. For purposes of your unjust enrichment analysis, you already placed economic value on four of the bullet points that are referenced in Appendix C, is that correct? A: I would say I looked at four specific items that are alleged to be part of Nephron's confidential information to tie the unjust enrichment or disclosure of profit that I calculated to the alleged misappropriation and/or use."); *see also id.*, Distler Depo at 120:24–122:11.
[66] **Exhibit 1** at ¶¶ 56, 59 n.134, 101 n.227; **Exhibit 4**, Distler Depo. at 120:1–12.

A: That's the allegation in this matter. I would say that, again, my analysis of economic losses or damages it is tied to, I believe, to just four of the items mentioned within Appendix C.

Q: Okay. And is that for your entire analysis, your reasonable royalty and unjust enrichment, or is that just for one of them?

A: As I discussed in my report the reasonable royalty, *the quantitative benchmarks that I derived are using specific aspects of Appendix C*. But I do state within a reasonable royalty section that it would include the other items.

Q. The license would include the other items, is that correct?

A. Correct, yes.[67]

Because both her disgorgement and royalty opinions are tied only to the four trade secrets identified in Paragraph 31 of her May Report,[68] it would be confusing and misleading to allow Ms. Distler to expand the scope of her opinions to encompass all twenty-six alleged trade secrets outlined in Appendix C—Plaintiffs' own self-serving document outlining the alleged trade secrets they maintain were misappropriated.[69]

## 5.  Any remaining opinions by Ms. Distler should be excluded as unreliable.

Ms. Distler's disgorgement and royalty opinions are also deficient in several respects, which, considered collectively, renders her opinions unreliable. In assessing the reliability of an expert's opinion, "the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the

---

[67] **Exhibit 1** at ¶¶ 85–89 (using a modified analysis as used in her disgorgement theory to identify customer revenues for purposes of valuing Plaintiffs' alleged trade secrets); *see also* **Exhibit 4**, Distler Depo. at 119:12–120:12, 193:13–23.

[68] Ms. Distler only explicitly relies on the "Customer Summary Compilations" and the "List of Pretty Good Accounts" in reaching her royalty opinion. *See* **Exhibit 1** at ¶ 86. Thus, it would even be more appropriate to limit her royalty opinion to these two alleged trade secrets.

[69] Ms. Distler's opinion that only four of the alleged twenty-six trade secrets have value accords with Defendants' Motion for Summary Judgment regarding the limitations of Plaintiffs' evidence. *See* Doc. 107 at 8–15 (refiled in unredacted form at Doc. 118-1); Doc. 127 at 6–7.

facts of the case."[70] Stated differently, there must be a "'valid . . . connection to the pertinent inquiry as a precondition to admissibility.'"[71] Ultimately, "the gatekeeping inquiry must be tied to the facts of a particular case" to properly ensure reliability (and relevance) of the opinion.[72]

### A.  Ms. Distler's disgorgement opinion is unreliable.

*First*, Ms. Distler identifies *nineteen* customers whose revenues are subject to disgorgement.[73] Ms. Distler states that her analysis identifies customers "that could be directly tied to Defendants' alleged misappropriation."[74] But Ms. Distler ignores the undisputed fact that only *six* customers were linked to Hulsey (i.e., customers to whom Hulsey made sales herself as opposed to sales made by non-party Prodigy).[75] Ms. Distler states in the July Report that she did not need to limit her analysis because Plaintiffs allege that USC was provided the alleged trade secrets and there was growth in USC's sales in late 2018 and 2019.[76] But her assertion is speculative because despite whether USC was provided with the alleged trade secrets, there is no evidence that anyone at USC or Adamis circulated or provided such information to Prodigy, a non-party in this litigation.[77] Also, USC's sales growth, standing alone, is not sufficient to link Prodigy's sales to the alleged misappropriation, as the goal of any company that sells products is to increase its sales, including Plaintiffs.

