# Exhibit 1

(seeking leave to file unredacted copy under seal)

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

---

NEPHRON PHARMACEUTICALS CORPORATION, NEPHRON S.C., INC. AND NEPHRON STERILE COMPOUNDING CENTER LLC

Plaintiffs,

v.

JENNIFER SHELLY HULSEY AND U.S. COMPOUNDING, INC., D/B/A US COMPOUNDING PHARMACY AND ADAMIS PHARMACEUTICALS CORPORATION,

Defendants.

**Case No. 6:18-cv-1573-Orl-31LRH**

---

**EXPERT REPORT OF**

**CARRIE L. DISTLER**

*Carrie L. Distler*

---

**May 8, 2020**

**Highly Confidential – Attorneys' Eyes Only**

## TABLE OF CONTENTS

I.     SCOPE OF ASSIGNMENT .......................................................................... 1

II.    PROFESSIONAL CREDENTIALS ........................................................... 1

III.   INFORMATION CONSIDERED ................................................................ 3

IV.    SUMMARY OF OPINIONS ........................................................................ 4

V.     BACKGROUND INFORMATION ........................................................... 5

       A.   503(B) COMPOUNDING .............................................................. 5
       B.   NEPHRON ...................................................................................... 7
       C.   ADAMIS PHARMACEUTICALS ............................................... 8
       D.   U.S. COMPOUNDING .................................................................. 8
       E.   MS. HULSEY .................................................................................. 9

VI.    ALLEGED WRONGDOING ...................................................................... 10

VII.   UNJUST ENRICHMENT ........................................................................... 15

       A.   USC'S SALES TRENDS ................................................................ 15
       B.   USC SALES SUBJECT TO DISGORGEMENT ........................... 20
       C.   MS. HULSEY'S COMPENSATION ............................................. 24

VIII.  REASONABLE ROYALTY ....................................................................... 25

       A.   HYPOTHETICAL NEGOTIATION ............................................. 26
       B.   THE NATURE AND EXTENT OF THE USE THE DEFENDANT INTENDED FOR THE SECRET. ............................................................................. 27
       C.   THE RESULTING AND FORESEEABLE CHANGES IN THE PARTIES' COMPETITIVE POSTURE. ......................................................... 28
       D.   THE PRICES PAST PURCHASERS OR LICENSEES MAY HAVE PAID .............. 31
       E.   THE TOTAL VALUE OF THE SECRET TO THE PLAINTIFF, INCLUDING THE PLAINTIFF'S DEVELOPMENT COSTS AND THE IMPORTANCE OF THE SECRET TO THE PLAINTIFF'S BUSINESS. ............................... 36
       F.   OTHER UNIQUE FACTORS IN THE PARTICULAR CASE WHICH MIGHT HAVE AFFECTED THE PARTIES' AGREEMENT, SUCH AS THE READY AVAILABILITY OF ALTERNATIVES. ........................................ 47
       G.   DETERMINATION OF REASONABLE ROYALTY ................... 47

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## I.      SCOPE OF ASSIGNMENT

1.      Nephron Pharmaceuticals Corporation ("NPC"), Nephron S.C. Inc. ("Nephron SC"), and Nephron Sterile Compounding Center, LLC ("Nephron Compounding") (collectively, "Nephron" or "Plaintiffs") filed the third amended complaint against Jennifer Shelly Hulsey ("Ms. Hulsey"), U.S. Compounding Inc. d/b/a U.S. Compounding Pharmacy ("USC"), and Adamis Pharmaceuticals Corporation ("Adamis") (collectively, the "Defendants") on July 1, 2019 ("Third Amended Complaint").[1]   I understand the remaining claims seek damages and injunctive relief stemming from Defendants' alleged misappropriation of Nephron's trade secrets and/or confidential information, Ms. Hulsey's alleged breach of a non-disclosure agreement executed on June 17, 2015 (the "Hulsey NDA"), and USC's and Adamis' alleged intentional interference with Nephron's relationships with Ms. Hulsey.[2]

2.      FTI has been retained by Plaintiff's counsel, Nexsen Pruet, LLC ("Counsel"), to assist the trier-of-fact with determining damages in this matter.  In rendering my opinions, I assume that the Defendants are liable solely for the purpose of evaluating the amount of damages.  I offer no opinion relating to liability elements in this matter.

## II.     PROFESSIONAL CREDENTIALS

3.      I am a Senior Managing Director for FTI Consulting, Inc. ("FTI"), a multi-disciplinary, global business advisory firm.  At FTI, I am a member of FTI's Forensic and Litigation Consulting Practice and serve on the leadership team for the National Intellectual Property Practice.  I have been identified for the last five years as a leading patent litigation expert witness by *Intellectual Asset Management magazine's Patent 1000 – The World's Leading Patent Professionals* guide.

4.      I have analyzed economic and financial issues in numerous commercial and intellectual property disputes and have conducted complex studies of damages; and I have worked

---

[1] Third Amended Complaint, p. 1.
[2] Third Amended Complaint, pp. 10-13 and 25-32, Exhibit A; Order filed August 19, 2019 dismissing Counts IV, V, VI, and VIII of the Third Amended Complaint.

EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    Page 1 of 51

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

on over 100 projects related to the calculation of damages in matters involving breaches of contract, destruction of business claims, interference with economic relationships, intellectual property infringements or misappropriations, and personal injury / employment termination / wrongful death claims. In calculating damages, I have performed numerous lost profits and lost wages calculations that have entailed forecasting future earnings streams, analyzing costs and cost structures, discounting future earnings streams, and analyzing relevant markets and competitive influences. I have also calculated damages in the form of the infringer's or defendant's unjust enrichment, serving both to analyze and identify the revenue at issue and the relevant costs to earn such revenue for determining the appropriate amount of profits to disgorge. Finally, I have opined on reasonable royalties for use of assets subject to infringement or misappropriation.

5.      In addition, I have assisted Fortune 500 corporations and smaller companies to create, acquire, manage, protect, and extract value from intellectual property assets; and I have provided guidance to clients related to intellectual property transactions (*e.g.*, licensing, due diligence, and valuation) and performed services related to improvement and creation of intellectual property-related business processes (*e.g.*, licensing-in technologies).

**6.**      I graduated *Magna Cum Laude* from the University of Missouri with a Bachelor of Arts degree in Economics and subsequently received a Master of Arts degree in Economics from the University of Missouri. I am also a member of the Licensing Executives Society.

7.      **Appendix A** further describes my professional credentials, including disclosures as required under Federal Rules of Civil Procedure Rule 26(a)(2)(B). FTI is being compensated for its work in this matter at an hourly rate of $450 for all professionals working on this engagement under my direction. The amount of fees is not contingent upon the opinions expressed herein or the outcome of this matter.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## III.    INFORMATION CONSIDERED

8.      During the course of my work in this matter, I have examined documents provided to me by Counsel and other information I obtained from public sources.  A listing of the specific documents I considered and/or received is contained in the attached **Appendix B**.  In conjunction with my report, I have reviewed trial and/or deposition testimony of the following individuals:

- Ms. Hulsey – Former Nephron and current USC 503(B) Sales Representative;
- Jessica Lane ("Ms. Lane") – Former Nephron and current USC 503(B) Sales Representative;
- Robert Hopkins ("Mr. Hopkins") – Chief Financial Officer at Adamis and Chief Operating Officer at USC;
- Clay Guinn ("Mr. Guinn") – Former Director of Sales for USC;
- Gus Fernandez ("Mr. Fernandez") – Former Sales Manager for Adamis;
- Lou Kennedy ("Ms. Kennedy") – Chief Executive Officer at Nephron;
- Hank Jibaja ("Mr. Jibaja") – Chief Information Officer at Nephron; and
- Clark C. Walton ("Mr. Walton") – Digital Forensics Expert for Nephron.

9.      I have also held conversations with the following individuals:

- Ms. Kennedy; and
- Mr. Jibaja.

10.      This report, including the opinions and conclusions reached herein, are based on my review of documents, both public and produced in connection with this matter, the depositions and discussions mentioned above, as well as my knowledge, education, experience, and training. I reserve the right to update, amend, and/or supplement my opinions if additional pertinent information comes to light.  Also, in connection with my anticipated testimony in this action, I may use as exhibits, documents produced in this litigation, including those listed in **Appendix B**, which refer to or relate to the matters discussed in this report.  I may also create or assist in the creation of certain demonstrative exhibits to assist me in testimony.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## IV.    SUMMARY OF OPINIONS

11.    As discussed in **Section VI**, Ms. Hulsey is accused of misappropriating substantial amounts of Nephron's Confidential Information[3] for the benefit of Defendants in this matter.  I have calculated damages resulting from the alleged misappropriation in two ways: the Defendants' unjust enrichment and the Plaintiffs' actual losses in the form of a reasonable royalty.

12.    To assess the Defendants' unjust enrichment from the allegations in this matter,[4] I evaluated Defendants' revenues generated through the alleged misappropriation and/or use of Nephron's Confidential Information.   As discussed in **Section VII**, my evaluation of the Defendants' revenues focuses on five specific drugs for specific hospitals  based on the following criteria:

1)    USC sales made to customers where Ms. Hulsey had stored confidential customer information on an external hard drive from Nephron's customer relationship management ("CRM") system;

2)    USC sales from the customer list Ms. Hulsey provided to Mr. Fernandez that identified Ms. Hulsey's "pretty good accounts"[5] at Nephron; and

3)    USC sales to customers where USC had not made a sale of the five drugs in the twelve months preceding Ms. Hulsey's employment with USC.

After applying these criteria, USC revenues subject to disgorgement from September 2018 through January 2020 would be no less than approximately $1.1 million.[6]

13.    I also consider additional unjust enrichment specifically related to Ms. Hulsey's alleged wrongdoing.  This component of unjust enrichment includes two sources of compensation:

1)    Wages Ms. Hulsey earned from Nephron in the months she is alleged to have misappropriated and/or used Nephron's Confidential Information; and

2)    Commissions generated by Ms. Hulsey from the sale of the five drugs to USC customers.

---

[3] Confidential Information is defined in **Section VI**.
[4] Per the DTSA:  "any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss" (18 U.S. Code § 1836(b)(3)(A) - (B)).
[5] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 20.
[6] **Section VII.B**.  As discussed in **Section VII.B**, USC generated significant growth of these five specific drugs across more hospitals than those included in the unjust enrichment calculation.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

I estimate additional unjust enrichment specifically related to Ms. Hulsey's alleged wrongdoing of approximately $77,184.[7]

14.     With respect to Nephron's actual losses, such losses are measured as the benefits that Nephron should have received had the Defendants approached Nephron for a license to use the Confidential Information; *i.e.*, the revenues that Nephron was forced to forego by the Defendants' alleged unauthorized use of Nephron's Confidential Information.[8]  As discussed in Section **VIII**, utilizing the Court's proposed framework for the hypothetical negotiation of a license for trade secrets in *University Computing Co. v. Lykes-Youngstown Corp*,[9] it is my opinion that the reasonable royalty the parties would have agreed to for rights to disclose and/or use the Confidential Information would have been no less than $4.5 million and likely closer to $5.0 million.

## V.     BACKGROUND INFORMATION

### A.  503(B) Compounding

15.     Drug compounding is the process of combining, mixing, or altering ingredients to create a medication tailored to the needs of an individual patient.[10] Drugs are compounded for patients who cannot otherwise be treated with a Food and Drug Administration ("FDA") approved medication, such as a patient with an allergy to a certain dye that is used in the standard version of an FDA-approved medication.[11]  There are two types of drug compounding pharmacies: 503(A) and 503(B).  503(A) pharmacies provide patient-specific compounded prescriptions for home use, whereas 503(B) Compounding Outsourcing Facilities (herein referred to as "503(B) Outsourcing

---

[7] **Section VII.C**.
[8] Per the DTSA: "in lieu of damages measured by other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret" (18 U.S. Code § 1836(b)(3)(A) - (B)).
[9] University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. Ga. 1974).
[10] 'Compounding and the FDA: Questions and Answers', p. 1.
[11] 'Compounding and the FDA: Questions and Answers', p. 1.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Facility(ies)" or "503(B) Pharmacies")[12] provide large batches of these compounded medications for general use in physicians' offices, clinics, and hospitals.[13]

16.     503(B) Pharmacies are a category of compounders established in 2013 by the Drug Quality and Security Act.[14] These facilities are regulated by the FDA through strict Current Good Manufacturing Practices ("CGMP") guidelines, the same quality standards required of pharmaceutical manufacturers.[15] Under these standards, 503(B) Pharmacies must adhere to minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product,[16] as well as test every batch of medication for endotoxins, sterility, and potency.[17] I understand 503(B) Pharmacies often manufacture products to specifically address drug supply shortages.[18]

17.     While general pharmacies are common throughout the country, 503(B) Pharmacies are less common. Of the approximate 56,000 community-based pharmacies in the country, only about 7,500 specialize in compounding services, and of those, less than 80 are approved by the FDA.[19]  As of September 2019, there were 77 FDA registered 503(B) Pharmacies.[20]

---

[12] 503(B) Outsourcing Facilities and 503(B) Pharmacies are considered the same by the FDA, per http://www.wellsrx.com/503a-vs-503b-compounding-pharmacies/.
[13] https://www.olympiapharmacy.com/blog/what-is-a-503b-pharmacy/;
   https://www.compoundingcenter.com/503a-503b-compounding-pharmacy/.
[14] 'Compounding and the FDA: Questions and Answers', p. 2.
[15] https://www.olympiapharmacy.com/blog/what-is-a-503b-pharmacy/.
[16] https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-
   regulations/.
[17] https://www.olympiapharmacy.com/blog/what-is-a-503b-pharmacy/.
[18] https://healthtrustpg.com/thesource/pharmacy/pharmacy-operations/compounding-safety/.
[19] https://www.olympiapharmacy.com/blog/what-is-a-503b-pharmacy/.
[20] Registered Outsourcing Facilities by the FDA, updated as of September 6, 2019.

EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## B. Nephron

18.     Nephron is a privately-owned company with over 650 employees that is headquartered in West Columbia, South Carolina.[21] I understand Nephron, Inc. was formed on October 20, 2014 to hold interest in Nephron's wholly owned subsidiaries, which include 1) NPC (and its wholly-owned subsidiaries Nephron IC/DISC, Inc. and Loose Screw Construction, LLC) and 2) Nephron SC (and its subsidiary Nephron Compounding).[22]

19.     Nephron started as a developer and manufacturer of inhalation solution and suspension products that help patients with respiratory ailments, such as asthma.[23] I understand Nephron received FDA approval for its first drug in 1997 and has since focused on leading the industry in safety and quality, with a commitment to innovation through automation.[24] Nephron is renowned for its blow-fill-seal ("BFS") manufacturing process, a technology that allows a vial of medication to be formed, filled, and sealed in a continuous process without human intervention in a sterile, enclosed area.[25]

20.     In July 2014, Nephron became a registered 503(B) Outsourcing Facility.[26]  In 2017, it became licensed in all 50 states as a 503(B) Outsourcing Facility.[27] The Nephron 503(B) Outsourcing Facility is located in West Columbia, South Carolina[28] and is organized as a subsidiary (Nephron Compounding) under Nephron SC.[29] Being licensed as a 503(B) Outsourcing Facility allows Nephron to deliver pre-filled syringes and other sterile medications to hospitals, surgery centers, physicians' offices, and medical facilities across the U.S. to help mitigate drug

---

[21] https://www.nephronpharm.com/careers.
[22] NEPH0001366366 – 397 at 375.
[23] https://www.nephronpharm.com/.
[24] https://www.nephronpharm.com/about/.
[25] https://www.readysc.org/nephron/.
[26] https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.  I understand the initial date of registration is the date the FDA determined that the initial registration information submitted was complete.
[27] https://www.nephronpharm.com/about/company-history.
[28] https://www.nephronpharm.com/news/nephron-503b-outsourcing-facility-provides-ups-next-day-air-saverr-delivery-drug-shortage/.
[29] NEPH0001366397 at 375.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

shortages.[30] Nephron distributes its products among retail pharmacies, mail order pharmacies, hospitals, home care companies, and long-term care facilities.[31]

### C. Adamis Pharmaceuticals

21.    Adamis is a public company founded in 2006 with headquarters in San Diego, California.[32] Adamis is a specialty biopharmaceutical company that develops and commercializes pharmaceutical products in the areas of respiratory and allergy conditions.[33] On March 29, 2016, Adamis entered into a merger agreement to acquire USC, after which USC became a subsidiary of Adamis.[34]

### D. U.S. Compounding

22.    USC is a subsidiary of Adamis and is located in Conway, Arkansas.[35] USC is an FDA registered 503(B) Outsourcing Facility that provides compounded medications to physician clinics, hospitals, and surgery centers across the country and is licensed in all 50 states.[36] Its initial date of registration as a 503(B) Outsourcing Facility was in December 2013.[37] USC's product offerings include, among others, corticosteroids, hospital outsourcing products, sterile injectables, and topical compounds.[38]

---

[30] https://www.nephronpharm.com/outsourcing; Deposition of Lou Kennedy, dated February 28, 2020, p. 62.
[31] https://www.readysc.org/nephron/.
[32] http://www.adamispharmaceuticals.com/about/.
[33] http://www.adamispharmaceuticals.com/.
[34] https://www.globenewswire.com/news-release/2016/03/29/823567/0/en/Adamis-Pharmaceuticals-Announces-Agreement-to-Acquire-US-Compounding.html.
    http://www.adamispharmaceuticals.com/customized-medications/.
[35] https://uscompounding.com/.
[36] http://www.adamispharmaceuticals.com/customized-medications/
[37] https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.  I understand the initial date of registration is the date the FDA determined that the initial registration information submitted was complete.
[38] http://www.adamispharmaceuticals.com/customized-medications/.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### E.  Ms. Hulsey

23.    Ms. Hulsey was hired by Nephron in 2002 as a sales representative.[39]  While at Nephron, Ms. Hulsey's job duties included selling Nephron products to hospitals, physicians, surgery centers, and home care companies in her designated territory.[40]  Ms. Hulsey's sales territory at Nephron fluctuated over time, but generally included Missouri, Kansas, Nebraska, Colorado, North Dakota, South Dakota, Montana, Iowa, and Idaho.[41]    Nephron sales representatives, including Ms. Hulsey, were instructed as part of their job duties to become familiar with their customers' and customer prospects' pharmacy and respiratory departments and to record customer and prospective customer interactions into Nephron's CRM database.[42]  I understand Ms. Hulsey also had access to Nephron's Power BI system, which was an analytics tool used by Nephron to organize and visualize data, including data in Nephron's CRM.[43]

24.    On May 7, 2018, Ms. Hulsey contacted USC regarding employment opportunities at another 503(B) Pharmacy.  Ultimately, Ms. Hulsey began employment at USC starting on Monday, August 20, 2018.[44]  Ms. Hulsey's official last day at Nephron was Friday, August 24, 2018, five days after starting her employment with USC,[45] indicating that she was simultaneously employed and held activated resources (*i.e.*, computers) from both Nephron and USC for a minimum of five days.[46]

25.    Ms. Hulsey is currently employed by USC as a sales representative.[47]  Ms. Hulsey's sales territory has primarily been comprised of Missouri, Kansas, Nebraska, and Colorado;[48] however, Ms. Hulsey also has customers outside of her sales territory, including customers in

---

[39] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 24.
[40] Deposition of Lou Kennedy, dated February 28, 2020, p. 26.
[41] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 29.
[42] Deposition of Lou Kennedy, dated February 28, 2020, pp. 84 – 85.
[43] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 85 – 86.
[44] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 54, 163-164, Exhibit 37.
[45] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 176.
[46] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 26, 177 - 178.
[47] Deposition of Robert Hopkins, dated January 7, 2020, p. 32.
[48] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 28.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Montana and California. Ms. Hulsey testified at her deposition that supervisors at USC allow sales representatives to branch out beyond their assigned territories.[49]

## VI.    Alleged Wrongdoing

26.    I understand Plaintiffs are seeking damages and injunctive relief stemming from the following remaining claims in the Third Amended Complaint:[50]

1) Violation of the Federal Defend Trade Secrets Act ("DTSA") by all Defendants (Count I);

2) Breach of Contract by Ms. Hulsey (Count II);

3) Violation of the Florida Uniform Trade Secrets Act ("FUTSA") by all Defendants (Count III); and

4) Intentional Interference with Advantageous Relationships against USC and Adamis (Count VII).

27.    The details regarding the above claims contained in the Third Amended Complaint all relate to Defendants' alleged misappropriation of Nephron's trade secrets and/or confidential information.[51]  Below I discuss the terms of the Hulsey NDA that Plaintiffs allege were breached as well as my understanding of the trade secrets and/or confidential information that Plaintiffs allege was misappropriated.

28.    On July 15, 2017, Ms. Hulsey entered an Employee Confidentiality and Non-Disclosure Agreement with Nephron (previously defined as Hulsey NDA).[52]  The Hulsey NDA included a clause that defined confidential information as follows:[53]

> *"Confidential Information" means any information made available to or disclosed by Nephron to Employee, either directly or indirectly, prior to or after the date hereof, in writing, orally or by inspection of tangible objects, or otherwise acquired by Employee in connection with such employment, including, without limitation, Nephron's business plans, methods of operation, ingredients, formulae, compositions, sample products, customer data, customer*

---

[49] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 29.
[50] Third Amended Complaint, pp. 25-32; Order filed August 19, 2019 dismissing Counts IV, V, VI, and VIII of the Third Amended Complaint.
[51] Third Amended Complaint, pp. 25-32.
[52] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 32 and Exhibit 1.
[53] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, Exhibit 1.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

> names or information, vendor names or information, distributor
> names or information, designs, documents, drawings, accounting of
> financial records, financial analysis, hardware, inventions, market
> information, marketing plans, marketing strategies, new materials
> research, technological data, technological prototypes, processes,
> products, product plans, research and development information and
> strategies, services, specifications, recipes, methods, trade secrets,
> copyrights, works of authorship or any information which is the
> subject of a patent or patent application.  Confidential Information
> also includes, without limitation, information and/or documents or
> other similar items of the nature described above and disclosed to
> Employee by a third party, or that have been provided to Nephron
> by a third party, whether pursuant to a license, agreement or
> otherwise.

29.     Under the section outlining the obligations of Ms. Hulsey, the Hulsey NDA states:[54]

> Employee agrees, during the term of his/her employment with
> Nephron and any time thereafter, (a) to hold the Confidential
> Information in strict confidence, (b) not to disclose the Confidential
> Information to anyone other than Nephron employees who have a
> need to know as part of their job duties, (c) not to use the
> Confidential Information for any purpose other than in connection
> with his/her employment and for the benefit of Nephron only; and
> (d) not to reverse engineer, disassemble or decompile any
> hardware, prototypes, software, formulae, or other tangible objects
> which embody Confidential Information... Employee agrees not to
> copy any Confidential Information or remove any Confidential
> Information from Nephron's office locations, manufacturing
> facilities and/or computer systems, except as expressly authorized
> in writing by Nephron's President and Chief Executive Officer, Lou
> Kennedy.

30.     Plaintiffs allege that Ms. Hulsey breached the above provisions in the Hulsey NDA
by failing to return all Nephron property and customer records following her resignation and by
disclosing confidential and proprietary information, including trade secrets, to USC, Adamis, and
other third parties.[55]

---

[54] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, Exhibit 1.
[55] Third Amended Complaint, pp. 28-29.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

31.     Nephron identified the trade secrets it alleges were used or misappropriated in its response to Defendants' 30(b)(6) topic number 7.[56]  A listing of all the confidential and trade secret information that Plaintiffs allege were used and/or misappropriated by Defendants can be found in **Appendix C** (herein referred to as "Confidential Information").  While **Appendix C** indicates that numerous compositions of information and analyses are alleged to have been used or misappropriated by Defendants, for the purpose of my analysis of Defendants' unjust enrichment (**Section VII**), I consider four specific examples presented below.[57]

1)  "Hospital Customer Lists": Plaintiffs assert that Defendants misappropriated and/or used a customer list compilation identifying approximately 160 of Nephron's best hospital customers for 503(B) medications in Ms. Hulsey's former sales territory.[58]  As one such example of a customer list, on June 28, 2018, Ms. Hulsey sent images of 150 accounts, including hospital name and state location with a notation representing Ms. Hulsey's best accounts to Mr. Fernandez, Sales Manager at Adamis, ("List of Pretty Good Nephron Accounts").[59]  Mr. Fernandez then shared the List of Pretty Good Nephron Accounts provided by Ms. Hulsey with Mr. Guinn, Director of Sales at USC,[60] and with Kendra Williams ("Ms. Williams"), Commercial Analyst and Sales Support at USC.[61]  Ms. Williams cross-matched this listing of Nephron's customers to USC's internal customer database.[62]  Using the cross-matching analysis, Ms. Williams also populated an Excel spreadsheet that she titled "Shelly's Accounts", where she provided information on the status of the account at USC.[63]

---

[56] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10.
[57] As discussed in **Section VIII**, the additional Confidential Information contained in **Appendix C** would be considered when analyzing the reasonable royalty the two parties would have agreed to for all the Confidential Information that is alleged to have been used and/or misappropriated.
[58] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10.
[59] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 37 at USC024026 – 028.
[60] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 37 at USC024026 – 028.
[61] Deposition of Clay Guinn, dated October 25, 2019, p. 168, Exhibit 5.
[62] Deposition of Gus Fernandez, dated November 6, 2019, pp. 106-108.
[63] Deposition of Clay Guinn, dated October 25, 2019, pp. 169-171, Exhibit 37, Exhibit 37 e-mail attachment (USC024030).  My review of the "Shelly's Accounts" spreadsheet put together by Ms. Williams indicates that there were four customers that were included in Ms. Hulsey's snapshot images (Exhibit 37 at (USC0024026 - 028), but not included in the spreadsheet prepared by Ms. Williams (Exhibit 37 at USC024030): 1) ███████████████, 2) ███████████████████, 3) ███████████  and 4) ████████████████.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

2) <u>"503(B) Sales Summary by Product"</u>: Plaintiffs assert that Defendants misappropriated and/or used a compilation of Nephron sales data listing Ms. Hulsey's monthly sales for each Nephron product since the inception of Nephron's 503(B) program through June 2018, including product name, presentation, unit volume, and total revenue by month.[64] On June 13, 2018, Ms. Hulsey sent an e-mail to Mr. Fernandez and Mr. Guinn with a spreadsheet attached containing 503(B) Sales Summary by Product, which she described as her "*sales volumes at Nephron Pricing for the Products you offer…from the start of business 1/2017.*"[65] The document included strength, units, and revenues by month for the following products in various strengths: 1) Ephed, 2) Glyco, 3) Neo, 4) Pheny, and 5) Succs.[66]

