# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

NEPHRON PHARMACEUTICALS
CORPORATION, NEPHRON S.C., INC.
and NEPHRON STERILE
COMPOUNDING CENTER LLC,

               **Plaintiffs,**

**v.**                                     **Case No:   6:18-cv-1573-Orl-31LRH**

JENNIFER SHELLY HULSEY, U.S.
COMPOUNDING INC. and ADAMIS
PHARMACEUTICALS CORPORATION,

               **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS U.S. COMPOUNDING, INC. AND ADAMIS PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW (Doc. 107)** |
| **FILED:** | **May 6, 2020** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED in part and DENIED in part**.

## I.    BACKGROUND.

      On September 21, 2018, Plaintiffs Nephron Pharmaceuticals Corporation, Nephron S.C.,

Inc., and Nephron Sterile Compounding Center LLC (collectively, "Nephron") filed this case

against Defendants Jennifer Shelly Hulsey ("Hulsey") and U.S. Compounding Inc. ("USC").   Doc. 1.   The operative pleading is Nephron's third amended complaint, which adds Adamis Pharmaceuticals Corporation ("Adamis"), the parent company of USC, as a Defendant.   Doc. 74. According to the third amended complaint, Nephron manufactures generic respiratory products and sterile 503B medications.   *Id.* ¶ 15.   Hulsey is a former marketing representative of Nephron, who was originally hired by Nephron in January 2002.   *Id.* ¶ 25.   During her employment, Hulsey had access to Nephron's alleged trade secret information, and she was required to execute a non-disclosure agreement.   *Id.* ¶¶ 8, 27–28.   Hulsey resigned from her employment with Nephron effective August 24, 2018.   *Id.* ¶ 37.   Almost immediately thereafter, Nephron learned that Hulsey began working for USC, a direct competitor of Nephron in the 503B medication market.   *Id.* ¶¶ 41, 42.   After learning that Hulsey had emailed a Nephron customer following her resignation, Nephron investigated Hulsey's pre-resignation conduct.   *Id.* ¶¶ 41–46.   Nephron alleges that Hulsey misappropriated Nephron's trade secrets based on its findings from that investigation.   *Id.* ¶ 50. Nephron further alleges that Hulsey acted at the direction of, and in cooperation with, USC and its parent company, Adamis.   *Id.* ¶ 68.

On September 26, 2018, the Court granted in part Nephron's motion for a temporary restraining order, requiring each of the Defendants, among other things, to "cease and desist from any direct or indirect use, disclosure, or communication of information that was accessed by Defendant Jennifer Shelly Hulsey from Plaintiffs' secure electronic data systems or related computer programs, including without limitation, Plaintiffs' Customer Resource Management and Power BI systems," and to "preserve any and all full or partial copies of the Protected IP."   Docs. 12, 13, at 1.   On October 10, 2018, Nephron filed a proposed consent preliminary injunction

("CPI"), signed by counsel for both parties.   Docs. 24, 24-1.   On October 15, 2018, the Court entered the CPI.   Doc. 29.   The CPI supersedes and replaces the TRO.   *Id.* at 3.

On motions by each of the Defendants, the Court dismissed with prejudice several counts of the third amended complaint.   Doc. 82.   The counts remaining include:   (1) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA") against all Defendants (Count I); (2) breach of contract against Defendant Hulsey (Count II); (3) violations of the Florida Uniform Trade Secrets Act ("FUTSA") against all Defendants (Count III); and (4) tortious inference with advantageous business relationships against USC and Adamis (Count VII).   *See* Doc. 74.

On October 14, 2019, Hulsey filed a Notice of Bankruptcy Filing with the Court.   Doc. 89. Based on that Notice, Nephron's claims against Hulsey are automatically stayed.   Docs. 90, 91.

On May 6, 2020, USC and Adamis (hereinafter collectively, "Defendants") moved for summary judgment.   Doc. 107; *see also* Doc. 118-1 (unredacted version of motion for summary judgment).   Defendants also filed a "Statement of Material Facts in Support."   Doc. 108; *see also* Doc. 118-2 (unredacted version of statement of facts).[1]   With the motion for summary judgment and statement of facts, Defendants have filed several exhibits, some of which are filed on the public docket, and some of which have been filed in redacted form or under seal.   *See* Docs. 108-1 through 108-19; 117, 117-1 through 117-5; 118-1 through 118-21.   Defendants seek summary judgment on Counts I, III, and VII of the third amended complaint (the only remaining counts against them). Docs. 107; 118-1.

---

[1] Nephron sought to strike Defendants' "Statement of Facts" for violating Local Rule 3.01(a), and also filed a motion to file excess pages in response to the motion for summary judgment due to the length of Defendants' filings.   Docs. 112, 116.   Although the motion to strike had merit, "in an effort to streamline this contentious litigation," the Court denied the motion to strike and granted Nephron's motion for excess pages.   Doc. 119.   Hence Nephron's thirty-five-page response in opposition to the motion for summary judgment.   *See* Doc. 121.

Nephron has filed a response in opposition to the motion for summary judgment.   Doc. 121. Nephron has also filed numerous exhibits accompanying its response on the public docket, some in redacted form, as well as several exhibits in support under seal.   *See* Docs. 121-1 through 121-39; Docs. 124-1 through 124-11.   Defendants have also filed an authorized reply brief.   Doc. 127.

The motion for summary judgment was referred to the undersigned for issuance of a Report and Recommendation, and the matter is ripe for review.   After review of the extensive exhibits filed by the parties, each of which I have reviewed, in both redacted and unredacted form, and for the reasons discussed herein, I respectfully recommend that the motion for summary judgment be granted in part and denied in part as outlined below.

## II.      STANDARD OF REVIEW.

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The movant "bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'"   *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994)*, modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)).   Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact.   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citation omitted).   The non-movant must provide more than a "mere 'scintilla' of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party."   *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)).   In this analysis, the Court is

only required to consider the materials cited by the parties, but it may consider other materials in the record.   Fed. R. Civ. P. 56(c)(3).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.* 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Anderson*, 477 U.S. at 248).   When analyzing a motion for summary judgment, a court draws all reasonable inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor.   *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1304 (11th Cir. 2002)).   In addition, the court does not make credibility determinations when ruling on a motion for summary judgment.   *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Anderson*, 477 U.S. at 255).   However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'"   *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citation omitted).   Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   FACTUAL BACKGROUND.

The parties do not agree on much, and both parties take liberty with their respective construction of the record.   However, there are a few salient facts that cannot reasonably be disputed, and where the facts are in dispute, the undersigned specifically so states.

Nephron and USC are competitors in the 503B sales industry.   Doc. 121-4, at 24 (deposition testimony of Clay Guinn, Hulsey's supervisor and Director of Sales at USC).[2]   Hulsey began working for Nephron as a sales representative in 2002.   Doc. 118-3, at 24–25 (Hulsey deposition testimony).   Her employment was at-will.   Doc. 74-1 ¶ 7; Doc. 84, at 29; Doc. 121-3, at 431.   Hulsey did not sign a non-compete agreement with Nephron.   Doc. 118-4, at 48:14–18 (Nephron 30(b)(6) deposition transcript of Lou Kennedy, Nephron CEO).   However, Hulsey entered into an Employee Confidentiality and Non-Disclosure Agreement ("NDA") with Nephron effective July 17, 2015.   *See* Doc. 74-1.   Pursuant to the NDA, Hulsey agreed during her employment with Nephron "and any time thereafter" to hold Nephron's Confidential Information [3] in strict confidence; not to disclose the Confidential Information to anyone other than Nephron employees who need to know as part of their job duties; not to use the Confidential Information for any purpose other than in connection with her employment and to benefit Nephron only; and not to reverse

---

[2] Citations to the deposition transcripts refer to the internal pagination of the transcripts rather than the page numbers assigned by CM/ECF.

[3] The NDA defines "Confidential Information" as:

> any information made available to or disclosed by Nephron to Employee, either directly or indirectly, prior to or after the date hereof, in writing, orally or by inspection of tangible objects, or otherwise acquired by Employee in connection with such employment, including, without limitation, Nephron 's business plans, methods of operation, ingredients, formulae, compositions, sample products, customer data. customer names or information, vendor names or information, distributor names or information, designs, documents, drawings, accounting and financial records, financial analysis, hardware, inventions, market information, marketing plans, marketing strategies, new materials research, technological data, technological prototypes, processes, products, product plans, research and development information and strategies, services, specifications, recipes, methods, trade secrets, copyrights, works of authorship or any information which is the subject of a patent or patent application.   Confidential Information also includes, without limitation, information and/or documents or other similar items of the nature described above and disclosed to Employee by a third party, or that have been provided to Nephron by a third party, whether pursuant to a license, agreement or otherwise.

Doc. 74-1 ¶ 1.

engineer, disassemble or decompile any hardware, prototypes, software, formulae, or other tangible object embodying confidential information.  *Id.* ¶ 2.

On May 7, 2018, while Hulsey was still working for Nephron, Hulsey contacted USC via email to inquire about potential employment with USC.  Doc. 118-7; Doc. 121-4, at 62.  Hulsey wrote that her sales territory consisted of Missouri, Kansas, Nebraska, Colorado, Montana, Iowa, Idaho, North Dakota, and South Dakota.  Doc. 118-7.  She specifically inquired about a position with USC in the "Kansas City area."  *Id.*  From May 2018 through August 2018, Hulsey continued to communicate with Defendants regarding prospective employment.

Beginning May 18, 2018, Hulsey began downloading Nephron customer reports to a Seagate external hard drive because she "wanted to have them for reference."  Doc. 121-3, at 73.  She also printed out paper copies of her customer list, thinking that if she was "going somewhere, [she] might need them."  *Id.* at 74.  However, Hulsey testified that she later destroyed all paper copies before she left Nephron.  *Id.*  Yet, she retained copies on the Seagate hard drive.  *Id.* at 75.

On June 13, 2018, Hulsey emailed Clay Guinn (Hulsey's future immediate supervisor at USC), and Gus Fernandez (Guinn's boss), a spreadsheet containing Nephron sales information for products offered by USC.  Doc. 118-9; Doc. 121-3, at 87–90, 121–23.  Hulsey had previously emailed herself the sales information from Nephron's Power BI system.  Doc. 121-3, at 89–90, 93.

On June 22, 2018, Guinn emailed Hulsey asking her to consider certain products and "dollarize monthly volume in [her] current accounts."  Doc. 118-10, at 11.  In response, Hulsey sent Guinn a spreadsheet "with an estimate of turning over 1/2 of my last years sales for the products I am currently selling in the first 12 months," which included details such as product names, strengths, types, volumes, and packaging.  *Id.* at 7, 10.  According to Guinn, this information was

an "assessment of [USC's] current product line as it ties out to [Hulsey's] current territory."   *Id.* at 2.

