# EXHIBIT A

ATTORNEYS EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF FLORIDA

3                     ORLANDO DIVISION

4     NEPHRON PHARMACEUTICALS,   )

5     CORPORATION,               )

6              Plaintiff,        )   No.

7       vs.                      )   6:18-CV-01573-GAP-

8     JENNIFER SHELLY HULSEY,    )   LRH

9     U.S. COMPOUNDING, INC.,    )

10    AND ADAMIS                 )

11    PHARMACEUTICALS            )

12    CORPORATION,               )

13              Defendants.      )

14         The deposition of CARRIE DISTLER, called

15    for examination pursuant to the Rules of Civil

16    Procedure for the United States District Courts

17    pertaining to the taking of depositions, taken

18    before Jacqueline Shenberger, Certified

19    Shorthand Reporter within and for the County of

20    Cook and State of Illinois, VIA ZOOM, on

21    August 26, 2020, at the hour of 9:00 a.m.

22

23

24

ATTORNEYS EYES ONLY

Page 2

```
 1   APPEARANCES:

 2          NEXSEN PRUET, LLC

 3        BY:  MR. JAMES BYARS, and MS. NIKOLE

 4        MERGO

 5        1230 Main Street

 6        Suite 706

 7        Columbia, South Carolina 29201-6220

 8        jbyars@nexenpruett.com

 9             Representing the Plaintiff

10

11        BRADLEY, ARANT, BOULT, CUMMINGS, LLC

12        BY:  MR. BRANDON BUNDREN and MS. DIANA

13        EVANS

14        1600 Division Street

15        Roundabout Plaza - Suite 700

16        Nashville, Tennessee  37203

17        bbundred@bradley.com

18             Representing the Defendants

19                 *  *  *  *  *

20

21

22

23

24
```

ATTORNEYS EYES ONLY

Page 3

1                        I N D E X

   WITNESS                          EXAMINATION
2  CARRIE DISTLER
                                          7
3  BY MR. BUNDREN
                                        237
4  BY MS. MERGO:
                                        239
5  BY MR. BUNDREN
6
7
8                    E X H I B I T S

   NUMBER                           MARKED FOR ID
9   Deposition
10    Exhibit No. 1    EXPERT REPORT AND       10
11                     ATTACHMENTS
12    Exhibit No. 2    DISTLER REPORT WITH     11
13                     SCHEDULES
14    Exhibit No. 3    SUPPLEMENTAL            11
15                     APPENDIX B
16    Exhibit No. 4    DISTLER REBUTTAL        12
17                     REPORT
18    Exhibit No. 5    ENGAGEMENT LETTER       45
19    Exhibit No. 6    INVOICES                51
20    Exhibit No. 7    NEPHRON STATEMENT       89
21                     OF CLAIM
22    Exhibit No. 8    DOCTOR WIGGINS         225
23                     REPORT
24    Exhibit No. 9    WIGGINS               226

ATTORNEYS EYES ONLY

Page 4

1                    SUPPLEMENTAL

2                     EXHIBITS

3      Exhibit No. 10    LETTER AND SUBPOENA    229

4                        TO DISTLER

5      Exhibit No. 11    EMAIL AND SUBPOENA     230

6                        RESPONSES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ATTORNEYS EYES ONLY

Page 5

```
 1      VIDEOGRAPHER:  Here we go, one moment, please.
 2           Good morning.  We're going on the
 3   record, the time is approximately 9:07 a.m.,
 4   August 26th, 2020.  The videotaped deposition of
 5   Carrie Distler, taken by the Defendant, in the
 6   matter of Nephron Pharmaceuticals Corp, et-al,
 7   versus Shelly Hulsey, et-al, in the Middle
 8   District of Florida, Orlando Division.
 9           This deposition is being held remotely.
10   The witness is located in Chicago, Illinois.
11           My name is Tom Traci, from the firm of
12   Veritext Southwest, I'm the videographer.
13           The court reporter is Jackie Shenberger
14   from Veritext Southwest as well.
15           Counsel, could you please identify
16   yourself and who you represent for the record at
17   this time, starting with the Plaintiff's
18   Counsel.
19      MS. MERGO:  Nikole Mergo, Counsel for the
20   Plaintiffs.
21      MR. BYARS:  James Byars, Counsel for
22   Plaintiffs.
23      MR. BUNDREN:  This is Brandon Bundren,
24   Counsel for Adamis and US Compounding.
```

ATTORNEYS EYES ONLY

Page 6

1      MS. EVANS:  And Diana Evans, also for US

2  Compounding and Adamis.

3      VIDEOGRAPHER:  Thank you, Counsel.

4          The court reporter may swear in the

5  witness.

6          (Whereupon, the witness was duly sworn.)

7      MS. MERGO:  Brandon, if I could just put one

8  quick thing on the record before you start; it's

9  our understanding that the Defendants' expert

10  Dr. Wiggins is also participating in the

11  deposition, so I just want to make that clear for

12  the record.  And we don't object to that, with

13  the understanding that he's not confidentiality

14  designations and, obviously, reserving the right

15  if his testimony changes as a result of his

16  participation here today.

17      MR. BUNDREN:  I understand your reservations.

18  Doesn't necessarily mean I agree with them, but

19  I understand them.

20

21

22

23

24

ATTORNEYS EYES ONLY

Page 7

1                   CARRIE DISTLER,

2    called as a witness herein, was examined and

3    testified as follows:

4                     EXAMINATION

5    BY MR. BUNDREN:

6        Q.   Miss Distler, could you state your full

7    name for the record, please?

8        A.   It's Carrie Lynn Distler.

9        Q.   And where do you live, where do you

10   reside?

11       A.   I live in Chicago, Illinois.

12       Q.   How many times have you been deposed

13   before?

14       A.   I think approximately 18.  18, 19.

15       Q.   It looks like you were referring to

16   some papers in front of you.  What were you

17   referring to to answer the question?

18       A.   I was referring to my Appendix A of my

19   expert report.

20       Q.   Which report, the May 8th report or the

21   July 8th report?

22       A.   The July 8th report.

23       Q.   So every time you've been deposed is

24   reflected on Appendix A to your July 8th report?

ATTORNEYS EYES ONLY

Page 8

1      A.    Looking at it, it looks like it should

2    be, yes.

3      Q.    Okay.  During the deposition I'd ask

4    that you answer verbally when I ask a question.

5    Obviously, we've got this on video, but it's

6    helpful to have a verbal response.  Please let

7    me know if you don't understand the question,

8    I'm happy to help to the extent that I can if

9    you need some clarification.  Do you understand?

10     A.    Yes.

11     Q.    Okay.  And if you answer the question,

12   then I'm going to assume that you understood the

13   question that I asked.  And this isn't an

14   endurance contest, but if you need a break,

15   please let me know and I'm happy to take a break

16   when you need to do so, as long as a question is

17   not pending.  Do you understand that?

18     A.    Yes.

19     Q.    And even though we're participating

20   remotely in this deposition, I'd ask that you

21   refrain from any kind of electronic

22   communications during the deposition at least

23   while you're testifying.  Okay?

24     A.    Yes.

ATTORNEYS EYES ONLY

Page 9

1     Q.   Where are you physically located right

2  now?

3     A.   Fort Myers, Florida.

4     Q.   Where are you at?

5     A.   I'm in a private home.

6     Q.   And is anybody in the room with you?

7     A.   No.

8     Q.   Do you know -- it appears Miss Mergo is

9  in her office in South Carolina.  I take it that

10 she's not in the home where you're at in Fort

11 Meyers, is that correct?

12    A.   Correct.

13    Q.   And I saw you referring to some

14 documents that we talked about a few seconds

15 ago; what documents did you bring to the

16 deposition today?

17    A.   In front of me I have a copy of my

18 expert report and the attachments dated May 8th.

19         I have a supplemental Appendix B that

20 was adjusted for some Bates numbers after my

21 initial report.

22         I have my expert report issued July 8th

23 with the attachments to it in front of me.

24         I have the invoices issued by FTI

ATTORNEYS EYES ONLY

Page 10

1    Consulting that are Bates numbered in front of

2    me.

3              And then I have a copy of Dr.

4    Wiggins report dated June 8th with its

5    attachments in front of me.

6         Q.   Are those all the documents you have in

7    front of you?

8         A.   Yes, it is.

9         Q.   Do you have any notes on those

10   documents?

11        A.   I do not.

12        Q.   Okay.  We'll mark -- we'll go ahead and

13   mark those documents as Exhibit 1 to the

14   deposition.

15                   (Whereupon, Deposition Exhibit

16                    No. 1 was marked for

17                    identification.)

18   BY MR. BUNDREN:

19        Q.   And then, Miss Distler, what I would

20   like is for you to provide those documents

21   through Miss Mergo or directly to the court

22   reporter at the conclusion of the deposition and

23   the court reporter can mark it as Exhibit 1.

24              Do you agree?

ATTORNEYS EYES ONLY

Page 11

1      A.    Sure.

2      Q.    Do you agree?

3      A.    Yes.

4      Q.    Okay.  Let's also, before we really dive

5  in, let's go ahead and mark as Exhibit 2, the

6  May 8th, 2020 report.  And it's 151 pages

7  reflected on the screen; do you see that, Miss

8  Distler?

9                    (Whereupon, Deposition Exhibit

10                    No. 2 was marked for

11                    identification.)

12     A.    Yes.

13  BY MR. BUNDREN:

14     Q.    And then we're going to mark as Exhibit

15  3, the supplemental Appendix B.  Do you see that

16  exhibit on the screen, Miss Distler?

17                    (Whereupon, Deposition Exhibit

18                    No. 3 was marked for

19                    identification.)

20     A.    Yes.

21  BY MR. BUNDREN:

22     Q.    And that's a five-page document; is

23  that the same supplemental Exhibit B that you

24  have in front of you?

ATTORNEYS EYES ONLY

Page 12

1    A.   Yes, it is five pages.

2    Q.   And then we'll mark as Exhibit 4 the

3   July 8th rebuttal report of Carrie Distler, and

4   that's 66 pages.  Does that appear to be the

5   same expert report that you have in front of

6   you?

7                  (Whereupon, Deposition Exhibit

8                   No. 4 was marked for

9                   identification.)

10    A.   It is the same title page, I'm assuming

11   it's 66 pages with the attachments.

12   BY MR. BUNDREN:

13    Q.   Yeah, thank you.

14        And Miss Distler, looking at your

15   resume and CV and if we could, I think it would

16   be best to refer to the one you were referring

17   to a minute ago and that's your resume attached

18   as Appendix A to your July 8th report.  Do you

19   have that in front of you?

20    A.   Yes, I do.

21    Q.   Is that current as of July 8th, 2020,

22   when that report was filed or served by your

23   counsel?

24    A.   Yes, I believe so, yes.

ATTORNEYS EYES ONLY

Page 13

1       Q.   Is it current as of today's deposition,

2   which is August 26th, 2020?

3       A.   No.

4       Q.   Okay.  What's different about it from

5   when it was provided to -- by Counsel for

6   Nephron to Counsel for USC and Adamis on July 8th

7   as compared to now?

8       A.   First, in the Alector, Inc., versus Asa

9   Abeliovich action, there was an arbitration

10  where I provided testimony.

11      Q.   What page are you -- are you referring

12  to?

13      A.   The final page of Exhibit A.

14      Q.   All right.  Can you say that one more

15  time, please?

16      A.   Sure.  In the Alector versus the Asa

17  Abeliovich matter.

18      Q.   Yes.

19      A.   There was an arbitration where I

20  testified.

21      Q.   Okay.

22      A.   In Deltona v the Noco Company, I

23  provided a declaration.

24           Obviously, Nephron, I issued a second

ATTORNEYS EYES ONLY

Page 14

1    expert report.  And I issued two expert reports

2    in a matter not recorded on Appendix A.

3         Q.   And what matter is that?  Who do you

4    represent or who are you providing expert

5    consulting on behalf of?

6         A.   The matter is Fuma versus RJ Reynolds

7    and FTI was retained by, I guess, it's RJ

8    Reynolds Vapor.

9         Q.   And FTI was retained by RJ Reynolds?

10        A.   RJ Reynolds Vapor, I believe is the

11   proper entity.

12        Q.   And where is that case pending?

13        A.   As I sit here, I believe it's North

14   Carolina.

15        Q.   Federal Court or State Court?

16        A.   It's in Federal Court.

17        Q.   Could you spell the Plaintiff in that

18   case?

19        A.   F-u-m-a.

20        Q.   Thank you.  And have you provided any

21   testimony in that case as of today's date,

22   either by deposition or otherwise?

23        A.   I have not.

24        Q.   Have you provided an expert report in

ATTORNEYS EYES ONLY

Page 15

```
1   that case?

2       A.   Yes.

3       Q.   And what was the subject matter -- what

4   was FTI retained to do in the RJ Reynolds case?

5       A.   FTI was retained and specifically me to

6   provide expert testimony as needed in that

7   matter regarding damages.

8       Q.   What kind of matter is it, just

9   generally speaking?  Is it a patent case; is it a

10  trademark case?

11      A.   It's a patent infringement matter.

12      Q.   Okay.  Do you know if your report was

13  marked either confidential or attorneys eyes

14  only pursuant to a protective order in that

15  case?

16      A.   Yes.  And I would say there were two

17  reports, just to be clear.

18      Q.   Okay.  And what are the dates of those

19  reports, if you remember?

20      A.   Actually, there were three reports, I

21  want to correct that.  One would have been at

22  the end of July, toward the end-mid of July.  I'm

23  not sure of the exact date.  And the other would

24  have been on -- the other two were last Friday.
```

ATTORNEYS EYES ONLY

Page 16

```
 1      Q.   Now, you've been retained on behalf of
 2   the Defendant in that case?
 3      A.   Yes.
 4      Q.   Is there an affirmative damages claim
 5   in that case or are you providing rebuttal
 6   testimony to the Plaintiff's damages?
 7      A.   I need to clarify your question.
 8      Q.   Okay.  And you're providing -- you
 9   provided three reports in the RJ Reynolds case
10   in Federal Court in North Carolina; what are --
11   are those reports and you said the subject
12   matter of those reports is damages, is that
13   correct?
14      A.   No.
15      Q.   Okay.  What is the subject matter of
16   those reports?
17      A.   One -- my first report discusses the
18   distribution and marketing by RJ Reynolds Vapor.
19      Q.   Okay.
20      A.   The other two reports, one relates to
21   claims of marketing of products.
22      Q.   Okay.
23      A.   And one is a rebuttal of damages.
24      Q.   Okay.  So -- and I don't want to
```

ATTORNEYS EYES ONLY

Page 17

```
 1   misunderstand you, but it sounds like RJ
 2   Reynolds has an affirmative claim for damages
 3   related to marketing and then they're responding
 4   to the Plaintiff's claims for damages for patent
 5   infringement, did I understand that correctly?
 6        A.    Could you read that back again?
 7        Q.    Sure.  So you said there was a claim
 8   for marketing in that case, correct?
 9        A.    There's an issue around marketing.
10        Q.    Okay.  There's an issue, okay.
11              Does RJ Reynolds have any affirmative
12   claim for damages in the former case?
13        A.    Not that I provided, not that I'm aware
14   of that I provided any opinions.
15        Q.    Okay.  I think I understand.  Going to
16   your work history, on Appendix A to Exhibit 4,
17   does your CV and resume accurately reflect your
18   professional work history?
19        A.    Yes, since finishing my undergraduate
20   degree.
21        Q.    Thank you.
22              You said you worked at Pacey Economics
23   Group after you finished your masters, is that
24   correct?
```

Page 18

1      A.   Yes.

2      Q.   What did you do at Pacey Economics?

3      A.   I was an analyst at that firm that

4   provided economic consulting.

5      Q.   What kind of economic consulting, what

6   industries?

7      A.   The PhD at Pacey Economics Group, she

8   worked in multiple areas, including labor

9   economics issues.  We performed projects on

10  behalf of the State of Colorado.  And there were

11  some general commercial disputes as well where

12  damage opinions were provided.

13     Q.   Okay.  So you -- Pacey Economics Group

14  was a consulting company that provided, amongst

15  other things, litigation consulting services, is

16  that right?

17     A.   Generally yes, that was one area of

18  service.

19     Q.   And going back to your expert

20  retentions, including reports and testimonies;

21  does that reflect any testimony, expert

22  retention report that you had undertook while at

23  Pacey Economics Group?

24     A.   It does not.

Page 19

1      Q.   Are there other expert retentions

2   including reports and testimony from your time

3   at Pacey Economics Group that need to be added

4   to this list on Appendix A?

5      A.   At Pacey Economics Group I was not

6   retained as a testifying expert.

7      Q.   Okay.  That's fine.  Why did you leave

8   Pacey Economics?

9      A.   It was a small firm, and I wanted to

10  work for a larger consulting firm.

11     Q.   And after Pacey, you left to go to FTI

12  Consulting, is that right?

13     A.   Correct.

14     Q.   What kind of -- what does FTI do?

15     A.   Generally, as I described it in my

16  expert report, it's a global business advisory

17  firm across six continents at this point that

18  provides consulting services and some technology

19  services.

20     Q.   What are the various segments of

21  business lines that FTI Consulting provides

22  services?  And what I'm getting at, Miss

23  Distler, I'm just trying to understand if FTI is

24  strictly a litigation consulting firm or if they

ATTORNEYS EYES ONLY

Page 20

1    do other things?

2        A.    So FTI has five formal segments, along

3    with some other verticals that also provide

4    reporting information.  We are publically

5    traded.  The different segments offer different

6    types of services.

7        Q.    And is Forensic and Litigation

8    Consulting one of those five services?

9        A.    It would be one of the five segments.

10       Q.    Segments.  Okay.  What does that

11   segment specifically do?

12       A.    There are many areas of services

13   offered under the FLC umbrella.  Those include

14   forensic investigations, construction disputes,

15   trial services, expert witness, gosh, there are

16   monitorships.

17       Q.    What is that?

18       A.    In an enforcement -- in an enforcement

19   by the U.S. Government or other investigating

20   authority, there may be an agreement entered

21   into between the regulatory aid and a company on

22   modifications to their commercial operations.

23   So FTI would play that role.  We provide

24   valuation services under the FLC umbrella.

ATTORNEYS EYES ONLY

Page 21

1    There's many aspects.  Anti-money laundering,

2    sanctions, antitrust.  Those are the few that I

3    can think of as I'm siting here.  It's a large

4    umbrella.  FTI has over, I believe, five, six

5    thousand employees at this point.

6        Q.    What is your -- what are your job

7    duties and responsibilities at FTI?  What do you

8    do?

9        A.    My title is senior managing director.

10   Since we're publically traded, we're not

11   partners, so that's equivalent to a partner

12   status.  At FTI my job includes growing our

13   practice, both the individuals that work in our

14   practice, as well as, you know -- as well as

15   identifying and being retained as an expert and

16   provide consulting services to clients.

17       Q.    Could you describe for me the

18   hierarchy?  I know you said you're a senior

19   managing director which, as you put it, is like a

20   partner, I guess, in a law firm; is that what

21   you're referring to?

22       A.    Or a professional services firm

23   generally.

24       Q.    What is the hierarchy of the other

ATTORNEYS EYES ONLY

Page 22

```
 1   individuals that work with you in forensic and

 2   litigation consulting, by titles, for example?

 3       A.   Generally, there are six titles -- like

 4   on a general basis?

 5       Q.   Yes.

 6       A.   There's consultant, senior consultant,

 7   director, managing director, senior managing

 8   director.  And then there may be, I don't know

 9   if they have a formal title, but potentially

10   consultants or experts affiliated.

11       Q.   Now, we'll get to this in a minute, but

12   I saw there were some other individuals that

13   worked with you on this engagement.  And so I'm

14   trying to figure out what the hierarchy is with

15   those individuals as they report to you.  How

16   many people worked with you on this engagement?

17       A.   There were primarily two individuals

18   that I worked with on the project, and then there

19   may have been some others that assisted from

20   time to time, but two primarily.

21       Q.   Who are those two?

22       A.   One is Brian Clutter and the other is

23   Brian Meshler.

24       Q.   And so on the hierarchy, Mr. Meshler
```

Page 23

```
 1    would be on the lower end, entry level position

 2    in the forensic and litigation consulting

 3    business in your company, is that correct?

 4         A.   His title is consultant, yes.

 5         Q.   And then Mr. Cutler, I believe he's a

 6    senior director?

 7         A.   Clutter?

 8         Q.   I'm sorry, yes, Clutter.

 9         A.   C-l-u-t-t-e-r.  Yes, his title is Senior

10    Director.

11         Q.   What present licenses or certifications

12    do you currently hold?

13         A.   I do not have any professional

14    licenses.

15         Q.   And you know what I mean by

16    professional licenses, right?

17         A.   Generally I would assume you're

18    referring to like a CPA or something along those

19    lines?

20         Q.   Right, like a CPA or one of the series

21    registrations from FINRA or a real estate agent,

22    that sort of thing.  And so do I understand

23    correctly that you don't have any current

24    licenses or certifications?
```

ATTORNEYS EYES ONLY

1      A.    That's correct.

2      Q.    Are there any past licenses or

3   certifications that you no longer hold but you

4   did at one time in the past?

5      A.    No, not that I'm aware of.

6      Q.    What is the Licensing Executive

7   Society?

8      A.    It is an organization where you are a

9   member; where there are members with resources

10   that discuss various aspects of intellectual

11   property.

12      Q.    What's the purpose of the organization

13   generally speaking?

14      A.    As I sit here from recollection, I

15   would say generally education, networking,

16   knowledge sharing.  Generally.  I would want to

17   look at their website to get their formal

18   mission or purpose.

19      Q.    Are there any other professional

20   affiliations that you belong to other than the

21   Licensing Executive Society?

22      A.    I've been a general member of NACVA.

23      Q.    Can you spell that for me, please?

24      A.    N-A-C-V-A.

ATTORNEYS EYES ONLY

Page 25

1      Q.    What is that?

2      A.    I believe it stands for the National

3  Association of Certified Valuation Analysts.

4      Q.    And what does that association do?

5      A.    It is generally, my understanding, is

6  that it is an organization that fosters

7  educational services and certifications related

8  to valuation areas on methodologies.

9      Q.    Since you said you didn't have any

10  license, current licenses or certifications, are

11  there any CLE, continuing legal education

12  requirements that you participate in on an

13  annual basis?

14      A.    Can you read -- can you state your

15  question again?

16      Q.    Sure.  So you don't have any licenses

17  or certifications, which you testified to a few

18  minutes ago.  Do you participate in any

19  continuing forms of continuing legal education

20  in your line of work, seminars or meetings,

21  educational meetings that further where you

22  learn about things that you would do in your job

23  as a senior managing director at FTI?

24      A.    I do attend or participate in seminars,

ATTORNEYS EYES ONLY

Page 26

```
 1    conferences or meetings that provide continuing
 2    education, knowledge and information.
 3         Q.    How many hours do you think per year
 4    that you participate in those, that sort of
 5    continuing education, as a participant and not as
 6    a presenter?
 7         A.    I mean, across my entire year trying to
 8    estimate?
 9         Q.    Sure, just an average year.  How many
10    hours have you participated in this year?
11         A.    In like continuing education and
12    knowledge growing for this year alone?
13         Q.    Sure, sure.
14         A.    I would say daily given that I receive
15    information regarding case decisions, articles
16    that may be published.  I would say daily.
17         Q.    What about formal education or seminars
18    this year, about how many hours have you
19    participated in formal education or seminars?
20         A.    So by formal, FTI also has internal
21    presentations or discussions.  So including those
22    from like a formal perspective like that or a
23    roundtable and organized discussions?
24         Q.    Sure.
```

ATTORNEYS EYES ONLY

1      A.    I would estimate maybe twenty hours,

2    that would be an estimate.

3      Q.    And that's through this year, 2020, is

4    that right?

5      A.    I -- again, that would be a rough

6    estimate.

7      Q.    Okay.  Is that about the same -- the

8    same number of hours that, approximately, that

9    you participated in last year?  I know this year

10   is a unique circumstance, that's why I'd like to

11   ask you about last year.

12     A.    It would be more last year.

13     Q.    Approximately how many more hours?

14     A.    As I sit here, I don't know if I can

15   give you an estimate.

16     Q.    Would you say you spent a hundred hours

17   last year?

18     MS. MERGO:  Object to form.

19     A.    Potentially, I don't know as I'm

20   sitting here.  I'm trying to think of the

21   conferences that I attended in 2019, I just

22   can't recall what those were as I'm sitting here

23   today.

24

ATTORNEYS EYES ONLY

Page 28

1    BY MR. BUNDREN:

2        Q.    Okay.  Let's look at your speaking

3    engagements that are on your CV, resume/CV on

4    Exhibit 4, Appendix A.  Pull that up.

5            Okay.  There are a number of speaking

6    engagements that are listed on Exhibit 4.  Are

7    these speaking engagements where you presented

8    on a certain topic?

9        A.    Yes.

10       Q.    And is this a current list?

11       A.    Yes.

12       Q.    Can you tell me which of the -- if any,

13   of the engagements, speaking engagements on your

14   CV where you spoke on issues related to economic

15   damages in trade secrets cases?

16       A.    As I sit here and read through them, I

17   don't recall that any of these specifically

18   referenced trade secrets.

19       Q.    Are any of these speaking engagements,

20   are any of them related to economic damages for

21   reasonable royalties?

22       A.    Yes.

23       Q.    Okay.  Could you identify those for me,

24   please?

ATTORNEYS EYES ONLY

1      A.   If I recall, as I'm sitting here, the

2   bottom two would have likely related to

3   reasonable royalties.

4      Q.   And that's the Proving and Guarding the

5   Real Economic Value of IP.  And then the last

6   one is Knowing When and How to Pivot, is that

7   right?

8      A.   That was the name of the conference

9   overall, yes.  The Cost and Worth of a Patent,

10   the Economics of a Paragraph 4 Challenge, I may

11   have also mentioned reasonable royalties.  I

12   would expect that the Forging Ahead, Strategies

13   for the Unknown conference title, Get Ready

14   Now, Boosting Your IP Fitness For the Next

15   Business Challenge likely would have.  The Check,

16   Raise, or Fold likely would have.  Conference

17   Title.  And then likely the recent Federal

18   Circuit Court cases dated September of 2009.

19   The Trends and Damage Analyses in July of 2013,

20   probably would have.  And then the Recent Trends

21   in Patent Damages likely would have as well.

22      Q.   But none of the items on your speaking

23   engagement list would have related to economic

24   damages and a reasonable warranty in a trade

ATTORNEYS EYES ONLY

1    secrets case, is that correct?

2        A.   I mean, not that I recall.

3        Q.   Do you recall if you ever presented in

4    any seminar, roundtable, speaking engagement,

5    formal education program where you have

6    discussed reasonable warranties in trade secrets

7    cases?

8        A.   As I sit here, not that I recall.

9        Q.   Now, I may have asked you this, if I

10   did, I apologize.  Are there any additional

11   engagements, speaking engagements, that are not

12   listed on your resume/CV?

13       A.   Not that I recall as I sit here.

14       Q.   How much of your day-to-day

15   responsibilities involve providing litigation

16   related services, specifically as it relates to

17   expert witness retention and providing

18   testimony?

19       A.   How much of my day is the question?

20       Q.   Yes.

21       A.   I mean, it can depend on that

22   particular day.

23       Q.   Would you say -- well, how much of your

24   job duties and responsibilities are devoted to

ATTORNEYS EYES ONLY

Page 31

```
 1   providing litigation related services,

 2   specifically as it relates to expert witness

 3   retention and testimony?

 4        A.   I would say the majority.

 5        Q.   So over 50 percent?

 6        A.   Yes, that would be fair.

 7        Q.   What would you do with the rest -- what

 8   do you do with the rest of your time at FTI?

 9        A.   There would be projects that are not

10   litigation related or there hasn't been any

11   formal litigation proceedings.  And then there

12   would also be my internal firm commitments and

13   duties that I perform as well.

14        Q.   What percentage of your time would you

15   say accounted for your internal firm duties?

16        A.   I would estimate 15 percent, 10 to 15

17   percent, something in that area.

18        Q.   And then a little over 50 percent

19   devoted to providing litigation related

20   services, specifically related to expert witness

21   and retention?

22        A.   And it could depend on the year,

23   depending on the projects, but I would say

24   generally.
```

ATTORNEYS EYES ONLY

Page 32

1      Q.   What other -- so what do you do when

2   you're not providing litigation related services

3   or doing things in your management duties at

4   FTI, what other kind of things do you work on?

5      A.   So there will be projects where we will

6   help companies with understanding the value or

7   potential value of intellectual property assets.

8   There will be projects helping companies analyze

9   licensing in or licensing out opportunities.

10  There will be general consulting around business

11  processes.  It varies year to year on the types

12  of projects, generally that's pretty fair.

13     Q.   In your litigation related services,

14  the line of business, what would you say would

15  be the percentage of your testimony on behalf of

16  plaintiffs versus that of the defendant?

17     A.   I'm looking at the matters on my CV,

18  it's around 50 percent.

19     Q.   Have you provided or have you been

20  retained to provide any litigation related

21  services for plaintiff's counsel, either Shutts

22  Bowen or Nexsen Pruet?

23     A.   Can you read the question one more

24  time?

