# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

NEPHRON PHARMACEUTICALS
CORPORATION, NEPHRON S.C., INC.
and NEPHRON STERILE
COMPOUNDING CENTER LLC,

                **Plaintiffs,**

v.                              **Case No:   6:18-cv-1573-Orl-31LRH**

JENNIFER SHELLY HULSEY, U.S.
COMPOUNDING INC. and ADAMIS
PHARMACEUTICALS CORPORATION,

                **Defendants.**

_____

## REPORT AND RECOMMENDATION AND CERTIFICATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration after oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE ADJUDGED IN CIVIL CONTEMPT FOR FAILURE TO COMPLY WITH THE CONSENT PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW (Doc. No. 129)** |
| **FILED:** | **June 27, 2020** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED in part and DENIED in part**.

## I.     BACKGROUND.

On September 21, 2018, Plaintiffs Nephron Pharmaceuticals Corporation, Nephron S.C., Inc., and Nephron Sterile Compounding Center LLC (referred to herein as "Plaintiffs" or "Nephron") filed a Verified Complaint against Defendants U.S. Compounding Inc. ("USC") and Jennifer Hulsey ("Hulsey").   Doc. 1.   Three days later, Nephron filed a combined Motion for a Temporary Restraining Order and/or Preliminary Injunction ("TRO/PI").   Doc. 7.   The operative pleading is Plaintiffs' third amended complaint, which includes Adamis Pharmaceuticals Corporation ("Adamis"), the parent company of USC, as a Defendant.   Doc. 74.

According to the third amended complaint, Nephron manufactures generic respiratory products and sterile 503B medications.   *Id.* ¶ 15.   Hulsey is a former marketing representative of Nephron, who was originally hired by Nephron in January 2002.   *Id.* ¶ 25.   During her employment, Hulsey had access to Nephron's alleged trade secret information, and she was required to execute a non-disclosure agreement.   *Id.* ¶¶ 8, 27–28.   Hulsey resigned from her employment with Nephron effective August 24, 2018.   *Id.* ¶ 37.   Almost immediately thereafter, Nephron learned that Hulsey began working for USC, a direct competitor of Nephron in the 503B medication market.   *Id.* ¶¶ 41, 42.   After learning that Hulsey had emailed a Nephron customer following her resignation, Nephron investigated Hulsey's pre-resignation conduct.   *Id.* ¶¶ 41–49.   Based on the findings from that investigation, Plaintiffs collectively allege that Hulsey misappropriated Nephron's trade secrets.   *Id.* ¶ 50.   Plaintiffs further allege that Hulsey acted at the direction of, and in cooperation with, USC and its parent company, Adamis.   *Id.* ¶ 68.[1]

---

[1] On motions by each of the Defendants, the Court dismissed with prejudice several counts of the third amended complaint.   Doc. 82.   The counts remaining included:   (1) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA") against all Defendants (Count I); (2) breach of contract against Defendant Hulsey (Count II); (3) violations of the Florida Uniform Trade Secrets Act ("FUTSA") against all Defendants (Count III); and (4) tortious inference with advantageous business relationships against USC and Adamis (Count VII).   *See* Doc. 74.   Thereafter, on December 7, 2020, the Court granted in part

On September 26, 2018, the Court entered an Order granting the motion for TRO/PI in part. Doc. 12.   The same day, the Court entered a Temporary Restraining Order ("TRO") requiring USC and Hulsey, among other things, to "cease and desist from any direct or indirect use, disclosure, or communication of information that was accessed by Defendant Jennifer Shelly Hulsey from Plaintiffs' secure electronic data systems or related computer programs, including without limitation, Plaintiffs' Customer Resource Management and Power BI systems," and to "preserve any and all full or partial copies of the Protected IP."   Doc. 13, at 1.

According to the Court's Order on the motion for TRO/PI, "Protected IP" includes, among other things:

> [C]urrent and prospective customer lists and related databases, pricing data, purchasing histories, consumer data, market intelligence and strategies, product formulations and development information, proprietary manufacturing processes, and overall industry and product expertise."   (Doc. 7-1, ¶5; Doc. 1, ¶¶18, 23, 29.) With respect to Nephron Customers, the Protected IP includes "their identity, their location, contact information for the customer's pharmaceutical purchasing decision-makers, extensive order history and customer purchasing habits and preferences. (*See* Doc. 7-1, ¶8.)

Doc. 12, at 3 n.3.

On October 10, 2018, Plaintiffs filed a proposed consent preliminary injunction ("CPI"), signed by counsel for both parties.   Docs. 24, 24-1.   On October 15, 2018, the Court entered the CPI.   Doc. 29.[2]   The CPI supersedes and replaces the TRO; however, "the parties expressly preserve and do not waive the right to later assert any and all claims or defenses related to the

---

and denied in part Defendants USC and Adamis' motion for summary judgment, and summary judgment was entered in favor of those Defendants on Count VII of the third amended complaint.   *See* Doc. 196.

[2] On March 1, 2019, the Court granted Plaintiffs' consent motion to add Adamis, USC's publicly owned corporate parent, as a named defendant explicitly subject to the CPI.   *See* Docs. 49, 52.

obligations imposed by the TRO from its date of entry through entry of this Consent Preliminary

Injunction." *Id.* at 3.

> As relevant to the instant matter, the CPI includes the following provisions:

> Defendants and their respective officers, agents, servants, employees, attorneys and persons in active concert or participation with Defendants, are hereby preliminarily enjoined, restrained, and prohibited, directly or indirectly, from the following conduct:

> (a) Defendants shall not disclose, use, or communicate, in any manner whatsoever, either directly or indirectly, Nephron's trade secrets or confidential business information including, but not limited to, the Protected IP.

> (b) Defendants shall immediately preserve, and shall not delete, destroy, modify, tamper with, or otherwise alter the contents of, any Nephron trade secrets or confidential business information including, but not limited to, the Protected IP, on any electronic devices or accounts (including, without limitation, any computers, cell phones, tablets, external hard drives, electronic storage devices, thumb drives, dvds, cds, email accounts, web-based communication applications, and cloud storage accounts) in their possession, custody, or control.
> . . . .

> (j) U.S. Compounding shall not, directly or indirectly, use any of Nephron's trade secrets or confidential business information including, without limitation, the Protected IP in any manner including, without limitation, to solicit customers to do business with U.S. Compounding.  To the extent U.S. Compounding uses its own internal proprietary information (which is wholly unrelated, directly or indirectly to Nephron's Protected IP and trade secret or business confidential information) or open-source, publicly available measures to contact customers that may have or currently are doing business with Nephron, the parties agree such communications— provided no Protected IP was utilized—will not be deemed a violation of this order.