---

[70] *See United States v. Frazier*, 387 F.3d 1244, 1295–96 (11th Cir. 2004).
[71] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).
[72] *Id.* at 150, 152.
[73] **Exhibit 1** at ¶¶ 44–48, Table 6, Schedule 3.0.
[74] *Id.* at ¶ 42.
[75] *See supra* n.13.
[76] **Exhibit 3** at ¶¶ 32–33.
[77] **Exhibit 1** at § VII(B).

Because disgorgement damages must be specifically linked to the alleged wrongdoing,[78] the scope to which the information was shared or used is certainly relevant to and should have been considered in connection with Ms. Distler's disgorgement analysis. The only evidence regarding any alleged dissemination or use of the information ends with Hulsey, it then logically follows that the disgorgement analysis should be limited to the revenues specifically linked to Hulsey. Ms. Distler failed to take into consideration the impact of the actual sales made by Hulsey at USC, therefore her opinion is unreliable and should excluded.

*Second*, the methodology of how Ms. Distler narrowed the original set of 307 customers to nineteen customers as stated in the May Report is plainly incorrect. Ms. Distler outlines a sequential, four-step method she allegedly used to identify the nineteen customers:

> 44.    First, I identified the specific customers that purchased the Five Primary Drugs from USC over the second half of 2018 and 2019. This was approximately 307 customers
>
> 45.    Second, I narrowed the identified USC customers to those for which there was also a Customer Summary Compilation on the Seagate Backup. As previously discussed, Ms. Hulsey printed and transferred various files from her Nephron computer to the Seagate Backup. These files included at least 110 customer-specific reports that originated from Nephron's CRM system (referred to as Customer Summary Compilations in Section VI). . . . I used the Customer Summary Compilations as a further criteria to identify USC's revenues subject to disgorgement. In other words, only those USC sales of the Five Primary Drugs for customers where Customer Summary Compilations were identified were included as USC's revenues subject to disgorgement.
>
> 46.    Third, I further narrowed the identified USC customers using the List of Pretty Good Nephron Accounts that Ms. Hulsey provided to USC. The List of Pretty Good Nephron Accounts consisted of images of 150 of Hulsey's

---

[78] *See Med. Store, Inc. v. AIG Claim Services, Inc.*, 02–80513–CIV, 2003 WL 25669175, at *8 (S.D. Fla. Oct. 17, 2003) (noting that disgorgement damages must be attributable to the misappropriation of the trade secret); *S.E.C. v. Huff*, 758 F. Supp. 2d 1288, 1358 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012) ("Because disgorgement is remedial and not punitive, a court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.").

Nephron customers with customer name and state location and a notation for her best accounts at Nephron. The customers that purchased the Five Primary Drugs from USC, but did not appear on the List of Pretty Good Nephron Accounts Ms. Hulsey provide to USC and Adamis (as well as having a Customer Summary Compilation on the Seagate Backup) were excluded from USC's revenues subject to disgorgement.

47.   Finally, I analyzed USC's historical sales to each identified customer (those included in the List of Pretty Good Nephron Accounts and having a corresponding Customer Summary Compilation) to determine whether the customer was an active or inactive account at USC prior to Ms. Hulsey's employment by USC. . . . USC revenues subject to disgorgement only include revenues from the Five Primary Drugs for USC customers that had not purchased one of the Five Primary Drugs within the twelve-month period prior to Ms. Hulsey's employment at USC.[79]

But when asked at her deposition about how Ms. Distler applied her sequential methodology, Ms. Distler was unable to explain how she applied each step and how many customers she eliminated for each sequential step.[80] Because Ms. Distler was unable to explain the methodology outlined in her May Report, counsel requested that, following the deposition, Ms. Distler provide a more detailed explanation regarding the steps she followed to narrow the original set of 307 customers to the nineteen customers as stated in her disgorgement analysis.[81] On September 11, 2020, Ms. Distler produced a Supplemental Schedule 2.3, purporting to walk through each of the steps of her disgorgement analysis, which also highlighted the fact that her sequential methodology as described in her May Report was wrong.[82]