On July 2, 2018, after stating that he spent time with Ms. Hulsey on her projections that were based on Ms. Hulsey's month by month sales volumes and pricing at Nephron,[67] Mr. Fernandez noted in an e-mail to Mr. Guinn that the pricing Ms. Hulsey was able to capture at Nephron "caught his attention."[68] Mr. Fernandez also asked Mr. Guinn if he had ever heard of pricing this high, to which Mr. Guinn responded that he had not.[69]

3) <u>503(B) Sales Volume and Revenue by Product ("Saleable Inventory")</u>: Plaintiffs assert that Defendants misappropriated and/or used a compilation of Nephron sales data related to Nephron's annualized sales volume and revenue for the 503(B) products and related presentations that were also sold by Defendants, as well as potential new products.[70] On June 25, 2018, Ms. Hulsey provided to Mr. Guinn a document titled "Saleable_Inventory_CONFIDENTIAL.xls", where Ms. Hulsey included dollar and unit volumes of one-half of her current sales at Nephron, by product.[71] The next day, Mr. Guinn forwarded that information on to Mr. Fernandez.[72] Similar to the 503(B) Sales Summary by Product, this spreadsheet is isolated primarily to the Five Primary Drugs (defined in ¶ 36 below).[73] Additionally, Ms. Hulsey included three additional products[74] she sold at

---

[64] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10.
[65] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 11, Exhibit 11 e-mail attachment (ADAMIS0030).
[66] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 11 e-mail attachment (ADAMIS0030). There is also a hidden column in the native file that calculated the average price per unit (ADAMIS0030). The shortened names of these drugs are consistent with the Five Primary Drugs defined in ¶ 36 below.
[67] Deposition of Gus Fernandez, dated November 6, 2019, p. 117.
[68] Deposition of Gus Fernandez, dated November 6, 2019, p. 116, Exhibit 23.
[69] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 24.
[70] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10.
[71] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.
[72] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.
[73] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19 at ADAMIS003091.
[74] Diazepam and unique strengths of Neostigmine and Succinylcholine that USC was not already selling.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Nephron, stating that these products would be "*popular products to have included in your catalog.*"[75]

4) "Customer Summary Compilations": Plaintiffs assert that Defendants misappropriated and/or used a compilation of 100+ customer summaries exported from Nephron's CRM and/or Power BI databases.  Each customer-specific summary lists specific information related to Nephron's sales relationship with that customer, including such information as the customer name, all customer contacts and related contact information, contracted pricing by product, historical sales volume and revenue data, and sales representative notes related to the customer relationship as entered in Nephron's CRM by Nephron's salespeople.[76]

Based on the preliminary expert report of Mr. Walton, I understand that between May and August of 2018, Ms. Hulsey transferred information to a Seagate Backup hard drive from her Nephron computer ("Seagate Backup") and accessed a backup copy of such information subsequently on Defendants' devices.[77]  Moreover, Mr. Walton identified that Ms. Hulsey accessed the Seagate Backup from her USC/Adamis Surface device on the morning of August 24, 2018 and that forensic data showed her also operating her Nephron Surface device that same morning.[78]  Among other things, the Seagate Backup contained customer information sheets that included information consistent with the Plaintiffs' allegations discussed above for 110 customers (which Mr. Walton identified were transferred to the Seagate Backup in May 2018).[79] Mr. Walton also identified that the collection of information Plaintiffs are representing as a copy of the Seagate Backup was created on September 13, 2018 ("Seagate Expansion").[80]

32.     While there is additional information Plaintiffs allege was used and/or misappropriated by Defendants, considering only the information discussed above, the Defendants had Confidential Information that would have allowed Defendants to know Ms. Hulsey's specific Nephron customers and contact information, the quantities of the Five Primary Drugs Ms. Hulsey sold to those Nephron customers, the strengths and pricing of such drugs, and detailed notes from Ms. Hulsey's previous interactions with such Nephron customers.  Access to such information could yield significant insight and advantages, previously unique to Nephron, that other competitors trying to sell the Five Primary Drugs would not have known.

---

[75] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19 at ADAMIS003091.
[76] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10.
[77] Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, ¶ 6a.
[78] Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, ¶ 6b.
[79] **Schedule 1.0**; Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, ¶ 22.
[80] Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, ¶ 6a.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## VII.    Unjust Enrichment

33.     I understand Plaintiffs may be entitled to any profits obtained by Defendants from their alleged wrongdoing.  Furthermore, I understand that under the relevant legal statutes, it is Plaintiffs' responsibility only to identify the revenues generated by the Defendants' alleged wrongdoing, while it is the Defendants' burden to determine the relevant costs and deductions from such revenues.[81]   In that regard, I have developed an estimate of the Defendants' unjust enrichment generated through the use of the allegedly misappropriated Confidential Information.

### A.  USC's Sales Trends

34.     I analyzed USC's sales of 503(B) products – the category of pharmaceuticals sold by Ms. Hulsey at Nephron and at USC.  USC's revenues from sales of 503(B) products in 2017, 2018, and 2019 are summarized in the table below.

**Table 1: USC 503(B) Revenues, 2017 - 2019**[82]

|                      | 2017          | 2018          | 2019          |
|----------------------|---------------|---------------|---------------|
| 503(B) Revenues      | $  9,211,478  | $  10,558,776 | $  14,377,656 |
| *Y-o-Y Growth ($)*   |               | $  1,347,298  | $  3,818,880  |
| *Y-o-Y Growth (%)*   |               | *14.6%*       | *36.2%*       |

35.     Ms. Hulsey commenced employment with USC in late August 2018.  USC's 503(B) sales increased by approximately $3.8 million in 2019, an increase of more than 36% compared to 2018.[83]   As discussed in **Section VI** above, the 503(B) Sales Summary by Product and Saleable Inventory documents provided by Ms. Hulsey to senior management at USC and Adamis included pricing and anticipated sale conversion information which was focused on the Five Primary Drugs Ms. Hulsey sold to Nephron's customers.[84]   Ms. Hulsey also communicated

---

[81] Should the Defendants identify costs to be applied to the Defendants' revenues resulting from the alleged wrongdoing at a later date, I reserve the right to review and analyze these values.
[82] USC0034968.
[83] Defendants also produced revenues for January 2020.
[84] See "503(B) Sales Summary by Product" and "Saleable Inventory" items discussed in **Section VI**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

to Mr. Fernandez and Mr. Guinn that she expected to be able to "turn over" or convert $2.5 million of Nephron's revenues (which, as presented in the 503(B) Sales Summary by Product and Saleable Inventory documents, were principally from the Five Primary Drugs)[85] to USC in the first twelve months after switching companies.[86]   In addition to being the focus of Ms. Hulsey's communications with USC and Adamis, the Five Primary Drugs were also a majority of her sales at Nephron.[87]

36.   Therefore, I performed additional analyses of USC's sales of these drugs (herein defined as the "Five Primary Drugs"):

1)   Ephedrine Sulphate Injection ("Ephedrine") – a drug used for the treatment of hypotension occurring in the setting of anesthesia;[88]

2)   Glycopyrrolate Injection ("Glycopyrrolate") – a drug used to lower secretions, such as saliva, in surgery;[89]

3)   Neostigmine Methylsulfate Injection ("Neostigmine") - a drug used as a cholinesterase inhibitor for the reversal of non-depolarizing neuromuscular blocking agents after surgery;[90]

4)   Phenylephrine HCL Injection ("Phenylephrine") – an adrenergic receptor agonist that increases blood pressure in adults with hypotension resulting from vasodilation from septic shock or anesthesia;[91] and

5)   Succinylcholine Chloride Injection ("Succinylcholine") – a drug used to calm muscles during surgery and while on a breathing machine.[92]

37.   Ms. Hulsey began providing Nephron's Confidential Information to USC and Adamis in June 2018, including the 503(B) Sales Summary by Product[93] and the Saleable Inventory spreadsheet where Ms. Hulsey identified specific products she thought she could "turn over" in the first twelve months after changing companies.  In June 2018, Ms. Hulsey also shared

---

[85] See "503(B) Sales Summary by Product" and "Saleable Inventory" items discussed in **Section VI**.
[86] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 11.
[87] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 11 (ADAMIS003099).  Removing the filter in the native version of Exhibit 11 Provides Ms. Hulsey's total sales, of which over 75% relate to the Five Primary Drugs.
[88] https://www.drugs.com/pro/ephedrine-sulphate-injection.html.
[89] https://www.drugs.com/cdi/glycopyrrolate-injection.html.
[90] https://www.drugs.com/pro/neostigmine-methylsulfate-injection.html.
[91] https://www.drugs.com/pro/phenylephrine-hydrochloride-injection.html.
[92] https://www.drugs.com/cdi/succinylcholine.html.
[93] This included the strengths and pricing of products Ms. Hulsey sold at Nephron.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

the List of Pretty Good Nephron Accounts which included a listing of 150 of her "pretty good" and "best" customers at Nephron.[94]  The table below identifies USC's total sales of the Five Primary Drugs for the first and second halves of 2017 and 2018.

**Table 2: USC 503(B) Revenues Half-Year Growth Comparisons, 2017 - 2018[95]**

|  | 1H 2017 | 2H 2017 | 1H 2018 | 2H 2018 | 1H Growth '17 to '18 | 2H Growth '17 to '18 |
|---|---|---|---|---|---|---|
| Ephedrine | $    119,196 | $    157,629 | $    201,207 | $    265,110 | 68.8% | 68.2% |
| Glycopyrrolate | 379,263 | 402,310 | 423,871 | 635,602 | 11.8% | 58.0% |
| Neostigmine | 307,121 | 273,612 | 374,568 | 549,434 | 22.0% | 100.8% |
| Phenylephrine | 114,891 | 89,945 | 118,144 | 154,144 | 2.8% | 71.4% |
| Succinylcholine Chloride | 348,496 | 323,468 | 395,353 | 618,711 | 13.4% | 91.3% |
| **5-Drug Total** | **$ 1,268,967** | **$ 1,246,963** | **$ 1,513,143** | **$ 2,223,001** | **19.2%** | **78.3%** |
| Other Drugs | $ 3,491,941 | $ 3,203,606 | $ 3,112,978 | $ 3,709,654 | -10.9% | 15.8% |

In the first half of 2018, USC's revenues from sales of the Five Primary Drugs grew by 19% as compared to the first half of 2017, but the revenue growth for the Five Primary Drugs increased to over 78% in the second half of 2018.[96]  It is noteworthy that most of USC's revenue growth in 2018 occurred after Ms. Hulsey began sharing Nephron's Confidential Information with USC and Adamis.

38.     Not only did USC's 503(B) sales increase in the latter half of 2018, nearly all of USC's growth in 503(B) revenues in 2019 was attributable to the Five Primary Drugs.

---

[94] **Section VI**.
[95] **Schedule 2.0**.
[96] **Table 2**.

EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    Page 17 of 51

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## Table 3: Detailed USC 503(B) Revenues Summary, 2017 - 2019[97]

| | 2017 | 2018 | 2019 | Growth '17 to '18 ($) | (%) | Growth '18 to '19 ($) | (%) |
|---|---|---|---|---|---|---|---|
| Ephedrine | $ 276,826 | $ 466,316 | $ 1,005,530 | $ 189,491 | 68.5% | $ 539,214 | 115.6% |
| Glycopyrrolate | 781,573 | 1,059,473 | 1,763,521 | 277,900 | 35.6% | 704,049 | 66.5% |
| Neostigmine | 580,733 | 924,003 | 1,778,223 | 343,270 | 59.1% | 854,221 | 92.4% |
| Phenylephrine | 204,835 | 272,288 | 766,196 | 67,453 | 32.9% | 493,908 | 181.4% |
| Succinylcholine Chloride | 671,964 | 1,014,064 | 1,925,800 | 342,100 | 50.9% | 911,736 | 89.9% |
| **5-Drug Total** | **$ 2,515,930** | **$ 3,736,144** | **$ 7,239,271** | **$ 1,220,214** | **48.5%** | **$ 3,503,127** | **93.8%** |
| Other Drugs | $ 6,695,548 | $ 6,822,632 | $ 7,138,385 | $ 127,085 | 1.9% | $ 315,753 | 4.6% |

Of USC's total 503(B) revenue growth in 2019 of more than $3.8 million, all but approximately $300,000 was from the Five Primary Drugs. USC's revenues from the Five Primary Drugs – which were the majority of Ms. Hulsey's sales at Nephron[98] and were identified to Mr. Guinn as the primary drugs she expected to be able to generate revenues from if she moved to USC[99] – grew by approximately $3.5 million from 2018 to 2019, a growth rate of approximately 94%. By comparison, USC's revenues from sales of other 503(B) drugs grew by approximately $300,000 over the same period, a growth rate of less than 5%.

39.    I also analyzed the growth of USC's revenues from the Five Primary Drugs in Ms. Hulsey's sales region while at Nephron as compared to the growth of USC's revenues of those same drugs in other areas of the United States. In her deposition testimony, Ms. Hulsey identified Missouri, Kansas, Nebraska, Colorado, North Dakota, South Dakota, Montana, Iowa, and Idaho as her sales territory at Nephron.[100] Thus, I analyzed USC's revenues from the Five Primary Drugs in these nine states as compared to the rest of the United States.