On June 28, 2018, Hulsey emailed Fernandez a list of her "pretty good accounts" at Nephron, which included over 150 Nephron customers.   Docs. 117-4, 118-11, Doc. 121-3, at 134.   The list included the customer names and location, and a notation from Hulsey as to which were her "best ones."   *Id.*   Hulsey testified that Fernandez asked her for the customer list.   Doc. 121-3, at 133–34.   Hulsey further testified that she created the customer list on the Nephron Power BI system and emailed it to herself.   *Id.* at 134–35.

On July 5, 2018, Hulsey and Fernandez exchanged further emails regarding the account list Hulsey provided, with Fernandez indicating which of Hulsey's accounts overlap with those of USC, and Hulsey providing "ballpark price[s]" that her current customers paid for syringes "based on their contract."   Doc. 118-12, at 9–10.   Hulsey anticipated that she could have those customers switch to USC.   Doc. 121-3, at 139.   The information was utilized to create a pro forma to determine Hulsey's potential compensation at USC.   *Id.* at 149; Doc. 118-6, at 127–28 (Fernandez deposition testimony).

According to Guinn and Fernandez, during the interview process, Hulsey indicated that she was not happy at Nephron, was looking to change jobs, and would terminate her employment whether or not USC hired her.   Doc. 118-5, at 69; Doc. 118-6, at 77.   Hulsey testified that prior to her employment with USC, she did not inform Defendants about the NDA.   Doc. 118-3, at 430–31.

On July 26, 2018, USC sent Hulsey an offer letter.   Doc. 121-38, at 2, 5–9.   The offer letter stated that Hulsey's employment with USC would begin no later than August 20, 2018.   *Id.* at 5. Hulsey testified that she signed an employment agreement with USC on August 2, 2018.   Doc. 118-

3, at 170.   Hulsey further testified that she began working for USC on August 20, 2018.   Doc. 121-3, at 164, 196.   Hulsey gave her two-week notice to Nephron on August 10, 2018, and her last day of employment with Nephron was August 24, 2018.   Doc. 121-3, at 175, 178.   During her deposition, Hulsey admitted that she was employed by both companies (USC and Nephron) the week of August 20, 2018.   *Id.* at 177–78.

After she left Nephron and during her employment with USC, Hulsey solicited several of Nephron's customers on behalf of USC.   *See, e.g.*, Doc. 121-39 (example email sent by Hulsey to Nephron customers on August 27, 2018 titled "Lower 503b pricing – US Compounding "Shelly Hulsey"); Doc. 121-3, at 254–60 (Hulsey acknowledging emails she sent to Nephron customers on August 27, 2018); *see also* Docs. 121-21, 121-22.   The parties dispute, however, whether Hulsey used Nephron's confidential trade secret information to do so.   *See, e.g*., Doc. 121-3, at 183–84, 254–60, 285 (Hulsey deposition testimony that she emailed only Nephron accounts for which she had memorized the email addresses and that she never used confidential Nephron information while at USC).

## IV.   ANALYSIS.

### A.   Defendants' Hearsay Objections.

"As a general matter, a court may not consider evidence on summary judgment unless it can be reduced to an admissible form."   *Casiano v. Gonzales*, No. 3:04CV67/RV/MD, 2006 WL 229956, at *7 (N.D. Fla. Jan. 31, 2006) (citing *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999)). However, "a court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form, such as if a statement falls within an exception to the hearsay rule."   *Saunders v. Emory Healthcare, Inc*.,

No. 1:07-CV-0282-WSD, 2008 WL 11322924, at *4 (N.D. Ga. Dec. 30, 2008), *aff'd*, 360 F. App'x 110 (11th Cir. 2010) (citation and internal quotation marks omitted).

Here, in the reply brief, Defendants make a conclusory statement that they "object to Plaintiffs' Exhibits E, F, H, I, W, X, Y, Z, AA, BB, DD, EE, FF, GG, II, JJ on the basis of hearsay." Doc. 127, at 2.[4]   Defendants do not cite legal authority supporting this argument or otherwise explain why the referenced Exhibits constitute hearsay.   *See id.* & n. 40, 63, 64.[5]   Notably, Exhibits E, F, H, I, W, X, Y, Z, AA, BB, DD, EE, FF, GG, II, JJ comprise over 170 pages of documents, and include various types of documents such as Nephron's Responses to Defendant's Interrogatories, a preliminary forensic expert report and related exhibits, a copy of the NDA, copies of Nephron's employment policies, and cease and desist letters sent by Nephron to Defendants.   Because Defendants fail to support their hearsay objections with any legal argument or explanation, and the Court should not be compelled to fill in the gaps for Defendants, I recommend that the Court find Defendants' hearsay objections waived.   *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a "perfunctory and underdeveloped" argument, and citing authority for proposition that "an argument made without citation to authority is insufficient to raise an issue before the court"); *see also Lee v. Gulf Coast Collection Bureau, Inc.*, Case No. 8:13-cv-2276-T-24-MAP, 2014 WL 6978760, at *4 (M.D. Fla. Dec. 10, 2014) (declining to address argument raised at summary judgment because "Defendant failed to support this argument with

---

[4]   *See* Docs. 121-6 (Exhibit E), 121-7 (Exhibit F), 121-9 (Exhibit H), 121-10 (Exhibit I), 121-24 (Exhibit W), 121-25 (Exhibit X, filed under seal at Doc. 124-4), 121-26 (Exhibit Y), 121-27 (Exhibit Z), 121-28 (Exhibit AA), 121-29 (Exhibit BB), 121-31 (Exhibit DD), 121-32 (Exhibit EE), 121-33 (Exhibit FF), 121-34 (Exhibit GG), 121-36 (Exhibit II), and 121-37 (Exhibit JJ).

[5]   In three footnotes in the reply brief, Defendants attempt to reiterate their hearsay objections.   *See* Doc. 127, at 7 n.40; Doc. 127, at 10 n.63 & 64.   However, like the one-sentence statement at the opening of the brief, these footnotes do not expand on or otherwise sufficiently explain Defendants' hearsay objections or provide authority in support.   *See id.*

citations to authority, and the Court is not willing to reach an argument that is not properly briefed"); *Farah v. A-1 Careers*, No. 12-2692-SAC, 2013 WL 6095118, at *12 (D. Kan. Nov. 20, 2013) (on summary judgment, finding the plaintiff's mention that a document was hearsay, but failing to provide argument in support, waived the hearsay objection); *Nehara v. California*, No. 1:10-CV-00491-JLT, 2013 WL 522762, at *3 (E.D. Cal. Feb. 11, 2013) (overruling objections to declaration because "Defendant incorrectly assumes the Court will sift through the declaration and determine which objections Defendants might have intended to apply to which sentence(s).  Defendant has waived its objections, because the general objections are unsupported by legal argument or explanation.").

B.      DTSA & FUTSA (Counts I & III).

Defendants seek summary judgment on Counts I and III of the amended complaint, on Nephron's claims arising under the DTSA and FUTSA.  Docs. 107, 118-1.  Both Defendants and Nephron address these claims collectively.  *See id.*; Doc. 121.  Because the analysis of the DTSA and FUTSA claims is nearly the same, the undersigned likewise addresses these claims together for purposes of this Report.  *See, e.g.*, *Hurry Family Revocable Tr. v. Frankel*, No. 8:18-cv-2869-T-33CPT, 2019 WL 6311115, at *13 (M.D. Fla. Nov. 25, 2019) ("Plaintiffs' claims under the federal Defend Trade Secrets Act (DTSA) (Count III) and the Florida Uniform Trade Secrets Act (FUTSA) (Count IV) require very similar showings, namely, the existence of a trade secret and the defendant's misappropriation of that trade secret.").

To prevail on a DTSA claim, Nephron must demonstrate that (1) it owns a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate or foreign commerce.  *See* 18 U.S.C. § 1836(b)(1).  Under the DTSA, a trade secret is defined as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or
> engineering information, including patterns, plans, compilations, program devices,

formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

*Id.* §§ 1839(3)(A), (B). "Misappropriation" under the DTSA includes both the acquisition and disclosure or use of trade secrets. *Id.* § 1839(5). "Misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Fin. Info. Techs., Inc. v. iControl Sys., USA, LLC*, No. 8:17-cv-190-T-23MAP, 2018 WL 3391379, at *4 (M.D. Fla. June 12, 2018) (citations omitted).

Similarly, the FUTSA also provides a cause of action for the misappropriation of trade secrets. *See* Fla. Stat. §§ 688.001–009. To prevail on a claim under the FUTSA, Nephron must demonstrate that (1) it possessed a trade secret, and (2) the secret was misappropriated. *See Frankel*, 2019 WL 6311115, at *13 (citing *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018)). Under the FUTSA, a trade secret is defined as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

- 12 -

Fla. Stat. § 688.002(4).   The FUTSA defines "misappropriation" as

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> 1. Used improper means to acquire knowledge of the trade secret; or
>>
>> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>>
>>> a. Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 688.002(2).

Under both the FUTSA and DTSA, confidential business information and customer information may be protected.  *See New Country Motor Cars of Palm Beach, LLC v. Beresford*, No. 17-80856-CIV, 2019 WL 3890456, at *8 (S.D. Fla. May 3, 2019).  However, "[w]hether a particular type of information constitutes a trade secret is a question of fact."  *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410–11 (11th Cir. 1998).  Thus, "whether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'"  *Yellowfin Yachts, Inc.*, 898 F.3d at 1298–99 (citing *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978)).[6]

---

[6] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh

Defendants argue that they are entitled to summary judgment on Counts I and III for several independent reasons.   Each of their arguments are addressed below.

1.     *Whether only Nephron FL Can Maintain a Claim for Misappropriation of Trade Secrets.*

As a preliminary matter, Defendants argue that Nephron has improperly "group pled" the misappropriation of trade secret claims because, as Nephron's corporate representative admitted, "Nephron FL"[7] is the only named Plaintiff that actually owns the Customer Resource Management ("CRM") System and Power BI program, the databases that allegedly contain the trade secrets at issue.   Doc. 118-1, at 8.   Therefore, citing to Nephron's 30(b)(6) deposition in support, Defendants contend that only Plaintiff "Nephron FL" can maintain a trade secrets claim.   *Id.* & n. 39 (citing Doc. 118-4, at 25:6–15).   Defendants rely on 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action."), and 18 U.S.C. § 1839(4) (defining "owner" as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed"), in support.   *Id.*

Nephron does not respond to this argument in its opposition brief, Doc. 121, and therefore Defendants maintain in reply that only Nephron FL can maintain a trade secrets claim, Doc. 127.