ATTORNEYS EYES ONLY

Page 33

```
 1        Q.   Are any of these matters on your list
 2   where you provided expert testimony or an expert
 3   retention for either Shutts Bowen or a firm in
 4   Florida or Nexsen Pruet?
 5        A.   Yes.
 6        Q.   Which ones?
 7        A.   The very last on my Appendix
 8   page, second report.
 9        Q.   That specifically related to this case,
10   is that right?
11        A.   Yes.
12        Q.   Have you been retained to provide any
13   litigation related services on behalf of
14   Bradley, Arant, Boult, Cummings, which is my law
15   firm?
16        A.   Not that I can recall.
17        Q.   Other than the Nephron matter, this
18   matter, have you been retained to provide any
19   litigation or consulting services for Nephron or
20   any of its related entities?
21        A.   Not that I'm aware of.
22        Q.   So this is the first time you've worked
23   with Nephron, is that correct?
24        A.   Yes.
```

ATTORNEYS EYES ONLY

Page 34

1     Q.  Do you know who Miss Lou Kennedy is?

2     A.  Yes.

3     Q.  Have you been retained by Miss Kennedy

4 or any of her business ventures to provide any

5 sort of testimony, litigation consulting

6 services, expert retention, business valuation

7 other than the instant case, the Nephron case?

8     MS. MERGO:  Object to the form.

9     A.  The engagement letter in this matter,

10 it reflects retention by Nexsen Pruet in

11 connection with its representation of Nephron,

12 the company that Miss Kennedy leads.

13 BY MR. BUNDREN:

14     Q.  But other than this case, are you aware

15 of any other times where you have worked with

16 Miss Kennedy or any of her other business

17 ventures other than Nephron?

18     A.  Not that I'm aware of.

19     Q.  When did you first become aware of

20 Nephron?

21     A.  I would estimate in the fall of 2019.

22     Q.  Was that in connection with this

23 litigation?

24     A.  Yes, I believe so.

ATTORNEYS EYES ONLY

Page 35

1      Q.   So prior to the litigation you had not

2    in any of your business become familiar at any

3    time with Nephron?

4      A.   Not that I recall.

5      Q.   What about US Compounding, are you --

6    when did you first become aware of US Compounding

7    and let me limit that, outside of this litigation

8    context?

9      A.   Outside of this litigation, I don't

10   recall that I was aware of US Compounding.

11     Q.   What about Adamis, outside of this

12   litigation, when did you first become aware of

13   Adamis?

14     A.   I may have come across them in some of

15   the life sciences work that I've done, but if I

16   did, I don't recall.  As I recall, it would be

17   part of this litigation.

18     Q.   What is the life sciences work that you

19   do, generally speaking?

20     A.   So one of FTI's goals is life sciences,

21   where various aspects of pharmaceuticals,

22   medical devices, biotechnologies, healthcare

23   generally, there's an expert that's unleashed in

24   that space.  I sit with the intellectual

ATTORNEYS EYES ONLY

1   property practice at FTI, their national

2   practice, that focuses on intellectual property.

3   And I myself have done quite a bit of work

4   within that life sciences larger umbrella at

5   FTI.

6       Q.   What about Miss Hulsey, do you know who

7   Miss Shelly Hulsey is?

8       A.   Yes.

9       Q.   When did you first become aware of Miss

10  Hulsey outside of this litigation?

11      MS. MERGO:  Object to the form.

12  BY MR. BUNDREN:

13      Q.   Or were you aware of Miss Hulsey

14  outside of this litigation?

15      A.   Not that I'm aware of.

16      Q.   Okay.  I want to go back to your expert

17  retention including reports and testimony.

18          Looking at the current one or the most

19  current one, Appendix A to Exhibit 4, can you see

20  that?

21      A.   Yes.

22      Q.   I think it's a two-page list, bullet

23  point list of 28 retentions.  How many of these

24  engagements were or are, other than the Nephron

ATTORNEYS EYES ONLY

Page 37

```
 1   matter of course, related to economic damages in
 2   a trades secret case?
 3        A.   First, I think I've got more than 28.
 4        Q.   30.  You're right, I apologize.
 5        A.   And then which of these -- I'm sorry,
 6   can you say your question?
 7        Q.   Which of these on your list relate to
 8   expert retention including reports and testimony
 9   in a trade secrets case?
10        A.   The Regents of the University of
11   California, I don't know if there was a trade
12   secrets -- if there was a trades secret claim or
13   just the misuse or misuse of their proprietary
14   or confidential information.  I'm just not
15   certain as I sit here.  WTS Paradigm V Edge Aq.
16   Active Networking AT&T.  As I'm sitting here, I
17   don't recall if there was a trade secret count
18   or again the use of information.  Apex Benefits
19   Group V Eric Dreyfus, Elector V Asa Abeliovich.
20   And then Nephron.
21        Q.   Are any of these retentions, other than
22   the Nephron matter, related to 503A or 503B
23   Compounding Pharmaceutical Companies?
24        A.   No.
```

ATTORNEYS EYES ONLY

Page 38

1      Q.   Okay.  And of the six matters -- and

2    we'll exclude Nephron.  I understand the opinions

3    that you provided in this case.  But of the five

4    other matters, how many of those matters did you

5    provide an opinion as to a reasonable royalty?

6    And I'm just talking about the trade secrets

7    cases if that helps.

8      A.   Of the cases I just mentioned, the

9    Regents of the University of California with

10   the stipulation that I made in my prior answer,

11   WTS Paradigm V Edge Aq, I believe.  Apex

12   Benefits Group V Dreyfus.  And I think that's

13   all.

14     Q.   So the Regency University of California

15   case, the WTS Paradigm case and the Apex

16   Benefits Group, you provided testimony to -- and

17   your expert report, to the best of your

18   recollection, opining on a reasonable royalty,

19   is that correct?

20     A.   Yes, as I sit here, yes, that's my

21   recollection.  Obviously, I would want to review

22   those, but as I sit here I believe so.

23     Q.   In any of those three cases, the

24   Regency of California, the WTS Paradigm or the

ATTORNEYS EYES ONLY

Page 39

1   Apex case did you also issue an opinion on

2   disclosing of profits or unjust infringement

3   damages?

4        A.   Yes, I believe so.

5        Q.   And which ones are those of those

6   three cases?

7        A.   As I sit here, I believe all three had

8   a disgorgement component within my expert

9   report.

10       Q.   Okay.  What about of these three cases,

11   the Regents of the University of California, WTS

12   Paradigm and Apex where you issued a reasonable

13   royalty opinion, how many of these three did you

14   also issue an opinion on lost profits or actual

15   losses?

16       MS. MERGO:  Object to the form.

17       A.   In the Regents at the University of

18   California there was also a lost profits

19   component.  I think that's it as I'm sitting

20   here, I think.

21   BY MR. BUNDREN:

22       Q.   Of the thirty cases on your list, are

23   there any cases where you've been disqualified

24   or limited as an expert in whole or in part with

ATTORNEYS EYES ONLY

Page 40

1    respect to damages?

2       A.   Yes.

3       Q.   Which cases were those?

4       A.   Inguran V ABS Global.

5       Q.   Where is that on your list?  Which one

6    is that?

7       A.   Page 2.

8       Q.   Page 2, I apologize.  The Inguran

9    versus ST Genetics versus ABS Global?

10      A.   Yes.

11      Q.   Any others?

12      A.   And Halo V Comptoir or CDI.

13      Q.   Okay.  And that's on page 1?

14      A.   Yes.

15      Q.   Okay.  Any others?

16      A.   Not that I'm aware of.

17      Q.   What was the basis, to the best of your

18   recollection of -- strike that.

19           In the ST Genetics case, were you

20   excluded and your report excluded in its

21   entirety or just in part?

22      A.   In part.

23      Q.   And what was the part that was excluded

24   to the best of your recollection?

ATTORNEYS EYES ONLY

Page 41

1        A.   This was the second litigation between

2    Inguran or ST Genetics and ABS Global.  And in

3    the first litigation ST Inguran or ST Genetics

4    had been found to have engaged in

5    anticompetitive behavior.  In the second

6    litigation for which I was retained as the

7    damages expert, in discussing the hypothetical

8    negotiation between the parties, I referenced in

9    my report that Inguran and ST -- Inguran/ST

10   Genetics had been found guilty of

11   anticompetitive behavior in the prior litigation

12   and that may have influenced the bargaining

13   positions of the parties in the second

14   litigation.  In that matter the judge, when it

15   came time to trial, did not want to -- or did not

16   allow any referencing of being anticompetitive

17   finding from the prior litigation.

18       Q.   Were you otherwise still permitted to

19   provide testimony in that case related to a

20   reasonable royalty calculation?

21       A.   Yes.

22       Q.   Was your methodology challenged or

23   struck at all -- strike that.

24            Was your methodology in that case

ATTORNEYS EYES ONLY

Page 42

1    either limited or struck in part on the

2    reasonable royalty analysis other than what you

3    described?

4        A.   No.

5        Q.   Okay.  The second case you mentioned

6    was a Halo Creative and Design versus Comptoir,

7    CDI?

8        A.   Yes.

9        Q.   What was the -- were you struck in

10   whole or in part or limited in whole or in part

11   with regard to the testimony you were providing?

12       A.   Limited in part.

13       Q.   And how were you limited by the court

14   in that case?

15       A.   There were three claims in that case,

16   design patent infringement, trademark

17   infringement, and copyright infringement.  In the

18   copyright infringement analysis, I provided a

19   disgorgement profits analysis and a reasonable

20   royalty should the Court determine that a royalty

21   would be appropriate in that instant.

22       Q.   And how were you limited in your

23   testimony in that regard?

24       A.   I only presented disgorgement damages.

ATTORNEYS EYES ONLY

Page 43

1       Q.   So in the Halo case your opinion was --

2    on a reasonable royalty was excluded?

3       A.   Yes, it was limited, yes.  It was an

4    MIL.

5       Q.   And that's motion in limine?

6       A.   Yes.

7       Q.   So how was your opinion limited by the

8    court in providing testimony on a reasonable

9    royalty in the Halo case?

10      A.   How was it limited?

11      Q.   Better question:  Why was it limited,

12   to the best of your knowledge?

13      A.   To the best of my knowledge a royalty

14   was determined not to be an appropriate damage

15   remedy in a copyright infringement related to

16   lighting and furniture products.

17      Q.   Was your methodology challenged in that

18   case, in the Halo case, on your reasonable

19   royalty opinion?

20      A.   If I recall, my methodology was an

21   apportionment of profits using an analytical

22   approach, so that was the basis of my royalty

23   variation.  So that is what I did not talk

24   about.

ATTORNEYS EYES ONLY

Page 44

1      Q.   But was your methodology in arriving at

2    that conclusion challenged or was it a legal

3    decision by the court that reasonable royalty

4    was not available in that case at all?

5      MS. MERGO:   Object to the form.

6      A.   As I sit here, I don't know.

7    BY MR. BUNDREN:

8      Q.   Okay.  Are there any other cases on

9    this list where you've been retained or where

10   you've been struck as an expert or your opinions

11   have been limited, other than the ones we talked

12   about, which are the Halo case and the ST

13   Genetics case?

14     A.   Not that I'm aware of.

15     Q.   When were you retained by Nephron -- or

16   who were you retained to provide testimony on

17   behalf of in this case?

18     A.   The engagement letter is retention of

19   FTI Consulting by Nexsen Pruet, counsel on behalf

20   of or in connection with its representation of

21   Nephron.

22     Q.   Okay.  This engagement letter is dated

23   -- the engagement letter that I have that was

24   produced last evening is dated September 6th,

ATTORNEYS EYES ONLY

1   2019; is that the engagement letter that you

2   have as well?

3       A.   Yes, it is dated that.  It's Bates

4   number NEPH0002083, starts there.

5       Q.   And I want to mark the engagement

6   letter as Exhibit 5.  Do you see that engagement

7   letter in front of you?

8                    (Whereupon, Deposition Exhibit

9                     No. 5 was marked for

10                    identification.)

11      A.   Yes.

12  BY MR. BUNDREN:

13      Q.   And that's an 8-page document.  Does

14  that appear to be the same document that you

15  have in front of you?  And it's Bates number

16  Nephron2083 to Nephron2090?

17      A.   Yes, it's the same that I have in front

18  of me.

19      Q.   Now, the letter as we stated, I believe

20  that's Exhibit 5, the letter as we stated is

21  dated September 6th, 2019.  When did you first

22  become aware of this case where you've been

23  retained?  I just want to know a little bit more

24  about your retention process.  Was it a week

Page 46

```
 1    before, was it a month before and then you were

 2    retained?  What was the process of your

 3    retention?

 4        MS. MERGO:  Object to the form.

 5        A.   As of September 6th you're asking?

 6    BY MR. BUNDREN:

 7        Q.   Yes, correct.

 8        A.   I don't recall specifically here, but

 9    generally we'll run a conflict check.  And then

10    it will be reviewed and then I would be or

11    whoever would be -- whoever ran the conflict

12    check would be alerted whether or not

13    conflicts were cleared, and then generally there

14    would be a notification that we cleared

15    conflicts and then a draft engagement letter

16    would be created.

17        Q.   So Miss Distler, were you contacted

18    specifically of this retention by Nexsen Pruet or

19    did you receive this assignment through another

20    individual in your office?

21        MS. MERGO:  Objection, form.

22        A.   I do not recall being contacted by

23    counsel in this matter initially.

24
```

ATTORNEYS EYES ONLY

Page 47

1    BY MR. BUNDREN:

2        Q.    So how did this matter end up on your

3    desk?

4        A.    This matter -- using your language,

5    landed on my desk, it was through a referral

6    within FTI, within my office.

7        Q.    And who was it referred by?

8        A.    I believe -- it was either Brian

9    Clutter or Vince Thomas, I'm not sure which.

10       Q.    You said Vince Thomas?

11       A.    Yes, one or the other.

12       Q.    Do you know if either Mr. Clutter or

13   Mr. Thomas have provided expert related services

14   for either Nexsen Pruet or Nephron prior to

15   this matter?

16       A.    I believe so as I'm sitting here.

17       Q.    And who provided those services to the

18   best of your knowledge?

19       MS. MERGO:   Object to form.

20   BY MR. BUNDREN:

21       Q.    Was it Mr. Clutter or Mr. Thomas?

22       A.    I believe it was both.

23       Q.    And just to make sure we're

24   understanding each other, I'm talking about

ATTORNEYS EYES ONLY

Page 48

```
 1    other than this case, Nephron versus Adamis,

 2    US Compounding and Miss Hulsey; do you understand

 3    that to be my question?

 4        A.   Generally, I mean, yes, I believe Mr.

 5    Clutter and Mr. Thomas have provided services in

 6    the past.

 7        Q.   In the past for who?  Nexsen Pruet or

 8    Nephron and its related entities?

 9        A.   I'd -- Nexsen Pruet from what I

10    understand.

11        Q.   Do you know if Mr. Clutter or Mr.

12    Thomas have provided testimony, expert related

13    services for Nephron before this case?

14        A.   Not that I'm aware of.

15        Q.   Okay.

16        MS. MERGO:  Brandon, can we take a break?

17        MR BUNDREN:  Sure.  How long do you want to

18    take, Nikole?

19        MS. MERGO:  Probably ten minutes.

20        MR. BUNDREN:  That's fine.

21        MS. MERGO:  Thank you.

22        VIDEOGRAPHER:  We are off the record, the

23    time is approximately 10:22 a.m.

24                    (Whereupon, a short break was
```

1                        taken.)

2        VIDEOGRAPHER:  We're back on the record.  The

3    time is approximately 10:36 p.m. or a.m., I'm

4    sorry.

5    BY MR. BUNDREN:

6        Q.   Miss Distler, looking back at Exhibit

7    5, that's the engagement letter, it's my

8    understanding that FTI's work is worked in a

9    blended hourly rate of $450 per hour, is that

10   correct, to the best of your recollection?

11       A.   Yes.

12       Q.   And that's regardless of the

13   professional that works on the engagement?

14       A.   Yes.

15       Q.   What is your normal hourly rate?

16       A.   Generally it's -- I think generally

17   right now it's 575 per hour.

18       Q.   And it's my understanding you had a few

19   professionals work with you on this case and

20   we've talked about a couple of them, Brian

21   Clutter, Brian Meshler, Jacob Lensing, Hannah

22   Yatenie, is that right?

23       A.   Yatonie.

24       Q.   Yatonie.  Thank you.  And Kelly Meyer,

ATTORNEYS EYES ONLY

Page 50

1   is that correct?

2        A.   I can look through the invoices and

3   verify that, but generally that sounds right.

4        Q.   Okay.  And I think you said Mr. Clutter

5   and Mr. Meshler did -- I don't think you said

6   majority, but you said they did a lot of the

7   work on the case, right?

8        MS. MERGO:  Object to the form.

9        A.   I think I said something along the

10  lines that they primarily worked with me on this

11  case.

12  BY MR. BUNDREN:

13       Q.   Okay.  Other than Mr. Clutter and Mr.

14  Meshler, Mr. Lensing, Miss Yatonie and -- is it

15  Mr. or Miss Meyer?

16       A.   Miss Meyer.

17       Q.   Miss Meyer.  Anybody else that you

18  recall working on this engagement with you?

19       A.   I looked through my invoices as I'm

20  sitting here, not that I recall.

21       Q.   That's what you're referring to, your

22  invoices?

23       A.   I was just flipping through those.

24       Q.   Let's go ahead and mark that as the

ATTORNEYS EYES ONLY

Page 51

1   next Exhibit.  I think it's Exhibit 6 and it's

2   Nephron2042 to 2082.

3                    (Whereupon, Deposition Exhibit

4                     No. 6 was marked for

5                     identification.)

6   BY MR. BUNDREN:

7       Q.   Are those the documents you were

8   looking at, Miss Distler?

9       A.   Yes.

10      Q.   That's on the screen right here?

11      A.   Yes.

12      Q.   It looks like these are invoices from

13  your firm starting November 26th, 2019, is that

14  right?

15      A.   Yes.

16      Q.   The last invoice I have is July 24th,

17  is that correct?

18      A.   Yes.

19      Q.   Have there been any other invoices sent

20  to Nephron, Miss Kennedy specifically, on this

21  matter after July 24th?

22      A.   No.

23      Q.   How many hours have you worked on this

24  matter since June 30th, which I believe is

ATTORNEYS EYES ONLY

Page 52

```
 1   reflected on the last work date on the July 24th
 2   invoice?
 3        A.   As I'm sitting here, I don't know.
 4        Q.   What about other professionals that are
 5   working on the case with you, how many hours
 6   have they worked on this case since June 30th?
 7        A.   As I'm sitting here, I don't know what's
 8   the date end on the non-billed system.
 9        Q.   Okay.  So all the -- there's still some
10   unbilled time that is still sitting on FTI's
11   system that hasn't been invoiced yet to Nephron,
12   is that correct?
13        A.   Yes, I would assume so.
14        Q.   What's your normal schedule sending
15   invoices, is it every month?
16        A.   Yes, it's monthly.
17        Q.   Do you intend to testify at trial in
18   this case?
19        A.   Yes, as far as I know, yes.
20        Q.   Who is -- and I'm going to not
21   pronounce his name correctly, so I'm just going
22   to spell it.  V-l-a-d-y-s-l-a-v and then last
23   name T-o-r-i-s-h-n-y-a-k. Do you know who that
24   is?
```

ATTORNEYS EYES ONLY

Page 53

1          A.   He is an employee of FTI Consulting.

2          Q.   Did he work on this case with you?

3          A.   Not that I recall.

4          Q.   Now, as I understand it, Mr. Clutter is

5     a Senior Director.  Do you know what his normally

6     hourly rate is?

7          A.   As I sit here, I do not.

8          Q.   What about Mr. Meshler, he's a

9     consultant; do you know his normal hourly rate?

10         A.   I don't as I sit here.

11         Q.   And I think we talked about earlier,

12    consultants are entry-level positions in your

13    business segment, is that right?

14         A.   Across FTI, yes.

15         Q.   How much do consultants -- what are

16    consultants hourly rates generally speaking at

17    your company?

18         A.   As an estimate I would say

19    approximately, as an estimate sitting here, 300

20    to 375 as an estimate.

21         Q.   What about Miss Yatonie and Miss Meyer,

22    they're also consultants, is that correct, at

23    FTI?

24         A.   Yes, I believe so.  No --

ATTORNEYS EYES ONLY

Page 54

1      Q.   How is that incorrect?

2      A.   Miss Yatonie is a consultant at FTI.

3      Q.   What about Miss Meyer?

4      A.   She no longer works for FTI.

5      Q.   When she left, was she in a consultant

6   position?

7      A.   Yes.

8      Q.   And Mr. Lensing is a senior consultant,

9   is that correct?

10     A.   I believe that is his current title.

11     Q.   What are the hourly rates normally for

12   senior consultants at FTI?

13     A.   As I'm sitting here, I don't know the

14   range.  I would -- generally a senior consultant

15   would be more than a consultants' billing rate.

16     Q.   And then a senior director would be

17   more than a senior consultant, is that correct?

18     A.   Yes.

19     Q.   Do you know what a senior director

20   typically charges per hour at FTI?

21     A.   As I'm sitting here, I don't know the

22   range.

23     Q.   Now, ultimately you were asked -- what

24   were you asked to do in this case?

ATTORNEYS EYES ONLY

Page 55

1       A.   As I state in my report, I was retained

2   or FTI was retained to assist the trier of fact

3   in determining damages in this matter.

4       Q.   And you provided two reports, May 8th

5   and July 8th, and those were Exhibits 2 and 4, is

6   that correct?

7       A.   Yes.

8       Q.   You said damages, what kind of damages?

9   Economic damages, noneconomic damages, what was

10  the scope of your retention?

11      A.   Generally it would have been economic

12  damages.

13      Q.   What was it in this case?

14      A.   Economic damages.

15      Q.   Have you been retained in any other

16  matter by Nephron specifically with respect to an

17  estimation of damages in the bankruptcy case with

18  Miss Hulsey?

19      A.   Can you repeat that?

20      Q.   Sure.  Have you been retained by either

21  Nephron or Nexsen Pruet to provide any expert

22  related services with respect to the bankruptcy

23  case filed by Miss Hulsey that's pending in the

24  District of Kansas?

ATTORNEYS EYES ONLY

Page 56

1       A.    Yes, it's encompassed within.

2       Q.    Okay.  So that information would be

3    reflected in your two reports that you prepared,

4    is that right?

5       A.    I haven't issued a report in that

6    matter.

7       Q.    Okay.  That's what I'm trying to

8    understand.  So you provided two reports in this

9    case, and this is the case pending in the Middle

10   District of Florida.  Have you been retained to

11   provide any expert related retention services

12   with respect to the case involving Miss Hulsey

13   in the bankruptcy court in the District of

14   Kansas?

15      A.    It's my understanding that matter is

16   ongoing.  Since it is related to this matter, my

17   general understanding is yes.

18      Q.    But have you provided any reports in

19   that matter, the bankruptcy case, and

20   specifically I'm talking about the adversary

21   proceeding that Nephron's filed against Miss

22   Hulsey in the bankruptcy court?

23      A.    I have not provided a report.

24      Q.    Okay.  Have you been retained by

ATTORNEYS EYES ONLY

1    Nephron to provide any testimony, expert

2    retention services with respect to an individual

3    named Jessica Lane?

4         A.   Not that I'm aware of.

5         Q.   Are you aware that a case has been

6    filed by Nephron against Miss Lane and it's

7    pending in the District of New Jersey?

8         A.   Yes.

9         Q.   Have you been retained to provide any

10   services on behalf of Nephron?

11        A.   Not that I'm aware of.

12        Q.   All right.  Your May 8th report, which

13   is Exhibit 2, who prepared the report?

14        A.   I did.

15        Q.   And you wrote the report?

16        A.   I wrote large portions of this report

17   and reviewed other aspects that were drafted at

18   my direction for this report.

19        Q.   All right.  So let's look at Exhibit 2,

20   that's your May 8th report.  You said you wrote

21   a large portion.  Who else wrote portions of this

22   report?

23        A.   So, generally, in my expert reports I

24   prepare the outline and I will draft some of

ATTORNEYS EYES ONLY

Page 58

1    those portions accordingly, and then others on

2    the team may assist me based on my outlines.

3    And then I would review all drafting, edit, make

4    adjustments across the report.  It's a general

5    process.

6        Q.   So who else helped you write this

7    report?

8        A.   Brian Clutter would have assisted in

9    drafting portions of the report under my

10   supervision.

11       Q.   Anybody else?

12       A.   There may have been others that would

13   have assisted in some of the drafting and/or

14   creation of the schedules or attachments to the

15   report.  It would be reflective of those on the

16   invoices.

17       Q.   So if you wrote a large portion of this

18   May 8th report, what is your estimation of what

19   you consider a large portion?

20       A.   I would say first, as I stated, I

21   constructed the outlines.  As a large portion,

22   I don't have a defined percentage that I would

23   say.  As I'm sitting here, I specific -- as I

24   sit here, I don't specifically recall what I

ATTORNEYS EYES ONLY

Page 59

1    outlined versus drafted versus editing or

2    redrafted as part of the process.

3        Q.   How would you find out that

4    information?  What would you do to understand

5    that information?

6        MS. MERGO:  Object to the form.

7        A.   As I'm sitting here, I could potentially

8    touch base with individuals on my team to see if

9    they recall.  I know generally in the background

10   information we may have some of our consultants

11   assist in drafting those areas.  But, I mean,

12   that would be my best estimate.

13   BY MR. BUNDREN:

14       Q.   Would the task of individuals who

15   drafted or edited the May 8th report, would

16   their task be recorded in the invoices sent to

17   Nephron?

18       MS. MERGO:  Object to the form.

19       A.   They may be.

20   BY MR. BUNDREN:

21       Q.   And if you had the invoices in front of

22   you that were unredacted, would you be able to

23   determine if that was the case?

24       MS. MERGO:  Objection to form.

ATTORNEYS EYES ONLY

Page 60

1       A.    I don't know as I'm sitting here.

2    BY MR. BUNDREN:

3       Q.    Do you -- are you -- do you have access

4    to unredacted copies of the invoices?

5       A.    Yes, I do.

6       Q.    And you understand in this case the

7    only thing that's been produced are redacted

8    copies of the invoices, is that right?

9       A.    Yes, that's what I saw produced last

10   night.

11      Q.    What would typically be in an invoice

12   to a client in the description category?  And

13   I'm not specifically talking about these

14   invoices, but typically what would be recorded

15   by your team in preparing a report?

16      A.    Generally the task that someone was

17   working on.

18      Q.    So like drafting a report or

19   conversations regarding the report, those things

20   would be recorded, wouldn't they?

21      MS. MERGO:  Object to the form.

22      A.    They could be.  I don't know as I'm

23   sitting here the entries that went in including

24   the document review, the schedules, analysis at

ATTORNEYS EYES ONLY

Page 61

1   my request, yeah, they could be very general.

2   BY MR. BUNDREN:

3       Q.   But if we had the invoice today that

4   were unredacted, we would be able to tell who

5   did what at FTI for this case, would we not?

6       MS. MERGO:  Object to form.

7       A.   If you had non-redacted invoices, you

8   would see the task for it.

9       MR. BUNDREN:  Nikole, I think -- I know you

10  all produced redacted invoices.  I'm going to

11  formally request during this deposition a copy

12  of the unredacted invoices.  That information is

13  not privileged.  If there is some information

14  that's within those invoices that could possibly

15  be privileged, maybe I can see minor redactions,

16  but to redact the thing wholesale is not proper.

17  We're going to ask for production of the complete

18  copies of the invoices.

19      MS. MERGO:  Okay.  And we object.  We've

20  already produced the responses with the

21  objections that we deem appropriate, including

22  attorney-client work product.  I'll be happy to

23  have a discussion with you off the record.  We

24  will not be producing that today.

ATTORNEYS EYES ONLY

Page 62

1      MR. BUNDREN:  Okay.

2   BY MR. BUNDREN:

3      Q.   Now, Miss Distler, if you had

4   conversations with individuals at Nephron, let's

5   say Miss Kennedy, would that be reflected --

6   would that be the type of information that would

7   be reflected in your invoices?

8      MS. MERGO:  Object to the form.  I'm going to

9   instruct you not to answer if there's anything

10  in the invoices that betray client privilege or

11  work product.  To the extent of the question,

12  have you had conversations with Miss Kennedy,

13  she can respond to that.

14  BY MR. BUNDREN:

15     Q.   Have you had a conversation with Miss

16  Kennedy in preparation of your report?

17     A.   Yes.

18     Q.   And you relied on those conversations

19  in preparation of your report, did you not?

20     A.   Yes, I cite to Miss Kennedy within my

21  expert report.

22     Q.   And she's not the only person at

23  Nephron that you talked to, was it?

24     A.   That's correct.

ATTORNEYS EYES ONLY

Page 63

1      Q.   Who else did you talk to you at

2   Nephron?

3      A.   As identified on page 3 of my May 8th

4   Expert Report, Mr. Hank -- pardon my

5   pronunciation -- Jibaja, I think it's Jibaja.

6      Q.   So you talked to Miss Kennedy and then

7   Mr. Jibaja, is that correct?

8      A.   Yes.

9      Q.   Anybody else at Nephron that you talked

10  to in connection with your work on this case?

11     A.   Not that I recall sitting here.

12     Q.   And you relied on those conversations

13  in connection with preparing your report, did

14  you not?

15     A.   Yes.

16     MR. BUNDREN:  I think I've laid the

17  foundation, Nikole, if she relied on it then

18  it's fair game and it needs to be produced.  So

19  we can take it up later, but that's our

20  position.

21     MS. MERGO:  We can take it up later.

22  BY MR. BUNDREN:

23     Q.   All right.  What about your July 8th

24  report, who prepared your July 8th report?