*Id.* at 3, 7.  The CPI also notes the definition of "Protected IP" in the Court's Order on the motion

for TRO/PI.  *See id.* at 2 & n.1 (citing Doc. 12).

On June 27, 2020, Plaintiffs filed the instant Motion for an Order to Show Cause Why

Defendants Should Not Be Adjudged in Civil Contempt for Failure to Comply with the Consent

Preliminary Injunction, which is predicated on the conduct of a second former employee of

Nephron, Jessica Lane, who Plaintiffs state was hired by USC shortly after entry of the CPI.  Doc.

129, at 2.   Plaintiffs contend that USC and Adamis (hereinafter collectively "Defendants"),[3] through Lane, disclosed, used, and communicated Nephron's confidential, proprietary, and trade secret information in violation of the CPI.   *Id.*   Therefore, Plaintiffs asked the Court to issue an Order to Show Cause directing Defendants to show cause why they should not be held in civil contempt for violating the CPI.   *Id.*   Plaintiffs also asked the Court to find Defendants in civil contempt and to sanction Defendants by ordering their answer stricken and that default judgment be entered in Plaintiffs' favor.   *Id.*   Alternatively, Plaintiffs requested that the Court strike the affirmative defenses from Defendants' answer; to deny or strike from the record Defendants' motion for summary judgment; and to instruct the jury to infer that Defendants' misappropriation was willful, wanton, and malicious, should the jury ultimately determine that Defendants misappropriated Plaintiffs' trade secrets.   *Id.* at 24–25.   Plaintiffs further requested an award of its attorney's fees and costs incurred in investigating and filing the motion, including the fees and costs incurred by Plaintiffs in subpoenaing and deposing Lane.   *Id.* at 25.

On June 29, 2020, the presiding District Judge issued an Order to Show Cause directing Defendants to show cause why Plaintiffs' motion should not be granted and sanctions imposed. Doc. 131.   On July 8, 2020, Defendants submitted their written response to the Order to Show Cause.   Doc. 139.   Plaintiffs have also submitted an authorized reply to Defendants' response, Doc. 144, and Defendants have submitted an authorized sur-reply, Doc. 150.   The presiding District Judge referred the matter to the undersigned.

---

[3] On October 14, 2019, Hulsey filed a notice of bankruptcy, and Plaintiffs' claims against her have been automatically stayed.   Docs. 89–90.   Plaintiffs' above-styled motion for an order to show cause is directed to the remaining Defendants—USC and Adamis.   Doc. 129.   Accordingly, hereinafter, "Defendants" collectively refers only to Defendants USC and Adamis.

On November 19, 2020, the undersigned held a hearing on Plaintiffs' motion.   Docs. 180, 191, 199.   This Report and Recommendation and Certification[4] follows.

## II.   LEGAL STANDARD.

"[I]njunctions are enforced through the district court's civil contempt power."   *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 828–29 (11th Cir. 2010) (citing *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 n.23 (11th Cir. 2005)); *Reynolds v. McInnes*, 338 F.3d 1201, 1208 (11th Cir. 2003); *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000); *Newman v. Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982)).   "Where an injunction is ordered, the parties are bound to obey it and are under an obligation to take steps to insure that violations of the order, even inadvertent, do not occur. . . .   An injunctive order is an extraordinary writ, enforceable by the power of contempt."   *Smith Barney, Inc. v. Hyland*, 969 F. Supp. 719, 722 (M.D. Fla. 1997) (citations omitted).

"If a party contends that another party is violating an injunction, the aggrieved party should move the court for an order to show cause why the other party should not be held in civil contempt."   *Thomas*, 594 F.3d 823, 828–29 (citing *Reynolds*, 207 F.3d at 1298).   "If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose."   *Reynolds*, 207 F.3d at 1298.

---

[4] When the parties have not consented to magistrate judge jurisdiction, such as in this case, a magistrate judge does not have jurisdiction to hold an individual in civil contempt.   Instead, pursuant to 28 U.S.C. § 636(e)(6)(B), if a magistrate judge determines that an act constitutes civil contempt, she shall:

> forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified.   The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

"At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance." *Id.* (citing *Newman*, 683 F.2d at 1318).

A finding of civil contempt must be supported by clear and convincing evidence. *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) (citing *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000)). "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Id.* (*citing McGregor*, 206 F.3d at 1383). "In determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation, though it may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." *Id.* (citing *United States v. Greyhound Corp.*, 508 F.2d 529, 537 (7th Cir. 1974)); *Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1063–64 (11th Cir. 2001); *Reynolds*, 207 F.3d at 1300–01.

"The absence of willfulness is not a defense to a charge of civil contempt." *Fed. Trade Comm'n v. Latrese & Kevin Enters. Inc.*, No. 3:08-cv-1001-J-34JRK, 2012 WL 12952608, at *4 (M.D. Fla. Nov. 19, 2012) (quoting *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010)). "[S]ubstantial, diligent, or good faith efforts are not enough; the only issue is compliance." *Leshin*, 618 F.3d at 1232 (citations omitted). "[I]n a civil contempt proceeding the question is not one of intent but whether the alleged contemnors have complied with the court's order." *Id.* at 1233 (citation omitted).

The Court has "wide discretion in fashioning an equitable remedy for civil contempt." *McGregor*, 206 F.3d at 1385 n.5 (citation omitted). "[S]anctions in civil contempt proceedings

*may* be employed for either or both of two purposes: to coerce the [offender] into compliance with the court's order, and to compensate the complainant for losses sustained." *Tom James Co. v. Morgan*, 141 F. App'x 894, 899 (11th Cir. 2005)[5] (alteration and emphasis in original) (quoting *Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986)).