Indeed, Ms. Distler confirmed in Supplemental Schedule 2.3 that as a result of performing the second step of her methodology, she immediately narrowed 307 customers to

---

[79] *Id.* at ¶¶ 44–47 (footnotes omitted).
[80] **Exhibit 4**, Distler Depo. at 132:4–142:22.
[81] *Id.*, Distler Depo. at 140:18–142:22.
[82] **Exhibit 7**, Supplemental Schedule 2.3 to May Report.

nineteen customers, suggesting that no further steps were required in her analysis.[83] With the third step, comparing the nineteen customers to those on the "List of Pretty Good Accounts," Ms. Distler only eliminated one customer.[84] Finally, applying the fourth step—excluding customers who had not purchased the Five Primary Drugs from USC in the twelve months prior to August 2018—Ms. Distler did not eliminate any customers.[85] Accounting for one customer from January 2020, Ms. Distler thus reached her ultimate conclusion of nineteen customers whose revenues should be subject to disgorgement.[86]

This understanding of Ms. Distler's analysis was not possible from review of the May Report given her unequivocal sequential, four-step methodology as she described in the May Report. Worse yet, Ms. Distler could not explain in her deposition the sequential methodology she purportedly used to arrive at nineteen customers. Thus, the disgorgement analysis as reflected in her May Report is inaccurate. Combined with Ms. Distler's failure to limit her disgorgement analysis to account for the purported "use" of the alleged misappropriated information with respect to six customers, Ms. Distler's incorrect methodology renders her entire disgorgement opinion unreliable.

**B. Ms. Distler's royalty analysis is also deficient and unreliable because the variables she applies are not tied to the facts of the case.**

Here, Ms. Distler's methodology in calculating the royalty failed to account for several important variables and factors, rendering her opinion both unreliable and irrelevant. As a starting point in analyzing Ms. Distler's royalty opinion, it is helpful to understand the goal

---

[83] **Exhibit 1** at ¶ 45; **Exhibit 7** at n.6.
[84] **Exhibit 1** at ¶ 46; **Exhibit 7** at n.6.
[85] **Exhibit 1** at ¶ 47; **Exhibit 7** at n.6.
[86] **Exhibit 1** at ¶ 48; **Exhibit 7** at n.6.

underpinning a reasonable royalty award: "[A] reasonable royalty is simply that amount which the trier of facts estimates a person desiring to use a [trade secret] would be willing to pay for its use and a [trade secret] owner desiring to license the [trade secret] would be willing to accept."[87] Calculations under this approach imagine a "hypothetical negotiation" between the plaintiff and defendant "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before [misappropriation] began."[88] A hypothetical negotiation under *University Computing* must be based on a methodology that is supported by industry practice.[89]

*First*, with respect to the Income Approach, Ms. Distler fails to account for the fact that a reasonable royalty of approximately $5 million would leave USC with no profit, effectively amounting to a royalty rate of 100%. Using the Income Approach, Ms. Distler valued the present value of a revenue stream from forty-nine customers at $5.1 million.[90] Ms. Distler also opined that an appropriate royalty would be "no less than $4.5 million and likely closer to $5.0 million."[91] For a royalty to be a *reasonable* royalty it must leave the hypothetical licensee—here, USC—with some profit.[92] Therefore, Ms. Distler should have factored in some profit to USC in calculating an appropriate royalty rate to formulate a *reasonable* royalty. Instead, Ms. Distler's analysis applies a 100% royalty rate to her Income Approach. Even in a hypothetical negotiation, there is no scenario where a licensee would pay $5 million for a hypothetical