---

[97] **Schedule 2.0**.
[98] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 11 (ADAMIS003099). Removing the filter in the native version of Exhibit 11 Provides Ms. Hulsey's total sales, of which over 75% relate to the Five Primary Drugs.
[99] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.
[100] Deposition of Jennifer Shelly Hulsey dated February 11, 2020, p. 29.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

**Table 4: USC Revenue Growth Comparison for Five Primary Drugs –
Hulsey's Nephron Sales Territory vs. Other States Semi-Annually**[101]

|  | 1H 2017 | 2H 2017 | 1H 2018 | 2H 2018 | 1H Growth '17 to '18 | 2H Growth '17 to '18 |
|---|---|---|---|---|---|---|
| Hulsey Sales Region | $ 184,491 | $ 158,691 | $ 193,304 | $ 352,015 | 4.8% | 121.8% |
| Other States | $ 1,084,476 | $ 1,088,272 | $ 1,319,840 | $ 1,870,986 | 21.7% | 71.9% |

**Table 5: USC Revenue Growth Comparison for Five Primary Drugs –
Hulsey's Nephron Sales Territory vs. Other States Annually**[102]

|  | 2017 | 2018 | 2019 | Growth '17 to '18 | Growth '18 to '19 |
|---|---|---|---|---|---|
| Hulsey Sales Region | $ 343,182 | $ 545,318 | $ 1,934,761 | 58.9% | 254.8% |
| Other States | $ 2,172,748 | $ 3,190,826 | $ 5,304,510 | 46.9% | 66.2% |

40.     As shown in the table above, the growth from the first half of 2018 to the second half of 2018 and from 2018 to 2019 demonstrates considerably greater USC growth from the Five Primary Drugs in Ms. Hulsey's prior sales territory at Nephron as compared to the remainder of the United States.

41.     In analyzing the Five Primary Drugs before and after Nephron's Confidential Information was shared with USC and Adamis, it is clear USC's sales of the Five Primary Drugs increased substantially after such information was shared with the Defendants.  Moreover, the growth of the Five Primary Drugs was significantly greater than USC's growth of its other 503(B) drugs.  Additionally, USC's sales of the Five Primary Drugs within Ms. Hulsey's former sales region at Nephron grew substantially more than USC's sales of the Five Primary Drugs over the remainder of the country.  The above analyses suggest that USC benefitted from the allegedly misappropriated Confidential Information.

---

[101] **Schedule 2.1.**
[102] **Schedule 2.1.**

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### B.  USC Sales Subject to Disgorgement

42.      Despite the fact that USC's revenues from sales of these five drugs grew by $3.2 million more in 2019 than USC's revenues from sales of all other 503(B) drugs,[103] I have conservatively assumed that only a portion of the Defendants' revenues would be subject to disgorgement.  To determine which of Defendants' revenues should be subject to disgorgement, criteria was applied that limited USC's revenues to those that could be directly tied to Defendants' alleged misappropriation.

43.      Ms. Hulsey's communications with the Defendants focused on the Five Primary Drugs, the majority of sales made by Ms. Hulsey at Nephron were for the Five Primary Drugs, USC experienced significant growth in the sales of the Five Primary Drugs, and approximately 90% of the USC 503(B) sales generated from accounts assigned to Ms. Hulsey were of the Five Primary Drugs.[104]  Therefore, I focus my analysis of Defendants' unjust enrichment on sales of these Five Primary Drugs.

44.      First, I identified the specific customers that purchased the Five Primary Drugs from USC over the second half of 2018 and 2019.  This was approximately 307 customers.[105]

45.      Second, I narrowed the identified USC customers to those for which there was also a Customer Summary Compilation on the Seagate Backup. As previously discussed, Ms. Hulsey printed and transferred various files from her Nephron computer to the Seagate Backup.[106]  These files included at least 110 customer-specific reports that originated from Nephron's CRM system (referred to as Customer Summary Compilations in **Section VI**).[107]  These Customer Summary Compilations included specific information regarding Nephron's sales relationship with that

---

[103] **Table 3**.
[104] **Schedule 2.2**.
[105] **Schedule 2.3**.
[106] Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, p. 3; Deposition of Jennifer Shelly Hulsey dated February 11, 2020, pp. 68 and 72-74.
[107] **Schedule 1.0**; Deposition of Jennifer Shelly Hulsey dated February 11, 2020, pp. 68 and 77-77; Hulsey Deposition Exhibit 15; Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, Exhibit E identifies files on the Seagate external hard drive, including (as examples) files that have been produced in this matter as HULSEY00006769, HULSEY00006777, HULSEY00006791, and similar reports for many other Nephron customers.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

customer, such as customer name, all customer sales contacts and related contact information, contracted pricing by product, historical sales volume and revenue data, and Nephron's sales representative notes entered in Nephron's CRM, which Ms. Hulsey testified went to the heart of the customer relationship with Nephron.[108]  While the Seagate Backup contained more information than the Customer Summary Compilations, I used the Customer Summary Compilations as a further criteria to identify USC's revenues subject to disgorgement.  In other words, only those USC sales of the Five Primary Drugs for customers where Customer Summary Compilations were identified were included as USC's revenues subject to disgorgement.

46.    Third, I further narrowed the identified USC customers using the List of Pretty Good Nephron Accounts that Ms. Hulsey provided to USC.  The List of Pretty Good Nephron Accounts consisted of images of 150 of Hulsey's Nephron customers with customer name and state location and a notation for her best accounts at Nephron.[109]  The customers that purchased the Five Primary Drugs from USC, but did not appear on the List of Pretty Good Nephron Accounts Ms. Hulsey provide to USC and Adamis (as well as having a Customer Summary Compilation on the Seagate Backup) were excluded from USC's revenues subject to disgorgement.[110]

47.    Finally, I analyzed USC's historical sales to each identified customer (those included in the List of Pretty Good Nephron Accounts and having a corresponding Customer Summary Compilation) to determine whether the customer was an active or inactive account at USC prior to Ms. Hulsey's employment by USC.  According to Mr. Fernandez, accounts at USC were considered active if a sale had been made within the past six months; otherwise, the accounts considered "dead" and were subject to sales representative re-assignment.[111]  USC revenues subject to disgorgement only include revenues from the Five Primary Drugs for USC customers that had not purchased one of the Five Primary Drugs within the twelve-month period prior to Ms. Hulsey's employment at USC.[112]

---

[108] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10; Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 78 – 79.
[109] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 37 at USC024026 – 028.
[110] **Schedules 1.0** and **3.0**.
[111] Deposition of Gus Fernandez dated November 6, 2019, p. 196.
[112] My calculation uses a twelve-month period rather than a six-month period, or twice the number of months that USC itself used to identify "dead" accounts.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

48.    In summary, USC's revenues subject to disgorgement are calculated based on meeting all of the following criteria:

1)    The product sold was one of the five drugs Ms. Hulsey shared sales and pricing information with USC's and Adamis' senior sales managers (503(B) Sales Summary by Product) and identified as the main sources of revenue that she believed she could "turn over" in the first twelve months after changing companies (Saleable Inventory);

2)    The sale was made to a customer for which Ms. Hulsey stored Customer Summary Compilations on the Seagate Backup (Customer Summary Compilations);

3)    The sale was made to a customer on Ms. Hulsey's list of "pretty good accounts" at Nephron and provided to Mr. Fernandez (List of Pretty Good Nephron Accounts); and

4)    USC had not made any sales of the five primary drugs to the customer in the twelve months prior to the start of Ms. Hulsey's employment at USC.

In total, 19 customers of USC met all of these criteria.  For these 19 customers, USC generated revenues totaling $1.1 million over the period September 2018 through January 2020 from sales of the Five Primary Drugs.[113]

---

[113] See **Schedule 3.0**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### Table 6:  USC's Revenues Subject to Disgorgement[114]

| Customer | | Revenues: September 2018 through January 2020 |
|---|---|---|
| ███████ | Hospital | $ 59,271 |
| █████████ | | 49,629 |
| █████ | Medical Center | 73 |
| ██████ | Hospital | 60,093 |
| █████ | Hospital | 26,592 |
| ████ | Medical Center | 26,221 |
| ██████ | Hospital | 83,720 |
| █████████ | | 165,910 |
| ████ | Hospital | 120,710 |
| ███ | Medical Center | 30,527 |
| █████ | Hospital | 6,480 |
| ████ | Hospital - ████ | 2,000 |
| ████████ | | 130,290 |
| █████████ | | 45,042 |
| ████ | Hospital | 31,166 |
| ████ | Hospital - ████ | 218,061 |
| ███ | Medical Center | 36,218 |
| █████ | Hospital | 23,904 |
| ████████ | | 2,131 |
| **Total** | | **$ 1,118,035** |

---

[114] **Schedule 3.0**.  Certain of the customers identified in **Table 6** were internally identified as Prodigy accounts in USC's sales data.  That being said, for 11 of the hospitals identified as Prodigy accounts in the USC sales data ███████████████████████████████████████████████████████████████████████████████████ , Ms. Hulsey alerted Mr. Guinn and Mr. Fernandez in e-mail communications in July 2018 that "*The below account[s] are big volume currently.  They are buying all Neo, Glyco and Succs from Nephron.  I'm pretty close with the person in charge and could very likely get them to switch over if I could possibly take on just those drugs,*" and "*I just wanted to let you know that the below accounts bought 10,140 syringes from [Ms. Hulsey] in June totaling $135,203.  I'm wondering if at this point they no longer purchase from US Compounding*" (Deposition of Clay Guinn, dated October 25, 2019, Exhibits 25 and 26).  Ms. Hulsey testified the information she provided likely came from Nephron's system (Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 141).  An October 12, 2018 e-mail from Ms. Hulsey requested all dead USC accounts for the states of Missouri, Kansas, Colorado, Nebraska, Iowa, South Dakota, and Montana (seven of Ms. Hulsey's former states at Nephron).  Ms. Williams' reply email on October 15, 2018, included five of the customers in **Table 6** (████████████████████████████████████████████ (Deposition of Clay Guinn, dated October 25, 2020, Exhibit 59).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

49.     I understand that under the relevant legal statutes, it is Plaintiffs' responsibility only to identify the revenues generated by the Defendants' alleged wrongdoing, while it is the Defendants' burden to determine the relevant costs and other deductions from such revenues.

### C.  Ms. Hulsey's Compensation

50.     Ms. Hulsey first reached out to USC regarding an opportunity to work for them on May 7, 2018.[115]  In June 2018, Ms. Hulsey began providing Nephron's Confidential Information to USC and Adamis, including the 503(B) Sales Summary by Product,[116] the Saleable Inventory spreadsheet,[117] and the List of Pretty Good Nephron Accounts.[118]  On July 26, 2018, Ms. Hulsey executed her offer letter with USC and began her employment on August 20, 2018.[119]  Ms. Hulsey provided her two-week notice to Nephron of her intention to resign on August 10, 2018, and her official last day was August 24, 2018.  Ms. Hulsey's last day at Nephron was several months after she allegedly shared Nephron's Confidential Information with USC's and Adamis' management and nearly a month after she accepted USC's employment offer.  Moreover, Ms. Hulsey was actively employed and held active resources (*i.e.*, computers) from both Nephron and USC for at least five days.[120]

51.     Ms. Hulsey was compensated by Nephron from June 2018 through August 24, 2018, the period over which she is alleged to have shared Confidential Information in breach of the Hulsey NDA.  Ms. Hulsey testified she earned $114,000 in wages and commissions from USC in 2019, which was approximately $200,000 less than her compensation at Nephron (Ms. Hulsey estimated that USC paid her $100,000 less in both base salary and commissions).[121]  For the purpose of calculating the relevant portion of Ms. Hulsey's compensation, I assume Ms. Hulsey's June 13, 2018 e-mail  to Mr. Fernandez and Mr. Guinn was the first time she shared Nephron's

---

[115] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 54-55, Exhibit 8.
[116] This included the strengths and pricing of products Ms. Hulsey was selling at Nephron (see **Section VI**).
[117] Ms. Hulsey identified specific products she thought she could "turn over" in the first twelve months after changing companies (see **Section VI**).
[118] This included a list of 150 of her "pretty good" and "best" customers at Nephron (see **Section VI**).
[119] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 54, 163-164, Exhibit 37.
[120] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 26, 177 – 178, 180.
[121] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 28.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Confidential Information with USC and Adamis.[122]  Using Ms. Hulsey's testimony that she earned approximately $314,000 annually in wages and commissions at Nephron, her compensation from Nephron between June 13, 2018 and August 24, 2018 was approximately $61,940.[123]

52.    Additionally, Ms. Hulsey received commissions on sales made while employed by USC.[124]  The commission information produced by USC identified the drugs being sold as well as the specific customer such drugs were sold to.[125]  Commissions generated on sales of the Five Primary Drugs made to the 19 customers identified in **Part B** amount to approximately $15,244 from August 2018 through October 2019 (the most recent month of commission information produced by USC).[126]

## VIII.   Reasonable Royalty

53.    A reasonable royalty is often determined using one of two approaches:   an established royalty or a hypothetical negotiation for a reasonable royalty.  In the absence of an established royalty, a hypothetical negotiation seeks to derive the terms of the license agreement the parties would have reached through negotiation at the time of first infringement or misappropriation.  From my discussions with Ms. Kennedy and Counsel, I understand that Nephron has not licensed its Confidential Information in the past to competitors or other entities. Given no such established royalty, I derive a reasonable royalty for the allegedly misappropriated Confidential Information through the hypothetical negotiation construct.