Initially, Defendants cite no authority for the proposition that ownership is a required element under the FUTSA.   *Cf. Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1290 (S.D. Fla. 2010) ("No requirement of ownership appears in the [FUTSA].").   And even assuming ownership is required under the DTSA, the portion of the 30(b)(6) testimony that Defendants cite for the "undisputed" fact that only Nephron FL owns the databases purportedly containing the trade secrets

_____

Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[7] According to the third amended complaint, "Nephron FL" is Plaintiff Nephron Pharmaceuticals Corporation.   *See* Doc. 74, at 1.

does not conclusively support the ruling that Defendants ask this Court to make.  *See* Doc. 118-4, at 25:6–15.  Instead, when asked which Nephron entity owns the CRM System, the 30(b)(6) deponent testified:  "Nephron Pharmaceuticals Corporation, but I consider them all one in the same. . . . it still folds up into the Delaware holding company, all of them."  *Id.*  When asked about which entity owns Power BI, the deponent testified "Same."  *Id.*  I find this testimony insufficient to establish, as a matter of law, that only Nephron FL can maintain a claim for misappropriation of trade secrets.  Accordingly, I respectfully recommend that the Court deny Defendants' request for summary judgment on this basis.  *See, e.g.*, *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007) (denying summary judgment regarding ownership of database purportedly containing trade secrets when an issue of fact existed as to the plaintiff's claim of ownership in the database).

### 2.    *Whether the Information Provided by Hulsey Constitutes Trade Secrets.*

Defendants next argue that the information provided by Hulsey does not qualify as trade secrets because such information is publicly available and generally known to competitors in the community, the information is readily ascertainable by proper means, and because Nephron fails to take reasonable steps to maintain its secrecy.  Doc. 118-1, at 9.  Defendants argue that Nephron's trade secret claims are limited to three categories of information:  (1) a customer list; (2) pricing and sales information; and (3) a sales strategy.  *Id.* at 8.[8]

---

[8] Nephron disputes that its trade secret claims are limited to these three categories of information, and therefore argues that summary judgment is improper for "Defendants' failure to move for summary judgment on several of Nephron's alleged trade secrets."  Doc. 121, at 3–4.  For the most part, Nephron fails to identify these "several" other trade secrets.  *See id.*  However, Nephron argues that in accordance with the principles of agency, Defendants are liable for Hulsey's retention, access, and use of Nephron's trade secrets while she was working on Defendants' behalf.  *Id.* at 20.  Nephron gives two examples: (1) a customer compilation summary; and (2) customer contact lists.  *Id.* at 21–22.  Nephron's contentions in this regard are further addressed *infra*, § (IV)(B)(3)(c).

a.    Customer List.

There does not appear to be a dispute that customer lists may constitute trade secrets under governing law.  *See, e.g.*, *Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011) (collecting authority for proposition that the term "trade secret" includes active customer lists), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012). Here, however, the parties dispute whether the customer list that Hulsey provided to Defendants contained such trade secret information based on Defendants' assertions that the customer list only contained information publicly available and/or readily ascertainable by proper means. "Information that is generally known or readily available to third parties generally cannot qualify for trade secret protection under Florida law."   *Furmanite*, 506 F. Supp. 2d at 1141 (citing *Am. Red Cross v. Palm Beach Blood Bank, Inc*., 143 F.3d 1407, 1410 (11th Cir. 1998)).

Defendants argue that Nephron's customer list, which Hulsey emailed to Defendants, contains only the names of hospitals and health care entities and a notation by Hulsey as to which were her best customers.  Doc. 118-1, at 9–10; *see* Doc. 118-11 (copy of Hulsey's June 28, 2018 email to Fernandez listing her "pretty good accounts" and including attached list).   Pointing to the deposition testimonies of Hulsey and Fernandez, Defendants contend that the record demonstrates that hospital names are public information, available in directories and on the internet.   Doc. 118-1, at 10 (citing Hulsey depo, Doc. 117, at 432:24–434:6); Fernandez depo, Doc. 117-2, at 44:2–13). Defendants further state that competitors in the 503B industry already know the identities of each other's customers and the names of hospitals in each sales territory because 503B sales companies share the same customer base.  *Id.* (citing Hulsey depo, Doc. 117, at 434:4–16; Fernandez depo, Doc. 117-2, at 44:3–13).   As to the notations by Hulsey as to which hospitals constituted her "best accounts," absent a non-compete agreement, Defendants argue that Hulsey could use the knowledge

and experience she gained while employed by Nephron.  *Id.* at 11.  Defendants also note that Hulsey testified that she created the list of customers and customer contact information from memory and public sources, and that Hulsey testified that she never used Nephron information after she began working for USC.  *Id.* (citing Hulsey depo, Doc. 171, at 181–82, 252, 269, 284–85, 327, 431–33).

In response, Nephron contends that there is a genuine dispute as to whether the customer list was readily ascertainable.  Doc. 121, at 4–5.  In particular, Nephron contends that the public availability of hospital names is irrelevant because the customer list was derived directly from Nephron's CRM, consists of specific hospitals with active relationships with Nephron, was distilled from all hospitals in Hulsey's territory, and includes an indication by Hulsey as to which were her best customers.  *Id.* at 5–6.  Therefore, Nephron argues that this information was not generally known nor readily ascertainable by Defendants or the public.  *Id.*[9]  Nephron then asserts that Defendants duplicated the customer list into a new spreadsheet, which Defendants then gave to Hulsey to pursue sales on their behalf.  *Id.* at 6; *see* Doc. 121-4, at 168:3–173:9 (Guinn depo); Doc. 124-2, at 8–10 (email regarding list of accounts "from a competitive rep [USC] just hired").  Therefore, according to Nephron, whether the customer list is a trade secret is an issue for a jury.  Doc. 121, at 6 (citing *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 855 (11th Cir. 2017) ("If [the defendant] could readily have acquired the information through an alternative,

---

[9] Nephron suggests that after reviewing the customer list, Fernandez told Hulsey that Defendants had previously identified only about 20 of the listed Nephron customers.  Doc. 121, at 6.  However, the email Nephron points to in support fails to state as much.  *See* Doc. 118-12.  Instead, Fernandez emailed Hulsey that "about 20 accounts" overlap.  *See id.* at 2.  During Fernandez's deposition, he further explained that the "overlap" was between accounts that were already covered by Prodigy, which had an agreement with USC regarding sales.  *See, e.g.*, Doc. 117-2, at 91:8–92:22; *see also* Doc. 121-3, at 406 (Hulsey explaining that before USC had sales representatives of its own, Prodigy acted as the sales force for USC).

open source, it likely would not have knowingly assumed the legal risk of accessing, copying, and disseminating the [alleged trade secret] in the first place.")).

In reply, Defendants maintain that Nephron customers are readily identified using publicly available information; it is undisputed that competitors in the 503B industry share the same customer base; and in any event, the customer list originated from Hulsey's memory.   Doc. 127, at 7–8.

"Courts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets."   *Furmanite*, 506 F. Supp. 2d at 1141.   Indeed, "[t]he term 'trade secret' is one of the most elusive and difficult concepts in the law to define.   The question of whether an item taken from an employer constitutes a 'trade secret,' is of the type normally resolved by a fact finder after full presentation of evidence from each side."   *Id.* (citing *Lear Siegler, Inc.,* 569 F.2d at 289).

Here, as demonstrated by the parties' respective arguments and evidence cited in support, and drawing all reasonable inferences in the light most favorable to Nephron, there is a genuine issue of material fact as to whether the customer list is entitled to trade secret protection or whether such information was readily ascertainable in the public domain.   On the one hand, Defendants point to deposition testimony suggesting that competitors in the 503B industry share the same customer base and that customer base is readily ascertainable in the industry.   On the other, Nephron points out that the specific customer list at issue came from Nephron's secure database, identifies the customers in the 503B industry with specific ties to Nephron, and also includes a notation from Hulsey which of those accounts were the "best."   *Cf. Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294 (S.D. Fla. 2018) (on motion to dismiss, finding that "curated customer list" was sufficiently pleaded as trade secret in 340B pharmaceutical case, despite public availability of 340B program participants, because listing of participants who did business with

plaintiff was not publicly available).  And although Hulsey later purportedly recreated this customer list from memory, whether that testimony is to be believed is yet to be borne out.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Allen-Sherrod v. Henry Cty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the jury.");[10] *see also Matrix Health Grp. v. Sowersby*, No. 18-61310-CIV, 2019 WL 4929917, at *7 (S.D. Fla. Oct. 7, 2019) (denying summary judgment on trade secret claim because, among other things, the defendant's argument "turn[ed] on his testimony that he compiled this data 'on his own'—that . . . he simply kept all of this information stored somewhere in the recesses of his prodigious memory," because credibility determinations are the function of a jury, and "on this issue (if not others), a jury may well disbelieve [the defendant's] account").

Therefore, I recommend the Court find that Defendants have not established, as a matter of law, that Nephron's customer list is not entitled to trade secret protection.  Because an issue of material fact remains, summary judgment on this issue would be improper.  *See, e.g.*, *SMS Audio, LLC v. Belson*, No. 9:16-CV-81308, 2017 WL 1533941, at *4 (S.D. Fla. Mar. 9, 2017) (finding that because both parties put forth witness testimony on summary judgment supporting their argument as to whether alleged trade secret information was generally known or readily ascertainable, such factual determination was "properly left for the jury"); *Cheney v. IPD Analytics*, No. 08-23188-CIV,

---

[10] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority.  *See* 11th Cir. R. 36–2.

2009 WL 4800247, at *5 (S.D. Fla. Dec. 11, 2009) (finding issue of fact as to whether customer information was entitled to protection as a trade secret precluded summary judgment).

b.      Pricing and Sales Information.

Defendants acknowledge that Hulsey emailed the price ranges for some of Nephron's products to Defendants, and provided Defendants the sales volume for other Nephron products, including the revenue generated from such sales.   Doc. 118-1, at 12; *see* Doc. 118-9 (email from Hulsey to Fernandez and Guinn attaching Excel spreadsheet with Hulsey's sales volumes at Nephron pricing for products offered by USC, from start of business 1/2017); *see also* Doc. 118-10 (email from Hulsey to Guinn attaching excel spreadsheet titled "Saleable Inventory Confidential," which estimates Hulsey turning over half of her last year sales at Nephron for Defendants and includes details such as product names, strengths, types, volumes, and packaging); Doc. 118-12 (emails between Hulsey and Fernandez that discuss specific Nephron product details and overlap of Hulsey Nephron customers with current USC accounts).

Nonetheless, Defendants contend that Nephron's pricing and sales information does not qualify for trade secret protection because such information is readily ascertainable from both Nephron's and Defendants' customers.   Doc. 118-1, at 12.   In support, Defendants cite the deposition testimonies of both Hulsey and Guinn, who both testified that customers readily reveal competitor pricing information.   *Id.* (citing Hulsey depo, Doc. 117, at 284:16–288:1, 437:18–438:21; Guinn depo, Doc. 117-1, at 27:4–28:21, 30:18–31:8, 101:10–16, 313:4–315:8). Defendants also argue that even absent requesting the information from customers, customers also directly reveal pricing and sales information without prompting.   *Id.* at 13 (citing Doc. 118-17, an unsolicited customer response to email from Hulsey providing screenshot of products ordered from Nephron and prices paid for those products).   Moreover, Defendants contend that because Nephron

customers have received Nephron pricing without being subject to a confidentiality agreement, and because some of Nephron's agreements with its customers do not contain confidentiality clauses, Nephron's pricing and sales information cannot qualify as a trade secret.  *Id.* at 13–14 (citing Nephron 30(b)(6) deposition testimony, Doc. 118-4; Nephron purchase agreement, Doc. 118-5, and Nephron vendor agreement, Doc. 118-16)).