ATTORNEYS EYES ONLY

Page 64

1      A.   It would be myself and others working

2   with me on the project.

3      Q.   How much of the July 8th report did you

4   prepare and how much did others prepare?

5      A.   It would have been a similar process,

6   what I described earlier.  It would have been

7   generally I outlined the expert report and

8   members of the team will assist me in drafting

9   those.  I will review all of the sections with

10  them and edit, redraft accordingly.

11     Q.   What information were you provided in

12  order to perform your services for Nephron?

13     A.   Nephron produced various documents as

14  part of the discovery process.  Nephron would

15  have responded to other discovery requests that

16  I would have reviewed.  I would say generally

17  that would be my response to what was provided

18  by Nephron.

19     Q.   Were you provided everything that you

20  asked for?

21     A.   As I sit here, I don't recall anything

22  that I did not receive.

23     Q.   Did you ask for any information from

24  Nephron or Nephron's counsel that was not

ATTORNEYS EYES ONLY

Page 65

1    provided to you in preparation of your reports?

2         A.   As I'm sitting here, not that I recall.

3         Q.   Okay.  And it's my understanding that

4    the information that you relied on in your

5    reports in preparation of your reports is listed

6    in Appendix B to your May 8th report, which is

7    Exhibit 2.  And to my understanding you had a

8    supplemental Appendix B, which I think we talked

9    about that earlier and marked that as Exhibit 3.

10   And then there was a third version that was

11   produced in connection with your July 8th

12   report, is that right?

13        A.   Yes.

14        Q.   All right.  Let's look at the Exhibit

15   2, which is your May 8th report. And I'll pull

16   it up on the screen shortly.  Appendix B?

17        A.   Yes.

18        Q.   This a 5-page document or 5 pages of

19   documents that you were provided, documents,

20   websites for information, is that correct?

21        A.    I'm sorry, could you repeat that one

22   more time?

23        Q.   Sure.  These 5 pages of documents that

24   encompass Appendix B, this was all the

ATTORNEYS EYES ONLY

Page 66

1    information that you relied on in preparation of

2    your May 8th report?

3         A.   What I see here, yes, in conjunction

4    with my knowledge and experience.

5         Q.   Miss Distler, I want to turn your

6    attention to the first page of Appendix B.  What

7    are these documents that begin with the prefix

8    REL3?

9         A.   So these are documents that were sent

10   to FTI.  And that would have been the file

11   names, from what I recall.

12        Q.   Okay.  And those documents -- where

13   does FTI house those documents?  Does FTI have

14   its own database that reviews documents or were

15   you provided access to Nephron's -- or Nephron's

16   counsel's database to review documents?

17        MS. MERGO:  Object to the form.

18        A.   I would say that FTI does not have a

19   database.  We have a -- we save documents that we

20   receive.

21   BY MR. BUNDREN:

22        Q.   So is it your testimony that you

23   received individually all these documents that

24   are on the first 2 pages of Appendix B to your

ATTORNEYS EYES ONLY

Page 67

1    May 8th report?

2        A.   Yes.

3        Q.   Now, it's my understanding that REL

4    stands for relativity; does that ring a bell to

5    you about where these documents came from?

6        A.   I believe that's correct.

7        Q.   Okay.  What is your understanding now

8    about where the documents with the prefix REL

9    came from?

10       A.   They would have come from a relativity

11   database and then provided to us at FTI where I

12   saved them.

13       Q.   Did you have -- my point is I'm trying

14   to understand, did you have access to a

15   relativity database to review these documents?

16       A.   I don't recall as I sit here.  I would

17   -- I guess I don't recall if myself and my team

18   would have pulled them off of relativity for a

19   login or if they would have been sent to me.

20   And then as part of our creation, Appendix B, we

21   would generally write a script that will grab

22   the file names and then populate them into a

23   document for us to include in Appendix B.  So

24   I'm just not exactly sure what the process was

ATTORNEYS EYES ONLY

Page 68

1    to -- and if the file names were bad, I think I

2    recall, or if they were pulled down directly.

3         Q.   Have you ever reviewed documents in

4    connection with your work, not limited to this

5    case, but through a Relativity database?

6         A.   Yes, I have.

7         Q.   And that requires a user name and login

8    generally to get into the database?

9         A.   Yes.

10        Q.   And you don't recall one way or another

11   whether you used a user name to login, to login

12   into a Relativity database to review these

13   documents that you've listed on Appendix B of

14   your report?

15        A.   For this particular matter I don't

16   recall, but I can find out.

17        Q.   Yeah, I'd ask you to do that, if you

18   don't mind.

19        A.   Sure.

20        Q.   Do you recall whether or not you were

21   provided certain documents or did you have

22   unrestricted access to view documents that have

23   been produced in this case?  And by

24   unrestricted, I mean you could pick and choose

ATTORNEYS EYES ONLY

Page 69

1    what documents that you could look at whether

2    they were produced by any party or any nonparty.

3        A.   As I'm sitting here, I don't know if we

4    had a Relativity login, I just can't recall.

5    But I can find out that.  My understanding, if

6    there was a login, it would have been

7    unrestricted.

8        Q.   And you said, I think, before that FTI

9    does not have its own Relativity database,

10   is that correct?

11       A.   The answer to your question, no, I

12   would disagree with that.

13       Q.   You would disagree with what?  All I

14   want to know is whether FTI Consulting has its

15   own system, it's own Relativity database where

16   it can review documents that's managed and

17   controlled by FTI.

18       A.   FTI generally does have a service or a

19   license to Relativity for consulting projects

20   that would be independent of my segment.

21       Q.   Okay.  I understand.  And if they

22   weren't in your segment, you wouldn't have used

23   that Relativity database to review documents for

24   this case, is that correct?

ATTORNEYS EYES ONLY

Page 70

1      A.    In my work if I am provided a login in

2    a case, I would login generally to the law

3    firm's database remotely not an FTI database.

4      Q.    Now, I want to look back at, I believe

5    it's Exhibit 3, your Supplemental Appendix.

6      A.    Yes.

7      Q.    Now, this Supplemental Appendix and

8    specifically with regards to the Bates range

9    documents, the REL prefix documents have been

10   removed.  Do you recall what caused you to issue

11   this supplemental Appendix B after May 8th?

12     A.    If I recall, it was a request for what

13   those particular documents were.

14     Q.    Do you know if all those REL prefix

15   documents were produced in this case?

16     A.    As I said, sitting here I'm not

17   certain.  I know the ones that I relied on were

18   for sure, but I'm not certain about the others.

19     Q.    How would I know which ones you relied

20   on that are listed with the prefix REL that were

21   produced versus the ones that were not produced?

22   How would you be able to tell?

23     A.    As I'm sitting here, I would not -- I

24   couldn't tell you as I'm sitting here.

ATTORNEYS EYES ONLY

Page 71

1      Q.   Okay.  You'd have to go to the

2   Relativity database, wouldn't you?

3      MS. MERGO:  Object to form.

4      A.   I don't know if I would have to go to

5   the Relativity database.

6   BY MR. BUNDREN:

7      Q.   How would you figure it out?

8      A.   I would look at the Bates number

9   documents that I have received and my

10  supplemental.

11     Q.   Now, turning to Exhibit 4, which is

12  your July 8th report, you also produced a

13  supplemental -- actually, it's just an Appendix

14  B.

15     A.   Yes.  With additional pages.

16     Q.   What do you mean by additional pages?

17  So the first two pages you have information

18  relied upon for your May 8th report, right?

19     A.   Correct.  And then you keep going

20  forward and it says after May 8th.

21     Q.   Yes.

22     A.   So this goes in a documents post, my

23  initial report.

24     Q.   And those would have been documents

Page 72

1    that were produced after your initial report?

2        A.   Or documents that I received or relied

3    upon after my first report.

4        Q.   Okay.  Now, is this Appendix B the sum

5    total of all the documents and information that

6    you relied upon in connection with giving your

7    opinions in this case?

8        A.   I would say in conjunction with my

9    knowledge and experience.

10       Q.   And your conversations with the folks

11   at Nephron?

12       A.   Yes, as I identified in my May 8th

13   expert report.

14       Q.   All right.  Let's keep looking at your

15   July report, and specifically I want to look at

16   this bullet -- or not bullet point, it's

17   underlined.  It's called cited documents, all

18   documents cited in my expert report and

19   attachment to my report.  Do you see that?

20       A.   Yes.

21       Q.   That's not -- is that just everything

22   in your reports and the attachments?  I just want

23   to make sure there's nothing else that you're

24   referencing here that's not included?

ATTORNEYS EYES ONLY

Page 73

1      A.   Well, that is to denote to the extent

2   that I missed a cite for anything with my expert

3   reports or my schedules.  I would be capturing

4   it there.  And then I would say in addition to

5   my knowledge and experience.

6      Q.   Who made the decision to provide you

7   the legal documents that are referenced in your

8   Appendix B of your July 8th report?

9      MS. MERGO:  Object to the form.

10     A.   So I requested information as part of

11   the discovery in this matter.  And so there was

12   some information recorded in the May 8th report

13   and there are some that are recorded in the

14   post May 8th pages on Appendix B.  I will also

15   generally follow the dockets, especially in this

16   year, for cases so I understand changes in the

17   schedule.  So that may have also alerted me to

18   request certain documents.

19     Q.   You also looked at documents from Miss

20   Hulsey's bankruptcy case that's pending in the

21   District of Kansas, did you not?

22     A.   Yes.

23     Q.   Now, you listed a number of depositions

24   that you relied upon.  Did you ask for all the

ATTORNEYS EYES ONLY

Page 74

1    depositions that were given in this case?

2        A.   I asked for depositions that would

3    relate -- that would relate to economic areas.

4    So, for example, along with background Mr. Wine,

5    Mr. Fernandez, Mr. Hoffman, Miss Hulsey, Miss

6    Kennedy, Mr. Jibaja and Mr. Walton.

7        Q.   Who is Mr. Walton?

8        A.   As identified in my expert report, he is

9    the digital forensics expert for Nephron.

10       Q.   And you're aware that you obviously

11   relied on his report, did you not?

12       A.   In my first report, in my discussion of

13   the alleged wrongdoing, I referenced Mr.

14   Walton's report.

15       Q.   And here on Appendix B on the screen,

16   you relied on the preliminary expert report of

17   Clyde C. Walton, Esquire, and exhibits, is that

18   correct?

19       A.   Yes, he's cited in my expert report.

20       Q.   Okay.  And you also were provided and

21   relied upon the deposition that he gave on

22   February 28th, 2020, with exhibits, is that

23   correct?

24       A.   Yes, it's one of the documents that I

ATTORNEYS EYES ONLY

Page 75

```
 1   would have reviewed.

 2        Q.   And do you know if you reviewed it?

 3        MS. MERGO:  Object to form.

 4        Q.   I reviewed portions of his deposition.

 5   BY MR. BUNDREN:

 6        Q.   Did you read -- so you didn't read the

 7   entirety of his deposition?

 8        A.   Not that I recall.

 9        Q.   What about the other depositions that

10   were provided to you, did you read the entirety

11   of them or just portions?

12        MS. MERGO:  Object to form.

13        A.   Both.  So some I read in the entirety,

14   some I read portions thereof.

15   BY MR. BUNDREN:

16        Q.   Which of the depositions that are

17   listed in Appendix B did you read in their

18   entirety?

19        A.   Mr. Glenn's, Miss Kennedy.  I believe

20   all of Miss Hulsey's and I believe portions of

21   the remaining.

22        Q.   Okay.  Are you aware that Mr. Walton

23   also testified as the corporate representative

24   of Nephron on certain topics?
```

ATTORNEYS EYES ONLY

Page 76

1      A.   As I sit here, I do not recall.

2      Q.   Okay.  But nonetheless you relied on

3    Mr. Walton's report and the deposition that he

4    gave in this case, is that correct?

5      A.   I do not believe I cited directly to

6    his deposition in my report, but I do cite to

7    his expert report.

8      Q.   Well, Miss Distler, you listed Mr.

9    Walton's deposition on the information that you

10   relied upon for your May 8th report, is that

11   correct?

12     A.   Yes, he is listed as information that I

13   relied on.

14     Q.   Okay.  And you wouldn't put it on your

15   list of information that you relied upon unless

16   you reviewed it, is that right?

17     A.   Yes, I would have reviewed portions

18   thereof.

19     Q.   Have you received any documents since

20   the issuance of your July 8th report?

21     A.   I received Dr. Wiggins' deposition

22   and exhibits.  As I'm sitting here, that's all I

23   can recall.

24     Q.   Now, you were reviewing something.  What

ATTORNEYS EYES ONLY

Page 77

```
1    document were you reviewing to determine that

2    you were provided Dr. Wiggins' deposition and

3    exhibits?

4         A.    I was reviewing my Appendix B to my

5    second report.

6         Q.    And the Appendix B of your second

7    report was issued on July 8th, right?

8         A.    That is correct.

9         Q.    Okay.  And so Dr. Wiggins' deposition

10   just took place a couple of weeks ago, so that's

11   after the July 8th report, correct?

12        A.    Yes.

13        Q.    So do you have a list of any kind of

14   other documents that you had reviewed and relied

15   upon that have been received after your July 8th

16   report other than Dr. Wiggins' deposition?

17        MS. MERGO:  Object to form.

18        A.    I do not have a list.

19   BY MR. BUNDREN:

20        Q.    Okay.  Do you recall any other

21   documents that you reviewed and relied upon

22   since the issuance of your July 8th report other

23   than Dr. Wiggins' deposition and exhibits?

24        MS. MERGO:  Object to the form, asked and
```

ATTORNEYS EYES ONLY

Page 78

```
 1    answered.
 2         A.   As I'm sitting here, not that I recall.
 3    I may have reviewed -- as I'm sitting here,
 4    that's all I recall.
 5    BY MR. BUNDREN:
 6         Q.   What is the subject matter -- I'm sorry,
 7    strike that.
 8              What is your opinion on the economic
 9    damages that Nephron has suffered in this case
10    with respect to my clients USC and Adamis?
11         A.   As stated in my expert report dated
12    May 8th, it's my opinion that Nephron has
13    sustained damages in the form of lost royalties
14    pursuant to a hypothetical license between the
15    parties for Nephron confidential information.
16         Q.   That's your reasonable royalty opinion?
17         A.   Yes.
18         Q.   Okay.  What other opinions are you
19    prepared to offer as to the economic damages
20    Nephron has suffered in this case with respect
21    to my clients USC and Adamis?
22         A.   As identified in my May 8th report and
23    my July 8th report, I have also calculated USC's
24    or the Defendants' unjust enrichment.
```

Page 79

1      Q.   So backing up a little bit, you said

2   USC's or the Defendants' unjust enrichment.  There

3   are three Defendants in this case.  What is the

4   unjust enrichment that you calculated?

5      A.   I was using Defendants with an

6   apostrophe S or S apostrophe, so all three.

7      Q.   All three.  Okay.  And what is your

8   opinion on the amount of economic damages that

9   Nephron suffered in this case, specifically

10  pertaining to your unjust enrichment analysis?

11     A.   So in my July 8th report I calculate

12  USC's unjust enrichment as $351,527.

13     Q.   Okay.  What about your opinion as to

14  the amount of economic damages Nephron suffered

15  with respect to the reasonable royalty?

16     A.   As identified in my expert report dated

17  May 8th, it is my opinion that the reasonable

18  royalty the parties would have agreed to in a

19  hypothetical negotiation for the Nephron

20  confidential information is at least 4.5

21  million.

22     Q.   And that opinion is based on the claims

23  that are remaining in this case that have been

24  alleged against the Defendants in the third

ATTORNEYS EYES ONLY

Page 80

1    amended complaint?

2         A.   Yes, as referenced in my expert report.

3    I identified the remaining claims in the --

4    within the, I believe, the (inaudible) section.

5         Q.   And you're aware that there are three

6    remaining claims again my clients, USC and

7    Adamis:  Tortious interference, Federal Defend

8    Trade Secrets Act Claim, and then a Florida

9    Uniform Trade Secrets Act claim, is that right?

10        A.   Yes, that's my understanding.

11        Q.   Are you aware that Nephron has told a

12   federal bankruptcy Court that it has sustained

13   at least 7.5 million dollars in damages?

14        A.   I am generally aware of that.

15        Q.   Did you have any -- did you assist

16   Nephron with coming up with that number that

17   they prepared and showed the bankruptcy Court

18   that they sustained damages in the amount of 7.5

19   million dollars?

20        A.   What was your question again?

21        Q.   Did you have any -- did you assist

22   Nephron with determining the 7.5 million dollar

23   amount in damages that was specifically put

24   forth in a statement of claim filed with the

ATTORNEYS EYES ONLY

Page 81

1    bankruptcy court in Kansas?

2        A.    Yes.

3        Q.    Was the 7.5 your estimation?

4        A.    It was a preliminary value point at

5    that time based on the information that I had and

6    an analysis performed.

7        Q.    How did you undertake that analysis?

8        A.    If I recall, that was in December of

9    2019 and it would have been part of my general

10   process of reviewing documents and understanding

11   the allegation, the specific information at

12   issue, and then looking to identify quantitative

13   information that can assist in formulating

14   damage.

15       Q.    Did you prepare a report in connection

16   with that preliminary value point of 7.5

17   million?

18       A.    No.

19       Q.    Do you know how the 7.5 million in

20   damages came to be included in the statement of

21   claim in the bankruptcy case?

22       A.    I provided input to counsel who would

23   have prepared the document for the bankruptcy

24   court.

ATTORNEYS EYES ONLY

Page 82

1      Q.   And what was your methodology to

2   determine the 7.5 million dollar number?  How

3   did you figure it out?  Did you use a reasonable

4   royalty?  Did you a use a lost profits method?

5   How did you figure out the preliminary value was

6   7.5 million?

7      MS. MERGO:  Objection to form.

8      A.   At that time there was some limited

9   information from Miss Hulsey and/or USC or

10  Adamis, so I looked to information from Nephron

11  that related to some of the specific information

12  that was alleged to have been misappropriated.

13  BY MR. BUNDREN:

14     Q.   How did you come up with the 7.5

15  million dollar number?  Did you employ a

16  methodology to do so?

17     MS. MERGO:  Object to form.

18     A.   At that time I looked to a reasonable

19  royalty type of approach and looked for

20  quantitative data points that I could derive as

21  part of that analysis.

22  BY MR. BUNDREN:

23     Q.   Was that approach similar to what

24  you've done in this case that's referenced in

ATTORNEYS EYES ONLY

Page 83

1    your May 8th report?

2        A.   I would say it was a preliminary start

3    to that analysis based on information that I had

4    at that time.

5        Q.   So you did prepare a report to

6    determine the 7.5 million dollars?

7        A.   I did not prepare a report.

8        Q.   Okay.  Did you use the various bench

9    marking methods in determining your preliminary

10   value of 7.5 million dollars that's been set

11   forth in the bankruptcy case, similar to what

12   you did in the May 8th report?

13       MS. MERGO:  Object to the form.

14       A.   I did not use the same information.

15   BY MR. BUNDREN:

16       Q.   What did you use?

17       A.   I looked to the Nephron information,

18   financial information that corresponded to the

19   documents alleged to have been misappropriated

20   and/or used.  And at that point in time, I looked

21   to what those -- those customers revenues and,

22   you know, potential estimates of profitability of

23   those customers.  And looked to information that

24   I was able to discern about multiples within the

ATTORNEYS EYES ONLY

Page 84

1    space that may or may not be relevant based on

2    the information at that time.

3         Q.    That's pretty similar to what you did

4    in your May 8th report, is it not?

5         MS. MERGO:  Object to the form.

6         A.    If I recall your question, you asked if

7    I used the same information, and I would say I

8    used different or additional information in my

9    report.  But I would say from a methodology

10   perspective, yes, I was looking at a similar

11   methodology, reasonable royalty.

12   BY MR. BUNDREN:

13        Q.    Did you perform any analysis in

14   connection with this 7.5 million dollar

15   estimation that included a component of unjust

16   enrichment or disgorgement?

17        A.    At that time I do not believe I had

18   information to do so.

19        Q.    Did you perform some financial analysis

20   in order to calculate the 7.5 million dollars say

21   in the form of spreadsheets or anything similar

22   to that?

23        MS. MERGO:  Object to the form.

24        A.    I would have analyzed Nephron's sales

ATTORNEYS EYES ONLY

Page 85

1    data.

2    BY MR. BUNDREN:

3        Q.    Did you prepare any spreadsheets

4    yourself or on your direction that would have

5    led you to the conclusion at that time that

6    Nephron's actual damages as of December 19th

7    were 7.5 million dollars?

8        MS. MERGO:  Object to the form.

9        A.    As I'm sitting here, I don't know if I

10   created a spreadsheet, but I did look to -- like

11   I said, I analyzed Nephron's sales data by

12   customer, and I would have looked to publically

13   available information that was out there.  But

14   whether or not I created a spreadsheet, per se, I

15   don't know as I sit here.

16   BY MR. BUNDREN:

17       Q.    What about financial models, did you do

18   any financial models to determine the amount of

19   7.5 million dollars in actual damages?

20       MS. MERGO:  Object to the form.

21       A.    As I stated, I analyzed their sales

22   data.  I don't know if that would be considered a

23   financial model or not, but it was a financial

24   analysis of the customer data released by

ATTORNEYS EYES ONLY

Page 86

1    Nephron.

2    BY MR. BUNDREN:

3        Q.   Are you aware of the statement of claim

4    that was filed by Nephron alleging the amount of

5    7.5 million dollars has been amended in the

6    bankruptcy court?

7        MS. MERGO:  Object to the form.

8        A.   As I sit here, I do not know.

9    BY MR. BUNDREN:

10       Q.   But you would agree that the amount is

11   not 7.5 million dollars, correct, in damages

12   that Nephron suffered?

13       MS. MERGO:  Object to the form.

14       A.   Well, as more information was received

15   and I continued working on my analysis, I came

16   to a royalty opinion of 4-and-a-half to 5 million

17   in this action.

18   BY MR. BUNDREN:

19       Q.   And previously on December 19th of 2019,

20   your opinion was that it was 7.5 million in a

21   reasonable royalty, is that correct?

22       MS. MERGO:  Object to form.

23       A.   That was a preliminary estimate based

24   on the limited information that I had at that

ATTORNEYS EYES ONLY

Page 87

1    time.

2    BY MR. BUNDREN:

3        Q.   But that was your opinion at that time,

4    right, that it was 7.5 million dollars in

5    damages on a reasonable royalty?

6        MS. MERGO:  Object to the form.  Miss Distler

7    already testified she did not issue a report in

8    that case.

9        MR. BUNDREN:  I'm not asking about a report.

10   BY MR. BUNDREN:

11       Q.   Miss Distler, you provided a 7.5 million

12   dollar number to Nephron and Nephron's counsel

13   for it to be included in the bankruptcy case with

14   Miss Hulsey, did you not?

15       MS. MERGO:  Object to the form, calls for

16   attorney-client privilege.  I'll instruct you

17   not to answer as to that portion.

18   BY MR. BUNDREN:

19       Q.   Can you answer the question?

20       A.   What was the question again?

21       MR. BUNDREN::  Miss Court Reporter, can you

22   read it back?

23       COURT REPORTER:  Can you actually repeat it,

24   Brandon, please.

ATTORNEYS EYES ONLY

Page 88

1    BY MR. BUNDREN:

2        Q.   Was it your opinion, Miss Distler, that

3    December 19th, 2019, that Nephron's actual

4    damages in the form of a reasonable royalty was

5    7.5 million based on the preliminary data that

6    you had at that time?

7        MS. MERGO:  Object to the form.

8        A.   I would not say that was my opinion.

9    BY MR. BUNDREN:

10       Q.   Well, what was your opinion?

11       MS. MERGO:  Object to the form.  She's

12   testified she hasn't given an opinion in that

13   case yet.

14       MR. BUNDREN:  Well, she also testified that

15   she provided this information --

16       MS. MERGO:  Just because you don't like the

17   answer she's giving you.  She has not given an

18   opinion to the bankruptcy case yet, nor has she

19   been required to by the rules of that court.

20   BY MR. BUNDREN:

21       Q.   We're going to mark Exhibit 7, and

22   that's going to be the Proof of Claim.

23       MR. BUNDREN:  Diana, would you send that to

24   them, please?

ATTORNEYS EYES ONLY

Page 89

```
 1        MS. EVANS:  Yes.

 2                        (Whereupon, Deposition

 3                    Exhibit No. 7 was marked for

 4                    identification.)

 5   BY MR. BUNDREN:

 6        Q.   Miss Distler, have you seen this

 7   document before?

 8        A.   Yes, I believe so.  Just one moment.

 9        Q.   Sure.  It's a 61-page document that

10   contains the Statement of Claim.

11        A.   I believe so.

12        Q.   Okay.  Now, is that document listed in

13   your Appendix B?

14        A.   I don't know if it's listed in my

15   Appendix B as I sit here.

16        Q.   You would agree with me that Exhibit 7,

17   the Statement of Claim reflects that Nephron's

18   damages as of December 19th, 2019, the actual

19   damages were actually 7.5 million dollars?

20        MS. MERGO:  Object to form.

21        A.   That's what this document states.

22   BY MR. BUNDREN:

23        Q.   Okay.  And you're telling the jury that

24   you have no idea how that number came to be 7.5
```

ATTORNEYS EYES ONLY

Page 90

```
 1   million dollars?
 2       MS. MERGO:  Object to form.  Misstates the
 3   testimony.
 4       A.   I did not say that.
 5   BY MR. BUNDREN:
 6       Q.   Okay.  But you performed a preliminary
 7   value analysis -- I'm sorry, preliminary value
 8   point, is that correct?
 9       MS. MERGO:  Object to the form.  You can
10   answer.
11       A.   I would say at that time I looked at
12   the information available and I was evaluating
13   any potential data points that may be
14   informative to a hypothetical negotiation as
15   part of that work.  But at that point in time,
16   as I stated, I had limited information and I
17   did not provide an expert opinion of that
18   amount.
19   BY MR. BUNDREN:
20       Q.   I may have asked you this and if I
21   did, I apologize.  You're not aware of the
22   Statement of Claims being amended, are you?
23       MS. MERGO:  Object to the form.
24       A.    As I sit here, I don't what's happening
```

ATTORNEYS EYES ONLY

Page 91

1    in the bankruptcy proceeding.

2    BY MR. BUNDREN:

3        Q.   But nevertheless, you've opined in this

4    case that the reasonable royalty damages due to

5    the Plaintiffs are a reasonable royalty of

6    4.5 million dollars and unjust enrichment of

7    351,527?

8        A.   Can you read that back?

9        Q.   Sure.  In this case that you've opined

10   to the reasonable royalty and unjust enrichment

11   damages, you previously testified that the

12   reasonable royalty damages are at least 4.5

13   million dollars and the unjust enrichment is

14   351,527; is that correct?

15       A.   Yes.  I thought you stated something

16   differently in your first question, sorry.  I

17   was just clarifying.

18       Q.   Did you have access to Nephron's Power

19   BI or CRM databases in connection with your work

20   on this case?

21       A.   No, I did not.

22       Q.   Okay.  What assumptions did you make in

23   forming your opinion in this case, if any?

24       A.   In my assessment of damages in a

ATTORNEYS EYES ONLY

Page 92

1    project?

2        Q.   Yes.  Sure.

3        A.   I would assume liability that the

4    counts that are alleged occurred and, therefore,

5    there would be damages.  I've assumed in this

6    instance that the Nephron confidential

7    information is a trade secret that would be

8    misappropriated -- that I've assumed was

9    misappropriated and/or used.  Although that is

10   an assumption, I have also considered throughout

11   my discussions with both of my expert reports,

12   I've derived the value of what Nephron's

13   confidential information would be, and my

14   reasonable royalty analysis and to form economic

15   damages.  As I sit here, those are the two

16   primary assumptions I would say.  I'm trying to

17   think if there are others that will come to me.

18       Q.   Okay.  If you think of others, if you

19   can please let me know.

20       A.   Sure.

21       Q.   Have you been asked to do anything

22   since submission of your reports other than

23   preparing and attending today's deposition?

24       A.   Yes.

ATTORNEYS EYES ONLY

Page 93

1      Q.    What have you been asked to do?

2      A.    I was asked for assistance for Dr.

3    Wiggins' deposition.

4      Q.    That was before his deposition was

5    taken, is that correct?

6      A.    Yes.

7      Q.    Okay.  What else?

8      A.    I reviewed and responded to the

9    subpoena, I would say that's part of preparation

10   for this deposition.

11     Q.    Okay.

12     A.    As I sit here, that's all I recall at

13   this moment.

14     Q.    Have you been asked to prepare any

15   supplemental schedules or calculations?

16     A.    No, not as I'm sitting here, no.

17     Q.    What did you do to prepare for today's

18   deposition?

19     A.    I reviewed my expert report.  I

20   reviewed -- including my schedules.  I reviewed

21   the documents noted within my report and

22   schedules.  I reviewed Dr. Wiggins' report.  I

23   reviewed Dr. Wiggins' deposition and the exhibits

24   that were attached to his deposition.  I met with

Page 94

1    my team virtually.  I held discussions with

2    counsel.  As I'm sitting here, that's all I

3    recall.

4        Q.   Who was on your team that you met with

5    virtually?

6        A.   Brian Clutter.

7        Q.   How many times did you meet with Mr.

8    Clutter in preparation for your deposition?

9        A.   I would estimate two or three times.

10       Q.   Collectively how long did you meet with

11   Mr. Clutter over those two or three times in

12   preparation for your deposition?

13       A.   I would estimate approximately four

14   hours.