## III.   DISCUSSION.

As discussed above, to hold Defendants in contempt for violation of the CPI, the Court must find that  (1) the CPI was valid and lawful; (2) the CPI was clear and unambiguous; and (3) Defendants had the ability to comply with the order.  *See Riccard*, 307 F.3d at 1296.  Defendants do not dispute that the CPI was valid and lawful, or that that they were able to comply with the CPI. Thus, only the second requirement—whether the CPI was clear and unambiguous—is at issue with regard to Plaintiffs' motion.  If the CPI is clear and unambiguous, the Court must also determine whether there is clear and convincing evidence that Defendants violated the CPI.  *See id.*

In support of their motion and at the hearing before the undersigned, Plaintiffs have maintained that the CPI is clear and unambiguous, and that the plain language of the CPI demonstrates that Lane's conduct falls within the confines of the CPI.  Doc. 129, at 21; Doc. 199, at 11.  Plaintiffs argue that Defendants failed to notify Lane, as their employee, of the CPI, Lane "repeatedly" conveyed to Defendants that she was using Plaintiffs' confidential, proprietary, and trade secret information to further Defendants' business, but Defendants continued to use the information Lane provided in violation of the CPI.  Doc. 129, at 2.  Plaintiffs claim that Lane, among other things:   (1) used certain of Nephron's agreements containing member-specific pricing, as well as Nephron's historical information on products, dosages, and volumes sold; (2) used actual

---

[5] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants."  *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

numbers from Nephron's sales analysis system, Power BI; (3) gave Defendants Nephron's actual contract pricing, including by dosage, for specific drugs manufactured by Nephron but not yet manufactured by USC; (4) provided Defendants actual Nephron pricing for "'all products she had previously [while at Nephron]' by strength, not only to [USC], but also to Prodigy, a third party entity"; (5) disclosed identities of key decision makers and buyers for at least one "very big customer [at] Nephron"; (6) disclosed "specifics on the weekly standing orders that a specific hospital within a larger hospital system . . . placed with Nephron including, without limitation, the specific number of syringes and presentations that the customer regularly ordered"; and (7) disclosed, used, and communicated a Nephron-created competitive form used with customers to establish usage and pricing, which Lane used to create an identical form for USC. *Id.* at 9–15.  Plaintiffs argue that, at best, Defendants turned a blind eye toward Lane. *Id.* at 18.  Plaintiffs also contend that Lane still retains several items constituting Protected IP. *Id.* at 19 & n.101.  Plaintiffs submit several evidentiary exhibits supporting their claims. *See* Doc. 129-1 through 129-63, Doc. 137, 142, 144-1.

In response to the Order to Show Cause, Defendants make four primary arguments.  First, Defendants contend that the CPI is not as broad as Plaintiffs suggest, in that the CPI should be construed in accordance with the operative pleadings at the time the CPI was entered.  Doc. 139, at 2.  Thus, Defendants argue that the CPI can only be reasonably interpreted to apply to Nephron information allegedly misappropriated by Hulsey, which forms the basis for Plaintiffs' claims, and that the CPI does not apply to Nephron information allegedly misappropriated by Lane. *Id.* at 11–12.  As a result, at the very least, Defendants contend that the CPI is "not clear and unambiguous." *Id.* at 5, 12.

Second, Defendants also note that Plaintiffs have filed a separate action against Lane and Defendants in federal court in New Jersey, in which action Plaintiffs rely on the same facts to pursue their claims as Plaintiffs rely on in this motion.  *Id.* at 13.  Defendants contend that Plaintiffs are improperly seeking to avoid their burden of proving the merits in the New Jersey action by "bootstrapping" injunctive relief to the instant CPI.  *Id.*

Third, Defendants contend that Plaintiffs unreasonably delayed in filing the motion "for the purposes of procedural gamesmanship."  *Id.* at 18–19.  Finally, Defendants contend that the evidence submitted by Plaintiffs is not "clear and convincing" evidence of a violation of the CPI, citing several examples in support.  *Id.* at 13–19.  Each of Defendants' contentions will be addressed in turn.[6]

A.      *The CPI is Clear and Unambiguous.*

Defendants argue that the CPI is ambiguous because the CPI must be construed in relation with "the parties' intent and its overall purpose," and, according to Defendants, the "undeniable purpose was to reach an agreement solely for the information and documents allegedly misappropriated by Hulsey."  Doc. 139, at 3, 5–6 & n.11.  Defendants contend that Lane's alleged misconduct was not something that could have been foreseen by the parties at the time the CPI was entered, because Lane was not an employee of Defendants at the time of the CPI's entry, and accordingly, the CPI does not apply to Lane.  *Id.* at 5 & n.10.  Defendants state that this case has always been about Hulsey's conduct, mention of Lane is "notably absent" from the CPI, and Defendants had "no reason to agree to preliminary injunctive relief as broad as suggested by

---

[6] I note that in two sentences at the conclusion of their response, Defendants purport to object to Plaintiffs' Exhibits J, K, T, U, AA, BB, and MM on the basis of hearsay.  Doc. 139, at 24–25.  However, prior to the hearing, Defendants withdrew their hearsay objections.   Doc. 178, at 1–2.

Plaintiffs."   *Id.* at 5–10.   Defendants maintained this position at the hearing before the undersigned.   *See, e.g.*, Doc. 199, at 53, 56.

Upon consideration, Defendants' contentions that the CPI does not apply to any alleged misappropriation of Nephron confidential information by Lane and the communication, use, and disclosure thereof are unpersuasive for several reasons.   In general, an "injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them[,] or subject to their control."   *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).   Indeed, Defendants "may not nullify [the injunction] by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."   *See id.*; *see also Leshin*, 618 F.3d at 1235–36 ("An order binds those 'who receive actual notice of it,' including the parties, 'the parties' officers, agents, servants, employees, and attorneys,' as well as 'other persons who are in active concert or participation with [them.]'" (quoting Fed. R. Civ. P. 65(d)(2)).

The CPI is also to be construed by applying principles of Florida contract law.   *See Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008) ("We interpret a consent decree as we would a contract, applying principles of Florida's general contract law."); *Leshin*, 618 F.3d at 1231 (applying contract principles to interpret a stipulated injunction entered pursuant to the FTC Act); *N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 966 (11th Cir. 2001) (citation omitted) ("For enforcement purposes, consent agreements are interpreted under the principles of contract law. . . . [T]he obligations required of each party to a consent decree must be found 'within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'"); *Fed. Trade Comm'n v. Alcoholism Cure Corp.*, No. 3:10-cv-266-J-34JBT, 2011 WL 13137951, at *63 (M.D. Fla. Sept. 16, 2011) ("[E]ven though the Stipulated Preliminary Injunction arises under federal law, state contract law directs the Court's analysis.").