---

[87] *University Computing Co.*, 504 F. 2d at 537 n.31.
[88] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).
[89] *Endress & Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F. Supp. 1123, 1131 (S.D. Ind. 1995).
[90] **Exhibit 1** at ¶¶ 93–96.
[91] *Id.* at ¶¶ 14, 109.
[92] *Alcatel USA, Inc. v. Cisco Sys., Inc.,* 239 F. Supp. 2d 660, 670 n.9 (E.D. Tex. 2002) (quoting *Ga.-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1122 (S.D.N.Y. 1970) ("[T]he very definition of a reasonable royalty assumes that, after payment, the infringer will be left with a profit." (internal quotation marks omitted)).

license for a ten-year incremental profit stream of $5.1 million—which, as a projection of future sales, is inherently speculative. Because any royalty that does not leave the licensee with some appreciable gain is inherently unreasonable, Ms. Distler's opinion is therefore flawed.

*Second*, using the Income Approach, Ms. Distler calculates a royalty using a ten-year lifespan of the customer relationship.[93] Ms. Distler chose the ten-year time frame at the suggestion of Plaintiffs' Chief Executive Officer Lou Kennedy and Chief Information Officer Hank Jibaja and not any reliable evidence:

> In considering the length of such customer relationships, Ms. Kennedy and Mr. Jibaja indicated that due to their extensive relationships with Integrated Delivery Networks ("IDN") and Group Purchasing Organizations ("GPO"), Nephron's customer relationships would be expected to have useful lives in excess of 10 years.[94]

However, as Ms. Distler points out in the July Report, Plaintiffs' IDN and GPO agreements are not exclusive, and, in other words, Plaintiffs' customers are free to purchase from the 503(b) distributor of their choosing.[95] And, on top of that, Plaintiffs have only been in the 503(b) industry since 2017, so there is no factual basis to conclude that the term of the IDN and GPO contracts is reflective of the lifespan of Plaintiffs' customer relationships in the 503(b) segment of its business.[96] Ms. Distler picked the ten-year estimate based solely on Plaintiffs' suggestion and not on any reliable data.[97] Ms. Distler admitted in her deposition she

---

[93] **Exhibit 1** at ¶ 94.

[94] *Id.*

[95] *See* **Exhibit 3** at ¶ 80.

[96] *See* **Exhibit 1** at ¶ 81 (noting that Plaintiffs registered as a 503(b) entity in 2014 but started making sales of 503(b) products in 2017; *accord* **Exhibit 4**, Distler Depo at 196:13–14.

[97] **Exhibit 4**, Distler Depo. at 213:6–214:3 (Ms. Distler testified that although she reviewed about twenty of Plaintiffs' GPO and IDN contracts she did not know how many, if any at all, had a ten-year term); *see also* **Exhibit 1** at ¶ 94.

did not interview any of Plaintiffs' customers.[98] Even setting aside this deficit, the ten-year lifespan Ms. Distler estimates for Plaintiffs' customer relationships is also speculative because it fails to account for various external factors that could impact those relationships, including, but not limited to, new competitors in the marketplace, industry regulations, or developments in the need or use of 503(b) pharmaceuticals. Because this variable is not based on sufficient reliable data,[99] it casts further doubt on the reliability of her royalty opinion.

*Third*, Ms. Distler disregards data that was actually available to her and instead simply used data from an eight-month period for the life of her ten-year revenue stream. Indeed, Ms. Distler had data available to her reflecting Plaintiffs' sales to all of the forty-nine customers for 2018 and 2019,[100] yet she relied on eight months of data from 2018 to extrapolate future revenues for a ten-year period.[101] Additionally, Ms. Distler used a constant profit margin from 2018 for the ten-year period,[102] despite the fact that Plaintiffs' profit margin decreased by ten percent in 2019.[103] Where actual data was available to her or she should have accounted for future variations in such data, Ms. Distler did not consider such data or factor in future fluctuations in her analysis. These oversights only serve to heighten the speculative nature of Ms. Distler's royalty opinion.