54.    In deriving a reasonable royalty for trade secrets, the Court in *University Computing Co. v. Lykes-Youngstown Corp* proposed a framework for the hypothetical negotiation for a license, including the factors that the parties would likely consider in reaching such an agreement:[127]

---

[122] On June 13, 2018, Ms. Hulsey sent the 503(B) Sales Summary by Product spreadsheet to Mr. Fernandez and Mr. Guinn (Deposition of Clay Guinn, dated October 25, 2019, Exhibit 11).
[123] From June 13 to August 24 is 72 days.  $314,000 * (72/365) = $61,940.
[124] USC0034966.
[125] USC0034966.
[126] **Schedule 4.0**.  Depending on whether the Defendants' expert deducts commissions as an offset to USC's sales identified in **Section VII.B** above, this may or may not be a separate category of recovery to Plaintiffs.
[127] *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. Ga. 1974).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

> *Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place. In calculating what a fair licensing price would have been had the parties agreed, the trier of fact should consider such factors as*

> - *the resulting and foreseeable changes in the parties' competitive posture;*

> - *prices past purchasers or licensees may have paid;*

> - *the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business;*

> - *the nature and extent of the use the defendant intended for the secret; and*

> - *finally whatever other unique factors in the particular case which might have affected the parties' agreement such as the ready availability of alternative processes.*

Per the Court, the parties' expectations of the intended use of the trade secrets at the time of the misappropriation, *i.e.*, the hypothetical negotiation date, are considered. The date of the hypothetical negotiation and an analysis of each of these factors will be addressed in the following sections.

### A. Hypothetical Negotiation

55.     In this matter, the hypothetical negotiation would have occurred at some point between May 2018, when it is alleged Defendants began using or misappropriating the Confidential Information, and August 2018, when Ms. Hulsey began her employment with USC and ceased her employment with Nephron. As Ms. Hulsey allegedly initially shared Nephron's Confidential Information with senior sales managers at USC and Adamis as early as June 2018 (**Section VI**), the hypothetical negotiation would have likely occurred at or around this period of time.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

56.     For the purpose of the hypothetical negotiation, I assume the licensor would be Nephron and the licensee would be the Defendants.  The negotiated license in the hypothetical negotiation would provide the licensee the right to use the allegedly misappropriated Confidential Information provided in **Appendix C**, including the specific documents discussed in detail in **Section VI** to solicit Nephron customers.

### B.  The nature and extent of the use the defendant intended for the secret.

57.     For the purpose of my analysis, I assume the intent of Defendants at the time the alleged misappropriation took place was to use the Nephron Confidential Information to solicit Nephron customers to USC.  In fact, in several instances, Ms. Hulsey represented to USC management the amount of revenues that she could likely move over to USC based on Nephron's Confidential Information.  In one instance, Ms. Hulsey stated in an e-mail communication to Mr. Fernandez and Mr. Guinn on June 14, 2018 that she could "*conservatively pull $2.5mill over from [her] Nephron Sales during the first 12 months,*" which Ms. Hulsey noted was "*likely a conservative number.*"[128]  In another instance, using the Saleable Inventory analysis, Ms. Hulsey identified sales volumes that she estimated she could "turn over" to USC revenues.  This was approximately $1.7 million in sales of the Five Primary Drugs,[129] but Ms. Hulsey stated that "*I am sure I can grow this higher, but again I am being conservative.*"[130]  Additionally, in a July 12, 2018 e-mail communication with Mr. Guinn, Ms. Hulsey indicated that she had been pursuing ███████████████ in North and South Dakota while employed by Nephron, but when these hospitals reached out to her about purchasing 503(B) products from Nephron, she indicated to USC that she would try to "*hold them off for now*."[131]  Once she started at USC, Mr. Guinn emailed Ms. Hulsey on her first day at USC, August 24, 2018, to encourage her to target "*your loyal customers who will be receptive for quick wins with OR Syringes in hospitals.*"[132]

---

[128] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, Exhibit 21.
[129] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 19.
[130] Deposition of Clay Guinn, dated October 25, 2019, Exhibit 19.
[131] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, Exhibit 33.
[132] Deposition of Clay Guinn, dated October 25, 2019, pp. 190 – 191, Exhibit 42.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

58.    In summary, I assume that the Defendants intended to use the allegedly misappropriated Confidential Information to compete with Nephron in the 503(B) space.

### C. The resulting and foreseeable changes in the parties' competitive posture.

59.    The "*resulting and foreseeable changes to the parties' competitive posture*" is viewed in the context of what the parties would have agreed to as a fair price for the Defendants to license the Confidential Information for the purposes of what the Defendants intended at the time the misappropriation occurred.[133]    Among other data, the Confidential Information the Defendants are alleged to have misappropriated includes, but is not limited to, lists of Ms. Hulsey's top customers at Nephron, customer specific contact information and sales representative notes, specific pricing and product data, and commercial strategy information.[134]  Nephron would expect that licensing such information to USC, knowing that USC's intent was to solicit Nephron's customers using Nephron's Confidential Information, would significantly impact the parties' competitive postures.

60.    Nephron and USC both have FDA registered 503(B) Outsourcing Facilities that are licensed in all 50 states.[135]  Both sell similar drugs to customers and hospital systems across the country.  In discussing the potential hiring of Ms. Hulsey in July 2018, Mr. Fernandez testified that USC felt they needed to grow, which was the basis for trying to get an experienced sales person.[136]  In October 2018, shortly after Ms. Hulsey started at USC, USC implemented a sales incentive program designed to align with USC's and Adamis' "*core needs of expanding our footprint in the 503b space.*"[137]  Mr. Fernandez further testified that the goal of the sales incentive program was to generate new accounts and reactivate dead accounts.[138]

---

[133] *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518 (5th Cir. Ga. 1974).
[134] To be clear, the hypothetical negotiation would be for all items identified in **Appendix C**, although only specific attributes of those assets are noted.
[135] **Section V.B** and **V.D**
[136] Deposition of Gus Fernandez, dated November 6, 2019, p. 96.
[137] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 66.
[138] Deposition of Gus Fernandez, dated November 6, 2019, pp. 195 - 196.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

61.     In fact, USC did grow its 503(B) business, especially with respect to the Five Primary Drugs.  As discussed in **Section VII.A**, subsequent to the alleged misappropriation, USC generated significantly higher revenue growth in the second half of 2018 and in 2019 for the Five Primary Drugs, as compared to prior periods.  In the second half of 2018, the Five Primary Products generated a growth rate 62.5% higher than all of USC's other 503(B) product sales.[139]  In 2019, the growth differential between the Five Primary Drugs and USC's other 503(B) products grew to 89.1%.[140] Similarly, when considering the state location of the customers in the List of Pretty Good Nephron Accounts that Ms. Hulsey sent to Mr. Fernandez, the growth differential for the Five Primary Drugs in Hulsey's sales region compared to all other states in the U.S. was 49.9% and 188.6% in the second half of 2018 and 2019, respectively.[141]

62.     Moreover, there are instances where Nephron customers that had consistently purchased some or all of the Five Primary Drugs from Nephron started purchasing these drugs from Defendants after the alleged misappropriation.  One such example is ███████████
███████     On Monday, August 27, 2018, the first business day following Ms. Hulsey's last day at Nephron, she sent an e-mail to ██████████████████ Director of Pharmacy Services at ██████ Hospital, stating that she would be "*able to offer* ██████ *many of the same high quality products and some different than before, at lower costs to you*"[142] in her new employment. Starting in September 2018, shortly after Ms. Hulsey's e-mail to Mr. ███, Nephron's syringe sales of the Five Primary Drugs to ████████████ started decreasing significantly.  For the first eight months of 2018, monthly unit sales of Glycopyrrolate, Neostigmine, Phenylephrine, and Succinylcholine (four of the Five Primary Drugs) averaged slightly greater than ███ syringes.[143] By December 2018, Nephron only sold ███ syringes and made no sales of the Five Primary Drugs for the first six months of 2019.[144]  In fact, for 2019, Nephron sold only a total of ███ syringes for Succinylcholine and ███ for the other four primary drugs.[145]  In contrast to

---

[139] **Table 2**.
[140] **Table 3**.
[141] **Tables 4** and **5**.
[142] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, Exhibit 57.
[143] **Schedule 6.0**.
[144] **Schedule 6.0**.
[145] **Schedule 6.0**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Nephron's decline, USC started selling Glycopyrrolate, Neostigmine, Phenylephrine, and Succinylcholine (the same four drugs that Nephron was previously selling) to ███████ ███████ in September 2018 and, consistent with Nephron's prior performance, averaged slightly greater than 2,000 monthly syringe sales for all of 2019.[146]  Prior to September 2018, Nephron was generating roughly $████ per month from the nearly ████ syringes sold for the Five Primary Drugs to ████████████████.[147]  If one assumes that absent Defendants' misappropriation Nephron would have continued to sell the roughly ████ syringes of the Five Primary Drugs per month to ████████████████ (generating approximately $████ in monthly revenues), Nephron would have generated $██████ in revenues from September 2018 through December 2019,[148] or nearly $█████ more than the approximate $█████ Nephron actually generated over that period.[149]  This change in syringe sales for the Five Primary Drugs between the parties and the impact on Nephron's revenues is an example of the potential impact that could result from licensing the Confidential Information to Nephron's competitor.

63.     Beyond ████████████████, Ms. Kennedy and Mr. Jibaja indicated that the ████████████ hospital group in Colorado was impacted by Defendants' alleged use of the Confidential Information.  In analyzing the Nephron and USC sales trends of the Five Primary Drugs within this hospital group, I identified at least four instances where customers stopped purchasing the Five Primary Drugs from Nephron in January or early February 2019 and began purchasing similar (and often greater) quantities of such drugs from USC shortly thereafter.  A summary of the monthly unit purchases of the Five Primary Drugs by Nephron and USC for these four hospitals is detailed in **Schedule 6.2**.

64.     In summary, it would be foreseeable that licensing Nephron's Confidential Information to USC would change the competitive posture of the parties to the hypothetical negotiation.  Nephron would be providing a competitor with proprietary knowledge and information that the competitor would not otherwise have that would be used to solicit Nephron's customers.  In other words, the Confidential Information would be used to compete in the same

---

[146] **Schedule 6.0**.
[147] **Schedules 6.0** and **6.1**.
[148] $██████ = $██████.
[149] **Schedule 6.1**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

geography as the licensor in the same business for many of the same customers.  This would put significant upward pressure on the reasonable royalty resulting from the hypothetical negotiation.

### D.  The prices past purchasers or licensees may have paid.

65.     Based on my discussions with Ms. Kennedy, I understand Nephron has not historically licensed or attempted to license any of the allegedly misappropriated Confidential Information given the significance and value of such information to Nephron's business.  Absent any licensing of the Confidential Information, I considered publicly available data in the sterile compounding and pharmaceutical space, where such information can serve as benchmarks or value indicators.  As discussed further below, I reviewed historical multiples of revenues and profits for pharmaceutical preparations companies.  Understanding that these historical multiples are based on the entity as a whole, I also analyzed transaction data of compounding facilities and pharmaceutical companies in the years leading up to the hypothetical negotiation, specifically focusing on the ratio of customer relationships to overall enterprise value.

66.     To identify historical multiples associated with pharmaceutical preparations companies, I utilized U.S. Industry Benchmarking Data compiled by Duff and Phelps, which provides industry-level statistics based on the industry Standard Industrial Classification ("SIC") code.[150]  The U.S. Industry Benchmarking Data is compiled to provide industry-level inputs used in estimating cost of equity capital, weighted average cost of capital, and industry-level benchmarks.[151] The U.S. Industry Benchmarking Data includes a variety of industry specific information, including  Enterprise Valuation Multiples ("EVM").[152]

67.     In the derived EVM's, the Enterprise Value is calculated as "total debt, plus total market capitalization of common equity, plus non-controlling interest (a.k.a. minority interest), minus cash and cash equivalents."[153]  The EVM data is presented under a "Latest" analysis, which is based on the most recent fiscal year of the studied companies and a "5-Year Average" based on

---

[150] https://costofcapital.duffandphelps.com/estimate/inputs.
[151] https://dpcostofcapital.com/us-industry-benchmarking.
[152] Calculation of Industry Financial Statistics, U.S. Industry Cost of Capital Navigator, p. 24.
[153] Calculation of Industry Financial Statistics, U.S. Industry Cost of Capital Navigator, p. 26.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

the previous five fiscal years of the studied companies.[154]   The information is presented in five industry subcategories: 1) Median,[155] 2) SIC Composite,[156] 3) Large Composite,[157] 4) Small Composite,[158] and 5) High-Financial Risk.[159]

68.   From the U.S. Industry Benchmarking Data, SIC code 2834 (Pharmaceutical Preparations) was the most relevant:[160]

> *Establishments primarily engaged in manufacturing, fabricating, or processing drugs in pharmaceutical preparations for human and veterinary use. The greater part of the products of these establishments are finished in the form intended for final consumption, such as ampoules, tablets, capsules, vials, ointments, medicinal powders, solutions, and suspensions. Products of this industry consist of two important lines, namely: (1) pharmaceutical preparations promoted primarily to the dental, medical, or veterinary professions, and (2) pharmaceutical preparations promoted primarily to the public.*

69.   A summary of the Median, SIC Composite, Large Composite, and Small Composite EVMs for SIC code 2834 as of December 2018, the year of the hypothetical negotiation, is included in **Table 7** below.

---

[154] Calculation of Industry Financial Statistics, U.S. Industry Cost of Capital Navigator, p. 26.

[155] A median's proximate definition is the middle value (i.e., the 50th percentile) of a set of values ranked from highest to lowest. As such, the median can be thought of as the "typical" observation (Methodology, U.S. Industry Cost of Capital Navigator, p. 12).

[156] The SIC Composite is calculated in order to give the analyst a sense of the characteristics of the industry as a whole. The SIC Composite includes all companies identified in the screening process as "healthy" and having at least 75% of their revenues derived from a single SIC code (Methodology, U.S. Industry Cost of Capital Navigator, p. 13).