In response, Nephron argues that its pricing and sales data is not readily ascertainable.   Doc. 121, at 7–8.   Nephron states that it presented evidence regarding the confidentiality of its pricing, disputing how readily customers will disclose competitors' pricing, and questioning the reliability of those prices if disclosed.  *Id.* at 8 (citing 30(b)(6) testimony of Lou Kennedy, Nephron CEO, Doc. 121-2, at 59:17-77:4, in which Ms. Kennedy discusses confidentiality clauses in contracts with customers, questions whether customers actually disclose sales information to competitors, and states that companies cannot rely on prices given by customers because "those prices are just talk"). Nephron further contends that "Defendants' anecdotal testimony about customers' alleged willingness to disclose prices is irrelevant, because the data Defendants misappropriated goes far beyond the price a single customer pays for a single product at a given time."  *Id.*   Specifically, Nephron states that no third party had access to the CRM, from which the pricing and sales data was generated, and the pricing and sales data represented "a complete compilation of Nephron's historical 503B pricing and sales structure, revealing the average sales price across *all* territory customers, sales volume trends for all products and all presentations through the life cycle of Nephron's 503B program, and other valuable market intelligence."  *Id.*   Nephron relies on *Compulife Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020) to argue that its database is protectable.  *Id.* at 9.   Finally, Nephron argues that Defendants' assertion that the pricing and sales data was readily ascertainable is belied by Defendants' own ongoing efforts to obtain competitive

pricing and sales data through its employees, at the very least creating an issue of fact for a jury. *Id.* at 9–10.

In the reply brief, Defendants again submit that the sales and pricing information is readily ascertainable, and therefore fails to qualify as a trade secret, because the information is readily and frequently disclosed by Nephron customers to its competitors, relying on a decision from the South Carolina Supreme Court in support.  Doc. 127, at 8–9; *see Wilson v. Gandis*, No. 2018-001140, 2020 WL 2893257, at *15 (S.C. June 3, 2020).[11]

On review, the undersigned again agrees with Nephron that a genuine issue of fact exists as to whether the pricing and sales information constitutes a trade secret or whether that information was readily ascertainable by the public.  First, because the pricing and sales information indisputably came from Nephron's secure databases, there could be an overarching issue as to whether Nephron's database is protectable.  *See Compulife Software Inc.*, 959 F.3d at 1315. Second, Defendants' assertions that customers will reveal pricing information is not as conclusive as Defendants suggest.   For one, there is also record testimony calling those assertions into question and indicating that any such information from customers is unreliable.  *See* Doc. 121-2, at 59:17-77:4 (30(b)(6) deposition testimony in which Ms. Kennedy testifies that companies cannot rely on prices given by customers because "those prices are just talk").   At the very least, the conflicting deposition testimony on whether customers actually do reveal Nephron pricing and sales

---

[11] The *Wilson* case is, of course, not binding on this Court.   Moreover, it is not persuasive here. First, the court's findings followed a bench trial in the matter, and the case did not resolve on summary judgment.   Second, the evidence in that case was not analogous to what the parties have provided thus far in this case.   In particular, in *Wilson*, there was evidence that the customer and pricing information, among other things, was ascertainable from trade shows, trade associations, and other publicly available sources, and that no customers signed nondisclosure agreements and were free to share product information.   Here, however, at this point, the evidence is in dispute as to whether the customer and pricing information was publicly available, and it appears that Nephron's customers (some, if not all) entered into confidentiality agreements with Nephron.

information to competitors remains an issue of disputed fact improperly resolved on summary judgment.  *See Lane v. Celotex Corp*., 782 F.2d 1526, 1528 (11th Cir. 1986) (citations omitted) (on summary judgment, "the district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to assess the probative value of the evidence").

In addition, as Nephron contends, Defendants have not demonstrated that the pricing and sales information they allegedly received form current Nephron customers would necessarily include all of the information in Nephron's databases, which is the information at issue here.  *See, e.g.*, Doc. 118-10 (email from Hulsey to Guinn attaching excel spreadsheet titled "Saleable Inventory Confidential," which includes not only pricing information but details such as product names, strengths, types, volumes, and packaging).  *See also Marlite, Inc.*, 2011 WL 39130, at *6 ("Modular suggests that because Marlite's customers were free to disclose the company's prices to its competitors, the pricing information could not have constituted a trade secret.  But Marlite's trade secrets are more than just the price offered to one particular customer at a particular time.  It includes customer and pricing information based on an intimate knowledge of Marlite's costs and a personalized and historical knowledge of a customer's purchasing, shipping, and payment histories. This information was not publicly known."); *Synthes, Inc. v. Emerge Med., Inc*., 25 F. Supp. 3d 617, 707 (E.D. Pa. 2014) ("The value of the information was in the 'compilation, categorization, and organization of information' on thousands of customers and products, which could not be easily recreated by a competitor's mere talking with the customers.   Indeed, although Defendants suggest that they could have gotten individual bits of this information from other vendors or customers, they fail to show that they could have recreated this volume of information.").

As to Defendants' assertion that Nephron's pricing and sales information cannot qualify as a trade secret because Nephron allegedly does not require its customers to enter into confidentiality

agreements regarding this information, the evidence is also not as conclusive as Defendants suggest. For instance, Defendants point to Nephron's corporate representative (Lou Kennedy) deposition testimony to argue that "Plaintiffs' customers have received Plaintiffs' pricing information without being subject to a confidentiality agreement."   Doc. 118-1, at 14.   However, when asked whether every customer had a contract before purchase, Ms. Kennedy in fact testified that she "couldn't speculate on that," and that "[f]or the most part, everybody has got some sort of contractual language."   Doc. 118-4, at 60.   She also testified that she does not know of a customer that does not have a contract with Nephron.   *Id.* at 69.   When asked whether it was possible that customers have received Nephron pricing information without a confidentiality agreement, Ms. Kennedy testified "they could receive pricing information, but it may not be their exact price . . . [u]ntil we negotiate. . . . There could be a general price."   *Id.* at 61.

Defendants also argue that some of Nephron's contracts do not contain confidentiality clauses, specifically stating that "two customer contracts failed to contain *any* promise of confidentiality on behalf of the customer, while another expressly states that pricing information was the property of the customer."   Doc. 118-1, at 14 (citing Docs. 118-4, 118-15, 118-16).   Yet, Ms. Kennedy testified that Nephron has "well over a thousand customers."   Doc. 118-4, at 69: 15–16.   Accordingly, I do not find that Defendants' citation to three isolated customer contracts warrants summary judgment in their favor.   *See Marlite*, 2010 WL 11506348, at *3 (denying motion for summary judgment on trade secret claim for pricing information and customer list even though it was "questionable" whether that information constituted trade secrets and where the defendant argued that customers frequently disclosed vendor price quotas).

Based on the foregoing, I respectfully recommend that the Court deny Defendants' request for summary judgment on the issue of whether the pricing and sales information constitutes a trade secret.

c.      Commercial Strategy.[12]

In the third amended complaint, Nephron alleges that its 503B commercial strategy constitutes a trade secret.  Doc. 74.  Nephron alleges that Hulsey disclosed such information to Defendants and Defendants misappropriated it.  *Id.*; *see also* Doc. 117-3 (email from Guinn to Fernandez regarding content of meeting with Hulsey about Nephron business practices).

Citing to the deposition testimony of Robert Hopkins, Adamis's CFO, in support, Defendants argue this commercial strategy is not a trade secret because it is a known and commonly utilized strategy by other 503B compounding sales companies.  Doc. 118-1, at 15 (citing Hopkins depo, Doc. 118-18, at 229:14–233:22).  Defendants further argue that USC had actually used the same strategy, but discontinued it in 2016, before even meeting Hulsey.  *Id.* (citing Hopkins depo, Doc. 118-18, at 229:14–233:22).

In response, Nephron contends that Defendants' sole evidence—Hopkins' deposition testimony—is unsupported and insufficient on this point.  Doc. 121, at 10.  For example, Nephron's CEO Lou Kennedy testified that the commercial strategy was Nephron's unique business model, which Nephron claims calls into question Hopkins' testimony.  *Id.* (citing 30(b)(6) deposition testimony of Lou Kennedy, Doc. 121-2, at 178:21–183:5).  Nephron also points to an email between Guinn and Fernandez containing notes from a production meeting about

---

[12] Because details regarding the commercial strategy have been filed under seal or otherwise redacted in the summary judgment filings, this Report refers to the commercial strategy only in general terms.  *See, e.g.*, Doc. 117-5, at 229:14–233:22 (Hopkins deposition testimony, filed under seal); Doc. 121-15 (Exhibit N, redacted); Doc. 124 (Exhibit N filed under seal); Doc. 121-18 (Exhibit Q, redacted); Doc. 124-1 (Exhibit Q filed under seal).

implementing a commercial strategy "similar to Nephron." *See* Docs. 118-15, 124.  Nephron further cites to an email from Dennis Carlo, Adamis's CEO/President, encouraging the email recipients to look at Nephron's business.  *See* Doc. 121-17.  Then, Nephron points to a presentation in which Defendants included reference to Nephron's business strategy and stating that USC could use the "same business model."  *See* Docs. 121-18, 124-1, at 8.  Therefore, according to Nephron, a reasonable jury could conclude that Nephron's commercial strategy was not generally known.  Doc. 121, at 11.

In reply, Defendants reiterate their position that it is undisputed that they used the same strategy and discontinued it before Hulsey contacting them.  Doc. 127, at 9.  Again, Defendants point to Hopkins' deposition testimony to argue that Nephron's assertions are contradicted by the record because Hopkins testified that the information regarding Nephron's sales strategy was not presented by Adamis to anyone.  *Id.* at 9–10.

As the foregoing demonstrates, the parties once again cite to conflicting testimony to support their respective positions on whether Nephron's commercial strategy constitutes a trade secret or whether such strategy is known by competitors and commonly used.  Therefore, once again, this issue will ultimately require resolution by the trier of fact.  *See, e.g.*, *Sowersby*, 2019 WL 4929917, at \*7 (denying summary judgment on alleged trade secrets including "monthly patient lists, patient diagnosis and prescription information, pricing information, reimbursement/profit data, financial reports, patient health information, historical referral sources, and other related company strategies" because "[d]espite the parties' extensive given-and-take on this issue," the inquiry was fact intensive and not properly resolved on summary judgment).

d.  Reasonable Measures to Protect Trade Secrets.