15       Q.   Okay.  You said you also had discussions

16   with counsel, who was present during those

17   discussions?

18       A.   Miss Mergo, me, Mr. Byars potentially,

19   although maybe for only a brief moment.  And

20   then I also communicated with Miss Reyes

21   regarding the subpoena.

22       Q.   Okay.  How many times did you have

23   discussions with Miss Mergo and Mr. Byars?

24       A.   Miss Mergo, twice.

ATTORNEYS EYES ONLY

Page 95

1      Q.   What about Mr. Byars?

2      A.   I believe just once.

3      Q.   Collectively how much time did you

4   spend with Miss Mergo and Mr. Byars in

5   preparation for your deposition today?

6      A.   I'd estimate two to two-and-a-half

7   hours.

8      Q.   Did you review any documents in those

9   meetings with Miss Mergo and Mr. Byars?

10     A.   Yes, I believe so.

11     Q.   What documents do you recall reviewing?

12     A.   Dr. Wiggins' exhibits, some of them, not

13   all.  I believe that was it as I'm sitting here.

14     Q.   Let's turn to your May 8th report, it's

15   Exhibit 2.

16     A.   Are we getting close to a break?

17     MR. BUNDREN:  Sure, let's take a break.  How

18   long do you want?

19     MS. MERGO:  An hour.

20     MR. VIDEOGRAPHER:  We're going off the

21   record.  The time is approximately 11:54 a.m.

22                (Whereupon, a short break was

23                 taken.)

24     VIDEOGRAPHER:  We're going back on the record

ATTORNEYS EYES ONLY

Page 96

1    the time is approximately 1:00 p.m.

2    BY MR. BUNDREN:

3        Q.   Miss Distler, I'd like you to turn to

4    your May 8th report, and specifically paragraph

5    9 of that report on page 3.  It says you have

6    also held conversations with the following

7    individuals:  Miss Kennedy and Mr. -- I'm sorry,

8    I'm not going to pronounce his name correctly.

9    What is it?

10       A.   I believe it's Jibaja.

11       Q.   Jibaja.  Okay.  How many conversations

12   did you have with Miss Kennedy and Mr. Jibaja?

13       MS. MERGO:  Object to form.

14       A.   Miss Kennedy?

15   BY MR. BUNDREN:

16       Q.   Yes, sure.

17       A.   I recall there was one conversation.

18   With Mr. Jibaja, I recall approximately three

19   conversations.

20       Q.   Okay.  On the conversation with Miss

21   Kennedy, who was present during that

22   conversation?

23       A.   Mr. Jibaja, counsel for Nephron, myself

24   and Brian Clutter.

ATTORNEYS EYES ONLY

Page 97

1       Q.   Do you recall who was present for

2   Nephron as counsel?

3       A.   Outside counsel for Nephron?

4       Q.   Yes, outside counsel.  Do you recall

5   who was present?

6       A.   Nikole or Miss Mergo, and I don't

7   recall if Miss Cluverius was on the call or not.

8       Q.   Was that on the phone or was it by

9   video, how did you have that conversation with

10  Miss Kennedy?

11      A.   It was via telephone.

12      Q.   And did you rely on the information

13  that you received from Miss Kennedy during that

14  conversation in preparation of your report?

15      A.   Yes.  I cite that conversation within

16  my expert report.

17      Q.   Okay.  Tell me what you recall

18  discussing with Miss Kennedy during this

19  conversation?

20      MS. MERGO:  The question to which she

21  replied?

22      MR. BUNDREN:  She just testified that she

23  relied on the information that she received from

24  Miss Kennedy, and I'm going to ask her about

ATTORNEYS EYES ONLY

Page 98

1    that conversation.

2       MS. MERGO:  And I don't have an objection to

3    the extent upon what she relied.

4       A.   As documented in my expert report, I

5    discussed with Miss Kennedy the history of

6    Nephron and the formation of its 503B Division.

7    I discussed generally the role of sales

8    representatives at Nephron.  I discussed the

9    importance of -- the importance to Nephron of

10    the items attached as Appendix C to my expert

11    report as contained within her discussion or

12    attached to her deposition.  And to the extent

13    that I've, you know, forgotten anything within

14    my expert report as I'm sitting here, I would

15    obviously defer to Miss Kennedy.

16    BY MR. BUNDREN:

17       Q.   Okay.  What did Miss Kennedy tell you

18    about the sales reps role at Nephron?

19       A.   Generally, how the sales reps used the

20    CR in the system, like Miss Hulsey, did to track

21    and record their interactions with customers.

22    Generally, that was my discussion with her.

23       Q.   Okay.  What about Appendix C, what was

24    your discussion with Miss Kennedy in Appendix C

ATTORNEYS EYES ONLY

1    which is referenced in your report?

2         A.   Generally, Appendix C was attached to

3    her deposition, the source document, who it was.

4    So I briefly I asked her generally how important

5    would Nephron view these -- the trade secrets

6    that are alleged in this matter.  And she

7    indicated from her perspective they were

8    critical to Nephron's sales and success in the

9    marketplace.

10        Q.   Anything else that you can remember

11   about the Appendix C discussion with Miss

12   Kennedy?

13        A.   As I sit here, that's all that I

14   recall.

15        Q.   And that's one conversation you had

16   with Miss Kennedy present prior to the issuance

17   of your May 8th report, correct?

18        A.   Could you reread the question?

19        Q.   When did you talk to Miss Kennedy, was

20   it prior to your May 8th report or between your

21   May 8th report and your July 8th report?  I'm

22   just trying to understand when you talked to

23   her.

24        A.   As indicated in my expert report dated

ATTORNEYS EYES ONLY

Page 100

1    May 8th, it was populous.  I relied on it in that

2    report, so it was prior to that.

3         Q.   So you did not talk to her after or did

4    not have a conversation with her after you issued

5    your May 8th report?

6         A.   No, not that I recall.

7         Q.   What about -- you said you had three

8    conversations with Mr. Jibaja, and I'm assuming

9    based on your prior testimony one of those

10   conversations, that was the conversation with

11   Miss Kennedy, is that correct?

12        A.   Yes.

13        Q.   Okay.  On that call where Miss Kennedy

14   was present with Mr. Jibaja, what did you talk,

15   if anything, to Mr. Jibaja about?

16        A.   On that call I was working with Mr.

17   Jibaja to produce or to gather sales data that I

18   utilized in my report or updates to that sales

19   data.  There would have been discussion of being

20   a financial information as part of that call.

21   Generally, as I sit here that would be the

22   subject matter.

23        Q.   What was the specific conversation

24   about the financial information with Mr. Jibaja?

ATTORNEYS EYES ONLY

Page 101

1      A.   It was related to producing a single

2    data file of Nephron's sales over the entire

3    period considered within my report.

4      Q.   And how far back did you have Nephron's

5    sales information?  I mean, I know you used the

6    2018 information in your analysis, but did you

7    have Nephron sales information prior to the 2018

8    year?

9      MS. MERGO:  Object to form.

10     A.   Yes.

11   BY MR. BUNDREN:

12     Q.   Did you have Nephron sales information

13   for 2017?

14     MS. MERGO:  Object to the form.

15     A.   Yes.

16   BY MR. BUNDREN:

17     Q.   Did you have Nephron's sales information

18   prior to 2017?

19     MS. MERGO:  Object to the form.

20     A.   Not that I recall.

21   BY MR. BUNDREN:

22     Q.   Okay.  Then you said you had two

23   additional conversations with Mr. Jibaja.  Do you

24   recall who was present -- let's go one by one --

ATTORNEYS EYES ONLY

Page 102

1    during the next conversation?

2        A.    In the conversation we were just

3    referencing, I would say it would have been the

4    third.  Okay.  So the second --

5        Q.    Actually, go back to the first.  As I

6    understand your testimony, the first conversation

7    you had with anybody at Nephron was with Mr.

8    Jibaja?

9        A.    Yes.

10       Q.    Who was present during that

11   conversation?

12       A.    Mr. Jibaja, outside counsel for

13   Nephron, myself, Brian Clutter.  I believe that

14   was all.

15       Q.    Did you rely on information you learned

16   from Mr. Jibaja during that conversation in

17   preparation of your reports?

18       A.    I would say that he informed me of the

19   data that Nephron could provide.

20       Q.    Okay.  What did you talk about?

21       A.    Generally, their systems and the types

22   of data that Mr. Jibaja would be able to have

23   pulled from those systems and provided to me

24   based on my request.

ATTORNEYS EYES ONLY

Page 103

1      Q.    Anything else that you can recall?

2      A.    I believe that was the initial

3  conversation.  Understanding, you know, how

4  their data is stored generally and what was

5  quarriable.  And then the power BI systems and

6  generally that they have their CR in there.

7      Q.    Anything else that you can remember?

8      A.    As I sit here, those are the general

9  topics that we discussed.

10      Q.    And if that was the first conversation,

11  you had a second conversation with Mr. Jibaja,

12  is that right?

13      A.    Yes.

14      Q.    And how far apart was the first

15  conversation to when the second conversation

16  occurred?

17      A.    I would estimate approximately three

18  months or so.  That's an estimate.

19      Q.    When do you recall the first

20  conversation with Mr. Jibaja taking place?

21      A.    It would have been in November,

22  December of 2019.

23      Q.    And then you had a second conversation

24  with Mr. Jibaja approximately three months

ATTORNEYS EYES ONLY

Page 104

1    later?

2         A.    Approximately, yes.

3         Q.    Who was present during that call?

4         A.    Mr. Jibaja, outside counsel for

5    Nephron, Mr. Clutter and myself.

6         Q.    And did you rely on information that

7    Mr. Jibaja provided you during that conversation

8    in preparation of your reports?

9         A.    Again, I would say yes, with respect to

10   understanding data that I had received and

11   requesting additional data.

12        Q.    What additional data did you request?

13        A.    As I recall, information on costs and/or

14   profitability for Nephron's 503B Division and at

15   least the five primary drugs.

16        Q.    Okay.  Anything else that you can

17   remember from that conversation?

18        A.    As I sit here, that's my general

19   recollection.  And to the extent that I cited in

20   other areas in my report, I'll defer to my

21   report.

22        Q.    Other than the conversations with Miss

23   Kennedy and Mr. Jibaja, are there any other

24   conversations that you had and that you relied

ATTORNEYS EYES ONLY

Page 105

1    on in preparing and issuing your two reports?

2        A.    Not that I recall.

3        Q.    Okay.  If you turn to paragraph 10 of

4    your report, the May 8th report, the last

5    sentence says, I may also create or assist in the

6    creation of certain demonstrative exhibits to

7    assist me in my testimony.  Do you see that?

8        A.    Yes.

9        Q.    Have you created any demonstratives or

10   assisted in the creation of any demonstratives

11   as of today?

12       A.    I have not.

13       Q.    Now, paragraphs 11 through 14 of your

14   May 8th report are titled Summary of Your

15   Opinions, and I think we went over a little bit

16   of that before the lunch break.  Paragraph 12, I

17   just want a clarification.  You opined on May 8th

18   that the revenues subject to disgorgement were

19   approximately 1.1 million, and then earlier

20   during the deposition you revised that number to

21   351,527; is that correct?

22       A.    No.

23       Q.    What's not correct about that?

24       A.    I didn't revise the revenues.

ATTORNEYS EYES ONLY

Page 106

1        Q.   Okay.  Your analysis though, your

2    opinion that you're going to offer at trial, has

3    changed from the 1.1 million dollar number that

4    you offered on May 8th, is that correct?

5        A.   Can you repeat the question?

6        Q.   Sure.  On May 8th you issued your report

7    and gave an opinion that the revenues subject to

8    disgorgement were approximately 1.1 million

9    dollars, is that right?

10       A.   Yes.

11       Q.   And then earlier during the deposition

12   I asked you what your opinion was as to the

13   amount of economic damages for disgorgement and

14   then you said it 351,527.  Do you recall that

15   testimony?

16       A.   Yes.

17       Q.   Okay.  So the number, what you're going

18   to opine to the jury in this case as of today's

19   date, is that the profit subject to disgorgement

20   in this matter are $351,527?

21       A.   Yes.  Sitting here today, yes, that's

22   correct.

23       Q.   All right.  And then you also in

24   paragraph 14 referenced your summary of your

ATTORNEYS EYES ONLY

Page 107

1  reasonable royalty opinion.  Do you see that?

2      A.   Yes.

3      Q.   And then you used a hypothetical

4  negotiation of a license for trade secrets and

5  you've opined that that reasonable royalty will

6  be no less than 4.5 million and likely closer to

7  5 million.  Do you see that?

8      A.   Yes.

9      Q.   That license -- when would that license

10 begin?

11     A.   As discussed in my report, after the

12 hypothetical negotiations.

13     Q.   I think it's approximately July of

14 2018, I think that's in your report.

15     A.   I state as early as June 2018.

16     Q.   June.  Okay, June.  When would the end

17 date for that license occur?  In other words,

18 how long, assuming your hypothetical negotiation

19 construct, how long would US Compounding and

20 Adamis be entitled to use the information?

21     A.   My reasonable royalty is based on a

22 lump sum, so a one-time payment, that would

23 enable USC, Adamis, and/or Miss Hulsey to use

24 Nephron's confidential information in the

ATTORNEYS EYES ONLY

Page 108

1    future.

2        Q.   Okay.  And that's perpetually?  There's

3    not an end date?

4        A.   The end date would be the point at which

5    they would stop using it.  But in my calculation,

6    it would be a lump sum factoring in the motion of

7    perpetuity, yes.

8        Q.   Okay.  Thank you.  And we'll get into

9    it a little bit later.  But with the benefit of

10   having received Dr. Wiggins' report and reviewing

11   his deposition, has your opinion changed at all

12   in the amount of reasonable royalty due to

13   Nephron in this case?

14       A.   No, it has not.

15       Q.   Okay.  Now, paragraph 13, you

16   considered additional unjust enrichments

17   specifically related to Miss Hulsey's

18   wrongdoing.  And I think you opined that you

19   estimated that calculation to be $77,000 --

20   $77,184.  Do you see that?

21       A.   Yes.

22       Q.   Okay.  Is that -- are you going to tell

23   the jury and is it your opinion that that

24   $77,184 should be attributable to USC and

ATTORNEYS EYES ONLY

Page 109

1   Adamis?

2        A.   As I sit here, I am -- I do not believe

3   so, you know, based on the footnote in my report

4   around that dollar amount being inclusive within

5   the disgorgement calculation that I provided for

6   USC and Adamis and Miss Hulsey together.

7        Q.   Okay.  I'm sorry, I got a little

8   confused.  What footnote are you talking about?

9        A.    Footnote 126.

10       Q.   This is in your May 8th report?

11       A.   Yes, it is.

12       Q.   Okay.  And in footnote 126 you said,

13  depending on whether defendants' expert deducts

14  commissions as an offset to USC sales,

15  identifying the Section 7B above, this may or may

16  not be a separate category of recovering

17  components.  Did I read that correctly?

18       A.   That's right.

19       Q.   And it's your understanding that

20  Dr. Wiggins did deduct commissions as an offset

21  to USC sales, correct?

22       A.   Yes.

23       Q.   Okay.  So in other words, you do not

24  plan on -- you're not going to issue an opinion

ATTORNEYS EYES ONLY

Page 110

1   to the jury that USC and Adamis are liable for

2   $77,184 due to the unjust enrichment as

3   referenced in paragraph 12 of your report?

4        A.   As I sit here today, to the extent that

5   Dr. Wiggins and I would differ on what revenues

6   would be subject to disgorgement, potentially.

7   But to the extent that the jury were to award

8   unjust enrichment on all of the defendants based

9   on my analysis in 7B, then no, I would not.

10       Q.   Okay.  And you understand that that

11  $77,184 was actually compensation paid to Miss

12  Hulsey by either Nephron or USC?

13       A.   Yes.

14       Q.   Is it your opinion that Nephron is

15  entitled to receive both the unjust enrichment

16  calculation of $351,000 plus the reasonable

17  royalty as reported in your damages opinions?

18       A.   In my reasonable royalty analysis, that

19  would incorporate the 351,000, approximate

20  figure of 351,000, that would be subject to

21  disgorgement of profits.  If it is not awarded,

22  then there is an alternative.

23       Q.   And what would be that alternative?

24       A.   It would be the unjust enrichment, the

ATTORNEYS EYES ONLY

Page 111

1    disgorgement profit that I calculated.

2        Q.   Okay.  Paragraph 26 of your report you

3    referenced the alleged wrongdoing and the

4    various claims that are remaining in the case.

5    Do you see that?

6        A.   Yes.

7        Q.   Is it your opinion that for each of the

8    causes of action that are alleged, at least as

9    to USC and Adamis that the claim damages are the

10   same?

11       A.   I'm not providing a legal opinion, I

12   would -- it's my understanding, from not a legal

13   perspective again, that the Claim 1 and Claim 3

14   of the trade secrets would be similar.  It's my

15   general understanding.  Number 4, I'm not

16   certain as I sit here.

17       Q.   Okay.  What is your opinion on the

18   amount of damages that would be due to Nephron

19   if the fact finder finds that USC and Adamis were

20   liable for the Federal Defense Trade Secrets Act

21   on Count 1?

22       A.   I've calculated two measures of economic

23   damages in my report.  One being disgorgement of

24   profits and the other being a reasonable royalty.

ATTORNEYS EYES ONLY

Page 112

1      Q.   And is that also true of the Count 3,

2   Florida Uniform Trade Secret Act?

3      A.   From a layman's perspective, generally,

4   that would be the understanding as I sit here.

5      Q.   Okay.  How does that differ with what

6   your understanding is of the damages that could

7   be awarded or that you opined to that could be

8   awarded to Nephron if there was a violation by

9   USC and Adamis of the intentional interference

10  cause of action, Count 7?

11     A.   As I sit here, with respect to bullet

12  point number 4 of paragraph 26, I'm not certain.

13     Q.   Okay.

14     A.   I provided various damage points that

15  may be relevant to the trier of fact in

16  determining the economic losses sustained.

17     Q.   Okay.  So let's assume --

18     A.   One of those were appropriate for claim

19  for --

20     Q.   Okay.  Let's assume that this is just

21  an assumption.  Let's assume that the only claim

22  remaining in this case when it goes to the trier

23  of fact is Count 7, intentional interference by

24  USC and Adamis.  What number would you opine

ATTORNEYS EYES ONLY

Page 113

1   to that the defendants in this case, USC and

2   Adamis, would be liable to Nephron for?

3       MS. MERGO:  Objection, form.

4       A.   As I sit here, I would want to revisit

5   that particular claim and the potential recovery

6   mechanisms.  As I sit here right now, I would

7   want to review and see if any of it would be

8   relevant.

9   BY MR. BUNDREN:

10      Q.   So you don't know whether either unjust

11  enrichment or reasonable royalty would even be

12  applicable to an intentional interference cause

13  of action, do you?

14      MS. MERGO:  Objection to form.

15      A.   It is my general understanding that in

16  interference actions that disgorgement is a

17  method of recovery.  But as I stated, I would

18  want to review and likely consult with counsel

19  on the appropriate benchmarks for economic

20  damages related to that specific claim.

21  BY MR. BUNDREN:

22      Q.   What about reasonable royalty?  You just

23  mentioned unjust enrichment, so is it your

24  understanding that reasonable royalty would

ATTORNEYS EYES ONLY

Page 114

```
 1    apply and would be an available method of

 2    damages for a violation of intentional

 3    interference?

 4         MS. MERGO:  Objection, form.

 5         A.   Generally, from a non-legal perspective,

 6    I'm not aware that that is a method of recovery.

 7    BY MR. BUNDREN:

 8         Q.   Thank you.

 9              In paragraph 30 of your report, May 8th

10    report, you state plaintiff allege Miss Hulsey

11    breached the above provisions in the Hulsey NDA

12    by failing to return all of Nephron property and

13    customer records following her resignation and

14    by disclosing confidential and proprietary

15    information, including trade secrets to USC,

16    Adamis and other third parties.  Do you see

17    that?

18         A.   Yes.

19         Q.   Who are the other third parties?

20         A.   To the extent -- as I'm sitting here, to

21    the extent that information was shared within USC

22    or Adamis or to entities or agents that may have

23    been working on their behalf, that would

24    generally be my understanding of third parties.
```

ATTORNEYS EYES ONLY

Page 115

 1      Q.   Okay.  But can you tell me today what

 2   you meant by who are the other third parties

 3   specifically?

 4      A.   Well, I'm citing to the complaint

 5   there, so I would defer to the complaint.  But as

 6   I'm sitting here today, I would -- it would

 7   likely include Prodigy and potentially others

 8   within USC or Adamis that are not named.

 9      Q.   Okay.  What would lead you to the

10   conclusion that it would likely include Prodigy?

11      A.   I would refer to the complaint, third

12   amended complaint.  But in my analysis, as I

13   point out in my report, there are increases in

14   certain -- or in the five primary drugs that are

15   being sold by USC where some of those customers

16   had been coded to Prodigy, and where those sales

17   had been -- had occurred post the alleged

18   misappropriation of the Nephron confidential

19   information.

20      Q.   All right.  You're aware that Prodigy

21   is not a defendant in this case, correct?

22      A.   Yes.

23      Q.   And you're aware that Prodigy is a

24   separate legal entity unrelated to USC and

ATTORNEYS EYES ONLY

Page 116

1    Adamis; you understand that?

2        MS. MERGO:  Object to the form.

3        A.   I understand that they are a third

4    party, yes.

5    BY MR. BUNDREN:

6        Q.   Okay.  Other than your citation to the

7    third amended complaint and the information

8    that's contained in there and the increases in

9    sales of the five drugs, as you just testified

10   to, what other evidence do you have that any

11   information was shared to Prodigy by USC and

12   Adamis?

13       MS. MERGO:  Object to the form.

14       A.   As I stated this morning in our

15   session, I'm assuming liability.  I'm assuming

16   misappropriation in the use of the trade secrets,

17   and I'm assuming that they are trade secrets.  I

18   am not offering an opinion that information was

19   passed to Prodigy.  I'm calculating damages

20   here, so what I do note in my report is that

21   there are sales of products, the five primary

22   drugs, as I cite to, that increased significantly

23   after the misappropriation, after the alleged

24   misappropriation use of the Nephron confidential

ATTORNEYS EYES ONLY

Page 117

1    information.  So from my perspective I would not

2    be offering an opinion on a liability element.

3    BY MR. BUNDREN:

4        Q.    Other than Prodigy, is there anybody

5    else, any third party, anybody not affiliated

6    with USC or Adamis, and by affiliated I mean

7    employees that you're referencing when you

8    stated, "other third parties" in paragraph 3?

9        A.    As I sit here, not that I'm aware of.

10       Q.    All right.  Paragraph 31 of your report

11   references that you've relied upon a list of

12   trade secrets that Nephron alleges were used or

13   misappropriated.  Do you see that?

14       A.    I cite to Appendix C.

15       Q.    Okay.  And that's a 15-page bullet point

16   list.  And it's your understanding that each

17   bullet point represents an individual trade

18   secret, is that correct?

19       A.    Well, I would say that I'm assuming

20   those are trade secrets as identified in

21   Appendix C. For my analysis, as I discussed here

22   in this section, I looked to quantifying the

23   economic impact or economic damage related to

24   specific Nephron confidential information that

ATTORNEYS EYES ONLY

Page 118

1  was -- that's alleged to have been

2  misappropriated and/or used.  That would include

3  the listing of hospitals that were customers that

4  were purchasing products and targets for sales,

5  where the information related for the Nephron

6  confidential information related to the products

7  that were being sold to this set of target

8  hospitals.  And the volumes and prices of those

9  products that were being sold at these hospitals

10  was also allegedly misappropriated and were used.

11  And then in conjunction with notes and historical

12  information about specific customers of Nephron.

13      Q.   Let's look at Exhibit -- I'm sorry,

14  let's look at Exhibit 2, Appendix C.  That's your

15  report from May 8th.

16          Who created this list of alleged trade

17  secrets, to your knowledge?

18      A.   Well, I'm relying on Exhibit 10 from

19  Miss Kennedy's deposition, so I would defer to

20  her.  And then I had it created, like, into a

21  general summary of various aspects.

22      Q.   Okay.  Now, you're aware that Exhibit

23  10 to Miss Kennedy's deposition is in fact this

24  document, Appendix C, right, it's the same

ATTORNEYS EYES ONLY

Page 119

1    document?

2        A.   Yes.  I just don't know if I rearranged

3    any of the bullet points or not.

4        Q.   Do you understand or do you have any

5    understanding as to the origin of this list,

6    other than what Miss Kennedy testified in her

7    deposition?

8        MS. MERGO:  Objection, form.

9        A.   No, I did not participate in the

10   creation of Exhibit 10 to my knowledge.

11   BY MR. BUNDREN:

12       Q.   All right.  So it's your understanding

13   that exhibit -- this Appendix C which references

14   the alleged trade secrets, it's your

15   understanding that there are trade secrets and

16   you've been asked to assume that.  And then

17   you've also been asked to assume that all of

18   these trade secrets have been misappropriated,

19   is that correct?

20       A.   That's the allegation in this matter.

21   I would say that, again, my analysis of economic

22   losses or damages it is tied to, I believe, to

23   just four of the items mentioned within Appendix

24   C.

ATTORNEYS EYES ONLY

Page 120

1    Q.   Okay.  And is that for your entire

2  analysis, your reasonable royalty and unjust

3  enrichment, or is that just for one of them?

4    A.   As I discussed in my report the

5  reasonable royalty, the quantitative benchmarks

6  that I derived are using specific aspects of

7  Appendix C.  But I do state within a reasonable

8  royalty section that it would include the other

9  items.

10   Q.   The license would include the other

11  items, is that correct?

12   A.   Correct, yes.

13   Q.   Okay.  Let's look at your unjust

14  enrichment analysis.  For purposes of your unjust

15  enrichment analysis, you already placed economic

16  value on four of the bullet points that are

17  referenced in Appendix C, is that correct?

18   A.   I would say I looked at four specific

19  items that are alleged to be part of Nephron's

20  confidential information to tie the unjust

21  enrichment or disclosure of profit that I

22  calculated to the alleged misappropriation

23  and/or use.

24   Q.   All right.  Let's look at paragraph 31,

ATTORNEYS EYES ONLY

Page 121

1    subparagraph 1, Hospital Customer List.  Is that

2    referencing page 4 of Appendix C, Hospital

3    Customer List right here?

4         A.   Yes.  The Hospital Customer List would

5    reference the Hulsey listed, pretty good

6    accounts, pretty good Nephron accounts.

7         Q.   Okay.  Let's look at subparagraph 2 of

8    paragraph 31, 503B sales summary byproduct.

9    And that's found, at least the beginning of it,

10   on page 2 of Appendix C, is that correct?

11        A.   Yes, I believe that is the same

12   document.

13        Q.   All right.  And then paragraph 3 of --

14   subparagraph 3 of paragraph 31.  Is 503B sales

15   volume and revenue byproduct, "saleable

16   inventory".  Do you see that?

17        A.   Yes, my number 3, yes.

18        Q.   And this matches up with what is found

19   on page 3 of your Appendix C, is that correct?

20        A.   Yes, I believe this would.

21        Q.   Okay.  And then subparagraph 4 of

22   paragraph 31 is "customer summary compilations."

23   Do you see that?

24        A.   Yes, on page 14, yes.

ATTORNEYS EYES ONLY

Page 122

1      Q.   And that matches up with the customer

2   summary compilation bullet point on page 2 of

3   Appendix C, is that correct?

4      A.   Yes.  Let me just make sure the dates

5   are the same.  Generally, yes.  Hmm, hmm.

6      Q.   Okay.  Now, these are the four items in

7   paragraph 31, these are the only four items in

8   paragraph 31 that you specifically identified

9   that are also referenced on Appendix C, is that

10  correct?

11     A.   Yes.

12     Q.   And you're aware that -- and you can

13  count them, but I've counted 26 bullet points

14  over a 15-page document.  Do you see that?

15     A.   Yes, there's 26.  Yes, 24 of the 26.

16     Q.   And now let's go to paragraph 31

17  subparagraph 4, and this is the fourth alleged

18  trade secret that you referenced in your report

19  called the Customer Summary Compilation.  Do you

20  see that?

21     A.   Number 4 is Customer Summary

22  Compilations, yes, that's the title and the

23  record is Schedule 1.

24     Q.   And that's what you understand as

ATTORNEYS EYES ONLY

Page 123

1    100-plus customer summaries exported from

2    Nephron's CRM and Power BI databases, is that

3    right?  That's what you said in subparagraph 4 of

4    paragraph 31?

5         A.   Yes.

6         Q.   But I believe you testified earlier

7    this morning you did not review Nephron's CRM

8    and/or Power BI databases in preparation of your

9    report, is that correct?

10        MS. MERGO:  Object to form.

11        A.   I did not review -- I did not personally

12   review the CRM or Power BI software and/or

13   database at Nephron.

14   BY MR. BUNDREN:

15        Q.   Now, you're relying on in this portion

16   of your report, subparagraph 4, you're relying on

17   Mr. Walton, is that correct?

18        A.   Yes, I do cite to Mr. Walton.

19        Q.   And he concluded that the CRM Power BI

20   information was transferred to a Seagate hard

21   drive by Miss Hulsey, you're aware of that?

22        A.   Yes.

23        Q.   And that --

24        A.   Generally.

ATTORNEYS EYES ONLY

Page 124

1      Q.   Generally.  And that Miss Hulsey

2    accessed this information from her USC Adamis

3    computer?