Under Florida contract law, "[w]hen the terms of a voluntary contract are clear and unambiguous, as here, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 52 (Fla. 1st Dist. Ct. App. 2005) (cting *Emergency Associates of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d Dist. Ct. App. 1995)).   Here, as discussed above, the language of the CPI explicitly extends beyond the named Defendants in this case, and includes the following provisions:

> Defendants and their respective officers, agents, servants, employees, attorneys and persons in active concert or participation with Defendants, are hereby preliminarily enjoined, restrained, and prohibited, directly or indirectly, from the following conduct:
>
> (a) Defendants shall not disclose, use, or communicate, in any manner whatsoever, either directly or indirectly, Nephron's trade secrets or confidential business information including, but not limited to, the Protected IP.
> . . . .
>
> (j) U.S. Compounding shall not, directly or indirectly, use any of Nephron's trade secrets or confidential business information including, without limitation, the Protected IP in any manner including, without limitation, to solicit customers to do business with U.S. Compounding.   To the extent U.S. Compounding uses its own internal proprietary information (which is wholly unrelated, directly or indirectly to Nephron's Protected IP and trade secret or business confidential information) or open-source, publicly available measures to contact customers that may have or currently are doing business with Nephron, the parties agree such communications— provided no Protected IP was utilized—will not be deemed a violation of this order.

Doc. 29, at 3, 7 (emphasis added).   Accordingly, it is clear that the CPI extends beyond the Defendants named in the complaint.[7]

---

[7] I also note that under Florida contract law, "[a] contract is not to be read so as to make one section superfluous, and so all the various provisions of a contract must be so construed as to give effect to each. Further, a contract will not be interpreted in such a way as to render a provision meaningless when there is a reasonable interpretation that does not do so."   *Universal Prop. & Cas. Ins. Co. v. Johnson*, 114 So. 3d 1031, 1036 (Fla. Dist. Ct. App. 2013) (citations, quotations, and alterations omitted).   Thus, under both Fed. R. Civ. P. 65 and Florida law, it is clear that the CPI extends beyond the named Defendants, and to hold otherwise would render subsections (a) and (j) of the CPI superfluous.

Yet Defendants attempt to limit the CPI solely to confidential information allegedly misappropriated by Hulsey alone, and appear to argue that the CPI does not extend to alleged misappropriation by any other actor.  Doc. 139, at 5–7.  However, to adopt the interpretation that Defendants seek, the Court would actually have to *add* language to the CPI.  Specifically, the CPI prohibits Defendants and their respective officers, agents, servants, employees, attorneys and persons in active concert or participation with Defendants, from disclosing, using, or communicating "*in any manner whatsoever, either directly or indirectly, Nephron's trade secrets or confidential business information including, but not limited to, the Protected IP.*"  Doc. 29, at 3 § (a) (emphasis added).  Neither "Nephron's trade secrets or confidential business information," nor the definition of "Protected IP" are limited to the information allegedly misappropriated by Hulsey.  *See id.* at 2 n.1 (citations and internal quotation marks omitted) ("The Court defined 'Protected IP' in the Initial Order to include[], among other things, current and prospective customer lists and related databases, pricing data, purchasing histories, consumer data, market intelligence and strategies, product formulations and development information, proprietary manufacturing processes, and overall industry and product expertise.  The Initial Order also noted that, [w]ith respect to Nephron Customers, the Protected IP includes "their identity, their location, contact information for the customer's pharmaceutical purchasing decision-makers, extensive order history and customer purchasing habits and preferences.").  Moreover, the CPI nowhere limits the phrase "respective officers, agents, servants, employees, attorneys and persons in active concert or participation with Defendants" to only those persons in Defendants' employ or service at the time the CPI was executed.  Thus, to adopt the interpretation Defendants seek is inconsistent with the plain language of the CPI.

And Defendants' argument that the CPI should be limited to solely information allegedly

misappropriated by Hulsey is belied by the fact that the parties themselves, represented by experienced counsel, negotiated and voluntarily entered into the language reflected in the CPI. Doc. 29.[8]   Moreover, although Defendants point to several cases to support their argument that the injunction is to be construed in accordance with the operative pleadings, absent from Defendants' response is citation to any authority binding on this Court supporting that position, or citation to any case in which the Court limited a consent injunction to apply only to the parties named in the complaint, despite clear language extending the consent injunction to those parties' agents, employees, and the like, with no limitation in the definition of confidential information as to the source by whom it was allegedly misappropriated.[9]   Defendants' reliance on the language of the TRO is likewise unavailing, particularly given that the CPI specifically states that it supersedes and replaces the TRO.   *See* Doc. 29, at 3 ¶ 7.[10]

---

[8]  As Plaintiffs argue, the procedural history before entry of the CPI is also informative of the parties' negotiations regarding the CPI.   Indeed, when Plaintiffs moved for entry of the TRO/PI, the language it included in the proposed TRO/PI extended to the employees and persons acting in concert with Hulsey and U.S. Compounding.   Doc. 7-3, at 2.   However, the presiding District Judge only granted the request for a TRO/PI in part, and subsequently entered a TRO limited to Hulsey and U.S. Compounding only.   Doc. 13, at 1.   The parties subsequently engaged in negotiations regarding the CPI, which included several versions containing track changes, none of which changed the language extending the CPI to employees, officers, employees, persons acting in concert, or the like.   *See* Doc. 144-1.   And the CPI ultimately entered by the Court was that signed by counsel for Plaintiffs, Hulsey, and USC.   Doc. 29; *see also* Doc. 49 (rendering Adamis explicitly subject to the CPI on consent of Defendants).

[9]  In their response, as well as at the hearing, Defendants primarily point to *New York Telephone Co. v. Communications Workers of America, AFL-CIO*, 445 F.2d 39, 46 (2d Cir. 1971), to support their position that the CPI cannot extend to Lane's conduct.   Doc. 139, at 10–11; Doc. 199, at 63.   However, as discussed at the hearing, that case is factually distinguishable as the undersigned does not find the two different strikes at issue in that case analogous to the facts of this case, where there are two different employees (Hulsey and Lane) who engaged in the same alleged misconduct.   Nor did that case involve a consent preliminary injunction negotiated and stipulated to by the parties.   *New York Telephone* is also distinguishable because the court was, at least in part, required to consider whether the injunction at issue was permissible under the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq*.   *See New York Telephone Co.*, 445 F.2d at 47.