---

[98] **Exhibit 4**, Distler Depo. at 171:4–13.

[99] *See Goldberg v. Fla. Int'l Univ. Bd. of Trs.,* No. 18-20813-CIV-MARTINEZ/AOR, 2019 WL 692780, at *2 (S.D. Fla. Feb. 7, 2019) (excluding expert opinion because expert "conducted no independent research, nor any verification or critical assessment of the data provided to him" by the plaintiff); *Ameritox, Ltd. v. Millennium Lab'ys, Inc.,* No. 8:11-cv-775-T-24-TBM, 2014 WL 12623025, at *5 (M.D. Fla. May 29, 2014) (excluding expert opinion given expert was "merely parroting evidence provided to him by" the defendant); *First Premium Servs, Inc. v. Best Western Int'l, Inc.,* No. 95-1466-CIV, 2004 WL 7203535, at *3 (S.D. Fla. Jan. 8, 2004) (excluding expert opinion due to expert's "unquestioning reliance" on the information provided by the plaintiff).

[100] **Exhibit 1** at ¶ 76 n.173, Schedule 10.

[101] *Id.* at ¶ 94 n.208, Schedule 8.0; **Exhibit 4**, Distler Depo. at 201:23–202:23.

[102] **Exhibit 1** at ¶ 95

[103] *Id.* at Schedule 7.0 (showing that Gross Profit was 58.43% in 2018 but decreased to 48.34% in 2019); Schedule 10.0 (using 58.43% Gross Profit for the entire ten-year period).

*Fourth*, similar to her disgorgement analysis, Ms. Distler identifies royalty damages based on revenues from forty-nine customers to use as the royalty revenue base for both the Income Approach and the Market Approach. But Ms. Distler again ignores that only six customers identified in connection with her analyses were linked to Hulsey. With respect to the royalty analysis, a damages expert may consider the licensee's *actual* use of the alleged trade secret in opining as to a reasonable royalty.[104] While the hypothetical negotiation typically considers facts that could have been known at the time of the alleged misappropriation, the hypothetical negotiation construct is entirely theoretical to begin with, thus, in certain circumstances, such as where information about a particular industry or transaction may be lacking, as it is in the present case, actual data post-dating the hypothetical negotiation is relevant to the analysis.[105] Thus, it was improper for Ms. Distler to disregard Hulsey's actual sales in opining as to royalty damages.

*Fifth*, Ms. Distler assumes for purposes of her royalty analysis under both the Market and Income Approaches (to the extent she uses the forty-nine customers as the royalty base) that the hypothetical license would result in Defendants receiving 100% of the revenues from the customers identified as the base for her royalty calculation.[106] As referenced above, Ms. Distler fails to account for the fact that the hypothetical license would not be exclusive, and

---

[104] *See Bianco v. Globus Med., Inc.*, No. 2:12-cv-CV-00147-WCB, 2014 WL 5462388, at *16 (E.D. Tex. 2014) ("[F]actual developments occurring after the date of the hypothetical negotiation can inform the damages calculation."); *Honeywell Int'l. Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005) ("The [hypothetical negotiation] methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.").

[105] Consideration of actual data is particularly appropriate in this case where Plaintiffs have the benefit of a preliminary injunction that prevents use of their alleged trade secrets—which Ms. Distler also failed to account for in her analysis—and Plaintiffs seek permanent injunctive relief. *See* Doc. 74 at ¶¶ 89, 106.

[106] **Exhibit 1** at § VIII, ¶¶ 53–109.