[157] The Large Composite is calculated in order to give the analyst a sense of the characteristics of the largest companies in the specific industry. The Large Composite includes all companies identified in the screening process as "healthy" and having at least 75% of their revenues derived from a single SIC code (Methodology, U.S. Industry Cost of Capital Navigator, p. 13).

[158] The Small Composite is calculated in order to give the analyst a sense of the characteristics of the smallest companies in the specific industry. The Small Composite includes all companies identified in the screening process as "healthy" and having at least 75% of their revenues derived from a single SIC code (Methodology, U.S. Industry Cost of Capital Navigator, p. 13).

[159] The category of High -Financial Risk companies was not considered.

[160] The Occupational Safety and Health Administration defines this SIC classification as "(https://www.osha.gov/pls/imis/sic_manual.display?id=608&tab=description).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

**Table 7: 2018 EVMs, SIC Code 2834: Pharmaceutical Preparations**[161]

|  | Enterprise Value / Sales | | Enterprise Value / EBITDA | |
|---|---|---|---|---|
|  | Latest | 5-Yr Average | Latest | 5-Yr Average |
| Median | 4.1 | 4.5 | 13.2 | 13.8 |
| SIC Composite | 5.0 | 4.7 | 12.8 | 12.9 |
| Large Composite | 5.1 | 4.7 | 12.4 | 12.4 |
| Small Composite | 7.0 | 6.8 | 27.6 | 36.0 |

70.     The Confidential Information at issue relates to Nephron's specific customer relationships, including contact information, sales representative notes, and product pricing and sales.[162] The Pharmaceutical Preparations multiples in **Table 7** are based on the entity as a whole, including manufacturing and other assets that generate revenue and profits for those companies. As such, only a portion of the EVMs would be related to customer relationships.  To identify benchmarks to apportion the EVMs that would relate to customer relationships, I analyzed historical transactions in the sterile compounding and pharmaceutical industry in the years leading up to the hypothetical negotiation.

71.     To identify such information, I utilized industry data compiled by Markables, a worldwide provider of industry data with over 7,000 different customer portfolios with valuation data available.[163]  Specifically, Markables has a section of its offering that focuses on customer valuation multiples, where the fair value of customer relationships is analyzed in relation to a number of factors, including enterprise value.

72.     To identify companies within the Markables database that would be potentially comparable to Nephron, I considered U.S. based transactions in the sterile compounding and pharmaceutical space dating back to 2014.  From my search, I identified four transactions that

---

[161] Duff & Phelps U.S. Industry Benchmarking Statistics as of December 31, 2018, SIC code 2834.
[162] See **Appendix C** for full identification of the Confidential Information.
[163] https://www.markables.net/customer-relations/.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

provide insight regarding customer relationships in comparison to EVM.[164] A summary of these transactions is provided in **Table 8** below.

**Table 8: Summary of Markables Data: Customer Relationships Compared to EVM[165]**

| Acquired Company | Year | Customer Relationship Value | Enterprise Value | Customer Relationship Value as a % of Enterprise Value |
|---|---|---|---|---|
| PharMEDium Healthcare Corporation | 2014 | $ 358,000,000 | $ 894,863,000 | 40.0% |
| The Harvard Drug Group, LLC | 2015 | $ 470,000,000 | $ 1,105,000,000 | 42.5% |
| PharMEDium Healthcare Holdings, Inc. | 2016 | $ 882,700,000 | $ 2,700,000,000 | 32.7% |
| U.S. Compounding, Inc. | 2016 | $ 5,572,000 | $ 15,586,000 | 35.8% |

73.     The above referenced companies would be relevant to Nephron's customers in several ways, including at least the following:[166]

1) The timing of the transactions is within a few years of the 2018 hypothetical negotiation date;

2) Excluding Harvard Drug (which manufactures generic pharmaceuticals and over the counter health care products), the companies manufacture compounded sterile pharmaceuticals under Section 503(B);

3) Markables calculated an implied margin (defined as the rate which the appraiser most likely applied in valuing the existing customer relationships of a business), which ranges between 14.7% and 41.4% for the identified companies.

[164] I began my analysis in the Markables customer relationship database by performing a keyword search for each of the companies currently listed by the FDA as being a registered human drug compounding outsourcing facility under Section 503(B) (https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities). This search identified two transactions for PharMEDium and one for USC. Within the PharMEDium and USC data, there was a Central Product Classification ("CPC") code, which is as 5-digit coding system providing a classification framework to capture all different products, services and assets that occur in economic and public activities. The codes for the three identified transactions were 1) 61173 Wholesale trade services, expect for fee or contract basis, of pharmaceutical products, 2) 61174 Wholesale trade services, except on a fee or contract basis, of medical and orthopedic goods, and 3) 854 Packaging Services. I performed a search within these identified CPC codes as well as general terms such as "pharmaceuticals," "compounding," and "503B" to further refine my search of transactions for consideration.
[165] Customer Valuation Multiple Reports for PharMEDium Healthcare Corporation (ID # 35922), The Harvard Drug Group LLC (ID # 37428), PharMEDium Healthcare Holdings, Inc. (ID # 39951), and U.S. Compounding, Inc. (ID # 49722).
[166] Customer Valuation Multiple Reports for PharMEDium Healthcare Corporation (ID # 35922), The Harvard Drug Group LLC (ID # 37428), PharMEDium Healthcare Holdings, Inc. (ID # 39951), and U.S. Compounding, Inc. (ID # 49722).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Nephron's 2018 operating profit margin for the 503(B) business was ███%,[167] which falls in between those profitability ranges identified; and

4) The companies all have headquarters in the United States and transact business primarily in the United States (rather than globally or locally within parts of the United States).

74.     For the transactions identified, the fair value of customer relationships represented between 32.7% and 42.5% of the overall enterprise value, with an average of 37.7%. For those that were acquired by a public company[168] (Harvard Drug Group, PharMEDium Healthcare Holdings, Inc. (PharMEDium), and USC), the acquirer's respective 10-K for the above transactions identified the methodology utilized to derive the customer relationship value.[169] For example, AmerisourceBergen Corporation ("ABC"), which acquired PharMEDium in November 2015 (identified as 2016 in Markables database), provided insight into how the fair value of customer relationships was calculated in its 10-K. ABC's 10-K indicates that the "*the purchase price was allocated to the underlying assets acquired and liabilities assumed based upon their fair value on the date of acquisition*" and that such fair value consisted of $882.7 million allocated toward customer relationships.[170] Regarding ABC's methodology in valuing such customer relationships, ABC's 10-K further disclosed that it engages third-party appraisal firms to assist in determining such valuations and that "*future expected cash flow from and economic lives of customer relationships*" are critical estimates performing such valuations.[171]

75.     For benchmarking purposes, I utilized 37.7%, the average of customer relationship value of the four transactions, as an estimate of the portion of the Pharmaceutical Preparations EVMs that relate to customer relationships, resulting in the implied multiples for customer relationships in **Table 9** below.

---

[167] **Schedule 7.0**.
[168] Pharmedium Healthcare Corporation was acquired by a private entity in an arms-length transaction. Those buyers formed Pharmedium Healthcare Holdings, Inc. as the holding company for Pharmedium Healthcare Corporation (https://www.cdr-inc.com/news/press-release/clayton-dubilier-rice-completes-investment-pharmedium-healthcare-corporation; Customer Valuation Multiple Reports for PharMEDium Healthcare Corporation (ID # 35922).
[169] Cardinal Health, Inc., Form 10-K for the period ended June 30, 2016, pp. 52-53, 58; AmerisourceBergen Corporation, Form 10-K for the period ended September 30, 2016, pp. 34, 63; Adamis Pharmaceuticals Corporation for the period ended December 31, 2016, pp. F-9, F-14.
[170] AmerisourceBergen Corporation, Form 10-K for the period ended September 30, 2016, p. 63.
[171] AmerisourceBergen Corporation, Form 10-K for the period ended September 30, 2016, p. 34.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

**Table 9: 2018 EVMs, SIC Code 2834: Pharmaceutical Preparations, Adjusted to Estimate Portion Associated with Customer Relationships**[172]

|  | Estimated Customer Relationship Value / Sales | | Estimated Customer Relationship Value / EBITDA | |
| --- | --- | --- | --- | --- |
|  | Latest | 5-Yr Average | Latest | 5-Yr Average |
| Median | 1.5 | 1.7 | 5.0 | 5.2 |
| SIC Composite | 1.9 | 1.8 | 4.8 | 4.9 |
| Large Composite | 1.9 | 1.8 | 4.7 | 4.7 |
| Small Composite | 2.6 | 2.6 | 10.4 | 13.6 |

76.     Of the implied multiples for customer relationships, the Small Composite, which includes five pharmaceutical preparations companies with revenues ranging between $13 million and $177 million, is most similarly situated to Nephron's 503(B) business based on Nephron's revenues between 2017 and 2019.[173]  That being said, I utilized SIC Composite, which has lower implied multiples on sales and EBITDA than the Small Composite as estimates for the value of customer relationship as a portion of enterprise value. As shown in **Table 9**, the implied revenue and EBITDA multiples used to estimate the value of Nephron's customer relationships for the hypothetical negotiation are 1.8x to 1.9x of revenue and 4.8x to 4.9x of EBITDA.

### E.  The total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business.

77.     To value the Confidential Information to Nephron, I discuss the development and importance of such information to Nephron's business (see **Part 1**).  In **Part 2**, I calculate the value of the Confidential Information to Nephron for specific customers whose information was allegedly misappropriated by the Defendants.  As an alternative benchmark, in **Part 3**, I also consider the value to Nephron in terms of the revenues that could be lost as represented by Ms. Hulsey in her communications with USC and Adamis.

---

[172] Values in **Table 7** multiplied by 37.7%.
[173] Annual net revenues of the Nephron's 503(B) business were $▮▮▮▮▮, $▮▮▮▮▮, and $▮▮▮▮▮ for 2017, 2018, and 2019, respectively (**Schedule 7.0**).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### 1. *Nephron's Development of its 503(B) Business*

78.    For more than 15 years, prior to launching its 503(B) division, Nephron focused its business on generic respiratory medications.  As discussed in the following paragraphs, Nephron expended significant resources in developing relationships with customers who purchased its respiratory products.  Nephron's successful launch of its 503(B) division was predicated not only on this foundation of customer relationships, but also on significant investment made in areas such as FDA registration, manufacturing capacity, distribution capabilities, and software applications.

79.    Nephron had its first generic respiratory medication approved by the FDA in 1997.[174]  In the years following 1997, Nephron expanded its respiratory drug portfolio with several new drug approvals and expanded production facilities.[175]  Starting in 2002, the same year Ms. Hulsey started at Nephron, Ms. Kennedy joined Nephron to build a marketing sales force.[176]  Following 2002, Nephron continued to increase production, innovate within its respiratory drug portfolio, and expand its distribution footprint.[177]  Nephron also has longstanding relationships with its major drug wholesalers that distribute Nephron products to hospitals, pharmacies, home care companies, and long-term care facilities.[178]

80.    Dating back to 1997, Nephron has created customer relationships with hospitals and pharmacies and maintained such relationships through its systems, which, like its production facilities and drug portfolio, were further developed and updated over time.[179]  Nephron first invested in CRM software to track and maintain its customer relationships in 2003.[180]  Since then, Nephron has continued to develop and update its CRM to allow for more effective development and retention of pertinent customer information.[181]  For example, in 2018, Nephron invested in

---

[174] https://www.nephronpharm.com/about.
[175] https://www.nephronpharm.com/about/company-history.
[176] https://www.nephronpharm.com/about/company-history.
[177] https://www.nephronpharm.com/about/company-history.
[178] https://www.nephronpharm.com/products
[179] Discussion with Ms. Kennedy and Mr. Jibaja.
[180] Discussion with Ms. Kennedy and Mr. Jibaja.
[181] Discussion with Ms. Kennedy and Mr. Jibaja.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Power BI, which expanded its business intelligence capabilities and allowed its salesforce to develop customized reports and dashboards.[182]

81.    In 2013, Congress passed the Drug Quality and Security Act, which included a part that exempted compounded drugs from certain requirements if the drug is compounded by or under the direct supervision of a licensed pharmacist in a registered outsourcing facility.[183]   In an interview for EDGE talks, Ms. Kennedy indicated that when the act passed in 2013, Nephron knew it wanted to get into sterile compounding.[184] Nephron's initial date of registration as a 503(B) Outsourcing Facility was in July 2014.[185]   As part of the process to sell 503(B) products starting in 2017, Nephron invested in equipment and software to meet the requirements of 503(B) Compounding facilities, secured licensing in every state (including controlled substances), created formulations for 503(B) drugs for Abbreviated New Drug Application ("ANDA") submissions and approvals, identified and verified new suppliers for active pharmaceutical ingredients ("APIs") and other raw materials, constructed additional clean rooms, secured storage and shipping services, and trained its employees for the new manufacturing protocols and sales strategies.[186]   For example, Nephron invested in software applications to help facilitate the sale and appropriate regulation of its 503(B) products, including 1) a Pharmaceutical Information Management System software license, 2) an ecommerce application tool to assist with e-commerce, Drug Enforcement Agency ("DEA") reporting, and Controlled Substances Ordering System, 3) a controlled substance monitoring and tracking system, and 4) call center voice and data software.[187]   In 2017, a decision was made to add 36,000 square feet of manufacturing space to Nephron's West Columbia headquarters.[188]   The expansion was in part to support the expansion of Nephron's 503(B) division, which at the time was noted as one of the fastest growing 503(B) facilities in America with more

---

[182] Discussion with Ms. Kennedy and Mr. Jibaja.
[183] https://www.congress.gov/bill/113th-congress/house-bill/3204.
[184] http://www.sctechsystem.edu/edge/pharmaceuticals-and-healthcare-manufacturing/nephron-finds-formula-for-sucess-in-south-carolina.html.
[185] https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.  I understand the initial date of registration is the date the FDA determined that the initial registration information submitted was complete.
[186] Discussion with Ms. Kennedy and Mr. Jibaja.
[187] Discussion with Ms. Kennedy and Mr. Jibaja.
[188] https://www.sccommerce.com/news/nephron-pharmaceuticals-corporation-expanding-lexington-county-facility/.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

than 30 new products developed in 2017 alone.[189]  Ms. Kennedy stated that there are currently an

additional 60 iterations of 503(B) drugs that Nephron is selling.