As an alternative to the foregoing, and assuming that the Court finds that the information was not generally known or readily ascertainable, Defendants argue that the information still fails to qualify for trade secret protection because Nephron did not take reasonable steps to maintain its secrecy.   Doc. 118-1, at 15.   In reliance on excerpts from Nephron's 30(b)(6) deposition testimony (Doc. 118-4), Defendants take issue with the following:   (1) Nephron and Hulsey did not enter into the NDA until 2015, approximately 13 years after Hulsey began employment; (2) Nephron allowed Hulsey and other employees to use their personal smart phones for work to access work email and download information; (3) Nephron did not require employees to enter a password each time they accessed the information; Nephron did not ensure that employees properly locked access to their phones; and Nephron could not delete or wipe information from the employees' phones; (4) Nephron employees could use their personal home computers for business purposes, and could use such to access Power BI, Nephron's CRM, and Nephron email remotely, from which the employees could download reports, store them locally, attach them to email, and print them without restriction; (5) Power BI did not have differing levels of access, which Nephron employs for its truly secretive information; and (6) some of Nephron's customers received pricing information without being subject to confidentiality agreements, and some Nephron customer contracts do not contain a confidentiality clause (three such contracts being produced in discovery).  *Id.* at 16–19.

Nephron responds that Defendants fail to point to any evidence that the customer list, pricing and sales data, or commercial strategy were ever disclosed to any non-employee third party.   Doc. 121, at 12.   As to internal security measures, Nephron argues that at the very least, an issue of fact exists as to the reasonableness of the security measures.  *Id.* at 12–13.  Specifically, Nephron points out that only the sales and management team—approximately 40 of 1100+ employees—have

access to the internal databases storing the information at issue; the databases have several layers of complex password protection requirements and four varying levels of access based on job duties; and every employee with access to those databases was bound by a confidentiality agreement.  *Id.* (citing Doc. 121-2, at 242–44, 252–53, 250–67 (Nephron 30(b)(6) deposition); Doc. 121-7, at 8–10 (Nephron responses to Defendants' Interrogatories)).   Nephron contends that its security measures are not insufficient as a matter of law merely because Nephron could have theoretically done more.  *Id.* at 13.

In reply, Defendants reiterate that Nephron's customers were privy to the pricing and sales information, some of whom were not under a confidentiality obligation.   Doc. 127, at 10.  Defendants further contend that Nephron's claim that its employees were all bound by confidentiality agreements is belied by the fact that Hulsey did not enter into the NDA until 2015.  *Id.*  Defendants further argue that Nephron's contentions that it limits information to small subsets of employees cannot warrant trade secret protection because it "amount[s] to nothing more than the normal measures a business would take to protect its information."  *Id.* at 10–11.   Defendants object to each measure that Nephron allegedly employs (or fails to employ).  *Id.* at 11.

The undersigned finds the conflicting evidence relied on by each party demonstrates that a genuine issue of fact remains precluding summary judgment on this issue.  *See Furmanite*, 506 F. Supp. 2d at 1141 ("Courts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets.").   In particular, the record demonstrates that Nephron had its employees execute confidentiality agreements, which designated as confidential customer data, customer names, accounting and financial records, and strategies, among other things.  Doc. 74-1 ¶ 1; Doc. 121-7, at 8–9.   Nephron's Interrogatory responses further state that all Nephron-issued computers

must be password protected, and such passwords must meet certain complexity requirements.   Doc. 121-7, at 9.   Access to Nephron's CRM and PowerBI, which Nephron considers proprietary, are also password-protected in the same manner.   *Id.*   Nephron also limits access to its secure network to its employees.   *Id.* at 9–10.   Employee access to CRM and PowerBI is commensurate with an employee's duties.   *Id.* at 10.

Defendants point to no evidence that Nephron allowed its employees to disclose the alleged confidential information to third parties.   Based on the conflicting evidence each side submits in support of their respective positions, the undersigned cannot say, as a matter of law, that Nephron failed to employ reasonable measures to protect its alleged trade secrets.   *See Furmanite*, 506 F. Supp. 2d at 1142; *Jadael Inc. v. Elliott*, No. 6:05-cv-1623-Orl-DAB, 2007 WL 2480387, at *8 (M.D. Fla. Aug. 29, 2007) (denying plaintiff's motion for summary judgment on trade secret claim under Florida law due to disputed issue of fact as to whether reasonable efforts were taken to maintain secrecy); *Audiology Distribution, LLC v. Simmons*, No. 8:12-cv-02427-JDW, 2014 WL 7672536, at *9 (M.D. Fla. May 27, 2014) (finding, "[a]t the very least," an employment agreement of indefinite duration containing confidentiality provision created a genuine dispute of material fact regarding whether the plaintiff used reasonable efforts to maintain the secrecy of its customer lists); *see also Se. Mech. Servs., Inc. v. Brody*, No. 8:08-cv-1151-T-30EAJ, 2008 WL 4613046, at *12 (M.D. Fla. Oct. 15, 2008) ("Defendants point out possible measures that [plaintiff] chose not to employ, such as labeling information as 'confidential' or 'trade secret.'   The fact that [plaintiff] conceivably could have done more does not make what it did do unreasonable.").

In sum, Defendants have not established, as a matter of law, that the information at issue is not entitled to trade secret protection or that Nephron failed to take reasonable steps to protect its

alleged trade secrets. Accordingly, summary judgment on these issues would be improper. *See, e.g.*, *Furmanite*, 506 F. Supp. 2d at 1142.

        *3.*      *Whether Defendants Misappropriated Nephron's Purported Trade Secrets.*

As discussed above, "[o]ne party can misappropriate another's trade secret by either acquisition, disclosure, or use." *Compulife Software Inc.*, 959 F.3d at 1311 (citing Fla. Stat. § 688.002(2)). "A person misappropriates a trade secret by *acquisition* when he acquires it and 'knows or has reason to know that the trade secret was acquired by improper means.'" *Id.* (quoting Fla. Stat. § 688.002(2)(a)). "A person misappropriates a secret by *use* if he uses it 'without express or implied consent' and either:

> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
>> a. Derived from or through a person who had utilized improper means to acquire it;
>>
>> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

*Id.* (citing Fla. Stat. § 688.002(2)(b)). "'[I]mproper means' is defined to include 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" *Id.* (quoting Fla. Stat. § 688.002(1)); *see also* 18 U.S.C. § 1839(5) (DTSA definition of "misappropriation").

Whether Defendants "used" Nephron's trade secrets is a question of fact.  *See Putnam v. Henkel Consumer Adhesives, Inc.*, No. 1:05-CV-2011-BBM, 2007 WL 9701058, at *8 (N.D. Ga. May 25, 2007) (citing *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 n.6 (11th Cir. 2003)).

a.      Acquisition.

While Defendants maintain that Nephron's information disclosed by Hulsey does not qualify for trade secret protection, Defendants contend that even if it did, Defendants acquired no information from Hulsey via improper means, nor did they disclose or use it.  Doc. 118-1, at 20–23.  Defendants argue that Nephron can only show misappropriation through evidence that Defendants knew or had reason to know that their pre-employment communications with Hulsey would induce Hulsey to breach a duty to maintain secrecy owed to Nephron.  *Id.* at 21.  Defendants contend, however, that the undisputed facts demonstrate that Defendants did not know, and had no reason to know, that Hulsey was under any such obligation because Hulsey testified that she never told Defendants she had an NDA with Nephron and did not produce the NDA to Defendants until this lawsuit was filed.  *Id.* (citing Hulsey depo, Doc. 117, at 430–31).  Defendants further state that they (Fernandez and Guinn) only knew that Hulsey was not bound by a non-compete agreement, and Fernandez testified he knew no further details regarding her employment.  *Id.* (citing Guinn depo, Doc. 117-1, at 62:4–63:23; Fernandez depo, Doc. 117-2, at 73:20–74:11).

Nephron responds that there is no dispute that Defendants acquired the customer list, pricing and sales data, and commercial strategy from Hulsey, and that Defendants induced Hulsey's disclosure of those trade secrets because they expressly asked Hulsey for the information.  Doc. 121, at 14–15 (citing Hulsey depo, Doc. 121-3, at 400:21–402:6, in which Hulsey testifies that she "didn't give [Defendants] any information that they didn't ask [her] for," and that Defendants asked

her to provide Nephron documents to them).   Nephron contends that Defendants' argument that they had no "reason to know" about Hulsey's NDA "defies credulity," pointing to Guinn's deposition testimony in support.   *Id.* at 15 (citing Guinn depo, Doc. 121-4, at 63:15–65:1, in which Guinn testifies that Hulsey informed him that although she did not have a non-compete, she had an employment agreement, and Guinn testified that "[m]ost employment agreements do have confidentiality clauses in it," so even if Hulsey did not tell him about any confidentiality provision, he "would assume it did").   Nephron also points out that Defendants require their own employees to sign confidentiality agreements mirroring the terms of Hulsey's NDA.   *Id.* (citing Fernandez depo, Doc. 121-5, at 79:1–89:20, 97:3–104:25).[13]   Alternatively, Nephron contends that it need not establish that Defendants knew about Hulsey's contractual confidentiality obligations with Nephron (*i.e.*, that Defendants specifically knew about the NDA), contending instead that Hulsey had a common law duty to maintain Nephron's trade secrets, and that a reasonable jury could conclude that Defendants' "acquisition of information they knew to be confidential, from a *current* employee of a *direct* competitor, gave them ample 'reason to know' that their request would induce Hulsey's breach" of that duty.   *Id.* at 16 (emphasis in original).

In reply, Defendants maintain that Hulsey never informed Defendants of the NDA.   Doc. 127, at 12.   Defendants further argue that Nephron errs in relying on Guinn's testimony, "given Guinn testified he did not know the details of Hulsey's employment agreement with Nephron."   *Id.* (citing Guinn depo, Doc. 121-4, at 284:15–86:12).   Defendants also contend there is no evidence

---

[13] The specific pages of Fernandez's deposition that Nephron cites do not support its statement regarding Fernandez's deposition.   However, in other parts of his deposition, Fernandez does testify that USC has agreements that prohibit employees from sharing confidential information, such as a customer list, and that he signed such an agreement with Adamis.   Doc. 121-5, at 45:1–46:1.   Fernandez also testified that USC considers the type of information labeled confidential under Hulsey's NDA to be confidential and proprietary in its business as well.   *Id.* at 151:13–22

that Defendants knew or should have known about "Hulsey's supposed 'implied' duty to maintain secrecy." *Id.*

On review, I recommend the Court find there is a genuine factual dispute as to whether Defendants' misappropriated the alleged trade secrets. Once again, the parties point to conflicting testimony to support their respective positions. On the one hand, Hulsey testified that she told no one at USC regarding the NDA, and Guinn and Fernandez testified that they did not know about the NDA. On the other hand, however, Guinn testified that he knew Hulsey had an employment agreement and assumed it contained a confidentiality provision, and Fernandez testified that USC employees have confidentiality agreements and that USC considers the information described as confidential under the NDA to be confidential as well. At minimum, there is a genuine issue of material fact as to whether Defendants "ha[d] reason to know that the trade secret was acquired by improper means" or that it was "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(A), (B)(ii)(III); *see also* Fla. Stat. § 688.002. As a result, there is a genuine issue of material fact as to whether Defendants misappropriated Nephron's trade secrets.[14]

_____

[14] Absent the NDA, Nephron is correct that Florida imposes a common law duty on employees regarding proprietary trade secret information of employers. *See, e.g.*, *Brody*, 2008 WL 4613046, at *10 ("Florida law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment." (citing *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3d Dist. Ct. App. 1984))). While Defendants contend that they did not know or had no reason to know of such common law duty, this contention is unavailing, particularly in light of Guinn's deposition testimony. *See* Doc. 121-4, at 285:10–23 (Guinn testifying as to his knowledge of employee obligations outside of a non-compete agreement). And Defendants have not demonstrated that such common law duty could not be imputed to USC, based on Hulsey's conduct, if USC knew or had reason to know that proprietary information was acquired under circumstances giving rise to a duty to maintain its secrecy. *See Brody*, 2008 WL 4613046, at *12 (discussing fact that corporate defendants "knew or had reason to know that the individual defendants' knowledge of SMS's proprietary information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" in issuing a preliminary injunction against corporate defendants). Nonetheless, I do note that although the Eleventh Circuit recognizes that implied confidential relationships can be sufficient to trigger trade secret liability under Florida law, the court is "'wary of any trade secret claim predicated on the existence of" such a relationship."

b.      Use.