4      A.   Yes, that's generally my understanding.

5      Q.   Now, are you also aware that Mr. Walton

6    concluded that forensic records are insufficient

7    to conclusively determine whether and to what

8    extent Hulsey transferred Nephron information

9    derived from the CRM and Power BI platforms to

10   any USC Adamis device or networking sharing

11   service.  Are you aware of that information?

12     MS. MERGO:  Object to form.

13     A.   Yes, I'm generally aware.

14   BY MR. BUNDREN:

15     Q.   And that's what he stated on page 3 of

16   his report that you reviewed and that you relied

17   on in preparing -- in doing your analysis,

18   correct?

19     MS. MERGO:  Object to form.

20     A.   Yes, I reviewed Mr. Walton's expert

21   report, yes.

22   BY MR. BUNDREN:

23     Q.   And so you're aware that Mr. Walton was

24   unable to conclude that Nephron -- that USC or

ATTORNEYS EYES ONLY

Page 125

```
 1    Adamis ever received Nephron's Customer Summary
 2    Compilation, do you understand that?
 3        MS. MERGO:  Object to form.
 4        A.    That may be the case.  Again, I'm
 5    recording what's within Mr. Walton's report.
 6    I'm not providing a liability opinion one way or
 7    the other.
 8    BY MR. BUNDREN:
 9        Q.    What if Mr. Walton is correct in that
10    there is no conclusion that can be drawn that USC
11    received Nephron's Customer Summary Compilation,
12    how would that impact your damages analysis?
13        MS. MERGO:  Object to form, vague.
14        A.    Well, I would start by saying
15    information that was provided to USC or Adamis
16    personnel outside of the Customer Summary
17    Compilations included a list of hospital targets
18    that were revenue generating, as well as the
19    products, including the strengths and the
20    packaging of those products were provided.  And
21    then in conjunction with pricing information for
22    those products that Nephron was earning on the
23    sales of those products to that set of
24    hospitals.  That in and of itself would be, at
```

Page 126

1   least from my perspective and as I have

2   analyzed in my report, valuable information.

3   Again, I'm not providing an opinion on whether

4   or not that would be a trade secret.  But to the

5   extent, in my assumption, that it is, that would

6   be valuable information to the competitor that

7   is trying to grow the sales of their company.

8           Now, with respect to the Customer

9   Summary Compilation, I used those as a further

10  criteria upon which to limit certain of my

11  calculations in my analysis.  So I would say

12  it's another layer that I was trying to closely

13  tie the Nephron confidential information that's

14  alleged to have been misappropriated and/or used

15  to my advantages assessment.

16  BY MR. BUNDREN:

17      Q.   So in subparagraph 4, the Customer

18  Summary Compilation, paragraph 31 of your

19  report, how much of the reasonable royalty of no

20  less than 4.5 million and closer to 5 million did

21  you assign to this specific trade secret?

22      MS. MERGO:  Object to form.

23      A.   My analysis of the reasonable validity

24  considered the economic implications for all

ATTORNEYS EYES ONLY

Page 127

1    four of these, so I did not provide a separate

2    value for number 4 specifically.

3    BY MR. BUNDREN:

4        Q.   And you didn't provide a separate value

5    for numbers 1, 2 or 3, did you?

6        A.   Correct.  I looked at the combination of

7    information that would have been provided that's

8    allegedly Nephron confidential information that

9    was misappropriated and/or used and the value

10   that would provide in terms of the disgorgement

11   of profits, as well as in terms of a reasonable

12   royalty that the parties would have agreed to for

13   a license to use such (inaudible) as discussed in

14   my report.

15       Q.   So you didn't provide a specific value

16   on an individual basis for any of the alleged

17   trade secrets, did you, either in your unjust

18   enrichment analysis or in your reasonable

19   royalty analysis, is that correct?

20       A.   My analysis did not provide a separate

21   calculation for the Nephron confidential

22   information items that I highlight in this

23   section of my report.

24       Q.   Okay.  Paragraphs 37 and 38 of your

ATTORNEYS EYES ONLY

Page 128

```
1   report, and specifically my questions relate to
2   table 2 and then table 3.  This is all the
3   information or all the data, sales data, at USC
4   for the 503B segment, is that your understanding?
5       A.   Could you ask that again?
6       Q.   Sure.  So table 2 and table 3 are all
7   of USC's revenues in the 503B space for these
8   five drugs?
9       A.   I would say that this reflects USC's
10  503B revenues over the time period identified
11  within both tables 2 and 3, broken out by the
12  five primary drugs as I identified versus the
13  other 503B drugs sold by USC.
14      Q.   Paragraph 39, and specifically with
15  respect to tables 4 and 5.  Tables 4 and 5
16  reflect companywide data for USC, is that
17  correct, for the five primary drugs?
18      A.   Yes, it will contain -- yes, by
19  regions.  Hmm, hmm.
20      Q.   And then you have Hulsey's sales region
21  identified in table 4 and then also identified
22  in table 5, do you see that?
23      A.   Yes.
24      Q.   Are you aware if any other USC sales
```

ATTORNEYS EYES ONLY

Page 129

1    representatives were making sales in Miss

2    Hulsey's region during this time period?

3        MS. MERGO:  Object to the form.

4        A.   Can you repeat the question?

5    BY MR. BUNDREN:

6        Q.   Sure.  You've got some values for 2017

7    and 2018 from Miss Hulsey's sales region, the

8    number of sales at USC for the five drugs.  Do

9    you see that?

10       A.   Yes.

11       Q.   And in 2017 Miss Hulsey wasn't at

12   US Compounding, right?

13       A.   Yes.

14       Q.   And in this first half of 2018 she

15   wasn't at US Compounding either, correct?

16       A.   Yes.

17       Q.   And then you've got a second half of

18   2018 number from Miss Hulsey's sales region of

19   $352,015.  Do you see that?

20       A.   Yes.

21       Q.   Are you aware if there were other sales

22   representatives responsible in selling a portion

23   of those sales within Miss Hulsey's sales

24   region?

ATTORNEYS EYES ONLY

Page 130

1        MS. MERGO:  Object to form.

2        A.   So in this schedule, I'm looking at

3   Miss Hulsey's sales territory as identified in

4   her deposition for Nephron.  And I am summarizing

5   USC's sales in this region.

6   BY MR. BUNDREN:

7        Q.   Whether or not those sales were made by

8   Miss Hulsey or someone else, is that right?

9        A.   Well, yes, for the title, I'm looking

10  at what her region was at Nephron, which I

11  identified that she stated it was Missouri,

12  Kansas, Nebraska, Colorado, North Dakota, South

13  Dakota, Montana, Iowa and Idaho.  So I'm

14  comparing the trend in her sales region, at her

15  sales region that she had at Nephron to those

16  states, sales at USC and identifying an uptick

17  that's occurring in the second half of 2018.

18       Q.   In paragraph 42 this is where you

19  calculate the revenue from the five drugs that

20  you referenced in your report for 19 customers,

21  correct?

22       A.   In paragraph 42 I referenced that I

23  applied certain criteria.

24       Q.   Okay.  But ultimately you concluded

ATTORNEYS EYES ONLY

Page 131

1   that there were 19 customers that you included

2   in your disgorgement analysis, is that right?

3        A.   Yes.  After stripping down and tying as

4   closely as I could to the Nephron confidential

5   information that was allegedly misappropriated

6   and/or used, I got to 19 customers.

7        Q.   And the confidential information that

8   you assume is used is the four alleged trade

9   secrets referenced in paragraph 31?

10       A.   Yes.  I'm using those four specific

11   items of Nephron confidential information to

12   limit and/or strip down my analysis.

13       Q.   Okay.  And I want to look at how the

14   steps you took to bring -- to arrive at your

15   conclusion of 19 customers.  And so on paragraph

16   44 you state, first I identified the specific

17   customers that purchased the five primary drugs

18   from USC over the second half of 2018 to 2019.

19   This was approximately 307 customers, is that

20   right, that was your first step?

21       A.   Yes.  So, first, given that information

22   that was provided, Nephron confidential

23   information that was provided was for five

24   primary drugs, as I discussed earlier.  I then

ATTORNEYS EYES ONLY

Page 132

1    looked to see what potential sales of USC

2    occurred over the second half of 2018 and 2019

3    after the alleged misappropriation.

4         Q.   And so on paragraph 44, the first step

5    that you took in your analysis is you found 307

6    customers that had purchased the five drugs from

7    USC during the second half of 2018 and 2019, is

8    that right?

9         A.   Yes.

10        Q.   And then second, you narrowed down that

11   list to where there was also a Customer Summary

12   Compilation on the Seagate backup.  Do you see

13   that?

14        A.   Yes.

15        Q.   And it's my understanding there were

16   110 customers on the Seagate backup, and I

17   believe that's referenced in one of your

18   schedules, Schedule 1.0?

19        A.   Yes.

20        Q.   All right.  So after you applied this

21   second step, how many customers out of the

22   original 307 did you eliminate?

23        A.   As I sit here -- as I sit here, I don't

24   know.

ATTORNEYS EYES ONLY

Page 133

1    Q.   Well, how many customers were left after

2    you applied the second step?

3    A.   As I stated as I sit here, I don't

4    know.  There were 110 listed in Schedule 1, so

5    whatever would be remaining after that fact.  As

6    I sit here, I don't know that number.

7    Q.   Right.  But in paragraph 44 the first

8    step you took was you identified 307 customers,

9    right?

10   A.   Yes.

11   Q.   And then the second step in paragraph

12   45, you narrowed the list based on the Customer

13   Summary Compilation of the Seagate backup.  How

14   many customers did you narrow?  How many did you

15   eliminate?

16   A.   As I sit here, I indicated I don't know

17   the cut from that second step.

18   Q.   I mean, this is your report.  I'm trying

19   to understand how you did your analysis.  Please

20   tell the jury how you narrowed down the list of

21   307 to 100 and using a second step of 110?

22   MS. MERGO:  Object to form.

23   A.   Well, as discussed further in my report,

24   in the next paragraph, I end up at 19 after

ATTORNEYS EYES ONLY

Page 134

1    applying the other adjustments.  I did not do it

2    stepwise for each paragraph to identify.

3    BY MR. BUNDREN:

4         Q.   Well, that's not what your report says.

5    I mean, I understand you identified 19.  I'm

6    trying to get how you identified the 19 in

7    applying your logic.  Paragraph 44, you first

8    identified 307 customer and then you narrowed

9    down that list in paragraph 45 based on the

10   customers when there was a Customer Summary

11   Compilation on the Seagate backup.  How many

12   customers did you eliminate from step 1 to step

13   2?

14        A.   As I stated as I sit here, I do not

15   know, but it would have been a comparison of

16   Schedule 1 to a filter of -- to the 307 customers

17   in the USC database.

18        Q.   Well, let's look at the next paragraph,

19   46.  This is your third step of your analysis,

20   is that correct?

21        A.   Yes.  So then I looked to identify

22   those accounts that had been identified -- those

23   customers that had been identified as a list of

24   pretty good Nephron accounts.

ATTORNEYS EYES ONLY

Page 135

1      Q.   Okay.  So you first started at 307

2   customers, and then in step 2 you whittled down

3   307 to something.  And then in step 3 you

4   took another step.  How many customers were

5   eliminated in step 3?

6      A.   It would have been a combination of

7   looking at Schedule 1 with the last column that

8   says yes or no in conjunction with a filtering

9   of the USC sales data for customers that

10  purchased the five primary drugs in the second

11  half of 2018 and 2019.  Not every customer in

12  Schedule 1 was on the list, so it would not have

13  been considered to the extent that they weren't

14  already eliminated because they did not have

15  sales of the five primary drugs.

16     Q.   Well, Miss Distler, I'm just following

17  your analysis, and your analysis to get to the

18  19 customers that you very clearly state.  First

19  you identified the 307 customers and then second

20  in paragraph 45, you narrowed down that 307

21  list.  And then paragraph 36, third, you further

22  narrowed down that list based on the list of

23  pretty good accounts.  I'm trying to understand

24  how you took -- you started at 307 customers and

ATTORNEYS EYES ONLY

Page 136

1    where you went to get 19?

2         A.    Sure.  So if you look at Schedule 2,

3    it's schedule 2.3.

4         Q.    Schedule 2.3, that's the list of the

5    307 accounts, is that correct?

6         A.    Yes.  And then using this Schedule 3

7    you can then --

8         Q.    I'm sorry, did you say Schedule --

9         A.    Schedule 2.3.

10        Q.    Okay.

11        A.    Thank you.  And then from here you can

12   compare schedule 1.0 where I've identified the

13   110 Nephron customers, Customer Summary

14   Compilations, and then in the final column of

15   schedule 1.0 to be included in the list of pretty

16   good Nephron accounts, so you can compare those

17   to identify the customers that would have been

18   selected.

19        Q.    So from based on that testimony, so

20   from step 1 to step 2, you went from 307

21   customers to 110, so did you eliminate 207 of

22   the customers?

23        A.    That's not what I stated.

24        Q.    Okay.  I'm following your steps in your

ATTORNEYS EYES ONLY

Page 137

1    report, Miss Distler.  I'm trying to figure it

2    out.  You started at 307 and then that was your

3    first step.  And then your second step you narrow

4    down that list.  And then third, you further

5    narrowed down the list.  So all I'm looking for

6    is how -- by what number of customers did you

7    narrow down your list during each step?

8        A.   And I'm telling you that I can figure

9    that out for you right now based on the schedules

10   and the documentation that's been provided.

11   Using Schedule 2.3 and then also using schedule

12   1.0.

13       Q.   All right.

14       A.   So it will take me a bit here, but I

15   can do it.

16       Q.   Then why don't we go off the record,

17   take a break so that you can figure that out.

18       VIDEOGRAPHER:  We are going off the record,

19   the time is approximately 2:11 p.m.

20                  (Whereupon, a discussion was had

21                   off the record.)

22                  (Whereupon, a short break was

23                   taken.)

24       VIDEOGRAPHER:  We're going back on the

ATTORNEYS EYES ONLY

Page 138

```
1    record.  The time is approximately 2:35 p.m.

2    BY MR. BUNDREN:

3         Q.   Miss Distler, before we went on break I

4    was trying to understand how you began your

5    analysis in paragraph 44 with 307 customers and

6    then how you eventually came to 19 customers as

7    referenced in paragraph 48.  Are you able to

8    help me out and tell me how you did that?

9         A.   Yeah.  And so on the break I did a few

10   examples.

11        Q.   Okay.

12        A.   So for example -- so looking at Schedule

13   1, that's the Customer Summary Compilation.  And

14   then I looked for those customers on Schedule 1.

15   I looked for those customers on Schedule 2.3, and

16   so I just did five examples --

17        Q.   Okay.

18        A.   -- of matching them.  So for -- on

19   Schedule 2.3, if you go to number 137.

20        Q.   Okay.

21        A.   And you look at Schedule 1, 138.

22        Q.   Okay.

23        A.   And so that would then -- that would be

24   how you would do the paragraph that starts with
```

ATTORNEYS EYES ONLY

Page 139

1    second.  Let me just go there quickly.

2        Q.   You said line number 137 on Schedule

3    2.3.  I think that's what you initially -- where

4    you initially started, ███ ███-███ Medical

5    Center?

6        A.   Yes.

7        Q.   Okay.  And then what did you do?

8        A.   I looked for -- so I find that in

9    Schedule 1.0.

10       Q.   Okay.

11       A.   That hospital is noted as -- it's

12   number 38.

13       Q.   Okay.  Another example?

14       A.   Another example on schedule 2.3, if you

15   look at number 138, that is number 6 in Schedule

16   1.

17       Q.   That's ███████ ███████ Hospital?

18       A.   Hmm, hmm.  Yes, yes.

19            Another example, if you go to Schedule

20   2.3 number 148, and then you go to Schedule 1 on

21   number 5.

22       Q.   Hmm, hmm.

23       A.   The other example, if you go to

24   Schedule 2.3.

ATTORNEYS EYES ONLY

Page 140

1      Q.    Yep.

2      A.    Number 15.  And then you go to Schedule

3    1 that's on number 4.  And then if you go to

4    Schedule number 2.3 again and you go to number

5    158.  That is Schedule 1, number 7.

6      Q.    Okay.  But as we sit here right this

7    moment, are you able to tell me how many

8    customers you eliminated from the 307 in

9    paragraph 44 to get to paragraph 45?

10     A.    I can continue this analysis and I can

11   recreate it in that fashion.

12     Q.    Do you know right this second how many

13   you eliminated?

14     A.    Sitting here right this second, I do

15   not have an exact number for you.  But I can get

16   to one using the schedules that I provided as I

17   was demonstrating.

18     Q.    Would you be agreeable to supplementing

19   your deposition with a reference to how many

20   customers you eliminated going from each step,

21   first step to second step to third step to your

22   fourth step?

23     A.    I could, yeah.

24     MR. BUNDREN:  Nikole, I'm just trying not to

Page 141

1    be here all night.  I'm trying to move forward.

2    If she doesn't have the answer right now, if we

3    were to take a break, I'm not sure how long it

4    will take her.  And I'm trying to be efficient

5    here.

6        MS. MERGO:  I'm happy to discuss it offline.

7        MR. BUNDREN:  All right.  Is she going to

8    commit to doing it?  I want it on the record that

9    she will agree to do that.

10       MS. MERGO:  I will discuss it with her on the

11   break.

12       MR. BUNDREN:  Okay.  Well, then the

13   alternative is if she's going to have to recreate

14   her analysis and we're going to go on break,

15   because I'm certainly not going to use the time

16   that I'm allotted under the federal rules.  And

17   however long it takes her, it takes her, and if

18   we have to come back another day, we will.  I'd

19   rather not do that.  I'm just trying to get

20   efficient and be efficient use of our time and

21   resources.

22       MS. MERGO:  Okay.  I'll talk to her over a

23   break, if you'd like to take a break.

24       MR. BUNDREN:  All right.  Let's take a break.

ATTORNEYS EYES ONLY

Page 142

1      VIDEOGRAPHER:  We're going off the record,

2   the time is approximately 2:41 p.m.

3                        (Whereupon, a short break was

4                    taken.)

5      VIDEOGRAPHER:  Here we go.  We're going back

6   on the record, the time approximately 2:42 p.m.

7      MS. MERGO:  All right.  I understand that you

8   asked her to provide you with a supplemental

9   report recreating her work.  We don't think it's

10   necessary.  She's giving you the examples of how

11   to do it, but we'll be willing to do that if you

12   think it's helpful to your review.

13           Do you have anything to add to that,

14   Carrie?

15      THE WITNESS:  No.  We did it electronically

16   and the information in the schedules to derive

17   the calculation, and I'm happy to provide the

18   requested update of the number of particular

19   hospitals.

20   BY MR. BUNDREN:

21      Q.   Yeah, I mean, I appreciate that.  Thank

22   you.

23           What specifically I'm looking for is

24   your steps, 44, paragraph 44, paragraph 45,

ATTORNEYS EYES ONLY

Page 143

1    paragraph 46 and paragraph 47.  And paragraph 44

2    you started with 307 customers.  And in

3    paragraph 48 you ended with 19 customers.  So

4    the information I'm looking for is how many

5    customers you eliminated in connection with each

6    step of your analysis; that's all I'm asking

7    for.

8         A.   Yes.

9         Q.   And if you can identify the customers

10   that would be great.  But I'm looking to see how

11   many were eliminated and then how many were left

12   after each step.  Do you understand?

13        A.   Yes.

14        Q.   All right.  With that I'll move on.

15             In the sales information that you

16   received -- let me stop, backup.

17             You received US Compounding sales

18   information for 2018 and 2019, is that right?

19        A.   More than that.

20        Q.   Okay.  How far back did you get

21   US Compounding's sales information?

22        A.   My recollection is it included 2017.

23        Q.   Okay.  All right.  Now, in the

24   documentation you received from US Compounding or

ATTORNEYS EYES ONLY

Page 144

1   of US Compounding sales information, you were

2   able to see the salesperson who was associated

3   with an individual sale during that period, is

4   that right?

5       A.   There is a field in the data that

6   indicates the salesperson assigned or coded to.

7   I don't know as of what date that represents.

8       Q.   In paragraph 43 of your report you noted

9   you were able to identify the majority of sales

10  made by Miss Hulsey at USC, is that right?

11      A.   Per the coding in the data file.  Again,

12  I don't know if that's historic coding or if

13  that's a current coding.

14      Q.   And you reference that on note 2 to

15  Schedule 2.2 of your report, is that right?  And

16  I've got it on the screen if you want to see

17  it.  Note to Miss Hulsey's sales are identified

18  by S-e-s-h-e in the sales person I.D. for a

19  sales transaction column, is that right?

20      A.   Yes.

21      Q.   And your disgorgement analysis includes

22  19 customers, is that correct?

23      A.   Yes, it does.

24      Q.   You're aware that Miss Hulsey and the

ATTORNEYS EYES ONLY

Page 145

1    USC sales documentations show that Miss

2    Hulsey was responsible for only six of those

3    customers, sales to six of those customers, is

4    that right?

5        A.   There is a coding for Miss Hulsey for

6    six of them, and there's additional information

7    that indicated which accounts if in 2018 that

8    were "dead accounts" and/or pursuable to Miss

9    Hulsey.

10       Q.   Okay.  So out of the 19 customers that

11   are in table 6 of your report on page 23, Miss

12   Hulsey was the assigned sales representative for

13   six of those accounts, is that right?

14       A.   I would also note that this table 6 has

15   a footnote of 114.

16       Q.   I see the footnote, but --

17       A.   Yes, hmm, hmm, to your question.

18       Q.   So six were assigned to Miss Hulsey, yet

19   you included 19.  Why did you include 13

20   customers where Miss Hulsey was not the one

21   responsible for the sale according to USC's sales

22   documentation?

23       A.   So a few reasons.  First, as I stated,

24   whether or not the sales coded are historical or

ATTORNEYS EYES ONLY

Page 146

```
 1    current, I don't know.  As we sit here, I don't

 2    know what the requirement was.

 3              Secondly, what I do know from looking at

 4    documentation that was sent to USC as noted in

 5    footnote 14, there were a series of hospitals

 6    listed above in table 6 that were identified as,

 7    one, as dead accounts and/or those that Miss

 8    Hulsey had specifically identified as large

 9    volume or big accounts with big volume currently

10    and they're all buying Neo Glyco and SUCCS from

11    Nephron, S-U-C-C-S.  So given that information

12    was provided specific to these accounts, I also

13    included them within this analysis.

14         Q.   Now, 12 out of 13 of the accounts that

15    are not identified with Miss Hulsey, according

16    to USC sales records, are ████████  ████████

17    Hospital accounts.  Do you see that?  So out of

18    19 customers, you would agree with me you have

19    that six of the customers were specifically

20    referenced that Miss Hulsey was responsible for

21    those customers, leaving 13 customers out of

22    your 19.  Are you with me so far?

23         A.   Yes, that's what's reflected within the

24    sales data from USC.
```

ATTORNEYS EYES ONLY

Page 147

```
 1        Q.   And the sales data reflects that Miss
 2   Hulsey was the salesperson responsible for
 3   ██████████ Regional Medical, ██████████ Medical,
 4   ██████ Memorial, ████ ██████ Hospital, ████ ████
 5   Hospital and ██████ ██ ██████ is that your
 6   understanding?
 7        A.   Yes, I believe those are the six.
 8        Q.   Okay.  And then there are thirteen
 9   other hospitals that are on your list, twelve of
10   which are ██████   Do you see that?
11        A.   Yes.
12        Q.   Is there any reason why specifically
13   ██████ represents 12 out of 13 remaining
14   hospitals on your analysis?
15        MS. MERGO:  Object to the form.
16        A.   Is there a certain reason -- well, I
17   would cite to the various limitations that I
18   applied to get down to identifying the set of USC
19   revenues subject to disgorgement in conjunction
20   with the sales history of these particular
21   customers, including an identification that
22   certain of these center customers were dead
23   accounts as of October of 2018.  And then also in
24   mid 2018 these accounts were also identified by
```

ATTORNEYS EYES ONLY

Page 148

```
1    Miss Hulsey as large purchasers to USC, and I
2    don't see that any of these customers had been
3    purchasing the five primary drugs from September
4    2017 through August 2018 at USC.
5    BY MR. BUNDREN:
6         Q.   So is it your testimony that you did
7    not include █████████ because Miss Kennedy asked
8    you to include █████████ Hospitals on this list?
9         MS. MERGO:  Object to the form.
10        A.   No, I was not asked by Miss Kennedy to
11   include █████████
12   BY MR. BUNDREN:
13        Q.   Okay.  Your rebuttal to the Wiggins
14   report, and that's Exhibit 4, you take issue
15   with primarily two, well, three things with
16   Dr. Wiggins, and I just want to go over briefly
17   those three.  You have a disagreement with
18   Dr. Wiggins about the number of customers that
19   are subject to the revenue and analysis subject
20   to disgorgement, is that correct?
21        A.   I would say there are many things that
22   Dr. Wiggins and I disagreed on.
23        Q.   Okay.
24        A.   One of those items would be the customer
```

ATTORNEYS EYES ONLY

Page 149

```
 1   subject --
 2        Q.   Okay.
 3        A.   And disgorgement.
 4        Q.   I'm sorry.  I didn't mean to interrupt
 5   you.  The specific thing that I was looking at
 6   is that Dr. Wiggins uses six customers as his
 7   revenue base for the disgorgement analysis as
 8   compared to you who use 19 customers, is that
 9   right?
10        A.   Yes, generally.
11        Q.   Okay.  And then another criticism that
12   you have of Dr. Wiggins is regarding his usage
13   of, like, two-year average margin of the sales
14   made by USC in 2018 and 2019, is that right?
15        A.   Yes, I do criticize Dr. Wiggins.  We're
16   looking at an average across those years, a
17   straight average and applying that.
18        Q.   And then a third disagreement that I
19   have seen is that Dr. Wiggins applies for costs,
20   four categories of costs, to arrive at
21   disgorgement profits.  And those are sales,
22   returns and allowances, sales commission, and
23   salaries of sales personnel.  Do you recall
24   that?
```

ATTORNEYS EYES ONLY

Page 150

1      A.   Yes, Dr. Wiggins subtracts four items,

2  yes.

3      Q.   And you take issue with only one of

4  those four, is that right?

5      MS. MERGO:  Object to form.

6      A.   Generally, yes.

7  BY MR. BUNDREN:

8      Q.   Okay.  And that's the category of costs

9  called sales, salaries of sales personnel, right?

10      A.   Yes.

11      Q.   Okay.  The other three costs though you

12  don't have an issue or criticism on relative to

13  your rebuttal opinion?

14      A.   I have also deducted those costs.

15      Q.   Okay.

16      A.   And the disgorgement calculation.

17      Q.   All right.  Other than those three

18  issues that I see and what I just referenced, are

19  there any other criticisms that you have with

20  regards to Dr. Wiggins unjust enrichment

21  analysis?

22      A.   I would say I would disagree with that

23  Dr. Wiggins' report that it's zero.

24      Q.   Okay.

ATTORNEYS EYES ONLY

Page 151

1       A.   So I would disagree with that based on

2   my analysis, I guess, as we've discussed.  So I

3   would say that that is a disagreement.  Other

4   than that, as I sit here, I believe those would

5   be the three disagreements that I would look to.

6       Q.   Okay.  And those were all reflected in

7   your rebuttal report?

8       A.   Yes.

9       Q.   With respect to the cost issue,

10  specifically the deduction of salaries of sales

11  personnel, is it your opinion that deducting

12  salaries of sales personnel in a situation like

13  this would never be proper in calculating an

14  incremental profit?

15      A.   I think it depends on what is actually

16  subject, right.  So, for example, we're looking

17  at 1.18 million in revenues subject to

18  disgorgement on my side.  His is less than that

19  amount.  Of the 1.1 million we see that USC's

20  503B for the five primary drugs increased by

21  3 and a half million.  And overall it would

22  likely be 7.2 million approximately for the 503B

23  five primary drugs.  So whether it's 1.1 million

24  or it's Dr. Wiggins' lesser number, it would

ATTORNEYS EYES ONLY

Page 152

1    be -- the analyst would want to look to what

2    would be the incremental cost.  Is it appropriate

3    to put this particular amount of revenue in a

4    situation to deduct the sales salary of the

5    personnel.  And I haven't seen any information

6    that discusses the structure of the sales

7    salary, the salaries and the commissions of the

8    sales personnel at USC.  Dr. Wiggins wasn't aware

9    of any in his deposition testimony.  So given

10   it's such a small amount, and this is -- I think

11   it is inappropriate to deduct as I discussed in

12   my report.

13       Q.   But you certainly, in opinions that

14   you've issued, you deducted salaries and wages

15   in calculating incremental costs, haven't you?

16       A.   It depends on -- like, again, I said the

17   significance of the product line, is it an entire

18   product line, is it a large portion of the

19   revenues, yes.  But I haven't (inaudible).

20       Q.   And you did that in the Columbia

21   Sportswear case, didn't you?

22       A.   Yes, it was an entire product line.

23       Q.   Okay.  So it was appropriate in that

24   case, but it's not appropriate here?

ATTORNEYS EYES ONLY

Page 153

1      A.   Well, yes.  Because, again, we're

2  looking at an entire product line that was

3  subject to a disgorgement of profits calculation.

4  Here we're looking at a very small, as he said in

5  his own deposition, it's a very small portion of

6  the revenue.

7      Q.   Did you do any calculation or analysis

8  of the compensation structure of USC to sales

9  representatives versus the compensation structure

10  of Nephron to its sales representatives during

11  this time period?