[10]  Notably, Defendants never sought clarification from the Court as to whether the CPI would apply to additional former employees of Nephron hired by Defendants, which could be deemed a waiver of their argument that the CPI is ambiguous.   *Cf. Morgan*, 141 F. App'x at 897–98 ("Morgan voluntarily agreed to be bound by the terms of the injunction as part of the settlement agreement negotiated to amicably resolve the suit Tom James filed against Morgan.   In return, Tom James agreed to dismiss with prejudice its claims

Accordingly, on review, I find the plain language of the CPI clear and unambiguous and Defendants' arguments to the contrary unavailing. Thus, I recommend the Court find that the CPI applies to the conduct of Lane in the context of her employment with Defendants.

B.     The New Jersey Action is Inapposite.

Defendants next suggest that because Plaintiffs have filed a separate lawsuit in New Jersey pertaining to the same allegations regarding Lane as raised in the instant motion for order to show cause, "Plaintiffs seek to avoid their burden to prove both the merits of their case and the appropriateness of injunctive relief in the New Jersey action by bootstrapping that injunctive relief to the CPI and seeking contempt sanctions based on conduct that is squarely at issue and in dispute in the New Jersey action." Doc. 139, at 13; *see* Doc. 139-2 (copy of complaint filed in New Jersey). Defendants argue that Plaintiffs could have sought injunctive relief in the New Jersey action, or added allegations regarding Lane to the complaint in this case, further demonstrating that the CPI does not apply to the conduct of Lane. Doc. 139, at 13; Doc. 150.

This argument is wholly unpersuasive. Notably, Defendants cite no legal authority for the proposition that the CPI does not apply to Lane's conduct merely because Plaintiffs have filed a separate action regarding Lane's conduct in New Jersey. *See* Doc. 139, at 13; Doc. 150. Indeed, the instant matter concerns only the terms of the CPI, negotiated by the parties in this case, and whether Defendants, through Lane, violated the CPI. Tellingly, the CPI itself states that while Defendants consented to the entry of the CPI, the CPI "shall not be construed as an admission to the merits of Nephron's claims." Doc. 29, at 2 ¶ 5. And the present matter does not require the Court

---

against Morgan. Moreover, Morgan was represented by counsel in this bargained for exchange. At no point prior to the contempt proceeding did Morgan complain to the court about the adequacy of the terms of the injunction or seek to have it modified. Accordingly, at this point, any objection to the specific terms of the injunction is deemed waived.").

to make a determination regarding the merits of this dispute—*i.e.*, whether Defendants are liable for misappropriation of Plaintiffs' alleged trade secrets – nor is the Court, at this juncture, making any ruling on the merits of Plaintiffs' claims.

Therefore, the Court should reject Defendants' contention that the New Jersey action somehow demonstrates that the CPI in the instant case does not apply to the conduct of Lane.

C.      *Plaintiffs' Delay in Filing the Motion.*

Plaintiffs filed the above-styled motion on June 27, 2020, shortly after they responded in opposition to Defendants' motion for summary judgment.   Docs. 121, 129.

In response to the Order to Show Cause, Defendants suggest that Plaintiffs unreasonably delayed in filing the motion, "for the purposes of procedural gamesmanship and to use it—not for compensation of an actual wrong—but to gain an inappropriate tactical advantage."   Doc. 139, at 19.   Defendants contend that Plaintiffs are using the instant motion as "an end-run around proving their case."   *Id.* at 20.

The undersigned questioned counsel for Plaintiffs at the show cause hearing regarding the delay in filing the motion.   Counsel explained that the reason for the delay in filing was that Plaintiffs had to take the depositions of Lane, Hopkins, Fernandez, and Guinn in order to ensure that Plaintiffs had sufficient information in order to sustain the burden of proof on this "serious motion." Doc. 199, at 31.   Therefore, Plaintiffs elected to finish discovery so they had "a full understanding of the panoply of what had happened."   *Id.*   Counsel also stated that Plaintiffs received pertinent documents regarding the motion in December 2019.   *Id.*

Upon consideration, the undersigned finds Plaintiffs' explanation sufficient.   Notably, there does not appear to be any specific time limitation in bringing a motion for an order to show cause, and Defendants do not point to any authority holding otherwise.   Accordingly, insofar as

Defendants are asking the Court to deny Plaintiffs' motion as untimely, I respectfully recommend that the Court deny such request.

> D.     *Clear and Convincing Evidence Demonstrates Defendants Violated the CPI.*

Defendants next dispute that Plaintiffs have established by clear and convincing evidence that Defendants have violated the CPI.   Doc. 139, at 13–19.   Defendants assert that Plaintiffs "blatantly mischaracteriz[e]" the evidence.   *Id.* at 14.

While Plaintiffs' characterizations of some of the evidence submitted are certainly suspect, Defendants' response to the Order to Show Cause does not address the core issue involved— whether Lane's conduct as an employee of Defendants, assuming her conduct is subject to the CPI, demonstrates that Defendants violated the terms of the CPI.   *See id.* at 13–19.   Instead, Defendants focus on the characterization of evidence related to other employees of Defendants, including Hulsey, as well as additional employees of Defendants Clay Guinn (Director of Sales at USC), Gus Fernandez (Guinn's boss), and Robert Hopkins (Adamis' CFO).   *See id.*   And, Defendants nitpick through this evidence to argue that Plaintiffs' mischaracterizations somehow demonstrate that there is no clear and convincing evidence that Defendants violated the CPI.   *See id.*   Upon consideration of the evidence submitted by both parties, however, the undersigned finds clear and convincing evidence that Defendants violated the CPI through Lane's conduct.   Pursuant to 28 U.S.C. § 636(e)(6)(B), the undersigned therefore certifies to the presiding District Judge the following facts in support:[11]

> 1.     Jessica Lane is a former Nephron employee; she was terminated from employment in July 2018.   Doc. 142, at 30, 71.   While employed with

---

[11] Several of the exhibits filed in support of Plaintiffs' motion have been filed under seal.   Therefore, this Report refers to the information contained in such documents, such as customer information, product details, or product pricing, in general terms, but for ease of reference, the undersigned cites to the exhibit filed under seal when applicable.

Nephron, many of Lane's customers were members of one particular group purchasing organization ("GPO"), with 85 percent of Nephron's sales in Lane's former territory originating from that GPO's members.   *Id.* at 205. Lane also entered into an employee confidentiality and non-disclosure agreement with Nephron.   Doc. 129-12.

2. Lane testified at deposition that after she was terminated by Nephron, she contacted current employees for access to her "numbers" and for information "regarding a breakdown of the accounts."   Doc. 142, at 65–67, 71–73.   That information was sent to her by her former co-worker.   Doc. 129-32; Doc. 137-11.   Lane also testified at deposition that she kept certain Nephron contracts in her iCloud account after leaving Nephron, specifically outsourcing facility contracts for certain Nephron customers.   Doc. 142, at 157–58, 184, 193–94; *see* Docs. 129-21, 129-22, 129-28, 129-29; Docs. 137-4, 137-5, 137-8, 137-9.