Plaintiffs (and any other competitor) would remain free to compete with USC for sales with the same forty-nine customers, so Defendants would not be receiving the full value of Plaintiffs' relationships with those customers.[107] Ms. Distler provides no metric to account for the non-exclusivity of the hypothetical license.[108] Relatedly, Ms. Distler also fails to account for Plaintiffs' superior position in competing with USC for these same customers due to Plaintiffs' extensive use of GPO and IDN agreements.[109] While such agreements may not exclude Defendants from competing with Plaintiffs, they are an additional hurdle that reduces the value of the customer relationships to Defendants. Ms. Distler provided no method to account for these factors.[110]

*Sixth*, Ms. Distler's reliance on Hulsey's projections for purposes of the Market Approach is unsupported because those projections are completely untethered to any data or reliable methodology. Hulsey provided those projections to USC and Adamis employees during the hiring process to boost her chances of getting hired and they are not tied to any concrete numbers or reasoning.[111] Thus, Ms. Distler's reliance on Hulsey's projections as a basis for calculating royalty damages under the Market Approach are similarly unreliable,

---

[107] *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 6075566, at *6 (W. D. Tex. Apr. 22, 2016) (concluding that nonexclusive nature of the hypothetical license was a necessary factor to consider in the plaintiff's calculation of damages); *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (rejecting the plaintiff's proposed measure of damages because it was based on the total value of the trade secret to the plaintiff and the secret had not been destroyed and plaintiff retained use of the secret).

[108] **Exhibit 3** at ¶ 14 ("That being said, I did not explicitly adjust the calculated value indicators, despite the undisputed competition between USC and Nephron.").

[109] *Id.*

[110] *DataQuill Ltd v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2011) (holding that a damages expert must account for not only technological differences but economic differences in examining comparable transactions).

[111] **Exhibit 1** at ¶¶ 97–98, Tables 12–13.

especially where the actual data Ms. Distler received unequivocally demonstrated Hulsey made significantly less than her speculative self-made projections.

*Seventh*, in applying the Market Approach, Ms. Distler identifies revenue and EBITDA multiples to apply to the various revenue bases for purposes of determining royalty damages.[112] Because Plaintiffs have not previously licensed the alleged trade secrets, Ms. Distler examined standard industrial classification ("SIC") codes, looking at companies within the pharmaceuticals preparations industry (SIC code 2834), and selected four transactions involving acquired companies that she deemed "comparable" to the scope of the hypothetical license in this case for purposes of establishing the multiples:[113] (1) The Harvard Drug Group, LLC; (2) USC;[114] (3) PharMEDium Healthcare Corporation; and (4) PharMEDium Healthcare Holdings, Inc.[115]

However, the scope of the hypothetical license in this case is limited to customers who purchase the Five Primary Drugs.[116] The transactions identified by Distler cover not only companies who sell more than the Five Primary Drugs (USC included), but also cover companies that operate outside the 503(b) segment of the industry entirely (The Harvard Drug Group).[117] Thus, the multiple values, which are intended to reflect the value of the customer relationship, are based on each of these "comparable" businesses as a whole and are not reflective of the value of customers specially related to the 503(b) industry.[118] Ms. Distler also

---

[112] *Id.* at ¶¶ 65–76.
[113] *Id.* at ¶ 72, Table 8. Ms. Distler also limited her inquiry to U.S.-based transactions after 2014. *Id.*
[114] USC is not included in SIC code 2834. *See* **Exhibit 4**, Distler Depo. 177:8–178:11.
[115] **Exhibit 1** at Table 8.
[116] *Id.* at ¶ 86.
[117] *Id.* at ¶¶ 73, Table 8, 76 n.173.
[118] **Exhibit 4**, Distler Depo. at 191:11–22.

fails to demonstrate that Plaintiffs' customer relationship value would be similar to that of the identified transactions, where the customer relationship value of three of the identified companies, with the exception of USC, exceed Nephron's 503(b) yearly revenue by a significant amount.[119] Additionally, none of these involved a transaction between competitors where the buyer could compete with the seller post-transaction.[120] Because these transactions do not capture the value of the scope of the hypothetical license, they are not useful in determining a reasonable royalty for purposes of this case.[121] This is another example where Ms. Distler has failed to link the variables she chose to the specific facts of the present case.