82.     Nephron's investment in its distribution, manufacturing, and customer relationships

for its respiratory business discussed above set the stage for its success in the 503(B) space.

Nephron had the customer relationships in place from its success in the respiratory space and

leveraged those customer relationships when launching its 503(B) business.  Moreover, they had

the distribution relationships already in place to support robust growth shortly after launch.  In

fact, Nephron's revenues for the 503(B) business grew from $▇▇▇▇▇▇ in 2017 to over $▇▇▇

▇▇▇▇ in 2018 and more than $▇▇▇▇▇▇ in 2019, almost ▇▇▇▇▇ the revenue generated just two

years prior.[190]

83.     I understand Ms. Hulsey was part of the initial sales team that helped start

Nephron's 503(B) business.   In fact, the Customer Summary Compilations Ms. Hulsey

downloaded to the Seagate Backup document several instances where she was communicating

with her previously established customers about the launch of Nephron's 503(B) business and

products available.[191]  Ms. Hulsey testified that these CRM notes of the ongoing customer

interactions were what "*goes to the heart of the relationship*" between Nephron and its respective

customers.[192]

84.     Overall, at the time of the alleged misappropriation, Nephron's 503(B) division was

built upon over 15 years of cultivated customer relationships and significant investment in FDA

registration, manufacturing capacity, distribution capabilities, and software applications.

---

[189] https://www.sccommerce.com/news/nephron-pharmaceuticals-corporation-expanding-lexington-county-facility/.
[190] **Schedule 7.0**.
[191] For example, see HULSEY00007205, HULSEY00007224, HULSEY00007235, HULSEY00007349.
[192] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 79.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### 2.   *Value of Customers Contained in Allegedly Misappropriated Confidential Information*

85.     As discussed in **Section VI**, Ms. Hulsey transferred various files from her Nephron computer to the Seagate Backup.[193]   These files included at least 110 Customer Summary Compilations that originated from Nephron's CRM system.[194]   The Customer Summary Compilations included specific information about Nephron's customers, including customer name, all customer sales contacts and related contact information, contracted pricing by product, historical sales volumes and revenue data, and Nephron's sales representative notes entered in Nephron's CRM, which Ms. Hulsey testified "*goes to the heart of the relationship*" between Nephron and it customers.[195]

86.     Nephron's sales and profits generated from sales of the Five Primary Drugs to the customers in the Customer Summary Compilations provide an indication of the value of the customers contained in the Confidential Information. By cross-referencing the Nephron customers in the Customer Summary Compilations on the Seagate Backup[196] and the List of Pretty Good Nephron Accounts that Ms. Hulsey provided senior sales management at USC and Adamis, there were at least 49 Nephron customers that Ms. Hulsey had historically covered over nine states while at Nephron.[197]   For these customers, I analyzed the revenues and profits earned by Nephron on sales of the Five Primary Drugs.

---

[193] Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, p. 3; Deposition of Jennifer Shelly Hulsey dated February 11, 2020, pp. 72-73.

[194] Deposition of Jennifer Shelly Hulsey dated February 11, 2020, pp. 68 and 72-73; Hulsey Deposition Exhibit 15; Preliminary Expert Report of Clark C. Walton, Esq., dated November 27, 2019, Exhibit E identifies files on the Seagate external hard drive, including (as examples) files that have been produced in this matter as HULSEY00006769, HULSEY00006777, HULSEY00006791, and similar reports for many other Nephron customers.

[195] Deposition of Lou Kennedy, dated February 28, 2020, Exhibit 10; Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, pp. 78 – 79.

[196] **Schedule 1.0** is a compilation of all customers Ms. Hulsey backed up to her Seagate Backup.

[197] **Schedule 1.0**. It should also be noted that based on comments from Mr. Guinn and Mr. Fernandez, Nephron charges a premium on the sale of their 503(B) products (or at least the Five Primary Drugs excluding Phenylephrine) with Mr. Guinn further noting that he had "*not heard of pricing this high.*" (Deposition of Clay Guinn, dated October 25, 2019, Exhibit 22).  Therefore, the value of such Confidential Information, particularly as it relates to Nephron's specific customer information and pricing is significant as access and/or use of such information to solicit customers could cause Nephron to lose such customers or reduce profits from pricing pressures.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

87.    In the first eight months of 2018 leading up to Ms. Hulsey's resignation from Nephron and employment at USC, these 49 customers generated approximately $████████ from sales of the Five Primary Drugs.[198]  I annualized Nephron's expected sales over the first eight months of 2018 to estimate Nephron's 2018 sales absent the alleged wrongdoing.  Including an additional four months of sales for 2018 results in 2018 annualized net revenue of approximately $████████ for the Five Primary Drugs sold to the 49 customers.[199]  In the hypothetical negotiation, Nephron would consider the $██████ in net revenues as substantially at-risk in licensing its Confidential Information to a competitor.

88.    I also analyzed the relative profitability of the Five Primary Drugs to the profitability of the remainder of Nephron's 503(B) products.  Nephron produced standard cost, by product, for its 503(B) Outsourcing Facility as of 2019.[200]  As noted in **Schedule 9.0**, both the per-unit and profit percentage of the Five Primary Drugs is greater than the profits Nephron generated in 2019 for its remaining 503(B) drugs.[201]

89.    In total and for all of the Five Primary Drugs but Phenylephrine, the products' profit margins are higher as compared to Nephron's remaining 503(B) sales.[202]  For Phenylephrine, Nephron earned approximately $██████ in revenues in 2019, which is approximately ██% of the total revenues generated by the Five Primary Drugs in that year.[203]  Said another way, ██% of the Five Primary Drugs sold by Nephron had a higher profit than Nephron's overall 503(B) business.

*Implied Multiples for Customer Relationships Method*[204]

90.    In **Part D**, I derived implied revenue and EBITDA multiples for the fair value of customer relationships for pharmaceutical preparations companies.  As shown in **Table 9**, the

---

[198] **Schedule 8.0**.
[199] **Schedule 8.0**.
[200] NEPH0001752.
[201] **Schedule 9.0**.
[202] **Schedule 9.0**. From my discussion with Nephron personnel, the lower profitability was the result of increased competition.
[203] **Schedule 5.0**.
[204] This methodology employs a market or yardstick approach to estimating the value of Nephron's customer relationships.

EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    Page 41 of 51

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

implied revenue and EBITDA multiples for the SIC Composite ranged from 1.8x to 1.9x of revenue and 4.8x to 4.9x of EBITDA.  Applying the implied sales multiples to Nephron's annualized revenue for the Five Primary Drugs across the 49 customers ($███████), the estimated value of the customer relationships to Nephron contained in the Confidential Information would be approximately $4.9 million to $5.2 million.

**Table 10: Estimated Value Using Implied Revenue Multiple[205]**

| | Estimated Customer Relationship Value / Sales | |
|---|---|---|
| | Latest | 5-Yr Average |
| Revenue | $█████ | $█████ |
| SIC Composite | 1.9 | 1.8 |
| Estimated Value | $█████ | $█████ |

91.    I also applied the implied EBITDA multiples for customer relationships to Nephron's annualized EBITDA for the Five Primary Drugs in **Table 11** below.

**Table 11: Estimated Value Using Implied EBITDA Multiple[206]**

| | Estimated Customer Relationship Value / EBITDA | |
|---|---|---|
| | Latest | 5-Yr Average |
| Revenue | $█████ | $█████ |
| EBITDA % | ███% | ███% |
| EBITDA | $█████ | $█████ |
| SIC Composite | 4.8 | 4.9 |
| Estimated Value | $█████ | $█████ |

Based on implied EBITDA multiples, the value of Nephron's customer relationships would be approximately $4.9 million.

---

[205] **Schedule 8.0** and **Table 9**.
[206] **Schedule 8.0** and **Table 9**.  Consistent with the 2018 hypothetical negotiation date and the use of annualized 2018 revenues, I used Nephron's 2018 503(B) EBITDA of ███% (**Schedule 7.0**).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

92.     In the hypothetical negotiation, Nephron would consider the value of the customer relationships that would be put at substantial risk in licensing a competitor its Confidential Information, as demonstrated in **Tables 10** and **11**.

### *Discounted Future Profits Method*[207]

93.     As an additional indicator of the value of Nephron's 49 customers contained in both the Customer Summary Compilation and the List of Pretty Good Nephron Accounts, I discounted the estimated future stream of profits from those customers to their present value as of the June 2018 hypothetical negotiation date.  To arrive at the present value, I analyze the following factors: 1) Nephron's expected future revenues from the 49 customers, 2) incremental costs to generate those expected revenues, and 3) an appropriate discount rate to apply against the resulting incremental profits.

94.     To calculate the estimated future revenues, I use the 2018 annualized revenue of approximately $▮▮▮▮▮▮▮ for the Five Primary Drugs sold to the 49 customers as a starting point.  My analysis incorporates an annual reduction to those revenues for estimated customer attrition.  While certain customers would be expected to expand purchasing from Nephron and others would likely contract purchasing from Nephron, my analysis does not factor any additional growth beyond the revenues generated by the 49 customers in 2018.[208]  To estimate customer attrition, the Markables data for the four transactions identified and discussed in **Part D** above each provide an implied attrition rate, based on remaining useful lives of reported customer relationships.[209]  The range of the implied annual attrition rates for the four customers identified was 6.4% (2016 acquisition of PharMEDium) to 9.5% (2016 acquisition of USC).[210]  While it

---

[207] This methodology employs an income approach to estimating the value of Nephron's customer relationships.
[208] Certain of Ms. Hulsey's Pretty Good Accounts had not purchased any of the Five Primary Drugs over the period of January through August 2018 and, accordingly, are not factored into my calculation (see **Schedule 8.0**).
[209] Customer Valuation Multiple Reports for PharMEDium Healthcare Corporation (ID # 35922), The Harvard Drug Group LLC (ID # 37428), PharMEDium Healthcare Holdings, Inc. (ID # 39951), and U.S. Compounding, Inc. (ID # 49722).
[210] Customer Valuation Multiple Reports for PharMEDium Healthcare Corporation (ID # 35922), The Harvard Drug Group LLC (ID # 37428), PharMEDium Healthcare Holdings, Inc. (ID # 39951), and U.S. Compounding, Inc. (ID # 49722).

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

would likely be lower, my analysis assumes that Nephron's attrition or turnover rate would not be higher than USC's implied attrition of 9.5%.[211]   In considering the length of such customer relationships, Ms. Kennedy and Mr. Jibaja indicated that due to their extensive relationships with Integrated Delivery Networks ("IDN") and Group Purchasing Organizations ("GPO"), Nephron's customer relationships would be expected to have useful lives in excess of 10 years.  Nevertheless, applying the 9.5% customer attrition rate ceiling to the 2018 revenue of $██████ over a period of 10 years results in estimated customer revenues from the 49 customers of approximately $██ ██.[212]

95.     I then deducted incremental costs that would be required for Nephron to generate the estimated annual revenues identified above.  I first deducted Nephron's cost of sales ("COS"), on a percentage basis, where COS included direct materials, labor, overhead and a cost allocation to the 503(B) business based on certain expenditures incurred by its parent, Nephron SC.[213]   In 2018, the year of the hypothetical negotiation, Nephron's COS within its 503(B) business as a percentage of net revenue was ███%.[214]   I also considered whether certain general and administrative costs would be incremental in generating the identified revenues.  Given the small size of the $██████ as compared to Nephron's overall 503(B) business, it is unlikely Nephron would have had to incur additional general and administrative costs to generate such revenues (*e.g.*, hire additional administrative support, incur additional research and development costs or professional services costs, etc.).  However, I did identify two line items that would likely be incremental to the generation of the calculated revenues: 1) Sales Commissions (████████████

---

[211] For example, Mr. Fernandez testified that after the USC acquisition by Adamis "*U.S. Compounding required a lot of work, and there was a lot of interactive involvement to try and get them back up and running, because they had been – the sterile lab had been shut down for about a half year, as well as to try and rebuild their sales force*" (Deposition of Gus Fernandez, dated November 6, 2019, p. 67).  Mr. Hopkins further testified that when Adamis took over for USC in 2016 "*their focus was not a focus*" and that it was "*all over the place*" (Deposition of Robert Hopkins, dated January 7, 2020, p. 67).
[212] **Schedule 10.0.**
[213] **Schedule 7.0.** ████████████████████████████████ (see **Schedule 9.0**).
[214] **Schedule 7.0.** ████████████████████████████████

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

of net revenues) and 2) Freight Out (allocated at ▮▮% of net revenues).[215]  Deducting the incremental costs identified above results in incremental profits on the identified revenues of approximately $▮▮▮▮▮▮.[216]