Defendants argue that there is no evidence that Hulsey ever used or disclosed the information at issue after she began her employment with USC, stating that Hulsey repeatedly testified that she used none of Nephron's information, and when Hulsey contacted her former customers she relied on either public information or a list recreated from memory.   Doc. 181-1, at 21–22 (citing Hulsey depo, Doc. 117, at 252, 269, 284, 327, 431–33).

Nephron contends that, as it relates to the customer list, the evidence demonstrates that Defendants used such information because:   (1) in July 2018, Defendants used the information to determine how many Nephron customers overlapped with USC customers; (2) on August 20, 2018, Hulsey's first day of work, Defendants used the customer list to create an identical list of accounts for Hulsey to utilize;[15] (3) on August 27, 2018, Hulsey sent solicitation emails to dozens of Nephron's hospital customers; and (4) Defendants succeeded in diverting $1.1 million in sales from Nephron customers following Hulsey's hire (compared to $0 from those customers the prior year).

---

*Yellowfin Yachts, Inc.*, 898 F.3d at 1300 (quoting *Bateman v. Mnemonics, Inc*., 79 F.3d 1532, 1550 (11th Cir. 1996)).

[15] In the reply brief, Defendants take issue with the citation Nephron uses to support this statement, namely Guinn's deposition testimony.   Doc. 127, at 13 n.77; *see* Doc. 121, at 17 n.51.   Specifically, Defendants object on the grounds of the best evidence rule to Nephron's use of Guinn's deposition testimony to establish that Hulsey was provided with the customer list.   Doc. 127, at 13 n.77.   Defendants claim that Nephron is attempting to use Guinn's testimony to establish the contents of a written record (*i.e.*, that Kendra Williams (commercial analyst and sales support) emailed the list to Hulsey), but fail to include a copy of the email from Williams to Hulsey in the record.   I find this argument unpersuasive for three primary reasons.   First, Defendants cite no legal authority in support of their argument.   *See id.*   Second, Defendants fail to address the fact that although Nephron cites Guinn's testimony to support this statement, Nephron also cites to an email exchange between Ms. Williams and Guinn regarding a list of "accounts from a competitive rep [USC] just hired."   *See* Doc. 121-19.   Finally, even if the best evidence rule precluded the Court from relying on Guinn's deposition testimony to establish that Ms. Williams emailed a customer list to Hulsey, that fact is not dispositive in favor of summary judgment because, as discussed herein, there are several other issues outstanding as to whether Defendants "used" Nephron's confidential information.   For example, although Hulsey testified that she never used Nephron confidential information while working for USC, Nephron has submitted evidence suggesting that Hulsey sent solicitation emails to multiple Nephron customers from the customer list on USC's behalf after beginning employment with USC.

Doc. 121, at 16–18.  Regarding the pricing and sales data, Nephron argues that Defendants used such information to evaluate Hulsey for employment and determine her compensation, and as a benchmark for what to charge USC customers.  *Id.* at 18–19.  Finally, as to the commercial strategy, Nephron argues that there is evidence that Defendants discussed Nephron's commercial strategy in a production meeting after acquiring it from Hulsey and disclosed it in a presentation for prospective investors.  *Id.* at 19.  Nephron also urges the Court to look at the "dramatic" and "otherwise inexplicable" increase in Defendants' sales following Hulsey's disclosures.  *Id.*

In reply, Defendants contend that use of the customer list internally to determine whether to hire Hulsey and to identify the customers she would call on for USC cannot establish "use."  Doc. 127, at 12.  Defendants further argue that Nephron's contention that it "used" the pricing and sales data is speculative.  *Id.* at 13.  Defendants also argue that its internal discussions regarding the sales strategy and a contradicted assertion that it was disclosed to investors fail to demonstrate "use." *Id.*

"[W]hile not defined in the statute, the bar for what counts as 'use' of a trade secret is generally low."  *Compulife Software Inc.*, 959 F.3d at 1313 (citing *Penalty Kick Mgmt.*, 318 F.3d at 1292 ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'")).

Taking the evidence submitted in the light most favorable to Nephron, Defendants have not met their burden of demonstrating that no "use" of the information at issue took place.  At the very least, there is an issue of fact as to whether Hulsey used the alleged trade secrets during her employment with USC.  Although Hulsey testified that she never used Nephron confidential information while working for USC, Nephron has submitted evidence suggesting that Hulsey sent solicitation emails to multiple Nephron customers from the customer list on USC's behalf after

beginning employment with USC.   *See* Doc. 121-3, at 252:23–261:24 (Hulsey depo); Doc. 121-21 (table of emails sent by Hulsey from USC account, some labeled "Lower 503b pricing-US Compounding."   And again, whether Hulsey's (self-serving) testimony that she never used any Nephron information upon her beginning employment with USC is credible is within the province of a jury and not for the Court to resolve on summary judgment.   *See Allen-Sherrod*, 248 F. App'x at 147 ("It is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the jury.").[16]

Based on the foregoing, "the Court cannot conclude as a matter of law that no use of the information occurred."   *See Furmanite*, 506 F. Supp. 2d at 1142.   Accordingly, I recommend that the Court deny Defendants' request for summary judgment on the issue of misappropriation.

c.   Additional Trade Secrets Claimed by Nephron.

Within its acquisition analysis, Nephron includes an argument that Defendants have acquired and used additional trade secrets through Hulsey, beyond those previously discussed (*i.e.*, customer list, pricing and sales information, and commercial sales strategy).   Doc. 121, at 20.   Nephron argues that "any Nephron trade secrets that Hulsey failed to return to Nephron upon her resignation—and instead diverted for her use on Defendants' behalf—is imputable to Defendants in accordance with principles of agency."   *Id.*   And, Nephron points out that agency is a question of

---

[16] In the reply brief, Defendants rely on *In re Sotera Wireless, Inc.*, 591 B.R. 453 (S.D. Cal. 2018), *aff'd*, 794 F. App'x 625 (9th Cir. 2020) to argue that internal discussions are insufficient to demonstrate "use." Doc. 127, at 12 & n.76.   *Sotera* is not binding on this Court, nor is it persuasive here, in particular because Nephron has submitted evidence of alleged "use" by Hulsey's solicitation of its customers, which clearly could constitute "use" for purposes of the DTSA and FUTSA.   *See Penalty Kick Mgmt.*, 318 F.3d at 1292 ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'").

fact, which it claims precludes summary judgment. *Id.*[17] Nephron gives two examples of additional trade secrets which it claims are at issue: (1) a customer compilation summary; and (2) more customer contact lists. *Id.* at 21–22.

In the reply brief, Defendants argue that "[t]here is no evidence that Hulsey was acting as Defendants' agent or employee when she acquired any of this information, which Plaintiffs concede took place before she was working for USC and while she was working for Nephron." Doc. 127, at 14. Defendants contend that there is no evidence that Defendants authorized Hulsey to act on their behalf. *Id.* at 15. Moreover, Defendants point out that Hulsey repeatedly denied that after she began working for USC, she took, accessed, or used any of Nephron's information for Defendants. *Id.* at 16.

Because there are genuine issues of material fact remaining as to whether the information Hulsey took from Nephron and shared with Defendants qualifies for trade secret protection under governing law, or whether Defendants misappropriated those alleged trade secrets, I find it unnecessary to address in detail Nephron's additional contentions regarding additional trade secrets.[18] Nonetheless, as with the customer list; pricing and sales data; and commercial strategy, I note that the parties once again point to conflicting testimony on what Hulsey did or did not do with Nephron information once she began employment with USC. *Compare* Doc. 121, at 22–25,

---

[17] Under Florida law, "[a] principal is liable for the tortious conduct of his agent, even though not authorized, if the agent was acting within the scope of his employment or his apparent authority. Whether acts are within the scope of an agent's apparent authority or whether the acts were ratified by the principal are determinable as questions of fact. The general rule is that, unless the evidence is susceptible to but one interpretation[,] the question of whether an agency relationship exists is for the jury to determine." *See Universal Physician Servs., LLC v. Del Zotto*, No. 8:16-cv-1274-T-36JSS, 2018 WL 4677739, at *10 (M.D. Fla. Sept. 29, 2018) (internal citations and quotation marks omitted).

[18] In addition, as Nephron correctly points out, Defendants did not move for summary judgment on the issue of these "additional" trade secrets, and therefore, I recommend the Court find that summary judgment in Defendants' favor on this issue would be improper.

*with* Doc. 127, at 14–15.   Therefore, once again, there exist issues of material fact as to whether the additional trade secrets claimed by Nephron—the customer compilation summary and customer contact lists—qualify for trade secret protection and/or whether Defendants misappropriated such trade secrets.

Because whether Defendants misappropriated these additional alleged trade secrets presents an unresolved question of fact, I recommend that the Court decline to enter summary judgment on the FUTSA and DTSA claims.

> *4.     Whether Defendants Proximately Caused Nephron Damages.*

Defendants contend that Nephron has failed to identify or provide evidence supporting alleged damages.   Doc. 118-1, at 22.   Defendants argue that Nephron is asking the Court to speculate what the damages are and how those damages were caused.   *Id.*[19]

Nephron responds that issues of causation and damages are for the finder of fact.   Doc. 121, at 25.   Nephron points to the report of its expert, Carrie Distler, which according to Nephron, at minimum, creates an issue of fact precluding summary judgment on the issues of causation and damages.   *Id.* at 26–27.   *See* Doc. 121-8 (copy of Distler report opining as to unjust enrichment and reasonable royalty damages, which report was served on Defendants after motion for summary judgment was filed).