12      A.   I did not have information on the

13  compensation structure or plan of the USC sales

14  personnel.

15      Q.   So you did not have the amount of

16  Nephron's sales commissions or salaries from

17  2017, 2018 and 2019; you didn't have that

18  information?

19      MS. MERGO:  Object to form.

20      A.   I think there's a difference in the

21  question.  Did I have a P&L that had those line

22  items versus did I have information to understand

23  how they may or may not be relevant to the five

24  primary drugs; is there a difference in

ATTORNEYS EYES ONLY

Page 154

1   commission and/or salary related to those and

2   other incentives that might be going on related

3   to those drugs.  I did not know on the USC side

4   whether or not there were incremental thresholds

5   or those types of things that you might hit in

6   terms of implicating the sales salary personnel

7   as an appropriate deduction.

8   BY MR. BUNDREN:

9       Q.   Miss Distler, my question was did you

10  have Nephron's commissions and salaries for its

11  sales personnel during -- for 2017, 2018 and

12  2019?

13      A.   So on the Nephron side, yeah, I have --

14  I had that identified in a PNO.

15      Q.   All right.  Did you have the same

16  information, commissions and salaries

17  information for US Compound for 2018 and 2019?

18      A.   I had a single line item for USC's

19  commissions and sales personnel salaries.

20      Q.   So the answer is yes, you did have that

21  information?

22      MS. MERGO:  Object to the form.

23      A.   Again, it goes back to my prior answer

24  where it was a discussion of understanding what

ATTORNEYS EYES ONLY

Page 155

1    would really be incremental.

2    BY MR. BUNDREN:

3        Q.   Yeah, that's not my question, Miss

4    Distler.  All I'm asking is if you had the

5    information at your disposal to identify what USC

6    sales commissions and salaries that it paid in

7    the years 2018 and 2019.

8        MS. MERGO:  Object to the form.

9        A.   In total for their 503B, yes.

10   BY MR. BUNDREN:

11       Q.   Thank you.  All right.  Now, looking at

12   your rebuttal report for unjust enrichment, and

13   specifically I want to look at rebuttal Schedule

14   12.0.  Let me know when you're there.

15       A.   I'm there.

16       Q.   We'll try to put it up on the screen.

17   It's a little slow.  Rebuttal Schedule 12.0.

18   This is where you performed an analysis to

19   arrive at the opinion of USC profits subject to

20   disgorgement of $351,527, is that right?

21       A.   Yes.

22       Q.   And you used the three costs, three of

23   the four costs that Dr. Wiggins supplied, is that

24   right?

ATTORNEYS EYES ONLY

Page 156

1      A.   I used three of the four line items from

2  the PNO for USC

3      Q.   Okay.  And then the other item you used

4  that's different than Dr. Wiggins, you calculated

5  a different applicable margin rate, is that

6  right?

7      A.   Yes.

8      Q.   And that was based on your criticism

9  that Dr. Wiggins should have used the actual

10  margin during each period, 2018 and 2019, as

11  opposed to the average margin over a two-year

12  period?

13     A.   Yes, in conjunction with the inclusion

14  of sales personnel salaries that I disagreed

15  with.

16     Q.   Yes, I understand.  And this $351,527,

17  this is for the 19 customers as opposed to 6

18  customer used as the basis, is that right?

19     A.   Yes.

20     Q.   Okay.  Now, you also have a Schedule

21  11.1.  Let me know when you're there.

22     A.   Yes.

23     Q.   Now, this is Dr. Wiggins' analysis, your

24  adjustments to Dr. Wiggins' analysis for the

ATTORNEYS EYES ONLY

Page 157

```
1    6 customer base, is that correct?

2         A.   Yes, generally, yes.

3         Q.   Okay.  And so are you offering an

4    alternative calculation of the USC profits

5    subject to disgorgement would $8,135 assuming

6    that the fact finder finds that 6 customers is

7    appropriate versus 19 customers?

8         A.   I would say I'm adjusting Dr. Wiggins'

9    damages opinion for my disagreements with him and

10   indicating what that value would be.

11        Q.   Okay.  So if the court or the fact

12   finder, whoever that might be, determines that a

13   revenue base of 6 customers as Dr. Wiggins

14   referenced in his report is applicable, as

15   opposed to the 19, this would be your analysis

16   of what the project profit subject to

17   disgorgement would be for those 6 customers with

18   the other adjustments, of course, that you made?

19        A.   Yes, generally.

20        Q.   All right.  Let's go to paragraph 53 of

21   your original report.  You referenced a

22   discussion with Miss Kennedy and counsel.  Is

23   that the same discussions that we talked about

24   earlier?
```

ATTORNEYS EYES ONLY

Page 158

1      A.   Yes, it would be the same discussion.

2      Q.   And is it true, to your understanding,

3    that there are still not any licenses that

4    Nephron -- Nephron's not licensed their alleged

5    confidential information?

6      A.   That is correct.  That's my

7    understanding.

8      Q.   Paragraph 57 and 58 of your report

9    referenced Miss Hulsey's indication that she had

10   been pursuing ███████ Hospital system in North

11   and South Dakota while employed by Nephron.  Do

12   you see that?

13     A.   Yes.

14     Q.   Could you please tell the jury whether

15   or not ███████ Hospital System in North and South

16   Dakota is included anywhere in your economic

17   analysis of profits subject to disgorgement or

18   reasonable royalty?

19     A.    It is not included.

20     Q.   Let's go to paragraph 62 of your May 8th

21   report, paragraph 62 and 63.  It's my

22   understanding that you are referencing certain

23   customers who have essentially switched buying

24   from Nephron and are now buying from USC, is that

ATTORNEYS EYES ONLY

Page 159

 1   right?

 2        A.   Yes, as demonstrated in Schedules 6 and

 3   6.1.

 4        Q.   Okay.  And in paragraph 62 you assumed

 5   that had Miss Hulsey not left Nephron, Nephron

 6   would have made approximately $400,000 more than

 7   it did from September of 2018 to December of

 8   2019.  Do you see that?

 9        A.   Can you repeat your question?

10        Q.   Sure.  You say Nephron would -- if one

11   assumes, this is on page -- it's at the tail end.

12   It's on page 30, paragraph 62.

13        A.   All right.

14        Q.   If one assumed that absent defendants'

15   misappropriation, Nephron would have continued to

16   sell roughly 2,000 syringes to ████ ████ and

17   that Nephron would have generated $████ in

18   revenues.  Ordinarily $████ more than the

19   approximate $████ Nephron actually generated

20   over that period.  Do you see that?

21        A.   Yes.

22        Q.   Is it your testimony that $████

23   difference is solely attributable to Miss Hulsey?

24        A.   Well, I would say that I am assuming

ATTORNEYS EYES ONLY

Page 160

```
 1   that absent defendants' misappropriation, as I
 2   stated in that sentence, that would be the
 3   potential revenue.  In this instance I'm not
 4   calculating loss or profits.  So I'm evaluating
 5   the different data points that may be considered
 6   by the parties as they're sitting across the
 7   table from one another negotiating for a license
 8   to the Nephron confidential information.
 9       Q.   Did you consider any other factors that
10   would impact whether or not Nephron would have
11   made approximately $        more or are you
12   assuming that's 100 percent solely to the
13   misappropriation?
14       A.   As I stated in the sentence, if one
15   assumed that absent that.  So I'm saying even
16   assuming that absent that misappropriation,
17   Nephron would have made those sales.  Again, I'm
18   not performing a loss profits calculation here.
19   I'm looking at a remedy that is accepted for
20   determining economic damages in a trade secret
21   matter, unreasonable royalty.  And you're
22   looking for data points and information that
23   will inform the hypothetical negotiation and/or
24   the bargaining position of the parties as of
```

ATTORNEYS EYES ONLY

Page 161

1    that date.  That's what I'm doing here in this

2    instance under the factor, the result in any

3    unforeseeable changes in the parties and

4    competitive posture.

5         Q.   Now, I think you said earlier, and I

6    wrote this down but I want to make sure this is

7    right.  You had all of Nephron's 503B sales data

8    dating back to 2017?

9         A.   Yes, as presented in Schedule 5.

10        Q.   And you were able to analyze all that

11   data and offer your own conclusion on how that

12   data impacted Nephron and their sales, right?

13        A.   Can you restate the question?

14        Q.   Sure.  You had all of Nephron's sales

15   data in 503B dating back to 2017, so you were

16   able to independently look and determine how

17   Nephron sales were impacted by the alleged

18   misappropriation, is that right?

19        A.   I had sales data for Nephron across

20   those three years, yes.

21        Q.   And you can look at that data and

22   determine where Nephron lost sales to USC,

23   assuming the misappropriation, is that right?

24        A.   There were instances where I could,

ATTORNEYS EYES ONLY

Page 162

1    yes.  But as I discussed in my report and

2    presented, if USC failed to make sales, sales to

3    Nephron's customers, that's not necessarily a

4    reflection of the value or the harm to Nephron

5    or the economic value or contribution of the

6    Nephron confidential information.  So, again,

7    stepping back to a contract of a reasonable

8    royalty using the UCC life factors.  One is

9    (inaudible) the difference based on those four

10   factors, the different data points and

11   benchmarks, the information that would be

12   considered in determining the royalty that would

13   be agreed to between the parties, which is what

14   I've down here.

15       Q.   Well, Miss Distler, if you had all the

16   sales data from Nephron from 2017 to the present,

17   2019, so to speak, why did Miss Kennedy and

18   Mr. Jibaja have to indicate to you that ████████

19   Hospital was impacted by the alleged use of the

20   confidential information?

21       A.   Well, I asked them if there were other

22   issues that unbeknownst to me, they're just

23   looking at the data that may impact Nephron in

24   terms of making a sale.

ATTORNEYS EYES ONLY

Page 163

1        Q.   Yeah, but the data is the data.  You had

2    that data before you asked Miss Kennedy and

3    Mr. Jibaja about other hospitals, correct?

4        A.   So, right.  So what I did was that I

5    analyzed the data and I discussed some of those

6    areas with Miss Kennedy and Mr. Jibaja.

7        Q.   So going back to your unjust enrichment

8    analysis, I believe you said earlier that twelve

9    of those hospitals were ██████  Health Group

10   Hospitals that you called them?

11       A.   Yes.

12       Q.   Okay.  So are you going to tell this

13   jury that you did not include those hospitals at

14   the behest of Ms. Kennedy and Mr. Jibaja?

15       MS. MERGO:  Object to form.

16       A.   As I stated earlier in my answer, I

17   performed an analysis looking at the data.  I

18   noticed a set of customers under ██████

19   different institutions under the ██████

20   different hospitals, different buyers and I

21   reached out to, as part of my conversation and in

22   reviewing my analysis, to Miss Kennedy and

23   Mr. Jibaja to understand if there was anything

24   outside of the use of Nephron's confidential

ATTORNEYS EYES ONLY

Page 164

1   information which would have included

2   identification of these hospitals as Miss Hulsey

3   (inaudible).  It would have indicated the five

4   products that were primarily sold to these

5   hospitals.  And then, lastly, the pricing that

6   Nephron had for these five products in the

7   marketplace.  So with that information, I asked

8   Miss Kennedy and Mr. Jibaja whether or not they

9   would consider that the customer subjects were

10  impacted by it.  Now, did I just rely on their

11  information?  I mean, again, I'm assuming as I

12  state in the sentence the alleged use and

13  misappropriation right.  From their perspective,

14  these would be issues that they would be looking

15  to hypothetical negotiation.

16  BY MR. BUNDREN:

17      Q.   Miss Distler, I'm just asking, if you

18  had the data in front of you, why did Miss

19  Kennedy or Mr. Jibaja have to indicate anything

20  to you about how the sales were impacted with

21  respect to the numbers, sales numbers, that were

22  produced by Nephron?

23      MS. MERGO:  Object to form.

24      A.   Can you repeat the question?

ATTORNEYS EYES ONLY

Page 165

```
 1   BY MR. BUNDREN:

 2        Q.    Sure.  You had all the sales data from

 3   2017 to the present.  Why did you have to have

 4   Miss Kennedy and Mr. Jibaja indicate to you that

 5   ████████   Health Hospital Group in Colorado was

 6   impacted?  Couldn't you have figured that out on

 7   your own without talking to Miss Kennedy or

 8   Mr. Jibaja?

 9        MS. MERGO:  Object to form.

10        A.    As I stated earlier, I did look at the

11   data on my own.  I noticed the differences, the

12   shifts in these particular customers, and I asked

13   Miss Kennedy and Mr. Jibaja about those

14   specifically.

15   BY MR. BUNDREN:

16        Q.    All right.  In that paragraph you say I

17   identified at least four instances where

18   customers stopped buying the five primary drugs

19   from Nephron and began purchasing similar

20   quantities from USC.  I'm curious.  You

21   identified instances.  How many instances were

22   you looking at in your data set?

23        A.    As I sit here, I don't know how many in

24   total, but I identified this group in 6.2 as four
```

ATTORNEYS EYES ONLY

Page 166

1   as examples.

2       Q.   Let's go back a little bit.  Schedule

3   6.1 is your analysis with respect to ██ ██████

4   ██████

5       A.   Yes, it is.  One moment.  It's part of

6   the analysis.

7       Q.   Yeah, but Schedule 6.1 is limited to

8   the ██ ██████ ██████████ Hospital, is that

9   correct?

10      A.   And so is 6.0.

11      Q.   That's right.  6.0 is limited also to

12  ██ ██████ Chesterfield.

13           And then Schedule 6.2 is your analysis

14  of the four ██████ Hospitals that you identified

15  in paragraph 63 of your report?

16      A.   Yes, it includes ████████

17      Q.   Okay.  So that's four hospitals from

18  ████████ that, and one hospital from ██ ██████

19  That's five hospitals out of the 19 customers

20  that you used for your customer base for

21  disgorgement.  Are you with me so far?

22      A.   Yes, it would be ████████ yes.

23      Q.   Okay.  Did you do this analysis,

24  similar analysis, that you did in Schedule

ATTORNEYS EYES ONLY

Page 167

1    6.0, 6.1 and 6.2 for the remaining customers on

2    your disgorgement list?

3        A.   I don't know if I did or not.  I

4    focused on these particular customers as part of

5    the same group.

6        Q.   Okay.  So this is -- did you do the

7    analysis or not, that's all I'm asking, because

8    -- go ahead.

9        A.   I didn't know if there was an objection

10   so I was waiting.  I do not believe so, no.

11       Q.   Okay.  If you would have done that

12   analysis, would you have included that in your

13   report?

14       A.   As I sit here, I don't know.  I don't

15   recall doing any analysis.

16       Q.   All right.  If you did that analysis in

17   connection with your report on May 8th, I'd like

18   that to be produced to me.  Would you be able to

19   do that?  And that's assuming you did.  I'm not

20   asking you to go back and recreate it, I'm just

21   asking you if you did it prior to the issuance

22   of your May 8th report.

23       A.   I can look and see.  I would say though,

24   again, as part of my reasonable royalty analysis,

ATTORNEYS EYES ONLY

Page 168

1    I'm looking at instances of competition to inform

2    that particular factor.  So that's the intent of

3    performing that analysis to identify competition

4    amongst the parties.

5        Q.   I understand.  All I want to know is if

6    you've done it, I would like a copy of it.  If

7    you haven't, then obviously there's nothing for

8    you to provide.  I'm not asking you to create

9    it.  But if you did the same analysis on page --

10   Schedule 6.1 and 6.2 with respect to any of the

11   other hospitals on your customer list, would you

12   agree to provide it to me?

13       A.   Subject to any concern by counsel, if I

14   did it, sure.

15       MR. BUNDREN:  What do you think, Nikole, are

16   you okay with that?

17       MS. MERGO:  I'm not going to decide in the

18   middle of a deposition.  I'll discuss it with

19   her.

20       MR. BUNDREN:  Okay.  Well, if she's performed

21   this analysis, I mean -- I'll send you a letter

22   after the deposition.  If she performed the

23   analysis, we'd like to see it.  If she didn't,

24   then that -- obviously she didn't.  We're not

ATTORNEYS EYES ONLY

Page 169

1   asking her to recreate it.  The problem is that

2   she can't remember whether she did it or not.

3   BY MR. BUNDREN:

4       Q.   All right.  On ███ ███████ I think it's

5   Schedule 6.0.  If you look at the sales from

6   Nephron as compared to US Compounding, are you

7   with me?

8       A.   Yes.

9       Q.   Okay.  Let me pull it up.  Would you

10  agree with me that ███ ███████ the purchases

11  from USC did not exceed the purchases from

12  Nephron until December of 2018?

13      A.   Yes.

14      Q.   And that was approximately four months

15  after Miss Hulsey came to US Compounding from

16  Nephron, is that right?

17      A.   Yes.

18      Q.   If she misappropriated all the

19  information, wouldn't you have expected the data

20  to tell you a different story and that the sales

21  would have increased almost immediately upon her

22  arrival at USC?

23      MS. MERGO:  Object to form.

24      A.   Not necessarily.

ATTORNEYS EYES ONLY

Page 170

1    BY MR. BUNDREN:

2        Q.   Did you consider any other factors such

3    as why ████ ███████ started purchasing more from

4    US Compounding rather than purchasing from

5    Nephron during this period as referenced in

6    Schedule 6 of your report?

7        A.   Generally, yes.

8        Q.   What other factors did you consider?

9        A.   One could consider the pricing of the

10   products and whether or not USC was pricing their

11   products significantly lower than Nephron.  And

12   then as we have talked about earlier today,

13   that's one piece of the four specific items

14   within Section 6 of my report that I considered.

15   So that could be one of the reasons.  Whether or

16   not that reason is solely -- whether any

17   differences in prices, most of the parties for

18   this particular customer would have impacted St.

19   Luke's, it would be one of the reasons I did not

20   perform the loss profit calculation.  If there

21   were other market forces that I cannot discern

22   from looking at the data.  Therefore, reasonable

23   royalty would be a more appropriate mechanism

24   upon which to measure the economic harm or

ATTORNEYS EYES ONLY

1    economic damage to Nephron as the two parties

2    sat across the table from one another to

3    negotiate a license.

4         Q.   And did you talk to anybody from █████

5    █████ to ask them about why they're purchasing

6    habits switched in approximately December of

7    2018?

8         A.   I did not.

9         Q.   Did you talk to any of the customers

10   that are the subject of the analysis on your

11   disgorgement analysis or your reasonable royalty

12   analysis?

13        A.   I did not.

14        Q.   All right.  Looking at Schedule 6.0,

15   I'm sorry, I don't know the correct full term of

16   the drug.  I'm going to call it SUCCS like you

17   did.  S-U-C-C-S.

18        A.   Succinylcholine.

19        Q.   There you go.  If you can look at that

20   for 2019.  And you would agree with me from

21   January of 2019 to August 2019, USC sold

22   approximately 1331 units of SUCCS to █████

23   █████

24        A.   Yes, that's what Schedule 6 shows.

ATTORNEYS EYES ONLY

Page 172

```
 1      Q.   And then they didn't make a single sale
 2  for the rest of the year from September to
 3  December.  Do you see that?
 4      A.   Yes, for that particular drug.
 5      Q.   And then interestingly enough, SUCCS
 6  purchased 870 units -- ████ ██████  purchased 680
 7  units of SUCCS from Nephron during the August to
 8  December timeframe.  Do you see that?
 9      A.   Yes.
10      Q.   So how does that impact your
11  explanation and your exemplar of ███ ██████ of
12  the competition between Nephron and US
13  Compounding?
14      A.   So again, as I discussed, I'm looking
15  at the UCC Life Factors.  Of those factors,
16  there's a resulting and foreseeable change in
17  the parties competitive posture.  This would be
18  sitting at the eve of infringement.  What would
19  be the at-risk customers and revenues that
20  Nephron would be licensing the Nephron
21  confidential information to.  So, again, I'm not
22  calculating a loss profits analysis.  I'm
23  looking at sitting there across the table at
24  that point in time, what would that mean to
```

ATTORNEYS EYES ONLY

Page 173

```
 1    Nephron, both from Part C as well as in my
 2    discussion of Part D.  Now, at the same time
 3    within these sections of my report, I talk about
 4    references to USC and its desire to increase its
 5    revenues and grow, given that it has the
 6    manufacturing ability to make the products, so
 7    to incrementally increase its revenues.  So I'm
 8    looking at data points for both of the parties
 9    that would inform the hypothetical negotiation.
10    I understand Dr. Wiggins has performed a
11    mitigation analysis of my report, but I think
12    it's missing the point in that it's a reasonable
13    royalty analysis.  It's not a loss profits
14    analysis.  And I'm gathering data points.  I
15    gathered probably a dozen data points,
16    quantitative benchmarks that I used to determine
17    royalty, where these are derived using the best
18    available information possible.  And at the end
19    of the day, Dr. Wiggins ultimately uses my
20    methodology and my quantitative benchmarks
21    adjusted for the number of customers that he may
22    include within those.
23         MR. BUNDREN:  I'm going to object to the
24              answer as nonresponsive.
```

ATTORNEYS EYES ONLY

Page 174

```
 1   BY MR. BUNDREN:

 2        Q.    Let's go to Schedule 6.2.

 3        A.    Yes.

 4        Q.    Now, these are the ████████ Hospitals,

 5   the four of them where you did an analysis, the

 6   Nephron sales as compared to the US Compounding

 7   sales, is that right?

 8        A.    Yes, I compared for these four

 9   hospitals, yes.

10        Q.    What's the shaded area represent in your

11   analysis where you shaded the month of February

12   of 2019?

13        A.    Those would be the months after which

14   Nephron no longer made sales of those products.

15   You can see that there's an average net sales

16   calculation that's provided at the bottom.

17        Q.    See it.

18        A.    So it would be calculating the average.

19        Q.    And you're aware that's almost seven

20   months after Miss Hulsey came to work for USC?

21        A.    I believe it's six, approximately.

22        Q.    All right.  Beginning on paragraph 65

23   you began the discussion of using multiples in

24   your -- incorporating multiples into your
```

ATTORNEYS EYES ONLY

Page 175

1   reasonable royalty analysis.  And in paragraph

2   65 you say in the absence of licenses you

3   analyzed other pharmaceutical companies to

4   estimate the ratio of customer relationships to

5   the company's enterprise value, is that right?

6        A.   Yes, that's a summary.

7        Q.   All right.  Have you ever performed

8   this methodology or used this methodology in

9   litigation in calculating a reasonable royalty?

10        A.   Yes.

11        Q.   And which cases would those be on your

12   CV?  I'll pull it up.

13        A.    That would be Apex Benefits Group

14   versus Eric Dreyfus.

15        Q.   Are there any other times when you used

16   this analysis to estimate the ratio of customer

17   relationships to the company's enterprise value

18   other than Apex?

19        A.   As I'm sitting here, that would be my

20   recollection.  That would be all.

21        Q.   In Apex did you use -- did you

22   specifically estimate the ratio of customer

23   relationships to the company's enterprise value

24   using the same methodology that you used in this

ATTORNEYS EYES ONLY

Page 176

```
1    case with SIC codes and pharmaceutical

2    transactions?  I'm just trying to figure out if

3    that's the same.

4         MS. MERGO:  Object to the form.

5    BY MR. BUNDREN:

6         Q.   Do you understand my question?

7         A.   I think generally.  So in that report I

8    looked to professional services firms that would

9    be in a similar offering area as the subject, as

10   the plaintiff.

11        Q.   Did you use a prior contract as a

12   benchmark in Apex?

13        A.   I believe I did, yes, I believe so.

14        Q.   You didn't use a prior contract or

15   license in this case, right, because there

16   weren't any?

17        A.   Yes.  In this instance, as I stated,

18   there was not an existing license or an

19   established royalty.

20        Q.   Okay.  In paragraph 68 you identified

21   SIC Code 2834, pharmaceutical preparations as

22   the most relevant groupings to conduct your

23   analysis here, is that right?

24        A.   Yes.  I looked for information that
```

ATTORNEYS EYES ONLY

Page 177

```
 1    would be available to inform the hypothetical
 2    negotiation across different data sources to
 3    do so.  So one of those that I looked to in
 4    conjunction with, like as I said, used my
 5    discounted future profit methodology.  I looked
 6    at the SID Code 2834, which is the SIC code that
 7    would be relevant to Nephron.
 8         Q.   What about USC, would it be relevant to
 9    USC?
10         A.   I believe USC is not coded to 2834.
11         Q.   Okay.  Is Nephron coded to SIC Code
12    2834?
13         A.   Yes.
14         Q.   Do you have an understanding, if you do,
15    as why -- what would be the basis for coding
16    Nephron to SIC Code 2834 and USC would not be
17    coded similarly given their business?
18         A.   Can you ask your question one more
19    time?
20         Q.   Yes.  Do you have an understanding of
21    why USC, US Compounding, and Nephron are not
22    grouped in the same SIC Code 2834?
23         A.   So my general understanding around SIC
24    codes is that it's -- at least in this
```

ATTORNEYS EYES ONLY

Page 178

```
 1    particular setting, they're looking at where the

 2    majority of the operations are within on that

 3    particular SIC code.  So there's enough of a

 4    volume or substantial level to reach that.  So

 5    on the USC side, the 503B business, they may have

 6    not have been coded to do a 2834 at that time.

 7         Q.   Do you know whether or not US

 8    Compounding is coded to 2834?

 9         A.   I believe I just answered that.

10         Q.   And it's not, right?

11         A.   That's what I stated.

12         Q.   Okay.  Do you know what SIC code is

13    coded to US Compound?

14         A.   I am not -- not off the top of my head.

15         Q.   Is that information available to you in

16    the course of your analysis?  Are you able to see

17    what companies are coded to particular SIC codes,

18    generally speaking?

19         A.   You can do a search to see if --

20    sic.com, I think is the website to see if they

21    bring up, provided the entity exists in a

22    fashion that they can actually bring up an SIC

23    code for it.

24         Q.   How many companies are grouped within
```

ATTORNEYS EYES ONLY

Page 179

1    SIC Code 2834?

2        A.    There would be many.

3        Q.    Like over a thousand?

4    MS. MERGO:  Object to the form.

5        A.    There could be.  I don't know as I sit

6    here how many, but it's possible.

7    BY MR. BUNDREN:

8        Q.    Now, in Appendix D to your report,

9    you've included a Duff and Phelps report.  Do

10    you see that?

11        A.    I've included two.

12        Q.    Let's look at the one.  In your report

13    how many companies are in this Duff and Phelps

14    report -- I'm sorry.  How many companies are

15    coded to this 2834 SIC Code?

16        A.    Per the report it states 22.

17        Q.    Okay.  Would it surprise you to know

18    that there are over 1200 SIC code companies that

19    are coded to 2834?

20        A.    No, it would not.

21        Q.    And you would agree with me that the 22

22    companies are listed on the next page of the Duff

23    and Phelps report?

24        A.    The ones that are used within this

ATTORNEYS EYES ONLY

Page 180

```
 1    particular report, yes.
 2         Q.    And Nephron is not on that list, right?
 3         A.    And Nephron is not publically traded,
 4    so, yes.
 5         Q.    Nephron is not on the list of 22 SIC
 6    code companies that are coded at 2834 here on
 7    the Duff and Phelps report, is it?
 8         A.    Nephron is not on that list.
 9         Q.    Okay.  Are you aware that there are 6
10    and 7 and 8 digit code extensions for SIC codes?
11         A.    Yes.
12         Q.    Are you aware if the data for those
13    companies -- and specifically I'm talking about
14    the data that's listed on this screen right in
15    front of you:  The retired ratios, beta levels,
16    enterprise value multiples.  Are you aware if
17    that data is the same for SIC Code 2834 that it
18    would be for the extensions of SIC codes?
19         A.    I don't know as I sit here.
20         Q.    Did you look at that when you were
21    preparing for and issuing your report, did you
22    look at that information?
23         A.    I did not look at that information.
24         Q.    All right.  Now, table 7 of your report,
```

ATTORNEYS EYES ONLY

Page 181

1    which is on page 33.  Are you there?

2         A.    Table 7, yes.

3         Q.    Yeah.  And you got the data that's

4    within table 7 from this Duff and Phelps report

5    under enterprise valuation multiples, do you see

6    that?

7         A.    Yes.

8         Q.    Okay.  Why is the EBITDA multiple so

9    much larger than the sales multiple?

10        A.    Because it's a different value that's

11   being measured against that.

12        Q.    Okay.  I was just looking for a general

13   idea as to why it's so much larger.

14              All right.  Paragraph 70.  To identify

15   benchmarks, you apportioned the EVM, Enterprise

16   Valuation Multiples.  That would relate to

17   customer relationships.  You analyzed historical

18   transactions in a sterile compounding and the

19   pharmaceutical industry in the years leading up

20   to the hypothetical negotiation.  Do you see

21   that?

22        A.    Yes, that's what my report states.

23        Q.    Did you do this similar analysis that

24   you've done here, did you do this in Apex as

ATTORNEYS EYES ONLY

Page 182

1    well?

2         A.    Similar and apportionment?

3         Q.    Sure.  Analyzing historical

4    transactions.  Did you analyze historical

5    transactions in the Apex case?

6         A.    I don't recall if I did.  I know that I

7    looked at trading multiples.

8         Q.    All right.  In paragraph 72 you said to

9    identify companies potentially comparable to

10   Nephron you considered US transactions and a

11   sterile compounding and pharmaceutical space

12   dating back to 2014, and then those transactions

13   are summarized in table 8, is that right?

14        A.    Yes.  Along with a footnote around how

15   I derived or how I searched for transactions.

16        Q.    How many --

17        A.    If we can get to a point where we can

18   take a break at some point, that would be

19   awesome.  Thank you.