3. After Lane was terminated from employment with Nephron, she became an employee of USC; she signed an offer letter on October 28, 2018 and testified that she began her employment on November 17, 2018.   Doc. 142, at 118; Doc. 129-14.   When she began working for USC, Lane's sales territory overlapped with her former Nephron sales territory.   Doc. 142, at 126.

4. During her interview process with USC, Lane testified that she disclosed that she still possessed Nephron pricing information as well as "[her] . . . numbers from Nephron," including "numbers showing them [her] growth [at Nephron] on a monthly basis."   Doc. 142, at 51, 106.

5.     Prior to her employment with USC, Lane communicated to Hulsey that she had "a lot" of Nephron's customer and price information, as well as "accounts and contracts."   Doc. 142, at 109–10; Doc. 129-13, at 8.   She also testified that she told Hulsey that she "still had everything from Nephron."   Doc. 142, at 31.

6.     Lane testified at deposition that she called on some of the same customers that she had at Nephron on behalf of USC.   Doc. 142, at 47.   On November 19, 2018, Lane emailed Guinn to state that she reached out to two facilities, both Nephron customers.   Doc. 129-16.   Lane also emailed Hulsey, Guinn, and Glenn Hogue stating that she "heard from a couple of [her] big hospitals," and that she had visited each of the hospitals that day.   Docs. 129-17, 129-18; Docs. 137-1, 137-2.   Lane stated she would do a cost analysis for each of the hospitals "in regards to the possible savings the hospital would benefit from by switching to [USC] and [she hoped] if the sum is great enough it may sway the hospital . . . to get [USC] on the approved vendor list."   Doc. 129-17, at 2; *see also* Doc. 129-18, at 2–3; Docs. 137-1, 137-2.

7.     On November 20, 2018, Lane prepared and disclosed to USC a product cost analysis for a certain prospective USC customer, a current Nephron customer.   Docs. 129-19.   Later that day, Lane sent an email stating that she "dug out the hospitals actual numbers that [she] had" providing an updated cost analysis spreadsheet comparing USC costs to "competition cost."   Doc. 129-20; Doc. 137-3.   During deposition, Lane acknowledged that information would have come from "something [she] took from Power BI," Nephron's

database.   Doc. 142, at 144–49.   Lane also acknowledged that the actual numbers matched the information Lane retained on her iCloud account.   *Id.* at 158–60; *see* Docs. 129-21, 129-22, 129-28, 129-29; 137-4, 137-5, 137-8, 137-9.   Guinn emailed Fernandez regarding the product cost analysis, stating "I'm hopeful [Lane] will be able to close this account sooner than later." Doc. 129-47.

8.   Lane testified that she reached out to prior Nephron customers/contacts on behalf of USC.   Doc. 142, at 126, 129, 137, 171.   A December 5, 2018 email from Lane to Hulsey confirms that Lane reached out to a "very big customer at Nephron."   Doc. 129-23; Doc. 137-6.

9.   On December 5, 2018, Guinn asked Lane, Hulsey, and Hogue to fill in a "market price" column on a spreadsheet list of products, stating that Defendants needed "market intel regarding pricing."   129-24; Doc. 129-27. Lane responded by providing a market price for several products.   Doc. 129-27, at 2, 4.   At deposition, she testified that she did not remember where she got the numbers.   Doc. 142, at 183.   However, she acknowledged that the numbers matched exactly to the numbers on a Nephron outsourcing contract that she retained in her iCloud account after her employment with Nephron ended.   *Id.* at 185–92; *see* Doc. 129-28; Doc. 137-8.

10.   On December 19, 2018, Guinn forwarded an email to other USC employees containing specific pricing and product information put together by Lane containing revenue for a specific GPO from July 2017 to July 2018 (when she was employed by Nephron), in which Guinn stated that he did not "need

to send the level of micro information or it will come back to haunt us."   Doc. 129-31; Doc. 129-48; Doc. 137-10.   Guinn asked Hulsey and Hogue to provide similar information to that provided by Lane in order to "merge into one . . . business plan for Adamis." *Id.*   At deposition, Lane confirmed that the numbers she sent to Guinn matched exactly the numbers she received from her Nephron coworker with her actual numbers from Nephron during her employment.   Doc. 142, at 209–14; *see* Doc. 129-32, Doc. 137-11.

11. It appears that Guinn subsequently used the information received from Lane and others in providing a summary of opportunities by GPO to Rob Hopkins and Gus Fernandez.   Doc. 129-49; Doc. 137-18.

12. On January 2, 2019, Lane sent Guinn, Hulsey, and Hogue her 30-60-90-day projections for her "biggest GPO," "going to by history."   Doc. 129-33; Doc. 137-12.   Lane stated at deposition that "biggest GPO" referred to while at Nephron, and she projected the numbers based on her numbers at Nephron. Doc. 142, at 215–16.

13. On January 4, 2019, Guinn asked Lane, Hulsey, and Hogue for information to create a "master competitive price book," capturing certain information. Doc. 129-34.   In response, Lane sent to Hogue, Hulsey, Guinn, and others at Prodigy Health "the pricing of all products that [she] had previously."   Doc. 129-36; Doc. 137-13.   The list included product names, the price at which Nephron sells it, and the strength of the product.   Doc. 129-36, at 4; Doc. 137-13.   Lane used Nephron's actual numbers for the pricing.   Doc. 142, at 223–24.

14.    On January 29, 2019, Lane sent to several others specific "best pricing from Nephron" for a certain product sold by Nephron "as of July."   Doc. 129-37; Doc. 129-50; Doc. 137-14.   Lane testified that USC was "probably" planning to ultimately produce that product.   Doc. 142, at 230.

15.    On February 4, 2019, Guinn sent to Adamis "competitive pricing our team came up with for hospital products," incorporating the information from Lane.   Doc. 129-54

16.    On February 27, 2019, Lane sent Guinn an email with detailed information about a Nephron customer with which Lane and Guinn were scheduled to meet, including how much she previously sold to a hospital, details about the decisionmakers at the company, and the pricing information for the customer with Nephron.   Doc. 129-38; Doc. 137-15.   Lane also stated that she could give him actual numbers from the prior year and overall costs savings analysis.   *Id.*   During deposition, Lane confirmed that she sold to that customer on behalf of Nephron while she worked there.   Doc. 142, at 232.