While arguably any one of these flaws in Ms. Distler's analysis, standing alone, might not have been sufficient to render her royalty opinion unreliable, taken in the aggregate, these flaws in Ms. Distler's royalty analysis render it speculative and untethered to the unique facts of this case such that it is unreliable and unhelpful to the factfinder.[122] Accordingly, Ms. Distler's royalty opinion should be excluded.

## CONCLUSION

Because Ms. Distler's opinions are irrelevant, insufficient as a matter of law, or flawed in methodology and therefore unreliable, her opinions as to Plaintiffs' damages related to the remaining claims in this matter should be excluded.

---

[119] **Exhibit 1** at ¶ 73, Table 8.
[120] **Exhibit 4**, Distler Depo. at 185:20–22, 186:8–13.
[121] The very fact that comparable transactions where a competitor licenses its customer information to another competitor do not exist is telling that a reasonable royalty is likely not an acceptable measure of damages in this industry. *Cf. LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188 (S.D.N.Y. 2002) (concluding that a reasonable royalty must be based on royalties that would be acceptable in the industry).
[122] *ChromaDex, Inc. v. Elysium Health, Inc.*, No. SACV1602277CJCDFMX, 2020 WL 1279236, at *8 (C.D. Cal. Jan. 16, 2020) (concluding that expert's opinion was unreliable and should be excluded because too much uncertainty existed surrounding the variables relied upon by the expert).

## **Local Rule 3.01(g) Certification**

Counsel for Defendants conferred with counsel for Plaintiffs regarding the relief requested in this motion. Plaintiffs are **opposed**.

Dated: September 28, 2020

/s/ Scarlett S. Nokes
Scarlett S. Nokes (admitted *pro hac vice*)
Email: snokes@bradley.com
Brandon Bundren (admitted *pro hac vice*)
Email: bbundren@bradley.com
Bradley Arant Boult Cummings LLP
1600 Division Street, Suite 700
Nashville, TN 37203
Telephone: (615) 252-3556
Facsimile: (615) 252-6380

-and-

Jason P. Mehta (Fla. Bar No. 106110)
Email: jmehta@bradley.com
Diana N. Evans (Fla. Bar No. 98945)
Email: dnevans@bradley.com
Bradley Arant Boult Cummings LLP
100 North Tampa Street, Suite 2200
Tampa, FL 33602
Telephone: (813) 559-5500
Facsimile: (813) 229-5946

*Attorneys for U.S. Compounding, Inc. and Adamis*
*Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

   This is to certify that on this 28th day of September, 2020, a copy of the foregoing was filed via CM/ECF, which will provide notice to all counsel of record.

Jennifer S. Cluverius, Esquire
Nexsen Pruet, LLC
55 East Camperdown Way, Suite 400
Greenville, SC  29601
Email:  jcluverius@nexsenpruet.com

Mary Ruth Houston, Esquire
Jaclyn S. Clark, Esquire
Shutts & Bowen, LLP
300 South Orange Avenue, Suite 1600
Orlando, FL  32801
Email:  mhouston@shutts.com
    jclark@shutts.com

Nikole S. Mergo, Esquire
James A. Byars, Esquire
Nexsen Pruet, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, SC  29202
Email:  nmergo@nexsenpruet.com
    jbyars@nexsenpruet.com

James D. Myers, Esquire
Rachael D. Longhofer, Esquire
Shaffer Lombardo Shurin, P.C.
2001 Wyandotte Street
Kansas City, MO  64108
Email:  jmyers@sls-law.com
    rlonghofer@sls-law.com

Michael J. Furbush, Esquire
Dean, Mead, Edgerton, Bloodworth,
Capouano, & Bozarth, P.A.
420 South Orange Avenue, Suite 700
Orlando, FL  32801
Email: mfurbush@deanmead.com

        /s/ *Scarlett S. Nokes*
        Scarlett S. Nokes

27