96.     Finally, to arrive at the present value of the incremental profits, a discount rate must be applied.  A discount rate represents the expected rate of return that the market requires to commit capital to an investment.  In calculating a discount rate, it is common to consider the weighted average cost of capital ("WACC"), which considers both a company's cost of equity and its cost of debt.  In **Schedule 10.3**, I calculate the WACC for Nephron as of December 2018 to be approximately ▮▮%.[217]  Applying the estimated ▮▮% discount rate, I calculate the present value of Nephron's incremental profits that it would consider to be at-risk in licensing its competitor as approximately $5.1 million.[218]

### 3.  *Impact on Nephron Using Ms. Hulsey's Representations*

97.     As an alternative benchmark to value the Confidential Information to Plaintiffs, I also considered the representations made by Ms. Hulsey of the Nephron sales that she would move to USC through the alleged misappropriation of the Confidential Information.   As these communications were Ms. Hulsey's "conservative" estimates provided to USC, the impact of these revenues would be especially relevant to the hypothetical negotiation.   Ms. Hulsey "conservatively" estimated she could pull $2.5 million over to USC from Nephron in her first twelve months at USC.[219]  Mr. Hulsey also provided an estimate based on turning over one-half of her prior-year's sales of the Five Primary Drugs at Nephron once at USC, as summarized in **Table 12** below.[220]

---

[215] **Schedule 7.0**.
[216] **Schedule 10.0**.
[217] **Schedule 10.3**.
[218] **Schedule 10.0**
[219] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 11.
[220] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

### Table 12: Ms. Hulsey's "Conservative" Estimate of Nephron Sales She Would Convert to USC, by Product[221]

| Drug | Dollar Volume | |
|------|---------------|---|
| ePHEDrine sulfate | $ | |
| Glycopyrrolate | | |
| Neostigmine Methylsulfate | | |
| Phenylephrine | | |
| Succinylcholine Chloride | | |
| **Total** | **$** | **1,712,000** |

98.     Applying the SIC Composite implied multiple for customer relationships to the $1.7 million or $2.5 million "conservatively" estimated by Ms. Hulsey would result in a value indicator for the hypothetical negotiation ranging from $3.0 million to $4.7 million, as shown in **Table 13** below.[222]

### Table 13: Range of Value Indicators Using Ms. Hulsey's Representations[223]

| | $1.72 Million Estimate Estimated Customer Relationship Value / Sales | | $2.5 Million Estimate Estimated Customer Relationship Value / Sales | |
|---|---|---|---|---|
| | Latest | 5-Yr Average | Latest | 5-Yr Average |
| Revenue | $1,712,000 | $1,712,000 | $2,500,000 | $2,500,000 |
| SIC Composite | 1.9 | 1.8 | 1.9 | 1.8 |
| Estimated Value | $3,227,120 | $3,033,493 | $4,712,500 | $4,429,750 |

---

[221] Ms. Hulsey indicated that she "*will very likely turn over and sell more than ½ the volume that I am currently selling, but I wanted to give a conservative number.*" Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.

[222] Applying the same methodology outlined in **Part E.2** above to estimate the discounted future profits of the $1.7 million and $2.5 million identified by Ms. Hulsey results in value indicators ranging between $3.2 million and $4.6 million, respectively (**Schedules 10.1** and **10.2**).

[223] **Table 9**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

## F. Other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternatives.

99.     I am not aware of alternatives that would have been available to Defendants short of developing the identified Confidential Information themselves.  While the timeframe to develop specific pieces of the Confidential Information could vary, as described in **Section VII.E.1**, Nephron's collective time and investment in developing its customer relationships in its respiratory business was leveraged to start its 503(B) business.   Such customer information data, in conjunction with pricing and product information, are contained within the Confidential Information subject to the hypothetical negotiation.[224] The Confidential Information allegedly misappropriated and the proprietary systems from which such information was generated was described as priceless as it contained "*20 years' worth of notes about who to call on, where to go, where to park, what to do...*" and "*would allow a brand new sales rep to walk in with everything they need to know to compete.*"[225]   Even Ms. Hulsey indicated that the CRM notes of the ongoing customer interactions were what "*goes to the heart of the relationship*" between Nephron and its respective customers.[226]  I am not aware of alternatives that would be available to the Defendants that would provide the same customer, pricing, product, and other intelligence contained within the Confidential Information.  Other than licensing from Nephron, I would assume the only option available to the Defendants would be to re-create such data, information, and knowledge.  Given the assumption of the alleged misappropriation of Nephron's Confidential Information, the Defendants would have determined such action would be too costly and/or time-intensive of an endeavor.

## G. Determination of Reasonable Royalty

100.     I use the data and information contained within the factors above to derive the reasonable royalty that Nephron and the Defendants would have agreed to for the misappropriation and/or use of the Confidential Information.   The hypothetical negotiation between the parties would have occurred in or around June 2018.  In the hypothetical negotiation, I assume that the

---

[224] See **Appendix C** for Confidential Information subject to the hypothetical negotiation.
[225] Deposition of Lou Kennedy, dated February 28, 2020, p. 186.
[226] Deposition of Jennifer Shelly Hulsey, dated February 11, 2020, p. 79.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Defendants intended to use the Confidential Information to compete directly with Nephron's 503(B) business.

101.    Among other data, the Confidential Information subject to the hypothetical negotiation would include, but is not limited to, lists of Ms. Hulsey's top customers at Nephron, customer specific contact information and sales representative notes, specific pricing and product data, and commercial strategy information.[227]  Ms. Kennedy testified that Nephron's CRM, and thus, the Confidential Information that was allegedly misappropriated, was priceless as it contained "*20 years' worth of notes about who to call on, where to go, where to park, what to do...*" and "*would allow a brand new sales rep to walk in with everything they need to know to compete.*" [228]

102.    In the hypothetical negotiation, Nephron would be agreeing to provide a competitor with its proprietary knowledge and information, which the competitor would not otherwise have, that would ultimately be used to compete directly with Nephron.  Nephron would know that licensing such information to USC would arm USC's sales representatives with Nephron's customer and product knowledge and provide a competitive advantage to USC.  In fact, with respect to Nephron's customer ███████████████, after the alleged misappropriation, Nephron ceased making average monthly sales of ████ syringes and USC began making average monthly sales of ████ syringes.  Other such examples after the alleged misappropriation are identified in **Schedule 6.2**.

103.    As part of the hypothetical negotiation, Nephron would evaluate the opportunity cost of licensing a competitor its Confidential Information, where that opportunity cost would be based on estimate of the value of the customer relationships to which it was granting a competitor access.  By cross-referencing the Nephron customers in the Customer Summary Compilations on the Seagate Backup[229] and the List of Pretty Good Nephron Accounts that Ms. Hulsey provided senior sales management at USC and Adamis, there were at least 49 Nephron customers that Ms.

---

[227] The hypothetical negotiation would be for all items identified in **Appendix C**, although only specific attributes of those assets are discussed in greater detail.
[228] Deposition of Lou Kennedy, dated February 28, 2020, p. 186.
[229] **Schedule 1.0** is a compilation of all customers Ms. Hulsey backed up to her Seagate Backup.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

Hulsey had historically covered over nine states while at Nephron.[230]   For these customers, Nephron generated annualized net revenues of approximately $█████ for only the Five Primary Drugs,[231] where nearly all of the Five Primary Drugs generated greater profit margins than the remainder of Nephron's 503(B) drugs.  In fact, from a discounted future profits perspective, the value of sales of the Five Primary Drugs across these 49 customers would be approximately $5.1 million.[232]  This would represent customer relationships valued at $5.1 million that would be at-risk to Nephron from licensing its Confidential Information to a competitor.

104.    As an alternative to analyzing discounted future profits to estimate the value of its customer relationships, Nephron would also consider publicly available data and information regarding transactions and industry benchmarks that could be used to derive value indicators for its customer relationships.  Publicly available transaction multiples adjusted to reflect customer relationships only would indicate that the value of Nephron's 49 customers (for the Five Primary Drugs only) would be approximately $4.9 million to $5.2 million.  Again, this would represent customer relationships valued at $4.9 million to $5.2 million to Nephron that would be at-risk from licensing its Confidential Information to a competitor.

105.    At the same time, the Defendants actively wanted to grow USC's 503(B) business and were looking for opportunities to do so.  Following the acquisition by Adamis, USC took an active role and made large investments to re-open USC's sterile lab and rebuild its sales force in an effort to turn around USC's negative cash flows and income as quickly as possible.[233]  The Confidential Information would assist in leveling the playing field against a competitor through the use of that competitor's own information about its customers, pricing, and products.  The Defendants would consider what, if any, alternatives to accessing or acquiring comparable data or

[230] **Schedule 1.0**. It should also be noted that based on comments from Mr. Guinn and Mr. Fernandez, Nephron charges a premium on the sale of its 503(B) products (or at least the Five Primary Drugs excluding Phenylephrine) with Mr. Guinn further noting that he had "*not heard of pricing this high.*" (Deposition of Clay Guinn, dated October 25, 2019, Exhibit 22).  Therefore, the value of such Confidential Information, particularly as it relates to Nephron's specific customer information and pricing, is significant, as access and/or use of such information to solicit customers could cause Nephron to lose such customers or reduce profits from pricing pressures.
[231] **Schedule 8.0**.
[232] **Schedule 10.0**.
[233] Deposition of Gus Fernandez, dated November 6, 2019, p. 67; Deposition of Robert Hopkins, dated January 7, 2020, pp. 58-59, 67.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

information to the Confidential Information would be available.  Given the Defendants' desire to turn-around USC into a profitable entity, USC would want to avoid the time and resources to re-create the Confidential Information that it would want to use to further develop and grow its 503(B) business.

106.    Therefore, when taking a license to the Confidential Information, the Defendants' intent at the hypothetical negotiation would be to utilize the licensed assets, as discussed in **Appendix C**, to increase sales of USC's 503(B) business.  In considering the value of the Confidential Information it would be licensing, the Defendants would look to Ms. Hulsey's representations of Nephron's sales of the Five Primary Drugs she "conservatively" estimated she would turnover to USC in the first year:  $████████ and $2.5 million.  Applying the implied customer relationship multiples to Ms. Hulsey's "conservative" estimates of revenue that she would switch from Nephron to USC would translate into a "conservatively" estimated at-risk value to Nephron of $3.0 million to $4.7 million.  These at-risk values would not reflect the "very likely" outcome of selling more than one-half of these values in her first year, as represented by Ms. Hulsey.[234]

107.    USC's sales of 503(B) products grew significantly following Ms. Hulsey's alleged misappropriation and employment at USC, but especially with respect to the Five Primary Drugs. USC generated significantly higher revenue growth in the second half of 2018 and in 2019 for the Five Primary Drugs, as compared to prior periods and as compared to the growth rates of USC's other 503(B) products.  USC's sales of the Five Primary Drugs grew at rates higher than 62.5% and 89.1% more than other 503(B) products for the second half of 2018 and 2019, respectively. The same can be said for growth of the Five Primary Drugs to hospitals in states included in the List of Pretty Good Nephron Accounts.  USC's growth differential for the Five Primary Drugs in Ms. Hulsey's Nephron sales region compared to all other states in the U.S. was 49.9% and 188.6% in the second half of 2018 and 2019, respectively.[235]

---

[234] Deposition of Gus Fernandez, dated November 6, 2019, Exhibit 19.
[235] **Tables 4** and **5**.

United States District Court Middle District of Florida, Orlando Division
Case No. 6:18-cv-1573-Orl-31LRH
*Nephron Pharmaceuticals Corporation et. al. v. Jennifer Shelly Hulsey et. al.*

108.   Although Ms. Hulsey did not ultimately generate $███████ to $2.5 million in her first year at USC for the Five Primary Drugs, at least $1.1 million in revenue from sales of the Five Primary Drugs was generated at USC from customers 1) where Ms. Hulsey had allegedly misappropriated Nephron's Confidential Information and 2) that had not purchased the Five Primary Drugs from USC in at least one year prior to Ms. Hulsey's employment with USC.  The $1.1 million in USC sales of the Five Primary Drugs subject to disgorgement is estimated based on my analysis limited to only four specific aspects of the Confidential Information allegedly misappropriated by the Defendants.[236]  Indeed, such an amount should be considered a floor on USC's potential sales from the alleged misappropriation.  In the hypothetical negotiation for the data and information contained within **Appendix C**, the Defendants would be allowed to access and use that data and information to freely solicit Nephron's customers.  After all, Ms. Hulsey testified that Nephron's CRM "*goes to the heart of the relationship*" between Nephron and its customers, and the Defendants would intend to use such information to compete with Nephron.

109.   The parties to the hypothetical negotiation would weigh these various factors and data points in arriving at a reasonable royalty for a license to the Confidential information.  Ms. Hulsey represented to USC that she could "conservatively" generate revenue levels ranging from $███████ to $2.5 million at USC, which Nephron would value at approximately $3.0 million to $4.7 million. From Nephron's perspective, at least 49 of its accounts would be at substantial risk due to a license of its Confidential Information to a competitor.  This at-risk value to Nephron would be in the range of $4.9 million to $5.2 million, considering only the Five Primary Drugs. The Defendants' desire to grow its 503(B) business quickly and its lack of alternatives to licensing Nephron's Confidential Information would push the ultimate reasonable royalty in the hypothetical negotiation to the higher end of Nephron's at-risk values.   In light of the information aforementioned in my report, it is my opinion that the reasonable royalty would be no less than $4.5 million and likely closer to $5.0 million.

---

[236] Saleable Inventory, 503(B) Sales Summary by Product, Hospital Customer Lists (specifically the List of Pretty Good Nephron Accounts), and Customer Summary Compilations.