"Damages for a FUTSA violation 'can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation.'"   *Advantor Sys. Corp.*, 678 F. App'x at 853 (quoting Fla. Stat. § 688.004(1)); *see also Balearia Caribbean, Corp. v. Calvo*, No. 16-23300-CIV, 2017 WL 8780944, at *4 (S.D. Fla. Aug. 3, 2017) (explaining that under the

---

[19] Defendants rely on *In re Maxxim Med. Grp., Inc.*, 434 B.R. 660, 692 (Bankr. M.D. Fla. 2010) to support their position.   However, I do not find *In re Maxxim* persuasive here because that decision was rendered after a twenty-six-day trial.   *See* 434 B.R. at 668 n.2.

DTSA, courts may award damages for actual loss caused by misappropriation of trade secret, and that injunctive relief is also available under certain conditions).   In seeking damages under the FUTSA, "[a] plaintiff's burden of proof . . . is 'liberal' and is satisfied by showing the misappropriation, the subsequent commercial use, and . . . evidence by which the jury can value the rights the defendant has obtained."   *Advantor Sys. Corp.*, 678 F. App'x at 853 (quoting *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 644 (Fla. 4th Dist. Ct. App. 2012)).

Here, I recommend the Court find that at the very least, Nephron's submission of Distler's expert report creates an issue of fact regarding whether Defendants caused Nephron's alleged damages.   *See* Doc. 121-8 (Distler report).   I also note that Nephron also seeks injunctive relief in the third amended complaint, *see* Doc. 74 ¶¶ 89, 106, which Defendants do not address in either the motion for summary judgment or the reply, *see* Docs. 118-1, 127.   Accordingly, I recommend that the Court deny Defendants' request for summary judgment on the basis of causation and damages. *See, e.g.*, *Camp Creek Hosp. Inns, Inc.*, 139 F.3d at 1412 (reversing grant of summary judgment on trade secret claim arising under Georgia version of UTSA; although the defendant argued that the plaintiff failed to provide evidence of damages, and the plaintiff's evidence did "not isolate losses directly attributable to any particular misuse of confidential information," under the UTSA, a reasonable royalty may be awarded if the plaintiff cannot prove damages or unjust enrichment by a preponderance of the evidence, and injunctive relief may also be appropriate).[20]

C.   Tortious Interference with Advantageous Relationships (Count VII).

"Under Florida law, the elements of a claim of tortious interference with a business relationship are: '(1) the existence of a business relationship, not necessarily evidenced by an

---

[20] Similar to the Georgia version of the UTSA, the FUTSA provides that a reasonable royalty may be awarded in lieu of damages measured by other methods, and injunctive relief is also available.   *See* Fla. Stat. §§ 688.003, 688.004.

enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of that interference.'" *Carlwood Safety, Inc. v. Wesco Distribution, Inc.*, 446 F. Supp. 3d 970, 978 (M.D. Fla. 2020) (quoting *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th Dist. Ct. App. 2009)).

Here, according to the third amended complaint, Nephron's tortious interference with advantageous relationship claim against Defendants is premised on two relationships:   Defendants' alleged interference with Hulsey's NDA with Nephron, and Defendants' alleged interference with Hulsey's at-will employment with Nephron.   Doc. 74 ¶¶ 141–42.

Defendants argue that summary judgment is proper on the tortious interference claim for five independent reasons:   (1) the claim is preempted by the FUTSA; (2) Defendants did not know about the NDA; (3) Defendants did not intentionally interfere with Nephron's advantageous relationship(s) with Hulsey; (4) Defendants did not unjustifiably interfere with Nephron's advantageous relationship(s) with Hulsey; and (5) Defendants did not proximately cause Nephron's alleged damages.   Doc. 118-1, at 1–7.   The preemption issue is dispositive of Count VII, and therefore this is the only issue that I address.[21]

The FUTSA states, in relevant part, that it "displace[s] conflicting tort, restitutory, and other law[s] of this state providing civil remedies for misappropriation of a trade secret" but does not affect other "civil remedies that are not based upon misappropriation of a trade secret."   Fla. Stat. § 688.008.   "Thus, as a general proposition other torts involving the same underlying factual

---

[21] "The issue of FUTSA preemption may be . . . properly addressed at the summary judgment stage." *SCIGRIP, Inc. v. Engineered Bonding Sols., LLC*, No. 6:15-cv-653-Orl-22KRS, 2015 WL 13792807, at *6 (M.D. Fla. Dec. 9, 2015) (citing *Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, No. 10-80293-CIV, 2011 WL 4591960, at *10 (S.D. Fla. Sept. 30, 2011) (reasoning that on a motion to dismiss a determination of FUTSA preemption is premature because a separate claim that is based on misappropriation of trade secrets may not actually be preempted if it is subsequently determined that there are no trade secrets)).

allegations as a claim for trade secret misappropriation will be preempted by FUTSA." *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 & n.65 (M.D. Fla. 2007) (citing *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1180–81 (M.D. Fla. 2005) (where "the allegations of trade secret misappropriation alone comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss")).   Thus, "[i]n order to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim." *Id.* & n. 66 (citing *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1335–36 (S.D. Fla. 2002)).   Therefore, here, "[t]he central issue before the Court . . . is whether Defendants' alleged misappropriation of . . . trade secrets 'alone comprise[s] the underlying wrong'" in Count VII of the third amended complaint.   *See PB Legacy, Inc v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29CM, 2018 WL 6325315, at *2–3 (M.D. Fla. Dec. 4, 2018).

Defendants argue that the FUTSA preempts Nephron's tortious interference claim because the tortious interference claim "is based on the *exact* same allegations that form the basis of the FUTSA claim" because Nephron's "allegations of interference are premised entirely on the purported misappropriation of trade secrets."   Doc. 118-1, at 3.

Nephron claims that the underlying wrong in its tortious interference claim is not limited to trade secret misappropriation.   Doc. 121, at 31.   Specifically, Nephron argues that its tortious interference claim is premised on Defendants' alleged unlawful interference with two distinct business relationships:   Hulsey's NDA and Hulsey's at-will employment.   *Id.*   According to Nephron, the FUTSA claim is not premised in any way on Hulsey's at-will employment.   *Id.* Therefore, Nephron argues that the claims are materially distinct.   *Id.* at 31–32.

On review, I respectfully recommend that the Court grant Defendants' request for summary judgment in its favor as to Count VII because, as Defendants argue, the facts underlying the tortious interference claim are indistinguishable from those underlying the FUTSA claim.  *See* Doc. 74 ¶¶ 145–46.   Specifically, in Count VII of the third amended complaint, Nephron alleges:

> 141. Nephron FL's NDA with Hulsey is a valid and binding contract and advantageous business relationship under which Nephron FL had and has legal rights.

> 142. In addition, Nephron FL and Hulsey's at-will employment relationship was an advantageous business relationship under which Nephron FL had and has legal rights.

> 143. Upon information and belief, U.S. Compounding and Adamis had actual and/or constructive knowledge of the existence and terms of the NDA with Hulsey, including, without limitation, Hulsey's contractual obligation prohibiting the disclosure or use of Nephron's confidential and proprietary information including, without limitation, its trade secrets, to any third party unrelated to her job duties at Nephron FL.

> 144. Upon information and belief, U.S. Compounding and Adamis had actual and/or constructive knowledge of the existence of Hulsey's at-will employment relationship with Nephron FL.

> 145.   More specifically, upon information and belief, U.S. Compounding and Adamis encouraged and/or aided and/or interfered with, and/or were willfully blind to, Hulsey's misappropriation of Nephron's confidential and proprietary information including, without limitation, its trade secrets, in violation of her obligations under the NDA.

> 146. Furthermore, and upon information and belief, U.S. Compounding and Adamis encouraged and/or aided and/or was willfully blind to, Hulsey's wrongful use of Nephron's confidential and proprietary information including, without limitation, its trade secrets, on behalf of both herself as well as U.S. Compounding and Adamis, in violation of Hulsey's obligations under the NDA and in violation of statutory and common law.

Doc. 74 ¶¶ 141–46.

Thus, as can be discerned from the third amended complaint, although Nephron alleges that Defendants interfered with two distinct business relationships it had with Hulsey (*i.e.*, the NDA and

her at-will employment), the underlying wrong is still the same as it relates to both relationships—alleged interference with "Nephron's confidential and proprietary information including, without limitation, its trade secrets." *See id.* There is no material distinction between the allegations of the FUTSA violations and the allegations in Count VII. Nor has Nephron pointed to any material distinctions in the record in its response. Doc. 121.[22]

Therefore, Count VII is preempted by the FUTSA claim. *See, e.g.*, *Jouria v. CE Res., Inc.*, No. 0:15-CV-61165-WPD, 2017 WL 3868422, at *4 (S.D. Fla. July 17, 2017) (on motion to dismiss, "[a]fter comparing the claims, the Court finds that NetCE's trade secret claim is based on Elite's use of 'confidential and proprietary information' subject to the NDA, and that is indistinguishable from the intentional interference claim. NetCE argues that the intentional interference claim is distinct because it requires allegations that Elite was aware of the NDA and intentionally induced its breach, but the underlying misconduct for both claims is the same—alleged misappropriation of confidential and proprietary information. . . . Therefore, the claim is preempted."); *Selectica, Inc. v. Novatus, Inc.*, No. 6:13-cv-1708-Orl-40TBS, 2015 WL 12843841, at *4 (M.D. Fla. Sept. 30, 2015) (granting summary judgment on tortious interference claim: "The actual wrong alleged in the tortious interference claim is that Novatus misappropriated Selectica's trade secrets, and as a result of that misappropriation, Selectica's business relationships were harmed. This same conduct and harm are alleged in Count I, the FUTSA misappropriation of trade secret claim."); *Am. Registry, LLC v. Hanaw*, No. 2:13-cv-352-FtM-29CM, 2014 WL 12606501, at *6 (M.D. Fla. July 16, 2014) ("Because all claims based on the misappropriation of information, whether or not it meets the

---

[22] As Defendants points out in the reply brief, Plaintiffs' damages expert report actually supports Defendants' position that the claims are preempted. *See* Doc. 121-8 ¶ 27 ("The details regarding the above claims contained in the Third Amended Complaint all relate to Defendants' alleged misappropriation of Nephron's trade secrets and/or confidential information." (citing third amended complaint, Doc. 74, at 25–32)).

definition of a trade secret, are pre-empted or displaced by the FUTSA, Count V is due to be dismissed."); *see also Am. Honda Motor Co.*, 390 F. Supp. 2d at 1180–81 (where "the allegations of trade secret misappropriation *alone* comprise the underlying wrong, only the FUTSA claim will survive [a] motion to dismiss.").[23]

Accordingly, I recommend that the Court grant Defendants' request for summary judgment on Count VII of the third amended complaint. *See also* Doc. No. 73, at 5 (dismissing Count V of second amended complaint alleging that USC and Adamis aided and abetted a breach of the duty of loyalty by directing Hulsey to store and transmit "confidential and proprietary information including, without limitation, [Nephron's] trade secrets," and finding that there were no material distinctions between that claim and Nephron's claim under the FUTSA).[24]

---

[23] I have reviewed the cases cited by Nephron, and find each to be distinguishable because in each of those cases, there were apparent factual distinctions between the FUTSA claims and underlying state tort claims at issue. *See, e.g.*, *Am. Honda Motor Co.* 390 F. Supp. 2d 1170; *Fenton*, 510 F. Supp. 2d 893; *Mortg. Now, Inc. v. Stone*, No. 3:09CV80/MCR/MD, 2009 WL 4262877, at *7 (N.D. Fla. Nov. 24, 2009). Here, based on a review of the third amended complaint, and in consideration of the parties' arguments regarding the motion for summary judgment, I have discerned no such apparent material factual distinctions between the FUTSA and tortious inference claims.