20        MR. BUNDREN:  Sure, we can take one now.

21        VIDEOGRAPHER:  We're going off the record at

22   approximately 3:51 p.m.

23                    (Whereupon, a short break was

24                      taken.)

ATTORNEYS EYES ONLY

Page 183

1      VIDEOGRAPHER:  Here we go.  One moment,

2  please.  We're going back on the record, the

3  time is approximately 3:59 p.m.

4  BY MR. BUNDREN:

5      Q.   Miss Distler, going back to table 8 of

6  your report on page 34.  You identified four

7  transactions.  And I think in footnote 164 you

8  described how you got to the four transactions,

9  is that right?

10     A.   Yes.

11     Q.   Did you select four transactions from a

12  greater set of a number of transactions that you

13  could consider?

14     A.   There were other transactions that did

15  appear, but there was limited information around

16  those, as part of my search, such that I couldn't

17  use them.

18     Q.   Limited information meaning they didn't

19  have customer relationship value or enterprise

20  value or percentage?

21     A.   Or they may be missing information about

22  sales or things like that to get to it.

23     Q.   Do you recall offhand any of the

24  transactions that you looked at but decided not

Page 184

1   to include?

2        A.   I do not.

3        Q.   Do you know what the SIC code is for

4   Medium Health Care Corporation?

5        A.   It's 2834.

6        Q.   What about the Harvard Drug Group, what

7   is its SIC Code?

8        A.   It is not 2834, but I can't recall what

9   it is.

10       Q.   Okay.  Fromn Medium Health Care

11   Holdings, Inc., is it 2384 as well?

12       A.   Can you ask the question one more time?

13       Q.   Yeah.  You said Fromn Medium Health

14   Care Corporation was in the same SIC Code 2834.

15   And my question is, is Fromn Medium Health Care

16   Holdings, Inc,. was, in 2016 during when this

17   transaction took place, do you know what its SIC

18   code was at that time?

19       A.   You said 2384 in your last question.

20       Q.   Ah, my mistake.

21       A.   Generally, I can see what it is today,

22   so I will assume it was.

23       Q.   So today Fromn Medium is in SIC Code

24   2834?

Page 185

1      A.   At least from the searching I did

2   around the time of my report.

3      Q.   Now, these transactions that you

4   selected, do you understand though that this does

5   not involve a situation where these transactions

6   -- where the buyer and the seller are competing

7   against one another after the transaction closes,

8   right?

9      A.   Well, yes.  So as part of a hypothetical

10  negotiation, you're looking to derive information

11  that can be informative to reaching a reasonable

12  royalty in the hypothetical negotiation.  So to

13  that end, you look for -- in this instance, I

14  looked for, you know, multiples to derive value

15  that would be perceived by Nephron as one of the

16  analyses that I did.  And then there has to be

17  apportioned appropriately to as close to the

18  (inaudible) that I can.  So closer to the

19  customer relationship aspects, that's what I did

20  in this analysis.  But, yes, so these would not

21  be transactions where its competitor V

22  competitor.  Dr. Wiggins makes the point in his

23  report that this would not be -- the hypothetical

24  transaction I'm looking to, would not exist in

ATTORNEYS EYES ONLY

Page 186

1    the real world.  It's the same type of construct

2    that one would find in a patent case for example,

3    right, where there would be a competitor V

4    competitor situation, where the two parties would

5    be forced to reach an agreement.  So it's the

6    same idea, the hypothetical where they must reach

7    a reasonable royalty.

8        Q.   But the surviving -- the buyer and the

9    seller, back to my original question, was whether

10   the buyer and the seller in this transaction

11   listed in table 8, they did not compete with

12   each other post transaction, is that right?

13       A.   Yes.

14       Q.   Okay.  And you utilized a 37.7 as the

15   average of the customer relationship value in

16   table -- I'm sorry.  Strike that.

17            Of the four transactions, you averaged

18   the customer relationship value as a percentage

19   of the enterprise value in table 8, is that

20   right?

21       A.   Yes.  I looked to the -- I did average

22   them, as I discussed in 70 -- paragraph 74.

23       Q.   And then you took that average and you

24   multiplied it by the SIC composite line item in

ATTORNEYS EYES ONLY

Page 187

1    table 9, is that right?

2        A.   By a portion the SIC code multiples for

3    the customer relationship to arrive at the

4    implied customer relationship method.

5        Q.   So you essentially -- you took 37.7

6    percent and you multiplied it by the data that's

7    contained in table 7?

8        A.   Yes, as stated in footnote 172.

9        Q.   And that's what appears in table 9, the

10   values?

11       A.   Yes.

12       Q.   How many customers does Nephron have to

13   your knowledge?

14   MS. MERGO:  Object to the form.

15       A.   For the five primary drugs I think it's

16   close to 2000.  My analysis is focusing in on a

17   select set of those 49.

18   BY MR. BUNDREN:

19       Q.   Okay.  And how many customers does

20   Nephron have not limited to the five drugs?  In

21   other words, how many customers -- are you aware

22   of how many customers Nephron has in total?

23       A.   As I sit here, I do not.

24       Q.   But for the five drugs it's your

ATTORNEYS EYES ONLY

Page 188

1    understanding that Nephron has 2000 customers?

2         A.    Around that number, approximately.

3         Q.    Aren't the values that are listed and

4    that you chose in paragraph 76 to estimate the

5    customer relationships, aren't those values of

6    100 percent of Nephron's customers?

7         A.    Well, when you look at the base to

8    which you're applying it to.  So here, to derive

9    indications of value, right, that the parties

10   would look to in a hypothetical negotiation.

11   I'm focusing in on only those subject revenues

12   that Nephron would be at risk as part of the

13   hypothetical negotiation.  So I'm not further

14   apportioning down to just that particular set.

15        Q.    That wasn't my question.  In paragraph

16   76 you say, as shown in table 9 the implied

17   revenue and EBITDA multiples used to estimate

18   the value of Nephron's customer relationships

19   for the hypothetical negotiation are 1.8X to

20   1.9X of revenue and 4.8X to 4.9X of EBITDA, is

21   that right?

22        A.    Yes.

23        Q.    And the customer relationships, that's

24   100 percent of Nephron's customer, isn't it?

ATTORNEYS EYES ONLY

Page 189

1      A.   The overall multiple would be derived

2   from that.  But then I'm only applying it to a

3   select subset.

4      Q.   So the overall multiples is derived from

5   100 percent of Nephron's customers?

6      A.   Well, it wouldn't be Nephron's

7   customers.  It's multiples from publically

8   traded companies.  They're not multiples on this

9   SIC bases, right, for non-publically traded

10  companies.  So I'm using that metric and then I

11  apportion it for customer relationship values.

12  And then to Nephron, I apply it specifically only

13  to the revenue at issue here or substantially at

14  risk as part of my hypothetical negotiation.

15     Q.   Yeah, I understand that.  But in

16  paragraph 76 the customer relationships that are

17  used in the multiples that are used 1.8X to 1.9X

18  of revenue and 4.8X to 4.9X of EBITDA, that's

19  for 100 percent of Nephron's customers, your

20  estimation?

21     A.   Well, I don't know if it's the Nephron's

22  customer relationships for hypothetical

23  negotiations.  That's what I'm applying it to.

24     Q.   And did you eliminate certain customer

ATTORNEYS EYES ONLY

Page 190

1    relationships before coming to the 1.8X and 1.9X

2    of revenue and 4.8X to 4.9X of EBITDA?

3        A.   No.  I removed it from the metric to

4    which it would be applied.  And then I also talk

5    about in this paragraph how the small composite

6    would be more in line with Nephron's revenues.

7    But I looked to the SIC composite.

8        Q.   Miss Distler, my question is:  Is the

9    estimated customer relationship value that you

10   have opined to here as reflected of revenue and

11   EBITDA, is that the estimated value of Nephron's,

12   100 percent of Nephron's customer relationships?

13       MS. MERGO:  Objection, asked and answered

14   multiple times.

15       MR. BUNDREN:  She's told me about what she

16   did next.  I'm asking about what she did here.

17       MS. MERGO:  She's answered that three times.

18   BY MR. BUNDREN:

19       Q.   Can you answer the question, Miss

20   Distler?

21       A.    I think I did.  I'm not trying to be

22   difficult.  I would say that, again, it's -- it

23   is the multiple that I derived that I applied

24   with base that reflects the customers at issue.

ATTORNEYS EYES ONLY

Page 191

1    So I've adjusted the base in terms of the

2    apportionment.

3        Q.    And what was the base?

4        A.    So I looked to the specific customers

5    substantially at risk as part of the hypothetical

6    negotiation.   That's the base metric that I'm

7    using.

8        Q.    But that's later on in your analysis, I

9    think that's starting on page --

10       A.    Right.   I applied the metrics, right?

11       Q.    Yeah, I mean, I see what you did.   I'm

12   asking the base of 1.9 and 1.8 multiples, 4.8,

13   4.9 multiples of EBITDA, that's representative of

14   100 percent of Nephron's customers in your

15   estimation?

16       MS. MERGO:   Object to the form.

17       A.    Maybe we're miscommunicating with

18   respect to base.   I would say those values, the

19   1.8X to 1.9X and the 4.8X to 4.9X, are derived

20   from the SIC code information that I report and

21   then apportion by the other information that I

22   report and those are based on the customer side.

23   BY MR. BUNDREN:

24       Q.    All right.   Going to paragraph 8 of

ATTORNEYS EYES ONLY

Page 192

1    your report.  You say Nephron first invested in

2    CRM software to attract and maintain its customer

3    relationships in 2003.  Do you see that?

4        A.   Yes.

5        Q.   And you're aware that Miss Hulsey began

6    her employment with Nephron in 2002?

7        A.   Yes.

8        Q.   And that she had access to Nephron's CRM

9    database since 2002?

10       A.   She was an employee since 2002.

11       Q.   Right.  And she had access to Nephron's

12   CRM database since the beginning of her

13   employment, is that right?

14       A.   I would assume so.

15       Q.   Okay.  And you're aware though that in

16   paragraph 27 in your report, that Miss Hulsey

17   didn't sign a nondisclosure agreement with

18   Nephron until 2017?

19       MS. MERGO:  Objection to form.

20       A.   Yes, where I cite -- I cite in paragraph

21   28 from July 2017.

22   BY MR. BUNDREN:

23       Q.   In footnotes 179 to 182 you referenced

24   this discussion with Miss Kennedy and Mr. Jibaja.

ATTORNEYS EYES ONLY

Page 193

1    Do you see that?

2         A.   Yes, I do.

3         Q.   And is this the third conversation in

4    the series of conversations we discussed earlier

5    today where both Miss Kennedy and Mr. Jibaja were

6    on the phone at the same time with you?

7         A.   Yes, it is.

8         Q.   Okay.  And the same question with

9    respect to footnote 186 and 187 as well as 182 --

10   I'm sorry, I've already covered that.  186 and

11   187.

12        A.   Yes, this would be the same discussion.

13        Q.   In paragraph 83 in determining your

14   reasonable royalty, you would agree with me that

15   here you've taken into consideration the customer

16   summary compilations that Miss Hulsey downloaded

17   to the Seagate backup?

18        A.   Yes, I do reference those.

19        Q.   And that's the same customer summary

20   compilations that we talked about earlier and

21   referenced earlier in your report, paragraph 31

22   subparagraph 4?

23        A.   Yes, it would be.

24        Q.   Okay.  In paragraph 84 of your report,

ATTORNEYS EYES ONLY

Page 194

```
1    you say overall at the time of the alleged

2    appropriation, Nephron's 503B petition was built

3    upon over 15 years of cultivated customer

4    relationships and significant investment in FDA

5    registration, manufacturing capacity,

6    distribution capabilities, and software

7    applications.  Do you see that?

8        A.   Yes.

9        Q.   Did you value, and by value, did you

10   place an economic value on this information

11   referenced in paragraph 84?

12       A.   I did not place an economic value on

13   those components as I look to the incremental

14   impact of a license and what that would be to

15   both parties.

16       Q.   All right.  If you'll turn with me to

17   Schedule 7 of your report.  This is Nephron's

18   503 profit and loss statements from 2017 to 2019.

19   Do you see that?

20       A.   Yes.

21       Q.   Did you create this profit and loss

22   statement or was it provided to you by Nephron?

23       A.   It was provided by Nephron.

24       Q.   Were you provided with any of the backup
```

ATTORNEYS EYES ONLY

Page 195

1    information that's referenced in Schedule 7?

2         A.    What do you mean specifically by backup

3    information?

4         Q.    Were you provided with the backup

5    documents and data that would show and support

6    the figures that are referenced in Schedule 7.0?

7         A.    I received a P&L that Nephron has been

8    using to track the 503B business separately from

9    the overall company, and so that's what I'm

10   relying on in my analysis.

11        Q.    Okay.  But you did not review the

12   backup data that would support the figures that

13   are referenced in Schedule 7.0 in the P&L?

14        MS. MERGO:  Objection to form.

15        A.    Well, I have the overall company's

16   financial statement for Nephron.  And then this

17   is a subset of that 503B business that they keep

18   in the ordinary course.  So I have not -- I do

19   not have data or information, you know, specific

20   to, for example, the repairs and maintenance line

21   items as an example.

22   BY MR. BUNDREN:

23        Q.    Okay.  And that's similar for the other

24   line items.  You didn't have any of the backup

ATTORNEYS EYES ONLY

Page 196

1    data and instead relied on this document, this

2    profit and loss statement that was provided to

3    you by Nephron?

4         A.    Along with discussions with Nephron

5    personnel about its creation and any particular

6    line items that I discussed within my report and

7    the attachments thereof.

8         Q.    All right.  Tell me about -- what about

9    those discussions can you recall.

10        A.    Well, first, there is a footnote number

11   3.  So you'll notice that inside the team there

12   was not yet an allocation made from NSC in the

13   COGS.  So I note that at that point in time the

14   business had just been created in 2017, the 503B.

15   So as they were perfecting their division P&L,

16   they had not made such an adjustment but they

17   started doing an adjustment, incorporating it in

18   2018 with a year history.  So then in 2018 they

19   produced information on the COGS and SGA amounts

20   allocated from NSC.  And then also they

21   identified which of those were assigned to which

22   categories, and I cited the Bates number there,

23   identified that.  And then in 2019 there are

24   costs assigned to those allocations again.  I

ATTORNEYS EYES ONLY

Page 197

```
1    identified what those are within the footnote

2    from the overall company.  And then within my

3    report there's at least one footnote where I

4    discussed the change in the company's

5    profitability at a gross profit level from 2018

6    to 2019.

7         Q.   Miss Distler, let's -- we can go through

8    this.  In 2018, the cost of goods sold for

9    Nephron as listed on Schedule 7 is $██████████

10   Do you see that?

11        A.   Sorry, you said for 2018?  Yes,

12   $█████████   yes.

13        Q.   All right.  Weren't you provided with

14   the source data as a backup to this figure in

15   connection with your engagement with Nephron?

16        A.    I'm not sure what you mean by the backup

17   information.

18        Q.   The source data.  I mean, you

19   understand, Miss Distler, that there are a lot of

20   numbers on this profit and loss report, and it

21   had to come from somewhere.  Did you rely just on

22   the profit and loss statement here as is or did

23   you look at the source data behind these numbers?

24        MS. MERGO:  Objection to form.
```

ATTORNEYS EYES ONLY

Page 198

1      A.   I did not audit this internal company

2   management report that Nephron created.  And nor

3   would I given as an internal management report

4   that they used.  Now, that being said, for the

5   five primary drugs, there were standard cost

6   information that was produced.

7   BY MR. BUNDREN:

8      Q.   Paragraph 85 of your report, you also

9   again referenced the Customer Summary Compilation

10  and this is the same -- is this the same Customer

11  Compilation that we referred to back in paragraph

12  31 subparagraph 4?

13     A.   Yes, yes.

14     Q.   Now, ultimately you took the 110

15  customers from the Customer Summary Compilation

16  and you cross-referenced that with Miss Hulsey's

17  pretty good account list, and that's referenced

18  in paragraph 86, correct?

19     A.   Yes.

20     Q.   And you came up with 49 customers that

21  Hulsey had historically covered over nine states

22  while at Nephron.  Do you see that?

23     A.   Yes.

24     Q.   What was the historically covered, how

ATTORNEYS EYES ONLY

Page 199

```
 1    far back did you go?

 2         A.    To her 503B status.

 3         Q.    So that would have been 2017?

 4         A.    The start of the 503B businesses.  At

 5    least with respect to the five primary drugs.

 6         Q.    I understand.  And then you analyzed and

 7    calculated the sales and resulting profits for

 8    those 49 customers, that analysis as reflected in

 9    Schedule 10.0?

10         A.    I would clarify your question.

11         Q.    Okay.

12         A.    I would say the incremental profits.

13         Q.    Okay.  Incremental profits.  And the 49

14    customers that are revenue based that's

15    referenced in Schedule 10.0, those customers are

16    listed on Schedule 8.0 to your report, is that

17    right?

18         A.    Yes.

19         Q.    But similar to the 19 customers in your

20    disgorgement analysis, you're aware that Miss

21    Hulsey only was responsible for sales with

22    respect to 6 of these 49 customers, is that

23    right.

24         A.    Could you repeat the question again?
```

ATTORNEYS EYES ONLY

Page 200

1      Q.   Sure.  There's 49 customers on the list

2   in Schedule 8.0, right?

3      A.   Yes.

4      Q.   And you're aware that Miss Hulsey,

5   through the sales data provided by USC, has only

6   been assigned and sales reported for 6 of these

7   49 customers?

8      A.   As we discussed earlier, the USC's sales

9   data is coded to her in that fashion, yes.

10      Q.   Okay.  As we just discussed the unjust

11   enrichment analysis you calculated are revenue

12   based of 19 customers.  But for the purpose of

13   your royalty analysis, you used 49 customers, is

14   that right?

15      A.   Yes, I considered 49 customers.  And in

16   looking at UCC Life Factor Number 4.

17      Q.   But that's different than the analysis

18   you performed in the Apex matter, isn't it?

19      A.   I'm not exactly sure what I did in the

20   Apex matter as I sit here.  I may have valued --

21   I may have looked at more customers.  If I recall

22   in that matter, I looked at customers where there

23   were particular documents that I reviewed, but

24   again, this is just from memory.

ATTORNEYS EYES ONLY

Page 201

1      Q.   In Apex you used 15 customer accounts

2   that the employee had worked on, even though the

3   confidential information could provide the

4   defendant and the new employer with resources to

5   compete with the plaintiff for any customer.

6   Does that ring a bell?

7      A.   Yes.  If it's from our report, that's

8   the case.  And as I recall in that case, I looked

9   at particular documents that were alleged to be

10  part of the misappropriation, were those

11  documents included -- included bid documents,

12  templates for bids, presentation, comparing

13  different types of plans, templates for examples

14  comparing different types of plans.  So I looked

15  at the detailed information for that particular

16  set of customers.

17     Q.   But in the Apex matter you only used

18  the 15 customers that the defendant in that case

19  sold to, right?

20     A.   I don't recall if they were sold to.  If

21  those customers at Apex were the customers he

22  sold to at the -- his subsequent employer.

23     Q.   Now, in paragraph 87 of your report,

24  even though you had Nephron's actual sales from

ATTORNEYS EYES ONLY

Page 202

1   2017, 2018, and 2019 for all 49 of these

2   customers, you only used the actual sales from

3   January to August 2018 in your analysis, is

4   that right?

5        A.   Yes.  I looked at the sales -- I looked

6   at the sales generated by Nephron within those

7   months leading up to Miss Hulsey's employment

8   with USC where that would have included the

9   period of misappropriation.

10       Q.   And then you annualized those sales for

11  the remainder of the year, September through

12  December 2018, is that right?

13       A.   Yes.

14       Q.   And you arrived at an estimated sales

15  of 2.75 million for five drugs to the 49

16  customers on your list, is that correct?

17                 (TECHNICAL ISSUES)

18  BY MR. BUNDREN:

19       Q.   I'll ask it again.  To arrive at the

20  estimated sales -- you estimated sales of 2.75

21  million for five drugs to 49 customers for the

22  period of 2018, is that right?

23       A.   Yes.

24       Q.   Why did you not use the historical data

ATTORNEYS EYES ONLY

Page 203

1    from 2017 to provide additional information for

2    your analysis?

3         A.   In 2017 Nephron had just started.

4         Q.   Yeah.  Why didn't you use the -- I'm

5    sorry.  I was just going to ask you why didn't

6    you use the other historical data that you had

7    to estimate -- -

8         A.   And I was.

9         Q.   Okay.  Great.

10        A.   So in 2017, Nephron had just started its

11   503B business, so it was growing.  And you can

12   see from other schedules within my report its

13   growth.  So, for example, in looking at my

14   Schedule 5, you'll see that total sales for

15   Nephron's 503B drugs were approximately 23.6

16   million, as they had started the business.  And

17   then you will see that significant growth was

18   occurring in, you know, over 2018 as the business

19   matured and it was making more sales and more

20   penetration.

21        Q.   Now, Schedule 8, which lists the sales

22   from January through August for these 49

23   customers of Nephron, you're aware that Nephron

24   made lots of sales to these customers during the

ATTORNEYS EYES ONLY

Page 204

1    September to December timeframe of 2018, aren't

2    you?

3         A.   Yes.  There may have been sales to some

4    of these customers.

5         Q.   And they made sales to those same

6    customers in 2019, didn't they?

7         A.   They may have.

8         Q.   And yet you didn't include this data in

9    your analysis, why not?

10        A.   Well, Dr. Wiggins provided new schedules

11   for his deposition that he indicated were related

12   to mitigation.  Again, in this instance, I'm

13   looking at determining a reasonable royalty in a

14   hypothetical negotiation.  So at this point, the

15   parties are looking at each other across the

16   table and negotiating.  And Nephron would be

17   licensing its confidential information to a

18   competitor where that competitor would be going

19   to use that information to compete with them

20   directly.  So as part of that, Nephron would say

21   -- look to see the at-risk, you know, value to

22   them as part of like sector 4, which is what I

23   did.  So, again, I'm not performing a loss

24   profits calculation here.  I'm looking at, you

ATTORNEYS EYES ONLY

Page 205

```
 1   know, deriving benchmarks or indications of value

 2   or informing the hypothetical negotiation where

 3   those may be incremental, the incremental revenue

 4   loss and/or gained by both parties and so,

 5   therefore, I look at incremental profits.  And

 6   then I also look at potential benchmarks that

 7   have been used.  We follow my analyses in whole.

 8   I come to a range of values that are probably

 9   close to a dozen different values that all sit

10   within a general band, and then I looked to the

11   remaining factors to determine where within that

12   band the parties would have ended up agreeing to

13   a reasonable royalty.  Based on all the

14   information discussed within my May 8th, 2020,

15   report.

16       Q.   Are those all the reasons why you

17   disagree with Dr. Wiggins in his use of the

18   mitigation figures referenced in his supplemental

19   schedules that you reviewed?

20       A.   I mean, sitting here I would say

21   generally I've only had them for about a week,

22   and there isn't much commentary other than what

23   he provided in his deposition.  But I think the

24   difference between us is the approach to the
```

ATTORNEYS EYES ONLY

Page 206

1    analysis is the reasonable royalties and the life

2    factors versus looking at it from a loss profits

3    perspective.

4         Q.   You don't think under any circumstance

5    the sales that Nephron made from September to

6    December of 2018 and then again in 2019 to these

7    49 customers should be considered in

8    determination of a reasonable royalty?

9         A.   Well, no.  As I just stated in my prior

10   answer, I derived multiple benchmarks, you know,

11   some of those which are based on information that

12   Miss Hulsey had indicated around the expected

13   revenue levels that she would be able to generate

14   for USC, 1.7 and 2.5.  The 2.7 that I'm using is

15   not that far from that 2.5 million dollar

16   conservative per Miss Hulsey's scenario that she

17   gave.  And I also have a 1.7 million where she

18   laid out additional information where that would

19   come from, including offering suggestions about

20   other products that USC might want to consider

21   selling.  So I would say I looked at the totality

22   of different data points that been informed by

23   the hypothetical negotiation in terms of arriving

24   at a reasonable royalty.  My royalty isn't lost

ATTORNEYS EYES ONLY

Page 207

1    profit, it's negotiations based on the life

2    factors.

3        MR. BUNDREN:  I'll object to the answer other

4    than the first word of the answer, which was no.

5        MS. MERGO:  That's not proper.  You asked her

6    a lot of questions.

7        MR. BUNDREN:  You can tell that to the Judge,

8    Nikole.  I made my objection.  You make your

9    objection and then we move on.  Okay.  That's my

10   objection.  We'll get out of here a lot sooner

11   if the answers to the questions are yes or no.

12   If she wants to explain, you can ask her on

13   redirect.

14       MS. MERGO:  If it takes her longer than you'd

15   like, then that's going to be an issue for you,

16   because she's allowed to explain her answer.

17       MR. BUNDREN:  Well, then if I need additional

18   time to take her deposition because I'm objecting

19   to nonresponsive, we'll take it up with the

20   court.

21   BY MR. BUNDREN:

22       Q.   We're going to go to paragraph 90.

23            Now, you did -- I'm sorry, in paragraph

24   93.  Now, you did estimate the value of the

ATTORNEYS EYES ONLY

Page 208

1   customer relationships by using a discounted

2   future profits method, correct?

3       A.   Yes, as discussed in my report.

4       Q.   And then you project the revenue out

5   over a ten-year period and that's reflected in

6   Schedule 8 -- Schedule 10, is that right?

7       A.   Yes, that's in Schedule 10.

8       Q.   Then you discounted it to present value

9   after applying other discounted factors like

10  attrition rate and your ultimate present value

11  of incremental profits over this ten-year period

12  as 5,102,137, is that right?

13      A.   I'm not sure.  You said present value

14  of incremental profits?  That would be my

15  calculation, the at-risk revenues as I discussed

16  in my report.

17      Q.   And this, again, doesn't include any

18  what Dr. Wiggins calls mitigation revenues that

19  Nephron received in 2018 or 2019?

20      A.   Yes, as I discussed in my prior answer.

21      Q.   Going back to footnote 202 in your

22  report, the sentence referenced in paragraph

23  89, you say in total and for all of the five

24  primary drugs.  But the products profits margins

ATTORNEYS EYES ONLY

Page 209

```
 1    are higher as compared to Nephron's remaining
 2    503B sales, footnote 202.  Do you see that?
 3         A.   Yes.
 4         Q.   And then you say, from my discussion
 5    with Nephron personnel the lower profitability
 6    was the result of increased competition.  Who is
 7    the Nephron personnel that you're referencing in
 8    footnote 202?
 9         A.   That would be Miss Kennedy.
10         Q.   And was this a conversation you had with
11    Miss Kennedy with Mr. Jibaja at the same time?
12         A.   Yes.  It was the same discussion that I
13    referenced earlier.
14         Q.   And do you understand whether or not
15    Nephron was decreasing its pricing of the five
16    drugs relative to other competition in the
17    marketplace?
18         A.   Can you repeat that question?
19         Q.   Well, you're saying in discussion with
20    Nephron personnel the lower profitability was the
21    result of increased competition.  What do you
22    mean by that?
23         A.   So if you look at my Schedule 9, you'll
24    see that I look at the standard cost per unit,
```

ATTORNEYS EYES ONLY

Page 210

```
 1    cost to make it, and net sales values that

 2    Nephron is generating.  And you'll see that the

 3    profit margin for that particular product in 2019

 4    is lower than the other five primary drugs as

 5    well as the other 503B drugs.  So I inquired why

 6    this was the case with Miss Kennedy and

 7    Mr. Jibaja, if they had any insight into that.

 8    And the discussion was that there was a pricing

 9    disconnect going on for that particular drug in

10    2019.  And it wasn't known specifically with who

11    there were pricing impacts occurring, that that's

12    the pressure they were feeling in the market.

13        Q.   Okay.  But they didn't tell you that it

14    was increased competition with US Compounding or

15    Adamis, did they?

16        A.   It was not specific.

17        Q.   In paragraph 94 you used -- you

18    referenced the usage of a 9.5 percent attrition

19    rate that you applied in Schedule 10.  In

20    paragraph 94 you said while it will likely be

21    lower.  What is that based on?

22        A.   So it would likely be lower.  So the 9.5

23    percent would likely be lower for Nephron given

24    Nephron's long term -- the general attrition
```

ATTORNEYS EYES ONLY

Page 211

1    levels they have with customers, as I referenced

2    here in paragraph 94.

3        Q.   Now, you had Nephrons's historical

4    sales, weren't you provided with the data to

5    calculate Nephron's attrition rate?

6        A.   Well, I only started for the 503B, 503B

7    drugs in 2017.

8        Q.   Did you have sales going back to the

9    year 2000 for all of Nephron's drugs, not just

10   limited to the five drugs?

11       A.   I'm focused not on the respiratory.  I'm

12   looking at the 503B side.

13       Q.   I'm just asking, did you have the data.

14   Did you have the historical sales data going back

15   to 2000 that would have certainly included the

16   503B sales but would have included everything

17   else?

18       MS. MERGO:  Objection to the form.

19       A.   As I sit here, I don't know going back

20   to 2000.

21   BY MR. BUNDREN:

22       Q.   Okay.  Now, in your rebuttal in

23   paragraph 65, that's your July 8th report.  In

24   response to Dr. Wiggins criticisms about the

ATTORNEYS EYES ONLY

Page 212

1    attrition rate, you said you corroborated the

2    use of such information with Miss Kennedy and

3    Mr. Jibaja.  Do you see that?  That's in the

4    first bullet point.