17.    Lane created a hospital account utilization form for use at USC.   Doc. 129-39; 129-40; Doc. 137-16.   On March 8, 2019, Guinn sent the form to others, stating that it was a "'remake' of a competitive form used with customers to establish usage and pricing."   *Id.* at 2.   At deposition, Lane testified that she used Nephron's format.   Doc. 142, at 244.   Lane testified that she did not think it was a "Nephron form" but acknowledged that it was created by a Nephron employee.   *Id.* at 244–50.

18.     At deposition, Lane testified that she did not know about the injunction entered in this case and that no one ever informed her about it.   Doc. 142, at 167.   Lane also testified that Defendants never told her not to use Nephron information during her employment nor placed any restrictions on who she could call on or information she could use to call on them.   *Id.* at 117, 168.

Given that the CPI prohibits Defendants and their employees from communicating, using, or disclosing Nephron's trade secrets or confidential business information, including but not limited to the "Protected IP," and that the definition of "Protected IP" includes pricing data, as well as customer order history and purchasing habits, I respectfully recommend that the Court find that there is clear and convincing evidence that Defendants violated the CPI.[12]

    E.    *Appropriate Sanctions.*

Assuming the Court finds that Defendants violated the terms of the CPI, Plaintiffs seek the following sanctions:   (1) striking Defendants answer and entering default judgment; or alternatively (2) striking the affirmative defenses from Defendants' answer; denying Defendants' motion for summary judgment; and instructing the jury to infer that Defendants' misappropriation was willful, wanton, and malicious.   Doc. 129, at 24–25.   Plaintiffs further seek an award of costs and reasonable attorney's fees in investigating Defendants' non-compliance with the CPI and the filing

---

[12] In their motion papers and during the hearing, both sides disputed whether the conduct of other USC and Adamis employees (such as Guinn and Hopkins) violated the CPI.   However, I need not resolve that dispute here, given that the CPI applies to *all* employees of USC and Adamis, and based on the facts listed above, it is clear that at least Lane has violated the CPI.   And with respect to Lane, I note that Counsel for Defendants candidly acknowledged at the hearing that Defendants have presented no affirmative evidence that Lane has either used or not used the information at issue, primarily taking the position that the CPI is ambiguous and does not apply to Nephron information allegedly misappropriated by Lane.   Doc. 199, at 70. And I note that Counsel for Defendants candidly conceded at the hearing that, insofar as Lane's conduct as an employee of Defendants is subject to the CPI, Lane's disclosure to other USC employees actual numbers from Nephron customers is a clear communication or disclosure under the CPI.   *See id.* at 82, 84.

of the above-styled motion, "as well as any other relief the Court deems just and appropriate."  *Id.* at 25.   At the hearing, Plaintiffs also stated that "certainly, we want [Defendants] to turn over the material and stop using it."  Doc. 199, at 38.   However, Plaintiffs are not seeking compensatory sanctions in the form of disgorgement, stating that will be addressed in the New Jersey case.  *Id.*

Defendants oppose imposition of Plaintiffs' request for "draconian" sanctions should the Court find a violation of the CPI, and characterize Plaintiffs' request as "trial by sanctions."  Doc. 139, at 20–21; Doc. 199, at 79.

As discussed above, under the Court's contempt power, any sanction imposed must be either coercive or compensatory.  *See Leshin*, 618 F.3d at 1239 (citations and quotation marks omitted) ("[A] contempt fine . . . is considered civil and remedial if it either coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained."). "Such options include a coercive daily fine, a compensatory fine, attorney's fees, expenses to the aggrieved party, and coercive incarceration."  *Hyland*, 969 F. Supp. at 722 n.6, *aff'd*, 148 F.3d 1070.   The Court may not "use the civil contempt power to impose what amounts to a punitive or criminal contempt sanction."  *Int'l Sch. Servs., Inc. v. AAUG Ins. Co.*, No. 10-62115-CIV, 2012 WL 4936054, at *8 (S.D. Fla. Oct. 17, 2012).   For example, "a flat, unconditional fine . . . after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance."  *See Beck v. Boce Grp., L.C.*, No. 04-20683, 2005 WL 8155884, at *5 (S.D. Fla. June 15, 2005), *report and recommendation adopted*, 2005 WL 8155891 (S.D. Fla. Sept. 28, 2005).

As discussed with the parties at the hearing, the sanctions Plaintiffs seek are neither compensatory nor coercive.   Instead, Plaintiffs are asking the Court to employ its inherent authority to issue case-dispositive sanctions (*i.e.*, strike summary judgment, strike answer, enter

default).  However, to employ its inherent authority, the Court must make a finding of bad faith.  *See Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith.").  Plaintiffs' only argument in this regard is the "flagrant nature of Defendants' misconduct in this case . . ., coupled with Defendants' intentional concealment from Nephron of the full extent of the noncompliance, collectively establish that Defendants acted willfully, maliciously, and in bad faith," and that Defendants' actions demonstrate "intentional disregard for this Court's authority."  Doc. 129, at 24.

Upon consideration, the undersigned finds Plaintiffs' allegations and the evidence submitted in support of the motion for order to show cause insufficient to warrant the case-dispositive sanctions Plaintiffs seek, such as striking Defendants' answer and entering default judgment or striking Defendants' affirmative defenses and instructing the jury to infer willfulness.[13]  Namely, as Defendants argued at the hearing, they interpreted the CPI not to apply beyond information misappropriated by Hulsey, and that to the extent it does, they believe that the CPI is ambiguous, negating Plaintiffs' contention that Defendants intentionally disregarded this Court's authority.  *See* Doc. 199, at 79.  And Plaintiffs cite no persuasive authority that in this Circuit, the types of sanctions requested are proper in the context of civil contempt.[14]  Accordingly, I respectfully

---

[13] Given that the Court has already issued its ruling on Defendants' motion for summary judgment, Plaintiffs' request to deny the motion for summary judgment as a sanction is moot.