[24] To the extent that the Court disagrees and finds that Count VII is not preempted, I alternatively recommend that the Court deny summary judgment on this issue because material factual disputes would exist as to the remainder of Defendants' contentions. Specifically, Defendants contend that summary judgment is proper because they had no actual knowledge of the NDA. However, as discussed above as it relates to the FUTSA and DTSA claims, there is conflicting testimony on this issue, precluding summary judgment. *See supra* § (IV)(B)(3)(a). Defendants also argue that there is a lack of evidence regarding interference. However, "[w]hether improper means were employed is a question typically left for determination by the jury." *See Simmons*, 2014 WL 7672536, at *12 (citing *Int'l Sales & Service, Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001); *Mfg. Research Corp. v. Greenle Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982) ("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."). And, as discussed above, whether Defendants proximately caused any of Nephron's alleged damages remains to be determined. *See supra* § (IV)(B)(4).

D.    <u>Evidence of Damages</u>.

Defendants contend that Nephron has failed to articulate a factual basis for any alleged damages, citing to Nephron's initial disclosures in support.   Doc. 118-1, at 23[25]; *see* Doc. 118-19 (Nephron's initial disclosures served on November 16, 2018); Doc. 118-20 (Nephron's supplemental initial disclosures served on February 17, 2020).   Defendants essentially contend that because Nephron's initial and supplemental disclosures did not provide "a sufficiently detailed estimate and calculation of damages," under Fed. R. Civ. P. 37, Plaintiffs cannot now present evidence of damages to oppose summary judgment.   Doc. 118-1, at 23–24.

In the initial disclosures, as it relates to computation of damages, Nephron wrote:

> The parties have not yet engaged in discovery relevant to damages and other harm caused to Nephron by Defendants' misconduct.   Accordingly, Nephron has not had the opportunity to discover or calculate the full extent of its significant damages arising from Defendants' misconduct, including, but not limited to, the misappropriation of Nephron's trade secrets and other confidential business information and the costs incurred by Nephron to put an end to further damages. Nephron will supplement this response as discovery continues and in accordance with the Court's scheduling order.

Doc. 118-19, at 3–4.

In the supplemental initial disclosures, as it relates to the computation of damages, Nephron states:

> In accordance with the Amended Case Management and Scheduling Order, which expressly provides for damages discovery to occur after the close of fact discovery, Nephron is in the process of computing each category of damages caused by Defendants and will, to the extent not already produced in this case, make available to Defendants the documents and evidentiary material on which each computation is based in accordance with the Amended Case Management and Scheduling Order and applicable procedural rules.

---

[25] Defendants filed the motion for summary judgment on May 6, 2020.   Doc. 107.   On May 8, 2020, the deadline set forth by the Court, *see* Docs. 103, 104, Nephron served its damages expert report on Defendants.   Doc. 121, at 28, Doc. 121-8.

Doc. 118-20, at 4.

While I agree with Defendants that Nephron failed to comply with the initial disclosure requirements of Fed. R. Civ. P. 26(a)(1), I do not find that such failure warrants summary judgment in Defendants' favor.   First, rather than raising this issue as a discovery matter earlier in the proceedings, Defendants have waited until summary judgment to, in essence, use Nephron's discovery failure as a complete bar to Nephron's claims.   This result is untenable.   *See Cheney*, 2009 WL 4800247, at *4 (finding that a similar argument had "no merit as it would render most of Fed. R. Civ. P. 26 useless and would encourage parties to resolve their discovery disputes at the summary judgment stage.").   Second, since Defendants moved for summary judgment, Nephron has provided its damages expert report to Defendants, effectively obviating any prejudice that occurred by Nephron's failure to comply with Fed. R. Civ. P. 26(a)(1).   *See id.*   Therefore, I respectfully recommend that the Court deny Defendants' request for summary judgment on the basis that Nephron did not disclose "any damages information" as required by Rule 26(a)(1).   *See id.*; *see also XTEC, Inc. v. Cardsmart Techs., Inc.*, No. 11-22866-CIV, 2014 WL 10250973, at *4 (S.D. Fla. Dec. 2, 2014) (on summary judgment, finding the defendants' argument regarding the plaintiff's failure to comply with Rule 26(a) waived because the plaintiff's failure to do so permitted the defendant to move to compel the production during the discovery period, which the defendant failed to do; alternatively finding that any non-disclosure was harmless because "it has been no secret what damages Plaintiff seeks and the damages do not require complex calculations").

E.      Punitive Damages, Exemplary Damages, and Attorney's Fees.

Finally, Defendants assert (in a conclusory fashion) that summary judgment is proper as to Nephron's claims for punitive damages (on Count VII) and exemplary damages and attorney's fees

(on Counts I and III) because Nephron presented "no evidence" to support these claims.   Doc. 118-1, at 24.

Under Florida law, punitive damages are available on the tortious interference claim (Count VII) if Nephron establishes by clear and convincing evidence that Defendants' conduct is fraudulent, deliberately violent or oppressive, malicious, or committed with such gross negligence as to indicate a wanton disregard for the rights of others, such as an illicit scheme to put the plaintiff out of business.   *See* Fla. Stat. § 768.72; *Bistline v. Rogers*, 215 So. 3d 607, 611 (Fla. 4th Dist. Ct. App. 2017).   Regarding the FUTSA and DTSA claims (Counts I and III), exemplary damages and attorney's fees are only available upon a showing of "willful and malicious" misappropriation.   Fla. Stat. §§ 688.004(2), 688.005; 18 U.S.C. §§ 1836(b)(3)(C), (D).

Nephron first argues that Defendants' bald assertion that it has presented "no evidence" to support the damages claimed cannot carry Defendants' burden on summary judgment to demonstrate the absence of a genuine dispute regarding Nephron's entitlement to these remedies. Doc. 121, at 30.   Nephron then argues, also in a somewhat conclusory fashion, that the record is "replete" with evidence from which a jury could infer that Defendants' conduct was willful, malicious, and intentional.   *Id.*   Nephron further argues that whether Defendants' conduct was "willful" or "malicious" presents a quintessential jury question, and that Nephron has presented substantial evidence in opposition to the motion for summary judgment establishing that Defendants had reason to know they were acquiring and using its trade secrets.   *Id.*

As discussed above, I recommend the Court find Nephron's tortious interference claim preempted by the FUTSA claim, and thus, Defendants' arguments regarding punitive damages under the tortious interference claim are moot.   However, as to the FUTSA and DTSA claims, and specifically whether Nephron can seek statutory exemplary damages and attorney's fees, I find that,

at the very least, there are genuine issues of material fact precluding summary judgment on this issue.

Initially, because Nephron has the burden of proof on damages, I find Defendants' assertion that Nephron provided "no evidence" to support its claim for exemplary damages and attorney's fees sufficient to raise the issue for summary judgment purposes. *See Fitzpatrick*, 2 F.3d at 1115–16 (citation omitted). Nonetheless, I find that Nephron has sufficiently carried its burden of demonstrating, for summary judgment purposes, that an issue of fact remains regarding whether Defendants' acted willfully or maliciously in their alleged misappropriation of Nephron's trade secrets. Specifically, because there are disputed issues of fact as to whether Defendants misappropriated Nephron's trade secrets by acquisition or use, there is similarly an issue of fact as to whether the evidence Nephron points to sufficiently establishes that Defendants acted willfully or maliciously in such acquisition. *See, e.g.*, *Connectus LLC v. Ampush Media, Inc.*, No. 8:15-cv-2778-T-33JSS, 2017 WL 2620541, at *8 (M.D. Fla. June 16, 2017) (genuine issue of fact on willful and malicious misappropriation precluded summary judgment on that issue); *see also Backjoy Orthotics, LLC v. Forvic Int'l Inc.*, No. 6:14-cv-249-Orl-41TBS, 2017 WL 3037497, at *4 (M.D. Fla. June 12, 2017) (noting that courts have concluded that a defendant's "knowing or reckless" misappropriation is sufficient to invoke Fla. Stat. § 688.005), *report and recommendation adopted*, 2017 WL 3022712 (M.D. Fla. July 17, 2017).[26]

---

[26] Defendants point to *Cherestal v. Sears Roebuck & Co.*, No. 6:12-cv-1681-Orl-28TBS, 2014 WL 644727, at *6 (M.D. Fla. Feb. 19, 2014) to support their argument that summary judgment is proper because Nephron failed to point to specific facts in response to the motion for summary judgment supporting their claim that any misappropriation was willful and malicious. Doc. No. 127, at 3 & n.15. However, *Cherestal* is distinguishable from the present case. First, *Cherestal* concerned a tortious interference claim and did not discuss the burden of proof on exemplary damages or attorney's fees under the FUTSA or DTSA. Second, in *Cherestal*, the court found summary judgment on the issue of punitive damages for the tortious interference claim proper because in opposition to summary judgment, the plaintiff solely stated that the issue of punitive damages was a factual dispute, providing nothing more in support. *Cherestal*, 2014 WL 644727, at *6. Here, Nephron points to argument and evidence that allegedly demonstrates that Defendants had "reason to

Accordingly, I recommend that the Court deny Defendants' request for summary judgment on Nephron's claim for statutory exemplary damages and attorney's fees under the FUTSA and DTSA.

## V.   RECOMMENDATION.

For the reasons discussed herein, it is **RESPECTFULLY RECOMMENDED** that the Court **GRANT in part and DENY in part** Defendants U.S. Compounding, Inc. and Adamis Pharmaceuticals Corporation's Motion for Summary Judgment (Docs. 107, 118-1) as follows:

1. **GRANT** summary judgment in favor of Defendants and against Nephron on Count VII of the third amended complaint; and

2. **DENY** the motion for summary judgment in all other respects.

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on October 7, 2020.

**LESLIE R. HOFFMAN**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:

---

know" that they were acquiring and/or using Nephron's trade secrets. Thus, Nephron has arguably presented some evidence to support its statutory claims for exemplary damages and attorney's fees, and at the very least, has raised an issue of fact precluding summary judgment on the issue.

Presiding District Judge
Counsel of Record