5         A.    Yes.

6         Q.    What did you corroborate?

7         A.    As I mentioned in the paragraph we just

8    came from, I discussed with them generally their

9    attrition rates that they experienced across

10   their business.  And then I looked at data within

11   the marketplace to form the attrition rate.

12        Q.    What is the attrition rate that you

13   observed at Nephron with respect to the 503B

14   sales?

15        A.    I did not calculate an attrition rate

16   for Nephron's 503B sales.

17        Q.    Was there any discussion in the use of

18   -- or your decision to use a 9.5 percent

19   attrition rate related to GPO or IDN contracts

20   that Nephron had?

21        A.    As I mentioned in my May 8th report,

22   yes, I do reference those.

23        Q.    Okay.  And is that a metric you used to

24   determine or to use a 9.5 attrition rate was the

Page 213

1    value of GPO and IDN contract?

2        A.   I did not use it explicitly.  I used it

3    as an understanding of why from Nephron's

4    perspective they would have a longer life on many

5    of their customers.

6        Q.   How many Nephron, IDN, or GPO contracts

7    did you look at?

8        A.   As I sit here, I don't know.  I would

9    say more than dozens.

10       Q.   More than dozens or more than a dozen?

11       A.   I would estimate somewhere in the range

12   of twenty.

13       Q.   Okay.  In the twenty that you looked at,

14   what was the typical term for the IDN and GPO

15   contracts?

16       A.   I don't know if I recall a particular

17   term, per se.  I was looking at other aspects of

18   the agreements.

19       Q.   Do you know how many of those had

20   roughly ten-year terms?

21       A.   As I sit here, I don't know.  As I said,

22   I don't recall what the terms were, the duration

23   of the agreements.  They may have been just a few

24   years.  I'm thinking about the database.  I think

Page 214

```
 1    they would be periods -- they may indicate a date
 2    for the GPO's.  I'm thinking about the Nephron.
 3    I'm just not certain as I sit here.
 4         Q.   What database is that again?
 5         A.   The Nephron database produced.  It
 6    included a field that I identified whether or not
 7    a particular customer hospital was subject to a
 8    GPO.
 9         Q.   Do you remember where these documents --
10    what was the source of that document?  Was it a
11    customer compilation?  Was it a -- what was it?
12    How would you figure that out?
13         MS. MERGO:  Object to the form.
14         A.   I don't understand your question.
15    BY MR. BUNDREN:
16         Q.   Well, I asked you about the IDN and GPO
17    contracts, and then you said -- you referenced
18    the database.  And I'm trying to figure out what
19    is the database that enabled you to identify
20    those contracts.  I didn't understand your
21    answer.
22         A.   So in the sales data produced by
23    Nephron, one of the fields was In-net, was
24    related to the GPO or IDN relationship.  So that
```

ATTORNEYS EYES ONLY

Page 215

1    would be a first indication of whether or not

2    those existed for a particular Nephron customer.

3    And at the same time I also reviewed actual

4    agreements that were produced.

5        Q.    The Schedule 10.0 in determining your

6    opinion on present value of incremental profits,

7    approximately 5.1 million, you identified a few

8    costs to calculate the incremental profits,

9    right?

10       A.    Yes.

11       Q.    And then you assumed the cost and

12   specifically the sales commission and freight-out

13   stay constant for ten years, is that right?

14       A.    No.

15       Q.    The sales commission you have in this

16   Schedule 10 is 2.79 percent, is that right?

17       A.    Yes, that's the percentage.

18       Q.    Okay.  And did you use that same percent

19   over the ten-year period for each period, each

20   year?

21       A.    I used the same percentage.

22       Q.    And then for the freight-out 2.09

23   percent, did you use the same percentage for

24   each year of the schedule?

ATTORNEYS EYES ONLY

Page 216

1        A.    Yes, I did.

2        Q.    Okay.  And then you also used the same

3   gross profit of 58.43 percent, is that right?

4        A.    Yes.

5        Q.    And that's based solely on what happened

6   between January and August of 2018, is that

7   correct?  I'm sorry.  It's based on -- it's based

8   on 2018, the year 2018?

9        A.    Yes.

10        Q.    And that's even though these cost

11   percentages varied greatly from 2018 to 2019?

12        A.    Yes, as discussed in my report.

13        Q.    All right.  So in paragraph 96 of your

14   report, you calculated the present value of

15   Nephron's incremental profits that would be

16   considered to be at risk in licensing its

17   competitor as approximately 5.1 million.  Do you

18   see that?

19        A.    Yes.

20        Q.    And I think earlier you called that --

21   would be a lump sum royalty?

22        A.    What reasonable royalty would be?

23        Q.    Yes.

24        A.    So as discussed in the determination of

ATTORNEYS EYES ONLY

Page 217

1    the royalty, I do arrive at a lump sum royalty.

2         Q.   And in paragraph 76 of your rebuttal you

3    state the upfront royalty could provide USC

4    substantial benefit generated over a number of

5    years with ongoing royalty.  Do you see that?

6         A.   Yes.

7         Q.   And so it's your opinion that Nephron

8    would pay -- I'm sorry -- that USC Compounding,

9    Adamis would pay Nephron 5 million dollars

10   approximately in an upfront royalty in this case,

11   that's your opinion, right?

12        A.   Yeah.  I say no less than 4.5 and closer

13   to 5 million.

14        Q.   And that's for a projected revenue

15   strain that you estimated over a ten-year period

16   with a net present value of 5.1 million dollars?

17        A.   That's one of the data points that I

18   looked to within my analysis of the reasonable

19   royalty.

20        Q.   And that's, in essence, that's a hundred

21   percent royalty on the sales over a ten-year

22   period, isn't it?

23        A.   4.5 million dollar royalty is not a 100

24   percent of 5.1.

ATTORNEYS EYES ONLY

Page 218

1      Q.   I think in the summary of your opinions,

2   paragraph 14 you state the royalty would be no

3   less than 4.5 million and likely closer to 5.0

4   million.  Do you see that?

5      A.   Yes.

6      Q.   Okay.  And so you're saying that USC and

7   Adamis were paid close to 5 million dollars for

8   an upfront royalty for a revenue stream that you

9   calculated for a ten-year period in Schedule 10

10  of 5.1 million dollars?

11     A.   Well, I think there are a number of

12  adjustments or considerations that I take in

13  in deriving my ultimate reasonable royalty

14  opinion as discussed in the determination of the

15  royalty section, and then also within the

16  remainder of the UCC analysis that I performed.

17  The different data points that I looked to.

18  There's 5.1.  There's another one that's

19  approximately 5.2.  But at the end of the day,

20  I'm weighing the bargaining positions and what

21  each entity is trying to achieve with a license

22  to the Nephron confidential information.

23     Q.   And it's your opinion that that closer

24  to 5.1 million royalty payment lump sum, it's

Page 219

1  reasonable?  That's your opinion, that it's a

2  reasonable thing?

3      A.   Well, yes, as I discussed within my

4  report.

5      Q.   Dr. Wiggins referenced the multi-period

6  excess earnings method and the distributor method

7  in his report dated, I believe, June 8th.  Do you

8  recall that?

9      A.   Yes, generally.

10     Q.   Were you aware of either of those

11 methods before you issued your report in May 8th

12 of this year?

13     A.   Yes.

14     Q.   Okay.  Did you consider using either of

15 those methods in your analysis?

16     A.   I did not, given the scope of my

17 analysis.

18     Q.   I take it you did not attempt to

19 calculate a value using either the multi-period

20 excess earnings method or the distributor method?

21     A.   No.  As I discussed within my rebuttal

22 report, I'm not performing a valuation of the --

23 no, I'm not performing a valuation that go to

24 reporting on a financial statement.  This is a

Page 220

1    reasonable royalty where what you're looking to

2    is the incremental value of what's going to be

3    licensed, the value to and the value defined in

4    this instance.  And that's what my analysis is

5    focused on.  So looking at the MPE and/or the

6    distributor method, it's -- it would not be

7    appropriate here as both entities have those

8    assets in place.  They're looking to generate

9    incremental revenues and incremental profit from

10   the license that they're going to be negotiating.

11   That's USC's goal.  So it wouldn't be relevant to

12   look at it from that perspective as we're

13   thinking of a reasonable royalty in a

14   hypothetical negotiation situation.

15       Q.   Now, are you aware that Miss Hulsey was

16   selling the product that she was -- the five

17   drugs that Nephron -- are you aware if she was

18   selling all of those to customers who were under

19   GPO or IDN contract?

20       A.   One more time.

21       Q.   Are you aware whether or not Miss Hulsey

22   was selling the five drugs that Nephron

23   referenced in your report while she was with

24   Nephron to Nephron's customers who were also

ATTORNEYS EYES ONLY

Page 221

1   under a GPO or IDN contract?

2        A.   Yes, I think some of those sales were.

3        Q.   Do you know what the percentage was

4   offhand?

5        A.   Sitting here, I do not.

6        Q.   Are you aware if Hulsey -- Miss Hulsey

7   made any assumptions in providing her what

8   Dr. Wiggins calls the base case and conservative

9   projection to USC?  In other words -- I'll step

10  back.

11           So you're aware that Miss Hulsey made

12  representations that she can convert an amount of

13  business over to USC when she started to work at

14  USC, is that right?

15       A.   I don't know if they were made when she

16  started.  She made representations, yes, at the

17  top of my report.

18       Q.   Right.  And I think you used the two

19  values.  She can conservatively pull 2.5 million

20  over to USC, and then you also used the value of

21  1.7 million; and that's in paragraphs 97 and 98

22  of your report, is that right?

23       A.   Yes, it is.

24       Q.   Do you know whether or not Miss Hulsey

Page 222

1    made that representation about the amount of

2    sales with the understanding that she would be

3    selling to GPO or IDN contracts while she was at

4    USC?

5         A.   I also want to say I referenced that

6    document -- those documents in another part of my

7    report too, paragraph 57, in that area.  I don't

8    recall the exact language would have been in Miss

9    Hulsey's communications with USC, in that

10   negotiation, but I know that she has stated that

11   she thinks she can grow it and being conservative

12   and there may be a reference, I just can't recall

13   the exact verbiage.

14        Q.   Okay.

15        THE WITNESS:  If we can take a break at some

16   point that's good for you.

17        MR. BUNDREN:  Sure.  We can do that right

18   now.

19        THE WITNESS:  Great.

20        VIDEOGRAPHER:  We're going off the record.

21   The time is 5:04 p.m.

22                  (Whereupon, a short break was

23                   taken.)

24        VIDEOGRAPHER:  We're going back on the

ATTORNEYS EYES ONLY

Page 223

1    record, the time is approximately 5:13 p.m.

2    BY MR. BUNDREN:

3        Q.   Miss Distler, looking at footnote 123 of

4    your rebuttal report, you say Dr. Wiggins'

5    assertion that these 30 customers that purchased

6    the five primary drugs in the twelve months prior

7    to Miss Hulsey's employment at USC is wrong.  Do

8    you see that?

9        A.   Yes.

10       Q.   And you're citing the Wiggins' report

11   page 36?

12       A.   Yes.  I believe so.

13       Q.   Now, page 36 of Dr. Wiggins' report, do

14   you have that in front of you?

15       A.   I'm going there now, yes.

16       Q.   In the first full paragraph, Dr. Wiggins

17   says, stated another way this includes Nephron's

18   sales from the five primary drugs from customers

19   that also executed sales with USC in the last

20   twelve months prior to Miss Hulsey's employment

21   with USC, do you see that?

22       A.   One more time, where are you?

23       Q.   Yes.  It's the second sentence that

24   starts, stated in another way.

ATTORNEYS EYES ONLY

Page 224

1      A.    Yes.

2      Q.    This says will include the Nephron sales

3  from the five primary drugs that customers that

4  also executed sales with USC in the last twelve

5  months prior to Miss Hulsey's employment with

6  USC, do you see that?

7      A.    Yes.

8      Q.    And that's the source of your criticism

9  in footnote 123 of your report, is that right?

10     A.    Yes.

11     Q.    But if you read the sentence, Dr.

12 Wiggins didn't say that USC executed sales of the

13 five primary drugs, do you see that?  He said

14 sales.

15     A.    Yes, yes.

16     Q.    So is your footnote 123, is that a

17 sentence -- do you need to amend that?

18     A.    To the extent that I thought he was

19 speaking of the five primary drugs because that

20 was my analysis based on the Nephron confidential

21 information that I analyzed.

22     Q.    Going back to the IDN, GPO contracts

23 that you reviewed, which were approximately

24 twenty of them.  Do you remember how many of

ATTORNEYS EYES ONLY

Page 225

1    those twenty had minimum purchase obligations?

2        A.   As I'm sitting here, I do not.  I recall

3    for some of them the minimal amount was not very

4    large.  I can't tell you with any precision.

5        Q.   Do you have any information as to the

6    percentages of facilities, customers with Nephron

7    that have IDN, GPO agreements?

8        A.   I do not have a percentage.

9        MR. BUNDREN:  And we'll mark Dr. Wiggins'

10   report as the next exhibit.  I think it's Exhibit

11   8.  Is that right?  Or is it 9?

12       MS. MERGO:  It's Exhibit 8, Brandon.

13       MR. BUNDREN:  All right, Exhibit 8.

14                   (Whereupon, Deposition Exhibit

15                    No. 8 was marked for

16                    identification.)

17   BY MR. BUNDREN:

18       Q.   Miss Distler, are you aware of any price

19   adjustments that Nephron made with respect to

20   these five drugs in response to Miss Hulsey

21   leaving and going to USC?

22       A.   No, not specifically.

23       Q.   Paragraph 78 of your rebuttal report

24   you say, however, Dr. Wiggins' analysis fails to

ATTORNEYS EYES ONLY

1  consider any price adjustments Nephron may have

2  been required to make as a result of having its

3  confidential information.  Do you see that?

4      A.   Yes.

5      Q.   But you're not aware of any price

6  adjustments that Nephron made with respect to

7  those five drugs?

8      A.   Well, not specifically.  But in the

9  paragraph above I discuss the analyses he

10  performed around the pricing trend of each of

11  the companies.

12      MR. BUNDREN:  Let's mark as the next Exhibit,

13  I believe it's Exhibit 9, Supplemental Schedules

14  from Dr. Wiggins that were provided, I think, the

15  day before his deposition.

16                    (Whereupon, Deposition Exhibit

17                     No. 9 was marked for

18                     identification.)

19  BY MR. BUNDREN:

20      Q.   Do you have those, Miss Distler?

21      A.   Yes, I printed this.

22      Q.   Okay.  Have we discussed already -- I'm

23  not going to plow new ground if I don't need to.

24  Have we discussed already all of your criticisms

ATTORNEYS EYES ONLY

Page 227

1    with respect to the Supplemental Schedules of Dr.

2    Wiggins that you have?

3         MS. MERGO:  Object to the form.

4         A.   I think so as I sit here.

5    BY MR. BUNDREN:

6         Q.   So you're not aware of any additional

7    criticisms to the Supplemental Exhibits 10.1 and

8    10.2 and a Supplemental Exhibit 12 that we have

9    not already discussed in the deposition today?

10        MS. MERGO:  Object to form.

11        A.   I mean, as I'm sitting here, not that I

12   can think of.

13   BY MR. BUNDREN:

14        Q.   Well, it changes the mitigation issue

15   that we previously discussed, right?

16        A.   And there's also some, I think,

17   generally -- I think generally, yes.

18        Q.   You also were provided a copy of the

19   transcript from Dr. Wiggins' deposition and

20   his exhibits to the deposition, and you've read

21   that, correct?  You read the deposition?

22        A.   Yes.

23        Q.   So is there anything else that we

24   haven't discussed today that you disagreed with

ATTORNEYS EYES ONLY

Page 228

1    in terms of what Dr. Wiggins said at his

2    deposition?

3        MS. MERGO:  Object to the form.

4        A.   As I'm sitting here, I mean, not that I

5    can recall off the top of my head.

6    BY MR. BUNDREN:

7        Q.   Have we covered today all of the

8    opinions related to your opinions of economic

9    damages in this case as it relates to USC and

10   Adamis, have we covered all of those opinions

11   today?

12       A.   I would say that to the extent that

13   greater information or additional information is

14   provided around the Prodigy compensation

15   structure, I may or may not adjust my

16   disgorgement of damage.

17       Q.   Okay.  You're aware that fact discovery

18   is closed in this matter, aren't you?

19       A.   Yes.

20       MR. BUNDREN:  All right.  Now, I want to mark

21   the next Exhibit as the subpoena -- actually, the

22   transmittal letter and subpoena dated August

23   11th, 2020.

24                   (Whereupon, Deposition Exhibit

ATTORNEYS EYES ONLY

Page 229

1                    No. 10 was marked for

2                    identification.)

3    BY MR. BUNDREN:

4        Q.   Do you see the subpoena in front of you,

5    Miss Distler, the transmittal letter and then the

6    subpoena?

7        A.   Yes, it was.

8        Q.   Okay.  And that's the subpoena you

9    received regarding your attendance today and

10   further production of documents?

11       A.   Yes, it was.

12       Q.   Okay.  And I think -- what's that

13   exhibit?  Is that Number 10?

14       A.   Yes, it's 10.

15       Q.   All right.  10.

16       A.   Can someone send me a copy of that.

17       MS. MERGO:  I'll send it to you, Miss

18   Distler.

19   BY MR. BUNDREN:

20       Q.   And in response to the -- I'll just go

21   ahead and mark it.

22       MR. BUNDREN:  I'll just go ahead and mark it.

23   I'm going to mark it as Exhibit 11.

24                    (Whereupon, Deposition Exhibit

ATTORNEYS EYES ONLY

Page 230

```
 1              No. 11 was marked for

 2              identification.)

 3   BY MR. BUNDREN:

 4      Q.   The e-mail from Nephron's counsel

 5   yesterday at 9:37 p.m. and following that e-mail

 6   is Miss Mergo's letter to Miss Evans and the

 7   actual responses to the subpoena.  Do you see

 8   that, Miss Distler?

 9      A.   Yes.

10      Q.   Now, these responses and objections to

11   these topics, they refer to the documents that

12   were requested.  Do you understand that, Miss

13   Distler?

14      A.   Yes, I would say generally.

15      Q.   Do you know, to your knowledge, is this

16   subpoena and the objections that were made in

17   response to the subpoena, are they your

18   objections to the subpoena, Miss Distler's

19   objections?

20      A.   With FTI counsel review.

21      Q.   Sure.  I'm just saying are they the

22   objections to the subpoena that had been lodged

23   on your behalf?

24      A.   I would say in some instances, I would
```

ATTORNEYS EYES ONLY

Page 231

1    defer to counsel and/or their interpretation.

2    For example, the invoices and the redaction.

3         Q.   Sure.  But these are your responses to

4    the subpoena as you understand it, is that right?

5         A.   These would be responses to my subpoena,

6    correct.

7         Q.   Okay.  I'm not trying to be coy here,

8    Miss Distler.  The caption of the document says

9    Plaintiff's Nephron Pharmaceuticals served these

10   responses, and it doesn't say they were Miss

11   Distler's objections.  But you understand them

12   to be your objections to the subpoena?

13        A.   I would say that FTI counsel also

14   reviewed those, as would be the responses, would

15   be in the normal and ordinary course of

16   responding to a subpoena.

17        Q.   But there are no other objections to the

18   subpoena that you're aware of other than Exhibit

19   11?

20        A.   Not that I'm aware of.

21        Q.   Okay.  I just have a couple of questions

22   about a few of these.  Did you review these

23   objections prior to you authorizing them to be

24   served in response to the subpoena?

ATTORNEYS EYES ONLY

Page 232

1      A.   Yes.  As did FTI counsel.

2      Q.   Okay.  Number 5 is a copy of each

3  publication authored by you, Miss Distler,

4  discussing reasonable royalty damages in matters

5  involving claims for trade secret

6  misappropriation.  Do you see -- I'm sorry, I

7  apologize.

8          Number 5.  A copy of these publications

9  authored by you discussing reasonable royalty

10  damages in matters involving claims for

11  misappropriation or trade secret

12  misappropriation.  Do you see that?

13      A.   Yes.

14      Q.   Do you recall if you authored any

15  publications that discuss reasonable royalty

16  damages and claims involving trade secret

17  misappropriation?

18      A.   Not that I can recall.

19      Q.   Okay.  Do you regularly author or do

20  you author publications in connection with your

21  work at FTI, like Cline Works (Phonetic) or

22  summaries of cases or something that you provide

23  to your customers or just to the general public?

24      A.   There are -- I guess, I would maybe

ATTORNEYS EYES ONLY

Page 233

1    call them case studies that are created at FTI

2    that may be disseminated provided appropriate

3    removal of confidential information and/or

4    names.  And I have contributed a case summary in

5    those instances.

6        Q.   Any of the case summaries that you

7    contributed relate to reasonable royalty damages

8    in matters involving trade secret

9    misappropriation?

10       A.   Not that I recall.

11       Q.   Okay.  What about number 6, a copy of

12   each presentation prepared by you, Miss Distler,

13   discussing reasonable royalty damages in matters

14   involving claims for trade secret

15   misappropriation.  Do you understand what I mean

16   by what this request says, what it's asking for?

17       MS. MERGO:  Object to the form.

18       A.    I -- so by presentation, I don't know

19   if that would mean like a confidential trial or

20   if that would mean -- just because it says

21   presentation.  Or if it would mean like a public

22   presentation, if that makes sense.

23   BY MR. BUNDREN:

24       Q.   Yes.  It was intended to mean a public

ATTORNEYS EYES ONLY

Page 234

```
 1    presentation and not a confidential presentation

 2    that could not be disseminated in accordance with

 3    whatever protective orders in here.

 4        A.   Got it.

 5        Q.   Okay.  So with that clarification, are

 6    you aware of any presentation prepared by you

 7    discussing reasonable royalty damages and matters

 8    involving claims for misappropriation or for

 9    trade secret misappropriation?

10        A.   As I'm sitting here, I don't recall one.

11        Q.   Would any -- let's go to Number 11.

12    Number 11 asks to the extent not otherwise

13    provided in your reports, copies of any

14    literature, authoritative text, or other

15    authorities you reviewed when preparing your

16    expert report.  Do you see that?

17        A.   Yes.

18        Q.   Any literature or authoritative text or

19    other authorities that you relied on that

20    wouldn't have sided with your report, is that

21    right?

22        MS. MERGO:  Object to form.

23        A.   So, I mean, as I included in this -- in

24    my response, there are numerous text articles, I
```

Page 235

1    guess, the case summaries or other pieces of

2    literature Blass, blog, et cetera, that I will

3    routinely review as part of just my general

4    knowledge base about data images and intellectual

5    property and what's happening, revolving.  So, I

6    mean, the specific request in 11 is when

7    preparing your expert report --

8         Q.   Yes.

9         A.   -- I don't recall looking at one of

10   those texts specifically for the preparation of

11   my expert report since I started working on this

12   project in approximately October of 2019.  You

13   know, I've looked obviously at information around

14   this topic, whether or not it was specifically

15   for preparing my expert report, that I can

16   recall.  But, in general, as I state in this,

17   there are -- there is a literature out there

18   around trade secret damages.

19        Q.   To the extent that you reviewed any of

20   the literature, authoritative text or other

21   authorities in preparing your report and you

22   relied on that, you would have cited that

23   information in your reports, is that right?

24        A.   If there's a specific thing that I was

ATTORNEYS EYES ONLY

Page 236

1    citing to, I would have.  But I would say in

2    general, I was citing life factors and their use

3    which is known within the trade secret damages

4    face and then there are multiples of texts that

5    I have to talk about those things.

6        MR. BUNDREN:  Why don't we take a ten-minute

7    break, and I think I can wrap this up when we

8    come back.  I just need to go through my notes.

9    We talked about this during a break -- let's go

10   off the record first.

11       VIDEOGRAPHER:  The time is approximately

12   5:36 p.m.

13                    (Whereupon, a short break was

14                     taken.)

15       VIDEOGRAPHER:  Here we go.  One moment,

16   please.  5:47 p.m.

17   BY MR. BUNDREN:

18       Q.   Miss Distler, you previously opined and

19   it's in your report and we talked about it

20   today, that your opinion on a reasonable royalty

21   is no less than 4.5 million but likely closer

22   to 5 million, is that correct?

23       A.   Yes.

24       Q.   What is your -- what's your implied

ATTORNEYS EYES ONLY

Page 237

```
 1    royalty rate in making that calculation, that

 2    opinion?

 3         A.   As I sit here, I don't know an implied

 4    rule based on.  I didn't calculate one.

 5         MR. BUNDREN:  With that, we don't have any

 6    further questions for this witness at this time.

 7    But we'll suspend the deposition pending review

 8    of the documents that we discussed during the

 9    deposition, as well as the redacted invoices,

10    which we also discussed during the deposition,

11    and we can talk about that offline.  But we'll

12    suspend the deposition.  I don't have any

13    questions left of this witness at this time.

14         MS. MERGO:  And we obviously disagree with,

15    but certainly we're willing to talk about the

16    documents that we discussed earlier.

17                    EXAMINATION

18    BY MS. MERGO:

19         Q.   Miss Distler, I have a few questions.

20    First of all, you recall earlier today you were

21    asked questions about whether or not you were

22    provided a login, password relative to the

23    database, do you recall that?

24         A.   Yes.
```

ATTORNEYS EYES ONLY

Page 238

1      Q.   Were you able to check to determine

2   whether or not you were provided a Relativity

3   login information and password?

4      A.   I was not.  I only had a login and

5   password to a Dropbox created by counsel for

6   transmission of documents.

7      Q.   All right.  Do you also recall earlier

8   today where you were asked a number of questions

9   related to the fact that you had members of your

10  team who participated in assisting you in the

11  preparation of your report; do you recall that

12  testimony?

13     A.   Yes.

14     Q.   Okay.  And that's typical for you to

15  have your team members to assist you in the

16  preparation of your report?

17     MR. BUNDREN:  Objection, leading.

18     A.   Yes.  It would be typical given the data

19  and the documents and the expert reports that

20  were created.

21  BY MS. MERGO:

22     Q.   And was the assistance provided by your

23  team members, was it done at your direction?

24     MR. BUNDREN:  Objection, leading.

ATTORNEYS EYES ONLY

Page 239

1      A.   Yes, it would have been done at my

2  direction.  And it is ultimately my opinion after

3  my review of the analyses and the report and

4  editing, after the direction that I provided in

5  creating those reports and schedules.

6  BY MS. MERGO:

7      Q.   And all of the opinions in the report

8  and the rebuttal report are yours, is that

9  right?

10     A.   Yes, they are.

11     MS. MERGO:  I don't have any further

12 questions.

13     MR. BUNDREN:  Just a followup.

14                      EXAMINATION

15 BY MR. BUNDREN:

16     Q.   Miss Distler, just to follow up.  Was

17 there anything else that you were able to check

18 on a break or anything else that you looked up

19 while you were on a break that would change any

20 of the other testimony you've given today?

21     A.   No.  I just looked up the login things

22 specifically at lunch because you asked if I

23 could, so I did that at that time.

24     Q.   All right.  And then --

ATTORNEYS EYES ONLY

Page 240

1        MR. BUNDREN:  We'll suspend.  I don't have

2   any further questions.

3        COURT REPORTER:  Signature, Nikole?

4        MS. MERGO:  I don't have any further

5   questions.  We will review and sign.

6        VIDEOGRAPHER:  This concludes the videotaped

7   deposition.  The time is approximately 5:52.

8              (Proceedings concluded at 5:52)

9

10

11

12

13

14

15

16

17

18

19

20

21   STATE OF ILLINOIS      )

22                         )   SS:

23   COUNTY OF COOK         )

24      I, Jacqueline Shenberger, Certified Shorthand

ATTORNEYS EYES ONLY

Page 241

1   Reporter within and for the County of Cook and

2   State of Illinois, do hereby certify that

3   heretofore, to-wit, on August 26, 2020,

4   personally appeared before me VIA ZOOM, CARRIE

5   DISTLER, in a cause now pending and undetermined

6   in the United States District Court, for the

7   Middle District of Florida, Orlando Division,

8   wherein NEPHRON PHARMACEUTICALS, CORPORATION is

9   the Plaintiff, and JENNIFER SHELLY HULSEY, U.S.

10  COMPOUNDING, INC., AND ADAMIS PHARMACEUTICALS

11  CORPORATION are the Defendants.

12      I further certify that the said witness was

13  first duly sworn to testify the truth, the whole

14  truth and nothing but the truth in the cause

15  aforesaid; that the testimony then given by said

16  witness was reported stenographically by me in

17  the presence of the said witness, and afterwards

18  reduced to typewriting by Computer-Aided

19  Transcription, and the foregoing is a true and

20  correct transcript of the testimony so given by

21  said witness as aforesaid.

22      I further certify that the signature to the

23  foregoing deposition was reserved by counsel for

24  the respective parties.

ATTORNEYS EYES ONLY

Page 242

1      I further certify that the taking of this

2  deposition was pursuant to Notice, and that

3  there were present at the deposition the

4  attorneys hereinbefore mentioned.

5      I further certify that I am not counsel for

6  nor in any way related to the parties to this

7  suit, nor am I in any way interested in the

8  outcome thereof.

9      IN TESTIMONY WHEREOF:  I have hereunto set my

10  hand and affixed my notarial seal this 4th of

11  September, 2020.

12

13

14

15

16

17         Jacqueline Shenberger

18

19

20

21

22

23

24