[14] Plaintiffs first point to *adidas AG v. 2017nmd.com*, No. 17-CV-61153, at Dkt. 87 (S.D. Fla. Mar. 14, 2018), which is unpublished and not available online.  Doc. 129, at 24.  Plaintiffs have not provided a copy of that decision to the Court.  But, according to Defendants, default was entered as a sanction in that case not only as a contempt sanction, but because the court had ordered the corporate defendant to obtain counsel, which it failed to do, rendering default appropriate.  Doc. 199, at 76.  Plaintiffs did not dispute this characterization at the hearing.  Plaintiffs also cite *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995), for the proposition that default is an appropriate sanction in the civil contempt context.  Doc. 129, at 24.  While *Shepherd* states that entering default falls within the Court's inherent authority, the court also held that default is only proper when lesser sanctions would not suffice, which Plaintiffs have not demonstrated here.  Moreover, *Shepherd* actually reversed imposition of default, which does not support Plaintiffs' position.  The other cases on which Plaintiffs

recommend that the Court deny Plaintiffs' requests to either strike Defendants' answer and enter default or strike Defendants' affirmative defenses and instruct the jury to infer willfulness.

However, based on the recommendation to the Court that Defendants have violated the CPI, I do find that an award of attorney's fees and costs in investigating and filing the motion for order to show cause, including but not limited to, the subpoena and deposition of Jessica Lane, proper. *See Abbott Labs. v. Unlimited Beverages, Inc*., 218 F.3d 1238, 1242 (11th Cir. 2000) (affirming award of fees and costs for violation of civil contempt); *Morgan*, 141 F. App'x at 899 (same); *Freedom Medical Inc. v. Sewpersaud et al*., No. 6:20-cv-771-Orl-37GJK, Doc. 163 (M.D. Fla. Nov. 3, 2020) (granting award of fees and costs in civil contempt proceeding); *Edwards Moving & Rigging, Inc. v. Jenkins*, No. 8:19-CV-1004-T-36SPF, 2020 WL 1545871, at *4 (M.D. Fla. Apr. 1, 2020), *report and recommendation adopted*, 2020 WL 2570138 (M.D. Fla. May 21, 2020) (same); *New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc*., No. 2:02-CV-459-FtM-29SPC, 2003 WL 23654790, at *10 (M.D. Fla. Nov. 12, 2003), *report and recommendation adopted*, 2020 WL 2570138 (M.D. Fla. May 21, 2020) (same).

Assuming this Court agrees that the CPI applies to the conduct of Lane in the context of her employment with Defendants, the undersigned also finds it appropriate to require Defendants to comply with the terms of the CPI as it relates to Nephron material retained by Lane, specifically subsection (b), which provides:

> (b) Defendants shall immediately preserve, and shall not delete, destroy, modify, tamper with, or otherwise alter the contents of, any Nephron trade secrets or confidential business information including, but not limited to, the Protected IP, on any electronic devices or accounts (including, without limitation, any computers, cell phones, tablets, external hard drives, electronic storage devices, thumb drives, dvds,

---

rely were not decided in the context of civil contempt for violating an injunction, and thus I do not find those cases applicable here.  *See, e.g., Malautea v. Suzuki Motor Co. Ltd.*, 987 F.2d 1536 (11th Cir. 1993); *Telectron v. Overhead Door Corp*., 116 F.R.D. 107 (S.D. Fla. 1987).

cds, email accounts, web-based communication applications, and cloud storage accounts) in their possession, custody, or control.[15]

Plaintiffs also request that Defendants bear the cost of any forensic investigation/preservation of documents retained by Lane in the context of her employment with Defendants, Doc. 199, at 95, which the undersigned finds appropriate. *Cf. Rivera v. Ore Seafood, Inc.*, No. 10-10053-CIV, 2013 WL 12248170, at *1 (S.D. Fla. Feb. 22, 2013) (ordering defendants to pay costs incurred with respect to forensic examination in conjunction with the plaintiff's motion to hold the defendants in contempt in discovery context).

Because counsel for Defendants could not state at the hearing whether Defendants were currently in compliance with the CPI regarding Nephron information allegedly misappropriated and being used by Lane, I further recommend that the Court impose a coercive daily fine, the amount of which to be established by the Court, until Defendants demonstrate full compliance with the CPI. *See Hyland*, 969 F. Supp. at 722 n.6 (coercive daily fine available remedy for civil contempt); *F.T.C. v. RCA Credit Servs., LLC*, No. 8:08-cv-2062-T-27MAP, 2011 WL 5924969, at *5 (M.D. Fla. Oct. 5, 2011) (imposing coercive daily fine upon finding of civil contempt to coerce compliance with the Court's orders).

## IV.     RECOMMENDATION.

For the reasons discussed herein, it is **RESPECTFULLY RECOMMENDED** that the Court **GRANT in part and DENY in part** Plaintiffs' Motion for an Order to Show Cause Why

---

[15]  According to Plaintiffs' motion, "Lane, an agent and employee of Defendants, still retains, without limitation, the following items, all of which constitute Nephron's Protected IP: Power BI data intricately detailing all orders by customer in Lane's former Nephron sales territory during her Nephron employment; Nephron GPO Pricing Proposals; Nephron Direct Pricing Proposals; Nephron 503B Outsourcing Facility Contracts with Nephron's standard Pricing; template Nephron customer contracts; Nephron customer forms; and Nephron's internal sales personnel training materials."   Doc. 129, at 19 n.101.

Defendants Should Not Be Adjudged in Civil Contempt for Failure to Comply with the Consent Preliminary Injunction (Doc. 129) as follows:

1.  **HOLD** Defendants in civil contempt for violating the CPI (Doc. 29);

2.  **AWARD** Plaintiffs their reasonable fees and costs for investigating and filing Plaintiffs' Motion for an Order to Show Cause Why Defendants Should Not Be Adjudged in Civil Contempt for Failure to Comply with the Consent Preliminary Injunction (Doc. 129), including but not limited to, the subpoena and deposition of Jessica Lane, and **PERMIT** Plaintiffs to file a motion for quantification by a date set forth by the Court;

3.  **ORDER** Defendants to comply with subsection (b) of the CPI with respect to documents retained by Lane in her employment with Defendants by a date certain;

4.  **ORDER** that any costs of forensic investigation/preservation be borne by Defendants;

5.  **IMPOSE** a coercive daily fine, the amount of which to be established by the Court, until Defendants demonstrate full compliance with the CPI;

6.  **DENY** Plaintiffs' Motion for an Order to Show Cause Why Defendants Should Not Be Adjudged in Civil Contempt for Failure to Comply with the Consent Preliminary Injunction (Doc. 129) in all other respects; and otherwise

7.  **DISCHARGE** the Order to Show Cause (Doc. 131).

## **NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on January 12, 2021.

**LESLIE R. HOFFMAN**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:

Presiding District Judge
Counsel of Record